Woodrow K. Glass (Pro Hac Vice Pending)
Oklahoma Bar No. 15690
Geoffrey A. Tabor (Pro Hac Vice Pending)
Oklahoma Bar No. 32880
Chloe N. Glass (Pro Hac Vice Pending)
Oklahoma Bar No. 36646
**GLASS & TABOR, LLP**
1601 36th Avenue NW
Norman, OK 73072
Phone: 405-360-9700
Email: geoffrey@glasstaborlaw.com; woody@glasstaborlaw.com; chloe@glasstaborlaw.com

Timothy R. O'Reilly
Nevada Bar No. 8866
**O'REILLY LAW GROUP, LLC**
325 S Maryland Parkway
Las Vegas, NV 89101
Phone: 702-382-2500
Email: efile@oreillylawgroup.com

**ATTORNEYS FOR PLAINTIFF COHEN FULLER**

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| COHEN FULLER, | Case No. |
| **Plaintiff**, | |
| vs. | **COMPLAINT FOR INJUNCTIVE RELIEF** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| **Defendant**. | |

COMES NOW Plaintiff COHEN FULLER, ("Plaintiff" or "Fuller"), and brings this action against Defendant NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ("Defendant" or "NCAA"), by and through counsel of record WOODROW K. GLASS, GEOFFREY A. TABOR, AND CHLOE N. GLASS (*Pro Hac Vice Pending*) of the law firm GLASS & TABOR, LLP and TIMOTHY R. O'REILLY of the law firm O'REILLY LAW GROUP.

**INTRODUCTION**

1.    Plaintiff Cohen Fuller ("Plaintiff" or "Fuller") brings this action for immediate and permanent injunctive relief, compensatory and punitive damages, and attorneys' fees and costs to enjoin and redress the National Collegiate Athletic Association's ("NCAA" or "Defendant") use against Fuller, a student-athlete, of unlawful eligibility rules that are currently preventing him from competing for a Division I institution for the 2026-2027 season in violation of federal antitrust laws.

2.    More specifically, this Action challenges the NCAA's Bylaws and enforcement mechanisms regarding, but not limited to, the following:

A.    NCAA Bylaw 12.02.3 ("Definitions and Applications: Intercollegiate Competition");

B.    NCAA Bylaw 12.1 and all applicable subparts ("Athletics Eligibility");

C.    NCAA Bylaw 12.6 and all applicable subparts ("Seasons of Competition: Five-Year Rule");

D.    NCAA Bylaw 12.9 and all applicable subparts ("Ineligibility");

E.    NCAA Bylaw 14.02.4 ("Definitions and Applications: Collegiate Institution");

F.    NCAA Bylaw 14.3.3 ("Seasons of Competition – Nonqualifiers");

G.    NCAA Bylaws, Article 12 ("Athletics Eligibility") regarding the eligibility calculations, qualifications, or standards regarding student-athletes who have competed at JUCO or NAIA schools and/or who have eligibility matters regarding the administration of four years of competition within the five-year window; and

H.    Any other Bylaws, Articles, or enforcement mechanisms regarding the eligibility calculations, qualifications, or standards regarding student-athletes who have

competed at JUCO or NAIA schools and/or who have eligibility matters regarding the administration of four years of competition within the five-year window.[1]

3.     The above-cited Bylaws and enforcement mechanisms of these Bylaws are unlawful, unfair, inequitable, and have substantial anti-competitive impacts that drastically affect JUCO and NAIA schools, JUCO and NAIA student-athletes regarding their economic opportunities and development, the Division I football product produced to consumers, and the Division I football market.

4.     The current NCAA Bylaws and enforcement thereon discourage student-athletes from attending JUCO and NAIA schools. While some student-athletes need or desire additional time to academically prepare for four-year colleges, the NCAA rules punish those who do seek this interim educational adjustment period at JUCO and NAIA schools. These anti-competitive rules are evident and causing a traumatic impact on Fuller, who attended JUCO and NAIA schools to help improve his academic standing and physical maturity to play Division I football.

5.     In addition, the unlawful NCAA Bylaws at issue unlawfully hinder student-athletes from earning compensation through the use of their Name, Image, and Likeness opportunities directly tied to their participation as NCAA Division I football players. This Action seeks declaratory and injunctive relief against the NCAA for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for its continued discrimination against JUCO and NAIA schools and student-athletes.

6.     In NCAA v. Alston, a landmark 2021 decision, a unanimous U.S. Supreme Court paved the way for the NCAA to allow college athletes to receive compensation for the use of their Name, Image, and Likeness ("NIL") due to the NCAA's violation of antitrust laws. *See* National

---

[1] The numbering of the NCAA Bylaws can change year-to-year. The cited Bylaws are from the NCAA's published Division I 2025-2026 Manual effective August 30, 2025 and are attached as Exhibit 1 in pertinent part.

Collegiate Athletic Ass'n v. Alston, 594 U.S. 69 (2021) ("Alston").

7.    The market realities of college sports have changed tremendously over the last forty (40) years. For instance, from 1982 to 1984, CBS Broadcasting Inc. paid $16 million per year to televise the March Madness Division I men's basketball tournament. In 2016, those annual television rights increased to $1.1 billion. As a result, the NCAA is no longer even arguably entitled to any sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade. Experts have stated that the NCAA exercises monopsony power in this market.

8.    In response to the Supreme Court's lecture that the NCAA received in Alston and the scathing criticisms it received in Justice Kavanaugh's concurring opinion, the NCAA lifted its prohibition on NCAA athletes receiving NIL Compensation on July 1, 2021. In the nearly four years since, the market for NIL Compensation opportunities available to NCAA Division I athletes has exploded, with the 2024 college football NIL market estimated at $1.1 billion. Significantly, those NIL Compensation opportunities are virtually only available to NCAA Division I athletes. Only $6.5 million – less than six tenths of one percent (0.6%) of the $1.1 billion in football NIL Compensation this year projects to go to non-NCAA Division I football players.

9.    The Supreme Court has characterized the NCAA as a "sprawling enterprise" that generates billions of dollars in revenue each year. Alston, 594 U.S. at 79, 93.

10.    In other words, athletes playing football outside of the NCAA monopoly have no meaningful opportunity to profit from their NIL. Athletes who begin their football careers outside the NCAA, particularly at JUCO and/or NAIA schools, are effectively denied meaningful opportunities to profit from their NIL as a result of this non-NCAA athletic participation.

. . .

. . .

**11.** As further evidence of unlawful restrictions with substantial anti-competitive effects, student-athletes are permitted only four (4) seasons of competition within a five (5) year window, regardless of whether some or all of that time is spent at a JUCO or NAIA school. This so-called "Five-Year Rule" and related enforcement Bylaws and mechanisms discourages athletes from using JUCO schools as a proper steppingstone to four-year institutions and/or using NAIA schools in a related fashion, penalizing those who do so despite the critical academic and developmental support those institutions provide.

**12.** In turn, the impact of this rule has deprived JUCO and NAIA schools of access to elite athletic talent, limiting their competitiveness and stifling broader market participation. These harms are compounded by the NCAA's eligibility bylaws, which uniquely disadvantage athletes who begin their collegiate careers at JUCO and/or NAIA schools. Unlike other football players who enroll directly at NCAA institutions and receive four seasons of eligibility and corresponding NIL earning potential, JUCO and NAIA athletes are arbitrarily limited to only two or three seasons of NCAA Division I competition.

**13.** The NCAA has historically disadvantaged JUCO and NAIA athletes by limiting their opportunities and imposing additional academic hurdles on those seeking to transfer to an NCAA institution.

**14.** Fuller has more than a reasonable probability of success on the merits. Alston and NIL have "drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their name, image, and likeness ('NIL')." Pavia v. National Collegiate Athletic Ass'n, Civ. No. 24-01336, 2024 WL 5159888 *1 (M.D. Tenn. Dec. 18, 2024) ("Pavia"). As such, courts throughout the nation have been trending towards granting preliminary injunctions and finding the NCAA's Bylaws at issue commercial in nature because an NIL agreement is a commercial transaction, and the Bylaws limit who is eligible to play and, therefore,

to negotiate a NIL agreement. Id. at *6.

15. Far from promoting competition or benefiting student-athletes, the NCAA Bylaws at issue actively suppress it, distorting the labor market for college football players, diminishing athlete welfare, and weakening the quality of play available to the public. The rules directly conflict with the NCAA's stated mission of supporting athlete well-being and constitute precisely the kind of anti-competitive restraint the antitrust laws are designed to prohibit. For Fuller and similarly situated former JUCO and NAIA athletes, the window to compete at the NCAA Division I level is rapidly closing, and absent judicial intervention, these NCAA mandated limitations will cause irreparable harm to their athletic careers and the broader market for both student-athletes and consumers.

16. Unless enjoined, the effect of the NCAA's anti-competitive conduct will result in Fuller being punished and penalized for having attended JUCO and NAIA schools. It will also permanently deprive him of a once-in-a-lifetime NIL contract opportunity and the opportunity to enhance his career and reputation by playing another year of Division I football. Additionally, this will harm Fuller's lifetime of hard work in the classroom and on the football field that he has pursued to even be considered for these opportunities. The NCAA's anti-competitive conduct, coupled with his former university affiliation's unreasonable denial of Fuller's ability to request a specific NCAA waiver, is resulting in irreversible damage. This conduct threatens him with immediate irreparable harm, with no solution. It is clear that absent the issuing of a TRO and/or preliminary injunction in this matter, Fuller (as well as others in the broader market as described herein) will experience irreparable harm.

17. The NCAA Bylaws at issue stifle the competition in the labor market for NCAA Division I football players, harming college athletes and degrading the quality of Division I football consumed by the public. These limitations are contrary to the NCAA's stated mission of

promoting the well-being of college athletes and are the very ills federal antitrust law seeks to remedy. Fuller and other former JUCO and/or NAIA football players who are harmed by this illegal restraint have a small window of time to compete in Division I football. Unfortunately, Fuller cannot relive his shortened college career. The harm inflicted by the NCAA is irreparable and ongoing, and temporary and preliminary injunctive relief is necessary and adequate.

18.    For the reasons stated herein, Fuller respectfully requests that this Honorable Court issue an injunction to preserve the status quo and to prevent the irreparable harm that will result to Fuller and to put a stop to the unjustified anti-competitive restriction on universities that seek to compete for college athletes, and to restore freedom of economic opportunity for himself and other college football players.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19.    The NCAA permits only member institutions (i.e., four-year institutions), conferences, or committees/subcommittees, not individual athletes, to file and seek legislative waivers to address specific circumstances that may impact an athlete's eligibility.

20.    Fuller and UNLV submitted a waiver request so that the NCAA could exercise its discretion to waive the applicable eligibility Bylaws as applied to Fuller. The request and all other administrative remedies were denied. Fuller has fully exhausted all NCAA and internal processes at UNLV before filing suit, and this matter is ripe to be heard by this Court.

## JURISDICTION, VENUE, AND PARTIES

21.    This Court has jurisdiction over this action under Section 1 of the Sherman Act (15 U.S.C. § 1), the Clayton Act (15 U.S.C. §§ 12-27), and under 28 U.S.C. §§ 1331 and 1337.

22.    This Court may exercise personal jurisdiction over Defendant NCAA because Defendant currently transacts business in this District and the state of Nevada. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television

agreements, and other revenue-generating activities as a member of the Mountain West Conference. (United States District Court for the District of Nevada, LR. 8-1).

23. Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2).

24. Fuller is a college football player who plays on the defensive line at UNLV and resides in Las Vegas, Nevada. Fuller is originally from Ontario, California. Fuller graduated high school in the Spring of 2022. Fuller's post-high school career is as follows:

| Season | School | Details |
|---|---|---|
| 2022 | Graceland University (NAIA)  Lamoni, IA | Played in 9 games |
| 2023 | El Camino College (JUCO)  Torrance, CA | Played in 11 games |
| 2024 | Coastal Carolina University (NCAA)  Myrtle Beach, SC | Played in 11 games |
| 2025 | University of Nevada, Las Vegas (NCAA)  Las Vegas, NV | Played in 12 games |

25. The NCAA is an unincorporated association headquartered in Indianapolis, Indiana, and is thus a citizen of Indiana. It governs college athletics nationwide and includes over 1,100 member institutions, with more than 350 in Division I. Through its Constitution and Bylaws, the NCAA has adopted rules regulating all aspects of college sports. These rules are enacted and amended by votes of the member institutions and their governing councils and thus constitute horizontal agreements among competing schools.

26. Membership in the NCAA is effectively mandatory for any academic institution wishing to participate in elite collegiate athletics. Institutions that fail to comply with NCAA rules face severe penalties, including scholarship reductions, postseason bans, vacated wins, monetary fines, and the most severe penalty a school can receive: a program suspension, commonly known

8

as the "death penalty." *See, e.g.,* the NCAA's administration of the death penalty to the University of Kentucky basketball program in 1952-1953; the University of Southwestern Louisiana (now University of Louisiana Lafayette) basketball program in 1973-1975; the Southern Methodist University football program in 1987; the Morehouse College men's soccer program in 2004-2005; and the MacMurray College men's tennis program in 2005-2007.

27.    The NCAA and its member institutions control the market for elite collegiate athletics on a horizontal basis. Any athlete seeking to exchange athletic services for educational benefits and the unique advantages of top-tier college sports must, as a practical matter, attend an NCAA Division I institution.

28.    More specifically, according to the NFL, the draft provides a chance for about 250 of the nation's finest athletes to live out the dream they have been preparing for all their young lives: a chance to play in the NFL. Seven rounds of selections and an additional 32 compensatory picks awarded to select teams determine who has made the grade.

29.    Notably, NFL draft data from 2023 showed that all draft picks in the 2023 draft were former NCAA athletes.

30.    No viable substitutes exist for the bundle of benefits NCAA Division I schools provide: (i) scholarships covering full or partial education costs; (ii) high-quality academics; (iii) premier training and facilities; (iv) access to top-tier coaching; (v) national exposure through broadcast deals and championships; (vi) NIL monetization opportunities; (vii) competition at the highest collegiate level; and (viii) the only route to the NFL.

## FACTUAL BACKGROUND

**A.    "The Financial Behemoth"**

31.    According to the NCAA, it is a voluntary, self-governing organization of four-year colleges, universities, and conferences committed to the well-being and development of student-

9

athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity, and inclusion. The NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools.

32.     As the NCAA acknowledged in Alston, its member schools collectively enjoy a monopoly in the market for student-athlete services, such that its restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." Johnson v. Nat'l Collegiate Athletic Ass'n, 108 F.4th 163, 170 (3d Cir. 2024).

33.     The Supreme Court has characterized the NCAA as a "sprawling enterprise" that generates billions of dollars in revenue each year. See Alston, 594 U.S. at 79, 93 (observing that annual television rights for the March Madness basketball tournament brought in close to $1.1 billion in 2016, and the television deal for the Football Bowl Subdivision College Football Playoff was worth approximately $470 million upon initiation).

34.     The NCAA comprises three Divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines. These rules include those that determine the eligibility of student-athletes to participate in intercollegiate athletics. Division I teams are the most popular and they attract the most money and the most talented athletes.

35.     Of the NCAA's approximately 1100 four-year colleges and universities, approximately 350 schools compete in Division I. Division I itself is divided, for football competition, into two subdivisions, one of which is the FBS. Id. at 80. Division I includes roughly 350 schools divided across 32 conferences. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. The NCAA rules governing participation in Division I are generally enacted by the Division I Board of Directors. . . .

36. Today, the NCAA generates approximately one billion dollars in revenues each year. The FBS conferences have a multi-year media contract with ESPN for the College Football Playoff, the total value of which is $5.64 billion. The five conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them. The revenues of the Power Five (now recently Power Four) have increased over time and are projected to continue to increase.

37. It is the NCAA's mission to provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience. The basic purpose of the NCAA is to support and promote healthy and safe intercollegiate athletics, including national championships as an integral part of the education program and the student-athlete experience. Indeed, the NCAA concedes in their regulations and manual that the ability to participate in college sports is both "vital" and "integral" to the four-year college experience.

B.    **JUCO and NAIA Schools**

38. In contrast to the four-year institutions governed by the NCAA, JUCOs are governed by the National Junior College Athletic Association ("NJCAA").

39. The NJCAA's mission is to promote, govern, and foster a competitive environment for two-year college athletics. The NJCAA recognizes the diverse nature of its membership, providing at all times a consistent and inclusive governance structure that provides opportunities for all stakeholders and emphasizes the academic, athletic, and community involvement goals of all student-athletes.

40. The NCAA and NJCAA have no affiliation. NJCAA president and CEO Christopher Parker has described his relationship with NCAA president Charlie Baker as "nonexistent."

41.    Each year, more than 60,000 student-athletes from 500 member colleges compete in 27 different sports and participate in the NJCAA. While the NCAA generates billions of dollars in revenue while televising nearly all Power 4 conference games, it took the NJCAA until 2022 to reach an agreement with ESPN to nationally televise just one NJCAA game (the JUCO national championship game), with 13 additional games available through an online streaming platform. To be clear, while the NJCAA streams a total of 13 games over its entire season, the NCAA televises dozens of games every single week of the regular season.

42.    Additionally, while the 2024 NIL market for college football is estimated at $1.1 billion, only $6.5 million, less than six-tenths of one percent, went to non-NCAA Division I football players.

43.    The NAIA was established in 1940 and is a college athletics association for schools in North America. During the 2025-2026 seasons, the NAIA had 235 member schools. The NAIA has 21 conferences, nine of which sponsor football.

44.    In short, playing for a JUCO or NAIA school is not a comparable alternative to playing Division I College Football in terms of exposure, either to generate income while in college through NIL Compensation or to National Football League scouts for future career opportunities.

C.    **The NCAA is Governed by Self-Created Bylaws that Discriminate Against JUCO and NAIA Athletes**

45.    Each NCAA Division maintains Bylaws proposed by member institutions. Per the NCAA, each NCAA member school is required to hold itself accountable to support and comply with the rules and principles approved by the membership. This dynamic creates a horizontal monopsony in the market.

. . .

. . .

12

46.     Generally, the NCAA Bylaws require that a student-athlete meet certain eligibility standards. Of relevance to this lawsuit that violate the Sherman Act and constitute a breach of contract and interference with Fuller's prospective business relations are:

**A.**     NCAA Bylaw 12.02.3 ("Definitions and Applications: Intercollegiate Competition");

**B.**     NCAA Bylaw 12.1 and all applicable subparts ("Athletics Eligibility");

**C.**     NCAA Bylaw 12.6 and all applicable subparts ("Seasons of Competition: Five-Year Rule");

**D.**     NCAA Bylaw 12.9 and all applicable subparts ("Ineligibility");

**E.**     NCAA Bylaw 14.3.3 ("Seasons of Competition – Nonqualifiers");

**F.**     NCAA Bylaw 14.02.4 ("Definitions and Applications: Collegiate Institution"); and

**G.**     NCAA Bylaws, Article 12 ("Athletics Eligibility") regarding the eligibility calculations, qualifications, or standards regarding student-athletes who have competed at JUCO or NAIA schools and/or who have eligibility matters regarding the administration of four years of competition within the five-year window.

47.     Any other Bylaws, Articles, or enforcement mechanisms regarding the eligibility calculations, qualifications, or standards regarding student-athletes who have competed at JUCO or NAIA schools and/or who have eligibility matters regarding the administration of four years of competition within the five-year window. NCAA Bylaw 12.02.3 ("Definitions and Applications: Intercollegiate Competition") unlawfully defines "Intercollegiate Competition" in conjunction with the enforcement of the other NCAA Bylaws regarding athletes who have participated at JUCO and/or NAIA schools. This is sometimes called the "Intercollegiate Competition Rule". [See Exhibit 1: NCAA Bylaws].

48.     NCAA Bylaw 12.1 ("Athletics Eligibility") unlawfully applies the NCAA Division I eligibility standards and calculations to athletes who have participated at JUCO and/or NAIA schools. [See Exhibit 1: NCAA Bylaws].

49.     NCAA Bylaw 12.6 ("Seasons of Competition: Five-Year Rule") unlawfully applies the NCAA's "Five-Year Clock", "Five-Year Rule", and "Four in Five" standards to athletes who have participated at JUCO and/or NAIA schools. [See Exhibit 1: NCAA Bylaws].

50.     NCAA Bylaw 12.9 ("Ineligibility") unlawfully applies the substantive NCAA Bylaws for calculating eligibility to make athletes who have participated at JUCO and/or NAIA schools ineligible for NCAA Division I participation. [See Exhibit 1: NCAA Bylaws].

51.     NCAA Bylaw 14.02.4 ("Definitions and Applications: Collegiate Institution") unlawfully and overbroadly covers non-NCAA schools such as JUCO and NAIA schools for purposes of eligibility and other NCAA enforcement matters. [See Exhibit 1: NCAA Bylaws].

52.     As further clear evidence of discrimination against JUCO and NAIA athletes, pursuant to these NCAA Bylaws, an athlete has five (5) years of eligibility to play four (4) seasons of defined "Intercollegiate Competition" in the student-athlete's chosen sport (the "Five-Year Rule"). The athlete's five-year window is known as an "Eligibility Clock" or "Five-Year Clock" and it starts to run from the date on which an athlete registers as a full-time student at any collegiate institution whether or not such institution is a member of the NCAA and whether or not the athlete competes in any sport at the non-NCAA institution.

53.     The NCAA's Intercollegiate Competition Rule operates in tandem with the "Five-Year Rule" to establish the so-called "Four-in-Five" framework in which a student-athlete is eligible to play four seasons of competition across five years. The Five-Year Rule forbids a student-athlete from engaging in more than four seasons of intercollegiate competition in any one sport. The Five-Year Rule cross-references the Intercollegiate Competition Rule, which defines

14

"intercollegiate competition" to include "represent[ing] the institution against outside competition", "compet[ing] in the uniform of the institution" or using school issued apparel, or competing and receiving expenses from the institution for competition.

54.    The NCAA's Guide for Two-Year Transfers has a section on the Eligibility Clock, where it explains that the purpose of the five-year rule is to "move student-athletes toward graduation in a timely manner." In other words, the NCAA concedes in its guidelines that the Five-Year Rule is not designed for any pro-competitive purpose.

55.    The five-year deadline begins to run whether a student plays a sport or not. A student can attend a JUCO or NAIA school without playing any sports, obtain an associate's degree, transfer to a four-year NCAA school, and the student still only has three years of eligibility to play three seasons of football and earn NIL.

56.    In contrast, a student who graduates from high school, plays football at a prep school for a post-graduate year, and then attends an NCAA school still receives five (5) years of eligibility to play four seasons. Id. Similarly, a student who graduates from high school and becomes a professional athlete in another sport can play that other sport for years, then go to college and still have five years of eligibility to play four seasons of a sport, as long as it is a different sport than they played professionally.

57.    The NCAA rules do not limit the ability of former professional athletes to play (or now, post-Alston, profit from NIL) even though they have had a chance to physically mature well beyond a typical 18-year-old college freshman. For instance, Chris Weinke entered Florida State University as a freshman following a six-year professional baseball career and ended up winning the Heisman Trophy, awarded annually to the most outstanding player in college football, at 28 years of age. Also of recent note is James Nnaji, who was the 31st pick in the 2023 NBA draft and European professional player who signed with Baylor in December 2025; J.R. Smith, who played

16 years in the NBA and then joined the golf team at North Carolina A&T State in 2021; Russell Wilson, who played minor league baseball for the Colorado Rockies and returned to Division I NCAA football for one season at Wisconsin in 2011; London Johnson, who played three years in the NBA G-League and returned to play college basketball in 2026 at Louisville; and Brandon Weeden, who played professional baseball from 2002-2006 for the Yankees, Dodgers, and Royals organizations and then played football at Oklahoma State University from 2007-2011, which included two full seasons in 2010 and 2011.

58.    Accordingly, it is apparent that the Five-Year Rule does not exist for reasons of competitive balance, or else it would preclude other older athletes from competing in Division I NCAA sports.

59.    Under the Intercollegiate Competition Rule, a student-athlete is forbidden from engaging in more than four seasons of intercollegiate competition in any one sport. Although JUCO and NAIA schools are excluded from Division I, the Bylaws define "intercollegiate competition" to include competition at JUCO and NAIA schools.

60.    The NCAA has provided blanket waivers of the Five-Year and Intercollegiate Competition Rules to institutions in light of certain events. One such blanket waiver was granted to institutions due to the COVID-19 pandemic. This waiver permitted NCAA member institutions to self-apply a waiver of the Five-Year and Intercollegiate Competition Rules for the 2020-2021 season.

61.    The NCAA also recently granted institutions a blanket waiver of the Intercollegiate Competition Rule in the wake of the decision of the United States District Court for the Middle District of Tennessee on December 18, 2024, in Pavia.

62.    In Pavia, the court granted Diego Pavia ("Pavia"), the now-Heisman finalist quarterback for Vanderbilt University, a preliminary injunction prohibiting the NCAA from (a)

16

counting a year that Pavia spent playing football at a Junior College as a season of competition for purposes of the Intercollegiate Competition Rule; and thereby (b) barring Pavia, who had otherwise played just three years of Division I college football, from playing for Vanderbilt in the 2025-2026 season.

63.     The Pavia decision further found that the NCAA's interpretation of the Intercollegiate Competition Rule harmed consumers. In so ruling, the court reasoned that the "restriction on the eligibility of former junior college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level." Pavia, 760 F. Supp. 3d 527, 540 (M.D. Tenn. 2024), appeal dismissed as moot, 154 F.4th 407 (6th Cir. 2025).

**D.     Fuller's Need for Immediate Injunctive Relief**

64.     Following the December 18, 2024, decision in Pavia, the NCAA provided a blanket waiver (which became known as the "Pavia Waiver") of the Intercollegiate Competition Rule to any student-athlete who (i) competed for a Junior College; (ii) would have been eligible to compete in the 2025-2026 season but for their time competing for a Junior College; and (iii) met all other eligibility criteria.

65.     But for the NCAA's continued and ongoing interpretation and application of the Five-Year Rule to Fuller, he would qualify for the Pavia Waiver or similar substantive relief.

66.     Fuller asked the NCAA to waive enforcement of the applicable NCAA Bylaws and regulations, which would automatically entitle him to eligibility for the 2026-2027 season. In essence, if the JUCO and/or NAIA eligibility requirement had been waived, Fuller would be able to compete in additional competition.

67.     Given the NCAA's refusal to permit additional and warranted eligibility, Fuller has been forced to file this action to obtain injunctive relief from this Court. The need for such

relief is urgent.

68.     Division I football programs begin spring practice for the 2026-2027 football season on or around March and April of 2026. These spring practices are critical to both the team and Fuller, as they would facilitate his integration into the team's overall strategy and offensive game plan and enable Fuller to develop a rapport with a Division I coaching staff and teammates. It is Fuller's understanding that if the NCAA does not grant him a waiver or he is not otherwise deemed eligible prior to the start of summer training, the schools that have offered him a spot on their team will be forced to replace him with another player and he will lose his opportunity to play for next season. There is also enormous benefit to summer training and the beginning of fall camp before the UNLV season starts.

**E.     Relevant Market**

69.     The relevant market for purposes of this type of case includes, but is not limited to the national labor market for NCAA Division I football athletes' services in the post-Alston landscape.

70.     The exclusive market power of the NCAA and its member schools are relevant antitrust markets.

71.     The United States is the relevant geographic market, and the NCAA and its member institutions are located throughout this geographic market.

72.     The NCAA's own economics expert in a related proceeding testified that he did not object to defining the relevant market as "the labor market for college football athletes in general and NCAA Division I football players in particular," and conceded that the Supreme Court's decision in Alston and the emergence of NIL deals have introduced a commercial aspect to collegiate athletics that makes NCAA rules on compensation and eligibility commercial in nature.

18

**F.    Anti-Competitive Effects**

73.    College athletes compete to earn spots on NCAA Division I athletic teams, and NCAA member institutions compete with other institutions to attract and secure top-level athletes. NCAA member institutions secure college athletes through the provision of various in-kind benefits, including full and partial scholarships, advanced academic programming, access to state-of-the-art training and rehabilitation facilities, and premier instruction from knowledgeable coaching staff.

74.    Participating in NCAA Division I athletics provides significant benefits and opportunities to college athletes, including: (1) the ability to maximize their chances to play professional sports by providing extensive exposure to scouts; (2) the opportunity to compete against the nation's best amateur athletes; (3) national publicity through nationwide broadcasting of sporting events; (4) full and partial scholarships; (5) the opportunity to earn personal sponsorship opportunities and marketing deals; (6) the ability to capitalize on NIL agreements, which sometimes provide millions of dollars in financial benefits; and (7) the receipt of top-tier academic support through student-athlete assistance programs.

75.    The most talented student-athletes have no practical alternatives in the relevant market to participate in NCAA Division I athletics, especially those wishing to compete for a spot in the NFL draft.

76.    The NCAA dominates the labor market for college football players, particularly those with professional aspirations. The NFL does not permit new entrants until at least three years beyond their high school graduation date, pushing talented players toward some form of higher education for at least three years and further concentrating the NCAA's market power.

77.    Thus, the NCAA exercises monopsony power in this market.

. . .

**78.** The NCAA has sole rule-making authority and maintains exclusive power over the promulgation of rules and regulations for its member institutions.

**79.** As the sole rule-making authority, the NCAA exercises power in the relevant market, and it is anticompetitive for the NCAA to count students' play at JUCO and/or NAIA schools against their NCAA year limit to participate in college athletics.

**80.** Although the NCAA is structured as a nonprofit organization, its member institutions derive substantial financial benefits from their relationships with student-athletes. These institutions generate revenue from hosting athletic events, merchandise sales, lucrative broadcasting agreements, and increased enrollment interest. In contrast, student-athletes receive only limited benefits, as outlined above.

**81.** Indeed, the relevant market of NCAA Division I football is the functional sole pathway to the NFL, and participation in these markets provide specific and unique once-in-a-lifetime benefits, which include NIL compensation not available in other markets, such as the JUCO system.

**82.** As a result, the NCAA has monopsony power over these markets regarding football. A monopsony is a market system where an entity has concentrated power on the buyer side of the market. *See* <u>Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.</u>, 549 U.S. 312, 320 (2007); <u>United States v. Syufy Enterprises</u>, 903 F.2d 659, 663 n. 4 (9th Cir. 1990) ("Monopsony is a market situation in which there is a single buyer…monopsony and monopsony power are the general equivalent on the buying side of monopoly and monopoly power on the selling side."). Thus, the NCAA has exclusivity regarding the buyer side of the markets for college football players' athletic services.

**83.** In the NIL era of college sports, the NCAA's monopsony power in these markets has become more powerful and concentrated, given that the NCAA Division I athletics accounts

for the vast majority and nearly all NIL transactions.

84.    Indeed, only 0.6% of the 2024 NIL market value (approximately $1.1 billion) was transacted to non-Division I NCAA schools.

85.    Furthermore, as of July 1, 2025, NCAA schools can now compete to recruit athletes with direct compensation. This new twist on the market landscape only further solidifies and dominates the NCAA's monopsony position.

86.    In other words, now that NCAA Division I schools can legally directly pay their players (with the unequal application of exclusion rules created unilaterally by the NCAA), this confirms and even further entrenches the NCAA's monopsony power.

87.    The players in this market are not all fungible. Disqualified athletes like Fuller are not simply replaced by eligible athletes. If market actors (such as other schools) believed that an athlete's services were purely fungible, they would not seek waivers and hold open offers. Simply put, not all football players are replaceable or worthy of receiving the same NIL compensation and other benefits. Any suggestion to the contrary does not understand how players contribute to their respective teams and how the sport functionally works.

88.    Within this unique and specific market, NCAA Division I schools are simultaneously colluders and competitors acting in concert through the NCAA, which, as established herein, possesses the sole ability to dictate the rules and regulations for participation.

89.    The NFL, JUCO system, NAIA system, or any other sporting/football-related entities are not potential substitute buyers for the market at issue. Any suggestion that other entities could act as potential substitute buyers would be a deflective attempt to avoid the NCAA's undisputed market dominance in the relevant labor market.

90.    Accordingly, the transactions between member institutions and student-athletes are inherently commercial in nature and fall within the purview of the Sherman Act.

**91.** The Bylaws and enforcement mechanisms at issue are commercial in nature because, among other things, a NIL agreement is a commercial transaction and the NCAA's actions limit who is eligible to play and therefore to negotiate a NIL agreement. Selectively limiting JUCO and NAIA students from that pool necessarily has a commercial effect.

**92.** There are no practical alternatives that provide the unique combination of attributes offered by Division I NCAA athletic schools: the ability to exchange athletic services for the payment of the partial or full cost of an education plus room and board; high-quality academic educational services; top-of-the-line training facilities; high-quality coaching capable of launching players to professional careers; national publicity through national championships and nationwide broadcasting contracts; opportunities to profit from NIL agreements; and competition at the highest level of collegiate athletics.

**93.** The NAIA has lost more than fifty percent of its membership since the mid-1970s, with most institutions converting to NCAA Division II or Division III affiliations. The NAIA is not a realistic challenger to the NCAA monopsony on Division I talent any more than the Canadian Football League is an economic threat to the NFL.

**94.** The Supreme Court confirmed this market definition in *Alston*, finding that NCAA's Division I essentially is the relevant market for elite college football, and accepting the uncontested premise that the NCAA enjoys monopsony control in that market — such that it is capable of depressing wages below competitive levels for student-athletes and thereby restricting the quantity of student-athlete labor.

**95.** The NCAA establishes and enforces rules purportedly designed to ensure fairness and promote student-athlete welfare, all under the guise of preserving amateurism. These rules are adopted through votes by the NCAA Division I Council and member institutions, amounting in practice to horizontal agreements between the NCAA and its member schools, which are

22

otherwise competitors in the market for student-athlete services.

96.     Horizontal restraints involve agreements between direct competitors, at the same level in a particular industry, to reduce competition. Here, NCAA member institutions are direct competitors for the same pool of athletic talent, and they collectively agree through the eligibility bylaws to restrict rivalry for that talent.

97.     NCAA eligibility rules are most accurately characterized as horizontal restraints that regulate entry into and participation within the market for student-athlete labor. Member institutions — direct competitors for athletic talent — collectively agree to limit both who may participate and the duration of that participation, constituting coordinated conduct that restricts output in a labor market.

98.     As the exclusive governing authority over intercollegiate athletics, the NCAA leverages its dominant market position to impose eligibility and academic requirements that disproportionately restrict and burden JUCO and NAIA athletes. By counting JUCO and NAIA participation against the NCAA's five-year eligibility clock and subjecting JUCO and NAIA athletes to these standards, the NCAA creates disparities and artificially restricts the career mobility of JUCO and NAIA athletes.

99.     Because the challenged eligibility restrictions are targeted directly at athletes who participated at the JUCO or NAIA level (and not those who competed at a prep school, in other sports, joined the Armed Services, or otherwise delayed their NCAA participation), the challenged rules constitute conduct closely analogous to a "group boycott," which is a per se antitrust violation of the Sherman Act. A group boycott arises where competitors jointly refuse to deal with a category of market participants. Here, NCAA institutions collectively decline to offer roster positions, scholarships, and NIL opportunities to athletes who have exhausted eligibility under NCAA-defined criteria — even where those athletes remain capable of competing and are

23

clearly in demand. This exclusion is not based on competitive merit, but on prior participation and the operation of an eligibility clock that is applied with unique force to former JUCO and NAIA athletes.

100. The NCAA exercises substantial monopsony power in the national labor market for NCAA Division I football athletes' services. Through its member institutions' collective agreements on eligibility rules, the NCAA controls and limits who may participate in Division I FBS football and under what conditions.

101. Formal economic research has consistently determined that the NCAA holds significant monopsony power over its labor markets. Nobel Laureate Gary Becker characterized the NCAA as a "cartel in sheepskin clothing."

102. Anticompetitive effects can be established either directly (through proof of actual harm on competition such as reduced output, increased prices, or decreased quality) or indirectly (through proof of market power plus some evidence that the challenged restraint harms competition). In the setting of a labor market, antitrust harm via monopsony power can be shown in multiple ways, including restraints on individuals' ability to move freely between positions with different employers or restrictions on their ability to compete for positions within their area of knowledge or expertise.

103. Anticompetitive harm via monopsony in a labor market can also be shown by underemployment, nonemployment, or wage suppression.

104. Allowing the NCAA to apply the Five-Year Rule to encompass time spent at JUCO and NAIA schools would cause significant anticompetitive harm to JUCO and NAIA schools, Fuller, and similarly situated student-athletes participating in the labor market. More specifically, as the court in Pavia found, enforcing NCAA rules that discourage or penalize student-athletes from attending JUCO schools harms the JUCO schools' ability to compete with

Division I schools for talented athletes and limits the choice of educational institutions available to student-athletes.

105.    Further, consumers who attend NCAA athletic events or watch them on television or streaming services will also be negatively affected by the NCAA's arbitrary and unreasonable conduct. It is reasonable to expect that fan interest in college athletics will dissipate if the governing body tasked with regulating and ensuring fair competition fails to do so. Moreover, consumers of Division I intercollegiate events will be harmed because the level of competitiveness of Division I teams will be reduced due to the restrictions placed on elite athletes who attend JUCO and NAIA schools.

106.    Additionally, JUCO and NAIA athletes are further disadvantaged by being subjected to unfair and inconsistent eligibility procedures that directly impair their ability to pursue professional athletic careers. Nearly every athlete selected in the NFL Draft originates from an NCAA institution, underscoring the NCAA's gatekeeping role in professional sports access. The structure fails to promote fair competition and deprives JUCO and NAIA athletes of equitable treatment, leaving them with only one viable pathway to professional advancement: NCAA membership.

107.    The NCAA's rules and conduct at issue artificially constrain the labor market by categorically excluding older student-athletes from competition, removing a significant number of potential participants from the collegiate football labor market. This constraint operates as a horizontal restraint through the collective agreement of NCAA member institutions to refuse the labor of a defined group of student-athletes.

108.    JUCO players have historically made up two-thirds of the market for transfers to the highest level of Division I FBS schools, with ten percent of NCAA Division I FBS new roster spots attributable to junior college transfers in 2019. As of October 2025, there were 1,062

NJCAA alumni on NCAA Division I football rosters, including 552 on FBS rosters and 178 on elite Power Four conference rosters. Curtailing these athletes' participation based on prior participation at JUCO or NAIA programs represents a demonstrable and measurable reduction in the quantity of experienced labor available in the relevant market.

109. By capping the number of seasons an athlete may compete and counting participation at non-NCAA institutions toward that cap, the NCAA reduces the total quantity of labor available in Division I athletics. This reduction is not offset by alternative opportunities of comparable value; JUCO, NAIA, and lower-division programs do not provide equivalent exposure, NIL opportunities, or professional pathways. The exclusion of athletes from Division I therefore represents a net decrease in market output.

110. The NCAA's rules and conduct at issue are not economically neutral. It is not so simple to suggest that when one player's eligibility ends, a roster spot opens for a newer player, making the net welfare effect zero. There is quantifiable harm placed on the entire group of newly ineligible athletes. As the Supreme Court recognized in *Alston*, the NCAA causes anticompetitive harm to the labor market for student-athletes by depressing wages below competitive levels and restricting the quantity of student-athlete labor through the exercise of monopsony power.

111. The NCAA targets precisely those athletes who command the highest market value. The NCAA and its member institutions have implemented a system that automatically removes their most "expensive" players from the market each year, creating an artificial ceiling on compensation that would not exist in a competitive market and providing a financial advantage to member institutions in the form of systematically lower labor costs.

112. NCAA member institutions benefit financially from the churn of athletes entering and exiting the market. Incoming players are less expensive than their departing replacements, particularly in the current NIL era where Power 4 conferences directly provide compensation to

athletes. The replacement of experienced athletes with lower-cost entrants is not economically neutral; it is a direct mechanism for suppressing wages below competitive levels.

113.    The interaction between the <u>House</u> settlement's roster limits and the NCAA's rules and conduct at issue herein creates a dual constraint on labor supply: fewer total positions through roster caps, and fewer eligible workers through eligibility limits. Together, these constraints enable coordinated control over both the quantity and composition of labor in the relevant market, which is consistent with textbook monopsony behavior.

114.    The NCAA distorts athlete decision-making regarding educational and athletic pathways. By penalizing participation at non-NCAA institutions, the rules discourage efficient developmental pathways, coercing athletes who would benefit from JUCO or NAIA development to instead enroll prematurely at NCAA institutions to preserve eligibility. This outcome reflects regulatory distortion rather than efficient sorting of talent.

115.    JUCO and NAIA programs serve important developmental functions. An athlete may not be academically or athletically ready for Division I competition at age eighteen, but two years at a JUCO or NAIA program can develop both the academic record and the athletic ability necessary to succeed at the Division I level — particularly in football, where size and strength can be significantly augmented in males after age eighteen. Many athletes who began their college careers at JUCO programs have progressed to Division I and then to the NFL, including Aaron Rodgers, Josh Allen, Tyreek Hill, Marquise Brown, Alvin Kamara, Rhamondre Stevenson, Cam Newton, Keyshawn Johnson, Jason Pierre-Paul, John Randle, and Warren Moon.

116.    All of this gives a recruiting advantage to NCAA Division I member schools over JUCO and NAIA schools, even though they are treated the same in terms of eligibility. Removing players with the NCAA Bylaws at issue distorts the labor market by reducing competition, depressing the prices at which Division I schools can acquire athletes, and the pay athletes can

27

earn in NIL agreements or their long-term careers.

**G.      NCAA Bylaw 12.9.4.2: The Rule of Restitution**

117.    Section 12.9.4.2 of the NCAA Bylaws (commonly known as the "Rule of Restitution") provides the following:

> **12.9.4.2 Restitution**. If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions:
> (a) Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;
> (b) Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;
> (c) Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;
> (d) Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;
> (e) Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;
> (f) Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;
> (g) Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;
> (h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

118. If the NCAA determines a student-athlete is ineligible, but a court issues an injunction allowing them to play, the Rule of Restitution comes into play if the court's decision is later overturned.

119. The Rule of Restitution allows the NCAA to retroactively and unjustly punish a student-athlete, their school, and their teammates. If the student-athlete and the member school rely on a court-issued TRO or preliminary injunction in the athlete's favor but the TRO or injunction is later revoked for any reason, the student-athlete, school, and teammates can be unfairly punished by later invocation of the Rule.

120. The clear purpose and effect of the Rule of Restitution is to deter challenges to the NCAA's anti-competitive and improper rules and rulings by making it impossible for student-athletes and member schools to rely on validly entered court orders and to obtain meaningful injunctive relief. These penalties can be significant, impacting an institution's athletic program and reputation.

121. In light of the Rule of Restitution (a form of extortion), colleges and universities typically do not permit a student-athlete to participate in athletic competition even if they obtain a TRO or preliminary injunction finding that an NCAA ruling is likely invalid and enjoining the NCAA from enforcing that unlawful restraint.

122. As a result, the Rule of Restitution must be enjoined for any injunction to have a meaningful effect.

123. For the preliminary injunctive relief requested by Fuller to be effective, this Court must enjoin the NCAA from enforcing the Rule of Restitution for complying with an order granting that relief.

124. As a result, courts across the country have enjoined the NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions who rely on a temporary restraining order or preliminary injunction when participating in intercollegiate athletics.

125. An important case on this interplay within the recent wave of litigation in the post-Alston era is Ohio v. Nat'l Collegiate Athletic Ass'n, 706 F. Supp. 3d 583 (N.D.W. Va. 2023), where the Northern District of West Virginia articulated that the Rule of Restitution is designed to punish challenges to the NCAA's anticompetitive rules, deprive courts of the ability to grant effective relief, and deter student-athletes from accessing the courts. Id. at 601. *See also* Williams v. Nat'l Collegiate Athletic Ass'n, No. CV24614ZNQJBD, 2024 WL 397760 (D.N.J. Feb. 2, 2024); Tennessee v. Nat'l Collegiate Athletic Ass'n, 718 F. Supp. 3d 756 (E.D. Tenn. 2024); Pavia v. Nat'l Collegiate Athletic Ass'n, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), appeal dismissed as moot, 154 F.4th 407 (6th Cir. 2025); Elad v. Nat'l Collegiate Athletic Ass'n, No. CV 25-1981 (ZNQ) (JTQ), 2025 WL 1202014 (D.N.J. Apr. 25, 2025), (vacated and remanded on other grounds), 160 F.4th 407 (3d Cir. 2025); Robinson v. Nat'l Collegiate Athletic Ass'n, 803 F. Supp. 3d 481 (N.D.W. Va. 2025), (vacated and remanded on other grounds), No. 25-2003, 2026 WL 914055 (4th Cir. Apr. 3, 2026).

## H. Irreparable Harm

126. Fuller will suffer substantial irreparable harm if the Court does not grant the preliminary injunction with temporary restraints requested in this action, which would enable him to immediately continue his promising football career during the 2026 football season.

127. The loss of NIL or other earning potential can be quantified, but lost opportunity to play a year of Division I football is incalculable in terms of personal experience on and off the field.

30

128. By contrast, if the Court does not grant Fuller the requested injunctive relief, he will be unable to play in his 2026 season. He will thus be denied the opportunity those games present to gain the attention and acclaim that can only be obtained playing for a Division I football team, to take advantage of NIL opportunities, and to increase his chances of earning a contract to play professional football following the season. Missing out on these opportunities is the very definition of irreparable harm.

129. Unless he is assured that he will be eligible to play during the 2026 season, Fuller will also lose the opportunity to participate in any remaining days of training before returning for formal summer training camp in actual preparation for the 2026 season. All of these missed training opportunities also harm Fuller irreparably, as it would deprive him of critical and irreplaceable opportunities to become integrated into the program's defense and the team as a whole. Further, if Fuller is not declared eligible to play in the 2026 season, UNLV may try to sign another player at his position through the transfer portal to fill his roster spot. In that event, Fuller will lose the opportunity to play Division I college football this coming season regardless of how his eligibility status is ultimately resolved.

130. This injunction is Fuller's only opportunity to complete his Division I career and transition into the NFL.

## I.    The Balance of the Equities

131. As set forth above, Fuller is likely to suffer substantial, immediate, and irreparable harm should he be prevented from playing this season. The NCAA, by contrast, would suffer little harm insofar as, should they later succeed on the merits, they can terminate [Fuller's] eligibility.

132. This Court's immediate intervention is needed to right this wrong.

. . .

. . .

31

## J.    Public Interest

133.    There is a compelling public interest in promoting fair competition and equal opportunities for all collegiate athletes, regardless of division or sport. The NCAA's discriminatory eligibility rules and waiver procedure not only impact Division I football but also reverberate across all divisions (II and III) and sports, disproportionately harming student-athletes seeking to transfer for better opportunities. These rules degrade the quality of competition available to both the public and student bodies and ultimately impair the integrity of college athletics. The ripple impacts extend to the professional level, impacting the NFL Draft and hindering athletes' ability to benefit from NIL opportunities, thereby restricting their livelihood and long-term career prospects.

134.    In order to prevent illegal antitrust acts, free and fair competition in the labor markets is essential to the American economy.

## K.    This Court has Recently Ruled in Favor of Student-Athletes on Similar Claims Against the NCAA

135.    This Court has recently granted preliminary injunctions in several other cases involving JUCO athletes with similar theories advanced in this lawsuit.

136.    In Braham v. Nat'l Collegiate Athletic Ass'n, 794 F. Supp. 3d 824 (D. Nev. 2025), this District Court granted a preliminary injunction based upon similar facts involving the NCAA improperly counting JUCO years against the athlete's years of eligibility.

137.    In Braham, the Plaintiff challenged the NCAA's actions and Bylaws regarding JUCO eligibility transfer and JUCO GPA matters after the Plaintiff attended a JUCO for three years, West Virginia University for two years, and the University of Nevada, Reno for one year. Id. at 830.

138.    In an Order signed July 18, 2025, Chief Judge Miranda M. Du ruled in the Plaintiff's favor for preliminary injunctive relief and found that the Plaintiff had satisfied the

preliminary injunctive factors as discussed by <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008), which are (1) likelihood of success on the merits; (2) likelihood of irreparable harm; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. <u>Id.</u> at 832.

139.    After discussing the preliminary injunction factors and substantive law at length for the Plaintiff's underlying claims, the District Court in <u>Braham</u> held the following:

> It is therefore ordered that Braham's Motion (ECF No. 8) for a preliminary injunction is granted. Pending a final decision on the merits, the NCAA is enjoined from enforcing the (1) Five-Year Rule as it applies to Braham's time at junior college in connection with Braham's eligibility in the upcoming 2025-2026 football season and the (2) Rule of Restitution against Braham.

<u>Id.</u> at 840.

140.    In <u>Martinson v. Nat'l Collegiate Athletic Ass'n</u>, 804 F. Supp. 3d 1109 (D. Nev. 2025), this District Court again granted preliminary injunctive relief against the NCAA's Five-Year Rule regarding JUCO athletes.

141.    Indeed, the <u>Martinson</u> Case even specifically concerned another then-UNLV defensive lineman who was denied eligibility due to prior playing time at a JUCO.

142.    In an order signed September 18, 2025, Judge Richard F. Boulware II cited <u>Braham</u> throughout the Order and granted the Plaintiff's request for a preliminary injunction.

143.    In <u>Blythe v. Nat'l Collegiate Athletic Ass'n</u>, 2026 WL 483345 (D. Nev. Feb. 2, 2026), Judge Anne R. Traum of this Court granted preliminary injunctive relief against the NCAA in favor of a University of Nevada, Reno baseball player named Noah Blythe. Blythe sued the NCAA alleging violations of antitrust laws, breach of contract, tortious interference theories, and a request to block enforcement of the NCAA's Five-Year Rule. Before seeking to play baseball at the University of Nevada, Reno, Blythe had played several seasons playing baseball at non-Division I schools.

**144.** In an Order signed February 20, 2026, Judge Traum granted Blythe's Motion for Temporary Restraining Order and Motion for Preliminary Injunction after applying the Winter factors.

**145.** Braham, Martinson, and Blythe are currently on appeal at the Ninth Circuit.

**L.** **The Recent "Division I Age-Based Eligibility Model", a/k/a "The 5-in-5 Rule"**

**146.** On June 23, 2026, the NCAA approved a sweeping overhaul of its eligibility rules, adopting an age-based model that grants all Division I student-athletes up to five years of eligibility to compete in five seasons of competition. Under the new rule, the five-year eligibility period begins with the earlier of a student-athlete's initial full-time college enrollment or the academic year immediately following the student-athlete's 19th birthday. The new rule eliminates seasons-of-competition limits, sport-specific eligibility rules, athletics redshirt rules, and eligibility extension waivers that previously restricted athletes to four seasons of competition within a five-year window.

**147.** For current student-athletes with eligibility remaining under the previous rules after the 2025-26 academic year, Division I schools are directed to apply either the previous rules or the new age-based model, whichever results in the most favorable outcome for each individual student-athlete. In addition to the prior eligibility rules and/or in the alternative, Fuller, at an absolute minimum, is a current student-athlete with eligibility remaining who is entitled to this most-favorable-outcome analysis for additional eligibility for the 2026-2027 season.

**148.** The NCAA has applied a transition carve-out that categorically excludes athletes it deems to have "used their final season of competition (under previous rules) during 2025-26" from any benefit of the new rule. The NCAA's premise for applying that carve-out to Fuller — that he exhausted his eligibility by counting his NAIA and JUCO seasons as seasons of NCAA intercollegiate competition — is the precise unlawful determination challenged in this action.

34

Allowing the NCAA to weaponize that unlawful determination as the basis for excluding Fuller from the transition rule perpetuates and compounds the antitrust injury described herein to the extent that the new eligibility standards apply.

149.    The NCAA's voluntary adoption of the age-based rule constitutes an affirmative admission that the prior "Four-in-Five" framework (specifically, the counting of NAIA and JUCO seasons as intercollegiate competition) served no legitimate pro-competitive purpose and that less restrictive means clearly existed. The NCAA's own Guide for Two-Year Transfers states that the purpose of the Five-Year Rule is to "move student-athletes toward graduation in a timely manner." Yet the NCAA has now eliminated the very rule it claimed served that purpose. Having conceded that the prior rule was unnecessary, the NCAA cannot continue to invoke it as a basis to deny Fuller eligibility he would unambiguously hold under the framework the NCAA itself chose to replace it with.

## LEGAL ARGUMENT / CAUSES OF ACTION
## COUNT 1: VIOLATION OF §1 OF THE SHERMAN ACT

150.    All preceding allegations are incorporated by reference herein.

151.    The NCAA, by and through its officers, directors, employees, agents or other representatives, has illegally restrained and suppressed competition in the relevant markets through its refusal to waive the NCAA Bylaws at issue as it applied to Fuller's year attending JUCO and NAIA schools. The threat posed by the NCAA having the license to bar student-athletes from realizing the opportunities they have earned without logical justification stifles the market's ability to flourish.

152.    The specific challenged actions and transactions of the NCAA, particularly in the post-Alston landscape, are commercial in nature. Along with the other harms discussed extensively herein, the NCAA's conduct excludes prospective laborers from the market, impairs the student-athlete's free exercise of their rights to engage in commerce, reduces output, decreases

product quality, and significantly impacts and alters monetary outcomes and standing for participants in the market. Thus, the NCAA's challenged actions and transactions at issue here are subject to the Sherman Act.

153.   Any suggestion that the challenged rules or conduct of the NCAA are not "commercial" in nature and therefore not subject to the Sherman Act does not reflect current market realities. Pursuant to express contracts between NCAA member institutions and athletes, athletes now earn compensation through NIL agreements, typically administered through NIL collectives tied to their universities' athletic departments. As of the 2025-26 seasons, the top NCAA football and basketball players earned up to nearly $7 million, with many players earning more than $1 million in NIL payments. An eligibility rule that directly determines who has access to this commercial marketplace is inherently commercial. Furthermore, with athletes now free to transfer from school to school as many times as they wish, thereby negotiating new contracts with other schools, and with direct revenue sharing now mandated by the *House* settlement, the challenged rules and conduct herein that arbitrarily limit a student-athlete's access to this commercial market are without question commercial in nature.

154.   As a direct result of the NCAA's unlawful conduct, the NCAA will establish a precedent that it may unreasonably restrict student-athletes' ability to participate in the relevant labor market.

155.   The NCAA's position results in no benefits to competition in Division I collegiate athletics for the NCAA's member institutions, college athletes, or consumers of NCAA athletic contests. The NCAA's position is logically inconsistent with its own decision to grant student-athletes a blanket waiver in these circumstances for purposes of the Intercollegiate Competition Rule.

. . .

**156.** Indeed, the Supreme Court has long held that restraints on labor through association rulemaking that unduly interferes with the free exercise of the rights by those engaged, or who wish to engage, in trade and commerce, are subject to the Sherman Act. *See* Anderson v. Shipowners' Ass'n of Pac. Coast, 272 U.S. 359, 362-63 (1926) (citations omitted).

**157.** The NCAA's anti-competitive acts were intentionally directed at the United States market and have had a substantial and foreseeable effect on interstate commerce.

**158.** The NCAA standards and actions at issue herein are not entitled to any special antitrust exemption.

**159.** The NCAA standards and actions at issue herein have substantial anticompetitive effects on the relevant market.

**160.** There is no procompetitive rationale for the restraints at issue.

**161.** To the extent any procompetitive rationale is proffered by the NCAA, the procompetitive efficiencies could be achieved through less anticompetitive means, including but not limited to (1) not counting non-NCAA seasons of competition toward the eligibility clock; (2) providing former non-NCAA transfer students with an extra year of eligibility; (3) changing the definition of "intercollegiate competition" to exclude non-NCAA schools such as JUCO and NAIA schools; and/or (4) changing the definition of "collegiate institution" to exclude non-NCAA schools such as JUCO and NAIA schools. Each of these alternatives would permit the NCAA to pursue any legitimate academic or competitive integrity goals while eliminating the discriminatory treatment of JUCO and NAIA athletes. Indeed, the NCAA's own existing exceptions, such as military participation, religious missions, professional participation in other sports, and prep school, demonstrate that the five-year clock is not uniformly applied. This exposes the arbitrariness of treating non-NCAA seasons at JUCO and NAIA schools as equivalent to NCAA Division I participation.

**162.**    The preservation of amateurism does not require categorical exclusion of athletes based on prior participation at non-NCAA institutions. As the Supreme Court made clear in *Alston*, the NCAA's conception of amateurism is not a free-standing defense to antitrust liability. Eligibility rules that penalize alternative developmental pathways do not preserve amateurism; they restrict access to a commercial marketplace.

**163.**    The NCAA's prior claims that eligibility rules promote competitive balance is unpersuasive. Excluding experienced athletes does not inherently equalize competition and may instead advantage programs with superior recruiting pipelines by forcing turnover among established players. Competitive balance, to the extent it is a legitimate objective, can be pursued through less restrictive mechanisms. Indeed, the claim that forcing out older players creates new academic and athletic opportunities for incoming replacements as a procompetitive justification is undermined by the House-imposed roster limits, which cap the total number of available positions and demonstrate that expanding opportunities for new athletes is not actually a concern the NCAA has sought to protect.

**164.**    The NCAA's prior claims that they properly preserve the alignment of academic and athletic careers ignore that the U.S. Department of Education measures college graduation over a six-year period from enrollment to graduation. The six-year period required to complete both a JUCO associate degree and a bachelor's degree from an NCAA institution is precisely the same period a typical student takes to earn a bachelor's degree.

**165.**    The NCAA's prior claims that eligibility rules differentiate its football product from professional football and thereby protect consumer demand lacks empirical support. Empirical studies have shown that when amateur rules were relaxed to allow some compensation, demand for NCAA football was not diminished. The COVID waiver policy granted an extra year of eligibility to many athletes with no apparent reduction in consumer demand for NCAA football.

There is no reason to believe that reduced demand would follow if the relief requested herein was granted.

166.    The asserted goal of integrating athletics and education is poorly tailored to the challenged restraints. Eligibility limits are tied to the passage of time rather than academic progress. Athletes may remain enrolled, in good academic standing, and advancing toward a degree, yet be barred from participation solely because their eligibility clock has expired.

167.    The NCAA's failure to adopt any less restrictive alternative is probative of anticompetitive intent. It suggests that the rules and conduct at issue are not narrowly tailored to serve legitimate objectives, but instead reflect a preference for administratively convenient restrictions that suppress the labor market for student-athlete services.

168.    The NCAA's conduct violates the Sherman Act by, among other things:

A.    Producing direct anticompetitive effects that harm JUCO and NAIA schools;

B.    Producing direct anticompetitive effects that harm JUCO and NAIA athletes athletically, academically, socially, and economically;

C.    Distorting, harming, and suppressing the labor market;

D.    Diminishing consumer choice and the product received by consumers in the college athletics marketplace; and

E.    Harming the market as outlined more broadly in this Complaint and in Plaintiff's expert analysis from Joel Maxcy, Ph.D., whose Declaration is attached as Exhibit 2 and is fully incorporated by reference herein.

## COUNT II: BREACH OF CONTRACT

169.    All preceding allegations are incorporated by reference herein.

. . .

39

170. UNLV is a member of the NCAA Division I. As such, it has agreed to submit to and abide by the NCAA's rules and regulations in exchange for the benefits of NCAA membership, such as participation in high-level intercollegiate athletic competitions. Furthermore, it has agreed to subject itself to NCAA discipline for any failure to comply with its rules and regulations.

171. Fuller, as a student-athlete enrolled at UNLV, who is subject to the same NCAA rules and regulations, is an intended third-party beneficiary of the contractual relationship between UNLV and the NCAA.

172. Fuller also has a scholarship and/or revenue sharing agreement to play football at UNLV, which is a member school of the NCAA and approved of by the NCAA pursuant to the NCAA's regulations and bylaws.

173. The NCAA has a contractual obligation to Fuller, as an intended third-party beneficiary and separately as a scholarship athlete, to enforce its rules and regulations fairly, consistently, and reasonably.

174. As a result, the NCAA's insistence that the seasons Fuller spent playing football at JUCO and NAIA schools count as intercollegiate competition for purposes of NCAA Division I eligibility is directly contrary to its promise to enforce and adjudicate its rules fairly.

175. Fuller's current ineligibility, based on the NCAA Bylaws at issue herein, clearly indicates that the NCAA has breached its contractual obligations to him.

176. As an intended third-party beneficiary of UNLV's agreement to be bound by the NCAA rules and regulations, Fuller has suffered and continues to suffer substantial and irreparable harm as a result of the NCAA without any valid contractual authority. Unjustly preventing Fuller from playing football during the 2026-2027 season deprives him of the once-in-a-lifetime opportunity to compete in Division I football games, improve his skills, support his

teammates, and showcase his talents to future professional employers. Specifically, Fuller will be unable to compete in athletic competition and avail himself of the myriad opportunities that emanate from his participation, including lucrative NIL rights.

## COUNT III: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

177.   All preceding allegations are incorporated by reference herein.

178.   Fuller had a reasonable expectation of prospective business relations with UNLV and other third parties, including but not limited to NIL compensation, revenue-sharing opportunity with UNLV, and increased draft stock to prospectively be drafted in the NFL.

179.   The NCAA knew or should have known of these expectancies.

180.   By denying additional eligibility, the NCAA knew that its actions were certain or substantially certain to prevent Fuller's ability and opportunity to pursue these prospective business relations and opportunities, thereby intending him harm.

181.   The NCAA's actions are without justification and are a disregard of the circumstances at bar.

182.   This breach has caused Fuller damages, including but not limited to lost eligibility, lost associated financial and educational opportunities, and irreparable harm to his career.

## PRAYER FOR RELIEF

183.   WHEREFORE, Fuller respectfully requests Judgment in his favor and against the NCAA as follows:

A.   Declaring that the NCAA's Bylaws at issue herein regarding Fuller's eligibility status violate the Sherman Act;

B.   Declaring that Fuller is eligible to compete at a Division I institution during the 2026-2027 and 2027-2028 football seasons;

41

**C.** Preliminarily and permanently enjoining the NCAA to immediately issue a waiver request to enable Fuller to compete at a Division I institution during the 2026-2027 and 2027-2028 football seasons;

**D.** Preliminarily and permanently enjoining the NCAA from enforcing the NCAA's Bylaws at issue herein to include time spent at JUCO and NAIA schools;

**E.** Preliminarily and permanently enjoining the NCAA from enforcing the Rule of Restitution against Fuller and any institution for which Fuller plays intercollegiate athletics for complying with and/or relying on any injunctive order entered by this Court; and

**F.** Awarding Fuller compensatory and punitive damages, attorneys' fees and costs, prejudgment and post-judgment interest, and such other and further relief as the Court may deem equitable and just.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

**SUPPORTING EXHIBITS**

**184.** The following exhibits are attached to the Complaint and are incorporated by reference herein:

A. Exhibit 1: Select NCAA Bylaws at issue

B. Exhibit 2: Declaration of Joel Maxcy, Ph.D.;

C. Exhibit 3: Declaration of Plaintiff Cohen Fuller;

D. Exhibit 4: Declaration of Geoffrey Tabor, Esq.;

E. Exhibit 5: UNLV Compliance Documents Regarding Plaintiff Cohen Fuller; and

F. Exhibit 6: NCAA Press Release on "5-in-5 Rule".

DATED JUNE 26, 2026.                    Respectfully Submitted:


                                        **/s/ Geoffrey A. Tabor**
                                        Woodrow K. Glass, OBA #15690
                                        Geoffrey A. Tabor, OBA #32880
                                        Chloe N. Glass, OBA #36646
                                        (PRO HAC VICE PENDING)
                                        **GLASS & TABOR, LLP**
                                        1601 36th Ave. NW
                                        Norman, OK 73072


                                        **/s/ Timothy R. O'Reilly**
                                        Timothy R. O'Reilly, Nevada Bar No. 8866
                                        **O'REILLY LAW GROUP**
                                        325 S Maryland Parkway
                                        Las Vegas, NV 89101
                                        ***ATTORNEYS FOR PLAINTIFF***
                                        ***ATTORNEY LIEN CLAIMED***

# EXHIBIT "A"

BYLAW, ARTICLE 12
# Athletics Eligibility

## 12.01 General Principles.

**12.01.1 Eligibility for Athletics Participation.** Only a student-athlete who meets the governing athletics eligibility legislation and interpretations is eligible for intercollegiate athletics participation in a particular sport. An individual who receives direct or indirect payment for athletics participation, except as permitted by the governing legislation and interpretations, is considered a professional athlete. A professional athlete in one sport may represent a member institution in a different sport and may receive institutional financial assistance in the second sport. *(Revised: 6/6/25 effective 7/1/25)*

**12.01.2 "Individual" vs. "Student-Athlete."** NCAA eligibility may be lost as a result of activities before enrollment in college. If NCAA rules specify that an "individual" may or may not participate in certain activities, this term refers to a person before and after enrollment in a member institution. If NCAA rules specify a "student-athlete," the legislation applies only to that person's activities after enrollment. *(Revised: 6/6/25 effective 7/1/25)*

## 12.02 Definitions and Applications.

**12.02.1 Actual and Necessary Expenses.** Actual and necessary expenses are defined as: *(Adopted: 1/19/13 effective 8/1/13, Revised: 6/6/25 effective 7/1/25)*

(a) Meals;

(b) Lodging;

(c) Apparel, equipment and supplies;

(d) Coaching and instruction;

(e) Health/medical insurance;

(f) Transportation (expenses to and from practice and competition, cost of transportation from home to training/practice site at the beginning of the season/preparation for an event and from training/practice/event site to home at the end of season/ event);

(g) Medical expenses

(h) Facility usage;

(i) Entry fees; and

(j) Other reasonable expenses (e.g., entertainment).

**12.02.1.1 Calculation of Actual and Necessary Expenses -- Limited to Specific Individuals.** The calculation of actual and necessary expenses shall not include the expenses or fees of anyone other than the individual who is permitted to receive the expenses pursuant to the applicable legislation (e.g., individual who participates as a member of the team or in a specific event, family member). *(Adopted: 1/19/13 effective 8/1/13, Revised: 6/6/25 effective 7/1/25)*

**12.02.1.2 Calculation of Actual and Necessary Expenses -- Individual Sports and Women's Beach Volleyball.** In individual sports and women's beach volleyball, the calculation of an individual's actual and necessary expenses shall be based on expenses incurred during each calendar year (January-December). *(Adopted: 1/19/13 effective 8/1/13, Revised: 1/23/19 Immediate; may be applied retroactively to expenses incurred on or after January 1, 2019., 6/6/25 effective 7/1/25)*

**12.02.2 Family Member.** A family member is an individual with any of the following relationships to the prospective student-athlete: spouse, parent or legal guardian, child, sibling, grandparent, domestic partner or any individual whose close association with the prospective student-athlete is the practical equivalent of a family relationship. *(Adopted: 4/25/18, Revised: 6/6/25 effective 7/1/25)*

**12.02.3 Intercollegiate Competition.** Intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution does any of the following: *(Revised: 1/10/91, 1/16/93, 1/11/94, 1/10/95, 1/9/06, 7/31/23, 6/6/25 effective 7/1/25)*

(a) Represents the institution against outside competition, regardless of how the competition is classified (e.g., contest, scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies;

(b) Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or

(c) Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition.

**12.02.3.1 Exempted Events.** Participation in events listed in Bylaw 16.8.1.2 is exempted from the application of this legislation. *(Revised: 1/10/92, 6/6/25 effective 7/1/25)*

**12.02.3.2 Participation on an Institution's Club Team.** Participation on a collegiate institution's club team is exempted from the application of this legislation, provided the institution did not sponsor the sport on the varsity intercollegiate level at the time of participation. *(Adopted: 6/24/09, Revised: 6/6/25 effective 7/1/25)*

**12.02.4 Limited Benefit -- Before Initial, Full-Time Enrollment at an NCAA Institution -- Expenses from a Permissible Source.** Before initial, full-time enrollment at an NCAA institution, if an individual receives expenses from a permissible source (e.g., event sponsor, club team) that exceed the individual's actual and necessary expenses by $300 or less, the eligibility of the individual shall not be affected. *(Adopted: 1/19/13 effective 8/1/13, Revised: 6/6/25 effective 7/1/25)*

**12.02.5 Limited Benefit -- Enrolled Student-Athlete -- Expenses from a Permissible Source.** If a student-athlete engages in permissible outside competition and receives expenses from a permissible source (e.g., event sponsor, club team) that exceed the student-athlete's actual and necessary expenses by $300 or less, the eligibility of the student-athlete shall not be affected and the institution is not required to submit a self-report of the infraction. *(Adopted: 1/19/13 effective 8/1/13, Revised: 6/6/25 effective 7/1/25)*

**12.02.6 Organized Competition.** Athletics competition shall be considered organized if any of the following conditions exists: *(Adopted: 7/31/14, Revised: 6/6/25 effective 7/1/25)*

(a) Competition is scheduled and publicized in advance;

(b) Official score is kept;

(c) Individual or team standings are maintained;

(d) Official timer or game officials are used;

(e) Admission is charged;

(f) Teams are regularly formed or team rosters are predetermined;

(g) Team uniforms are used;

(h) A team is privately or commercially sponsored; or

(i) The competition is either directly or indirectly sponsored, promoted or administered by an individual, an organization or any other agency.

**12.02.7 Professional Athletics Team.** A professional team is any organized team that: *(Revised: 4/25/02 effective 8/1/02, 8/8/02, 4/23/03, 4/24/04, 10/28/04, 6/6/25 effective 7/1/25)*

(a) Provides any of its players more than actual and necessary expenses for participation on the team, except as otherwise permitted by NCAA legislation; or

(b) Declares itself to be professional.

**12.02.8 Professional Sports Agent. [A]** A professional sports agent is a person who, directly or indirectly represents or attempts to represent any individual for the purpose of marketing the individual's athletics ability or reputation as a professional athlete for financial gain, or seeks to obtain any type of financial gain or benefit from a student-athlete's potential earnings as a professional athlete. A professional sports agent may include, but is not limited to, a certified contract advisor, financial advisor, marketing representative, brand manager or anyone who is employed or associated with such persons. *(Adopted: 6/6/25 effective 7/1/25)*

**12.02.9 Religious Mission, Official.** An official religious mission is one that is established by the religious organization of which the individual is a member and that results in the individual being unable to attend a collegiate institution during the period of the mission. *(Revised: 1/9/06, 4/2/10, 6/6/25 effective 7/1/25)*

**12.02.10 Road Racing.** Road racing is considered the same as cross country or track and field for purposes of Bylaws 12.1, 12.2, 12.3 and 12.6.3.2. *(Adopted: 6/6/25 effective 7/1/25)*

**12.02.11 Track and Field and Cross Country.** Cross country, indoor track and field, and outdoor track and field shall be considered separate sports for purposes of Bylaw 12.6.3. *(Adopted: 6/6/25 effective 7/1/25)*

**12.02.12 Triathlon and Cross Country, Track and Field and Swimming.** Triathlon and cross country are considered the same sport, triathlon and track and field are considered the same sport, and triathlon and swimming are

considered the same sport for purposes of Bylaw 12.1, 12.2, 12.3 and 12.6.3.2. *(Adopted: 1/18/14 effective 8/1/14, Revised: 6/6/25 effective 7/1/25)*

**12.02.13 Use of Overall Athletics Skill.** An individual who receives funds, awards, benefits or expenses not permitted by the governing legislation or interpretations for the use of overall athletics skill (e.g., superstars competition) is ineligible for competition in all sports. *(Adopted: 6/6/25 effective 7/1/25)*

**12.02.14 Volleyball and Beach Volleyball.** Volleyball and beach volleyball are considered the same sport for the purposes of Bylaws 12.1, 12.2, 12.3 and 12.6.3.2. *(Adopted: 8/26/10, Revised: 7/31/14, 6/6/25 effective 7/1/25)*

## 12.1 Athletics Eligibility.
An individual shall not receive or accept a promise to receive funds, awards, benefits or expenses not permitted by the governing legislation and interpretations for athletics eligibility. (See Bylaw 12.10 regarding the eligibility restoration process.) *(Revised: 6/6/25 effective 7/1/25)*

**12.1.1 Validity of Athletics Eligibility Status.** As a condition and obligation of membership, it is the responsibility of an institution to determine the validity of the information on which the athletics eligibility status of a prospective student-athlete (including two-year and four-year college transfers initially enrolling at an NCAA Division I institution) and student-athlete is based. (See Bylaw 14.01.3.) *(Adopted: 1/9/06 effective 8/1/06 for all final certifications for student-athletes initially enrolling at a Division I or Division II institution on or after 8/1/07, Revised: 1/8/07, 4/30/07, 6/6/25 effective 7/1/25)*

**12.1.1.1 Athletics Eligibility Certification Process.** An institution shall use an initial eligibility center approved by the Board of Governors to determine the validity of the information on which the athletics eligibility status of a student-athlete is based. *(Adopted: 1/9/06 effective 8/1/06 for final certifications for student-athletes initially enrolling at a Division I or Division II institution on or after 8/1/07, Revised: 4/30/07, 10/30/14, 6/6/25 effective 7/1/25)*

**12.1.1.1.1 Scope.** The certification of athletics eligibility status issued by the NCAA Eligibility Center is limited to activities that occur before the prospective student-athlete's request for final certification or the prospective student-athlete's initial, full-time enrollment at an NCAA member institution, whichever occurs earlier. *(Adopted: 4/30/07, Revised: 6/20/23, 6/6/25 effective 7/1/25)*

**12.1.1.1.2 Institutional Responsibilities.**

**12.1.1.1.2.1 Athletics Eligibility Status After Certification.** An institution is responsible for certifying the athletics eligibility status of a prospective student-athlete (including two-year and four-year college transfers initially enrolling at an NCAA Division I institution) from the time the prospective student-athlete requests that a final certification be issued by the NCAA Eligibility Center or from the time the prospective student-athlete initially enrolls as a full-time student at an NCAA member institution (whichever occurs earlier). *(Adopted: 4/30/07, Revised: 6/20/23, 6/6/25 effective 7/1/25)*

**12.1.1.1.2.2 Sharing Information and Reporting Discrepancies.** If an institution receives additional information or otherwise has cause to believe that a prospective student-athlete's athletics eligibility status has been jeopardized, the institution is responsible for promptly notifying the NCAA Eligibility Center of such information. Further, an institution is responsible for promptly reporting to the NCAA Eligibility Center all discrepancies in information related to a student-athlete's certification. *(Adopted: 4/30/07, Revised: 6/6/25 effective 7/1/25)*

**12.1.1.1.3 Eligibility for Practice or Competition.** Before engaging in practice or competition, a student-athlete shall receive a final certification of athletics eligibility status based on activities that occur before the student-athlete's request for final certification or initial, full-time enrollment at an NCAA Division I or II institution (whichever occurs earlier). *(Adopted: 4/30/07, Revised: 6/6/25 effective 7/1/25)*

**12.1.1.1.3.1 Temporary Certification.** If a prospective student-athlete reports for athletics participation before the student's athletics eligibility status has been certified, the student may practice, but not compete, for a maximum period of 45 days. After this period, the student's athletics eligibility status must be certified in order to continue to practice or to compete. *(Adopted: 1/9/06 effective 8/1/06 for all final certifications for student-athletes initially enrolling at a Division I or Division II institution on or after 8/1/07, Revised: 11/29/09, 6/6/25 effective 7/1/25)*

**12.1.1.1.3.2 Effect of Violations.** A violation of Bylaw 12.1.1.1.3 or Bylaw 12.1.1.1.3.1 in which the student-athlete is subsequently certified without conditions shall be considered an institutional violation per Bylaw 8.01.3 but shall not affect the student-athlete's eligibility. *(Adopted: 10/29/15)*

**12.1.1.1.4 Eligibility for Practice After a Final Not-Certified Certification.** After a final not-certified certification is rendered, a student-athlete may continue to engage in practice activities, provided the institution has

submitted a notice of appeal. At the point in which all appeal opportunities have been exhausted and no eligibility has been granted, the student-athlete may no longer participate in practice activities. *(Adopted: 3/21/07)*

**12.1.2 Permissible Funds, Awards, Benefits or Expenses.** The receipt of funds, awards, benefits or expenses pursuant to the following provisions is permitted. *(Adopted: 6/6/25 effective 7/1/25)*

**12.1.2.1 Educational Expenses or Services -- Before to Collegiate Enrollment.** A prospective student-athlete may receive educational expenses or services (e.g., tuition, fees, living expenses, books, tutoring, standardized test preparatory classes) before to collegiate enrollment from any individual or entity other than a professional sports agent, member institution or a representative of an institution's athletics interests, provided the payment for such expenses or services is disbursed directly to the individual, organization or educational institution (e.g., high school, preparatory school) providing the educational expenses or services. *(Adopted: 4/25/02 effective 8/1/02, Revised: 1/14/08, 5/1/19, 7/31/23, 11/7/24 effective 8/1/25, 6/6/25 effective 7/1/25)*

**12.1.2.2 Expenses from an Outside Sponsor.** *(Revised: 8/26/10, 1/19/13 effective 8/1/13, 11/7/13, 6/6/25 effective 7/1/25)*

**12.1.2.2.1 Participation as a Member of a Team.** An individual who participates in a sport as a member of a team may receive actual and necessary expenses for competition and practice held in preparation for such competition (directly related to the competition and conducted during a continuous time period preceding the competition) from an outside sponsor (e.g., team, neighbor, business) other than an agent or a representative of an institution's athletics interests (and, after initial, full-time collegiate enrollment, other than a professional sports organization). *(Adopted: 6/6/25 effective 7/1/25)*

**12.1.2.2.2 Participation as an Individual.** An individual who participates in a sport as an individual (not a member of a team) may receive actual and necessary expenses associated with an athletics event and practice immediately preceding the event, from an outside sponsor (e.g., neighbor, business) other than an agent or a representative of an institution's athletics interests (and, after initial, full-time collegiate enrollment, other than a professional sports organization). *(Adopted: 6/6/25 effective 7/1/25)*

**12.1.2.2.3 Expenses Before Full-Time Collegiate Enrollment -- Professional Sports Organization.** Before full-time collegiate enrollment, an individual may accept up to actual and necessary expenses for competition and practice held in preparation for such competition from a professional sports organization that sponsors the event. *(Adopted: 10/16/12, Revised: 6/6/25 effective 7/1/25)*

**12.1.2.3 Expenses for Family Members of Participants in Athletics Competition.** The family members of a participant in athletics competition may receive actual and necessary expenses from a nonprofessional organization sponsoring the competition , provided such expenses are made available to the family members of all participants in the competition. *(Adopted: 1/16/93, Revised: 1/11/97, 4/25/18, 7/31/23, 6/6/25 effective 7/1/25)*

**12.1.2.3.1 Postseason Events. [FBS]** A student-athlete may designate either additional individuals or substitutes (not to exceed a total of six individuals) to receive entertainment expenses related to an event organized by the nonprofessional sponsor of a postseason game specifically for the family members of participating student-athletes. [See Bylaw 17.12.6.2.1-(c).] The additional individuals or substitutes designated by the student-athlete shall be subject to the review and approval of the institution's athletics director (or designee). *(Adopted: 4/29/04 effective 8/1/04, Revised: 4/25/18, 1/23/19, 6/26/24 effective 8/1/24, 6/6/25 effective 7/1/25)*

**12.1.2.4 Prize Money or Payment Based on Performance.** *(Adopted: 4/25/02 effective 8/1/02, Revised: 12/12/06 applicable to any expenses received by a prospective student-athlete on or after 8/23/06, 4/26/12, 1/19/13 effective 8/1/13, 4/25/18, 6/6/25 effective 7/1/25)*

**12.1.2.4.1 Sports Other Than Tennis.** In sports other than tennis, an individual may accept prize money based on place finish or performance in an athletics event. Such prize money may not exceed actual and necessary expenses and may be provided only by the sponsor of the event. *(Adopted: 6/6/25 effective 7/1/25)*

**12.1.2.4.2 Tennis.** *(Revised: 6/6/25 effective 7/1/25)*

**12.1.2.4.2.1 Before Full-Time Collegiate Enrollment.** In tennis, before full-time collegiate enrollment, an individual may accept up to $10,000 per calendar year in prize money based on place finish or performance in athletics events. Such prize money may be provided only by the sponsor of an event in which the individual participates. Once the individual has accepted $10,000 in prize money in a particular year, the individual may receive additional prize money on a per-event basis, provided such prize money does not exceed the individual's actual and necessary expenses for participation in the event. *(Adopted: 4/26/12, Revised: 1/19/13 effective 8/1/13, 6/6/25 effective 7/1/25)*

**12.1.2.4.2.2 After Initial, Full-Time Collegiate Enrollment.** In tennis, after initial, full-time collegiate enrollment, an individual may accept prize money based on place finish or performance in an athletics event. Such prize money may not exceed actual and necessary expenses and may be provided only by the sponsor of the event. *(Adopted: 1/19/13 effective 8/1/13, Revised: 4/25/18, 6/6/25 effective 7/1/25)*

**12.1.2.5 Loan Against Future Professional Earnings Potential for Insurance. [A]** An individual may borrow against future professional earnings potential from an established, accredited commercial lending institution for the purpose of purchasing insurance incidental to participation in athletics (e.g., critical injury or illness, loss of value) (see Bylaw 16.11.1.4), provided a third party (including a representative of an institution's athletics interests) is not involved in arrangements for securing the loan. However, an institution's president or chancellor (or a designated representative from outside the department of athletics) may designate an institutional staff member (or staff members) (e.g., professional sports counseling panel) to assist a student-athlete with arrangements for securing the loan and insurance. *(Revised: 1/16/93, 1/14/97 effective 8/1/97, 1/16/10, 1/17/15, 8/3/22, 6/6/25 effective 7/1/25)*

**12.1.2.6 Payment of NCAA Eligibility Center Fee.** A high school booster club (as opposed to specific individuals) may pay the necessary fee for prospective student-athletes at that high school to be certified by the NCAA Eligibility Center, provided no particular prospective student-athlete is singled out because of athletics ability or reputation. *(Adopted: 1/11/94, Revised: 5/9/07, 6/6/25 effective 7/1/25)*

**12.1.2.7 NCAA College Basketball Academies.** The NCAA may provide actual and necessary expenses for a prospective student-athlete and one individual accompanying the prospective-student athlete to attend an NCAA College Basketball Academy per the policies and procedures of the NCAA College Basketball Academy. *(Adopted: 8/8/18 effective 4/1/19, Revised: 10/5/22, 6/6/25 effective 7/1/25)*

**12.1.3 Permissible Funds, Awards, Benefits or Expenses – Olympic and Paralympic Committee/National Governing Body.** The receipt of funds, awards, benefits or expenses pursuant to the following provisions is permitted. *(Adopted: 6/6/25 effective 7/1/25)*

**12.1.3.1 Training Expenses.** An individual may receive actual and necessary expenses for training (including grants, but not prize money, whereby the recipient has qualified for the grant based on performance in a specific event or events), provided such expenses are approved and provided directly by the U.S. Olympic and Paralympic Committee, the appropriate national governing body in the sport (or, for international student-athletes, the equivalent organization of that nation) or a governmental entity. *(Adopted: 1/10/91, Revised: 4/27/00, 1/19/13 effective 8/1/13, 10/17/19, 7/31/23, 6/6/25 effective 7/1/25)*

**12.1.3.2 Training Expenses for Elite Athletes.** An individual who has been designated by the U.S. Olympic and Paralympic Committee and the sport-affiliated national governing body (or the international equivalent) as an elite athlete may receive actual and necessary expenses for training, sport experts other than coaches, training partners and travel for parents or guardians, coaches, sport experts and training partners, provided such expenses are approved and provided directly by the U.S. Olympic and Paralympic Committee or the appropriate national governing body in the sport (or, for international student-athletes, the equivalent organization of that nation). *(Adopted: 1/23/20, Revised: 7/31/23, 6/6/25 effective 7/1/25)*

**12.1.3.3 U.S. Olympic and Paralympic Committee Elite Athlete Health Insurance Program.** An individual may receive the comprehensive benefits of the U.S. Olympic and Paralympic Committee Elite Athlete Health Insurance Program. *(Adopted: 1/10/90, Revised: 10/17/19, 6/6/25 effective 7/1/25)*

**12.1.3.4 Operation Gold Grant.** An individual (prospective student-athlete or student-athlete) may accept funds that are administered by the U.S. Olympic and Paralympic Committee pursuant to its Operation Gold program. *(Adopted: 4/26/01 effective 8/1/01, Revised: 10/17/19, 6/6/25 effective 7/1/25)*

**12.1.3.5 Incentive Programs for International Athletes.** An international prospective student-athlete or international student-athlete may accept funds from a country's national Olympic and/or Paralympic governing body (equivalent to the U.S. Olympic and Paralympic Committee) based on place finish in one event per year that is designated as the highest level of international competition for the year by the governing body. *(Adopted: 1/17/15 effective 8/1/15, Revised: 10/17/19, 1/22/20, 6/6/25 effective 7/1/25)*

**12.1.3.6 Expenses/Benefits Related to Olympic or Paralympic Games.** Members of an Olympic or Paralympic team may receive all nonmonetary benefits and awards provided to members of an Olympic or Paralympic team beyond actual and necessary expenses and any other item or service for which it can be demonstrated that the same benefit is available to all members of that nation's Olympic or Paralympic team or the specific sport Olympic or Paralympic team. *(Adopted: 11/1/00, Revised: 1/19/13 effective 8/1/13, 1/22/20, 6/6/25 effective 7/1/25)*

**12.1.3.7 Benefits to Family Members -- National Team Competition.** A commercial company (other than a professional sports organization) or members of the local community may provide actual and necessary expenses for an individual's family members to attend national team competition in which the individual will participate. In addition, an individual's family members may receive nonmonetary benefits provided to the family members of all national team members in conjunction with participation in national team competition. (See Bylaw 16.02.5.) *(Adopted: 1/11/94, Revised: 1/19/13 effective 8/1/13, 6/6/25 effective 7/1/25)*

**12.1.3.8 Expenses for Participation in Olympic or Paralympic Exhibitions.** An individual may receive actual and necessary expenses from the U.S. Olympic and Paralympic Committee, national governing body or the nonprofessional organizations sponsoring the event to participate in Olympic or Paralympic tours or exhibitions involving Olympic or Paralympic team members and/or members of the national team, provided that if the individual is a student-athlete, no class time is missed, and the exhibition does not conflict with dates of institutional competition. *(Adopted: 10/28/97 effective 8/1/98, Revised: 10/17/19, 1/22/20, 6/6/25 effective 7/1/25)*

**12.1.3.9 Commemorative Items.** An individual may receive commemorative items incidental to participation in the Olympic Games, Paralympic Games, World University Games (Universiade), World University Championships, Pan American Games, Parapan American Games, World Championships and World Cup events through the applicable national governing body. *(Adopted: 11/1/00 effective 8/1/01, Revised: 1/14/12, 1/22/20, 6/6/25 effective 7/1/25)*

## 12.2 Involvement With Professional Teams.

**12.2.1 Tryouts and Practice Without Competition.** *(Revised: 6/6/25 effective 7/1/25)*

**12.2.1.1 Tryout or Practice Before Enrollment.** Prior to initial full-time collegiate enrollment, an individual may participate in a tryout with a professional team or league, provided not more than actual and necessary expenses are received to participate. *(Adopted: 4/13/10 effective 8/1/10 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/10, Revised: 11/7/24 effective 8/1/25, 6/6/25 effective 7/1/25)*

**12.2.1.2 Tryout or Practice After Enrollment.** After initial full-time collegiate enrollment, an individual who has eligibility remaining may try out with a professional athletics team (or participate in a combine including that team) at any time, provided the individual does not miss class. The individual may receive actual and necessary expenses in conjunction with one 48-hour tryout per professional team (or a combine including that team). The 48-hour tryout period shall begin at the time the individual arrives at the tryout location. At the completion of the 48-hour period, the individual must depart the location of the tryout immediately in order to receive return transportation expenses. A tryout may extend beyond 48 hours if the individual self-finances additional expenses, including return transportation. A self-financed tryout may be for any length of time, provided the individual does not miss class. *(Revised: 1/10/92, 4/24/03, 5/26/06, 4/26/07 effective 8/1/07, 6/6/25 effective 7/1/25)*

**12.2.1.2.1 Exception for Major League Baseball Draft Combine.** In baseball, an individual may receive actual and necessary expenses from Major League Baseball or the national governing body to attend the MLB draft combine regardless of the duration of the combine. *(Adopted: 4/13/23, Revised: 7/31/23, 6/6/25 effective 7/1/25)*

**12.2.1.2.2 Exception for Basketball Draft Combine.** In basketball, an individual may receive actual and necessary expenses from a professional sports organization to attend that organization's basketball draft combine regardless of the duration of the camp. [See Bylaw 14.6.4-(e).] *(Adopted: 4/23/03, Revised: 5/26/06, 4/26/07 effective 8/1/07, 11/7/13, 7/31/23, 6/6/25 effective 7/1/25)*

**12.2.1.2.3 Exception -- Men's Basketball.** In men's basketball, an individual may receive actual and necessary expenses each year in conjunction with one 48-hour tryout per professional team and in conjunction with a professional organization's draft combine. An individual who is invited to participate in a professional organization's draft combine is permitted to miss class for such participation and associated travel. *(Adopted: 1/14/16)*

**12.2.1.2.4 Exception for National Hockey League Scouting Combine -- Men's Ice Hockey.** In men's ice hockey, an individual may receive actual and necessary expenses from the National Hockey League to attend the NHL scouting combine regardless of the duration of the combine. *(Adopted: 1/16/10, Revised: 7/31/23, 6/6/25 effective 7/1/25)*

**12.2.1.2.5 Exception for Major League Soccer Showcase.** In men's soccer, an individual may receive actual and necessary expenses from Major League Soccer to attend the MLS Showcase regardless of the duration of the event and without such activity being considered a tryout with a professional team. An individual who is invited to participate in a professional organization's draft combine is permitted to miss class for such participation and associated travel. *(Adopted: 6/26/24 effective 8/1/24, Revised: 6/6/25 effective 7/1/25)*

**12.2.1.2.6 Exception -- Postseason Practice Session -- Football. [FBS/FCS]** In football, an individual may participate in a postseason practice per Bylaw 17.12.7.4 without such activity being considered a tryout with a professional team. *(Adopted: 4/25/18 effective 8/1/18, Revised: 6/6/25 effective 7/1/25)*

**12.2.1.2.7 Prohibited Involvement of Institution's Coach.** An institution's coaching staff member may not arrange for or direct student-athletes' participation in football or basketball practice sessions conducted by a professional team.

**12.2.2 Competition.** *(Revised: 6/6/25 effective 7/1/25)*

**12.2.2.1 Competition Against Professionals.** An individual may participate singly or as a member of an amateur team against professional athletes or professional teams. *(Revised: 8/24/07, 6/6/25 effective 7/1/25)*

**12.2.2.2 Competition With Professionals.** An individual shall not compete on a professional team (per Bylaw 12.02.7) in that sport. However, an individual may compete on a tennis, golf, two-person beach volleyball or two-person synchronized diving team with persons who are competing for cash or a comparable prize, provided the individual does not receive payment or prize money that exceeds actual and necessary expenses, which may only be provided by the sponsor of the event. *(Revised: 1/9/96 effective 8/1/96, 1/14/97, 4/25/02 effective 8/1/02, 4/28/14, 7/31/15, 6/6/25 effective 7/1/25)*

**12.2.2.2.1 Exception -- Competition Before Initial Full-Time Collegiate Enrollment.** Before initial full-time collegiate enrollment, an individual may compete on a professional team (per Bylaw 12.02.4), provided the individual does not receive more than actual and necessary expenses to participate on the team. *(Adopted: 4/29/10 effective 8/1/10 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/10, Revised: 11/7/24 effective 8/1/25, 6/6/25 effective 7/1/25)*

**12.2.2.2.2 Professional Player as Team Member.** An individual may participate with a professional on a team, provided the professional is not being paid by a professional team or league to play as a member of that team (e.g., summer basketball leagues with teams composed of both professional and amateur athletes). *(Revised: 6/6/25 effective 7/1/25)*

**12.2.2.2.3 Professional Coach or Referee.** Participation on a team that includes a professional coach or referee does not cause the team to be classified as a professional team. *(Revised: 6/6/25 effective 7/1/25)*

**12.2.2.2.4 Exception -- Olympic, Paralympic or National Teams.** It is permissible for an individual to participate on Olympic, Paralympic or national teams that are competing for prize money or are being compensated by the governing body to participate in a specific event, provided the student-athlete does not accept prize money or any other compensation (other than actual and necessary expenses). *(Adopted: 8/8/02, Revised: 1/22/20, 6/6/25 effective 7/1/25)*

**12.2.2.3 Competition in Professional All-Star Contest.** A student-athlete who agrees to participate in a professional (players to be paid) all-star game becomes ineligible to compete in any intercollegiate contest that occurs after that agreement. Thus, a senior entering into such an agreement immediately following the last regular-season intercollegiate contest would not be eligible to compete in a bowl game, an NCAA championship or any other postseason intercollegiate contest. *(Revised: 6/6/25 effective 7/1/25)*

**12.2.3 Draft and Inquiry.** *(Revised: 6/6/25 effective 7/1/25)*

**12.2.3.1 Inquiry.** An individual may inquire of a professional sports organization about eligibility for a professional-league player draft or request information about the individual's market value without affecting the individual's eligibility status. *(Revised: 6/6/25 effective 7/1/25)*

**12.2.3.2 Draft List -- General Rule.** After initial, full-time collegiate enrollment, an individual shall not request to be placed on the draft list or supplemental draft list of a professional league. *(Revised: 4/25/02 effective 8/1/02, 6/6/25 effective 7/1/25)*

**12.2.3.2.1 Exception -- Men's Basketball -- Four-Year College Student-Athlete.** *(Revised: 6/6/25 effective 7/1/25)*

**12.2.3.2.1.1 National Basketball Association.** In men's basketball, a student-athlete may enter the National Basketball Association's draft each year during collegiate participation , provided: *(Adopted: 8/8/18, Revised: 6/6/25 effective 7/1/25)*

(a) The student-athlete requests an evaluation from the National Basketball Association's Undergraduate Advisory Committee before entering the draft;

(b) The student-athlete requests to be removed from the draft list and declares the intent to resume intercollegiate participation not later than 10 days after the conclusion of the NBA draft combine;

(c) The student-athlete's declaration of intent is submitted in writing to the institution's director of athletics; and

(d) The student-athlete is not drafted.

**12.2.3.2.1.2 Professional League Other Than the National Basketball Association.** In men's basketball, a student-athlete may enter a professional league's draft (other than the National Basketball Association's draft) each year during the student-athlete's four-year college participation, provided: *(Adopted: 4/30/09 effective 8/1/09, Revised: 4/28/11 effective 8/1/11, 1/14/16, 8/8/18, 10/9/24, 6/6/25 effective 7/1/25)*

(a) The student-athlete requests to be removed from the draft list and declares the intent to resume intercollegiate participation not later than 10 days after the conclusion of the professional league's draft combine. If the professional league does not conduct a draft combine, the student-athlete must request to be removed from the draft list not later than the end of the day before the first day of the spring signing period for the applicable year;

(b) The student-athlete's declaration of intent is submitted in writing to the institution's director of athletics; and

(c) The student-athlete is not drafted.

**12.2.3.2.2 Exception -- Basketball -- Two-Year College Prospective Student-Athlete.** In basketball, a prospective student-athlete enrolled at a two-year collegiate institution may enter a professional league's draft one time during the prospective student-athlete's two-year college participation, provided the prospective student-athlete is not drafted by any team in that league. *(Adopted: 4/24/03 effective 8/1/03, Revised: 6/6/25 effective 7/1/25)*

**12.2.3.2.3 Exception -- Women's Basketball -- Four-Year College Student-Athlete.** In women's basketball, a student-athlete may enter a professional league's draft one time during collegiate participation, provided the student-athlete is not drafted by any team in that league and the student-athlete declares the intention to resume intercollegiate participation within 30 days after the draft. The student-athlete's declaration of intent shall be in writing to the institution's director of athletics. *(Adopted: 1/11/94, Revised: 1/10/95, 1/14/97 effective 4/16/97, 4/24/03 effective 8/1/03, 4/30/09 effective 8/1/09, 8/8/18, 6/6/25 effective 7/1/25)*

**12.2.3.2.4 Exception -- Football. [FBS/FCS]** In football, a student-athlete (as opposed to a prospective student-athlete) may enter the National Football League draft one time during collegiate participation, provided the student-athlete is not drafted by any team in that league and the student-athlete declares the intention to resume intercollegiate participation within 72 hours following the National Football League draft declaration date. The student-athlete's declaration of intent shall be in writing to the institution's director of athletics. *(Adopted: 10/31/02, Revised: 4/14/03, 12/15/06, 6/6/25 effective 7/1/25)*

**12.2.3.2.5 Exception -- Sports Other Than Basketball and Football.** A student-athlete in a sport other than basketball or football may enter a professional league's draft one time during collegiate participation, provided the student-athlete is not drafted and, within 72 hours following the draft, declares the intention to resume participation in intercollegiate athletics. The student-athlete's declaration of intent shall be in writing to the institution's director of athletics. *(Adopted: 4/26/07 effective 8/1/07, Revised: 6/6/25 effective 7/1/25)*

**12.2.3.3 Negotiations.** An individual may request information about professional market value. Further, the individual (or family members) or the institution's professional sports counseling panel may enter into negotiations with a professional sports organization . *(Adopted: 1/10/92, Revised: 4/25/18, 6/6/25 effective 7/1/25)*

**12.2.4 Contracts and Compensation.** An individual shall not enter into any kind of agreement to compete in professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement. *(Revised: 1/10/92, 6/6/25 effective 7/1/25)*

**12.2.4.1 Exception -- Before Initial Full-Time Collegiate Enrollment.** Before initial full-time collegiate enrollment, an individual may enter into an agreement to compete on a professional team (per Bylaw 12.02.4), provided the agreement does not guarantee or promise payment (at any time) in excess of actual and necessary expenses to participate on the team. *(Adopted: 4/29/10 effective 8/1/10 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/10, Revised: 11/7/24 effective 8/1/25, 6/6/25 effective 7/1/25)*

**12.2.4.2 Nonbinding Agreement.** An individual who signs a contract or commitment that does not become binding until the professional organization's representative or agent also signs the document is ineligible, even if the contract remains unsigned by the other parties until after the student-athlete's eligibility is exhausted. *(Revised: 6/6/25 effective 7/1/25)*

## 12.3 Use of Agents. [A]

**12.3.1 Professional Sports Agent. [A]** An individual shall not agree (orally or in writing) to be represented by a professional sports agent for the purpose of marketing athletics ability or reputation in a sport to secure an opportunity as a

professional athlete. An agency contract not specifically limited in writing to a sport or particular sports shall be deemed applicable to all sports. *(Revised: 6/6/25 effective 7/1/25)*

**12.3.1.1 Exception -- Baseball and Men's Ice Hockey -- Before Full-Time Collegiate Enrollment. [A]** In baseball and men's ice hockey, before full-time collegiate enrollment, an individual who is drafted by a professional baseball or men's ice hockey team may be represented by a professional sports agent or attorney during contract negotiations. The individual may not receive benefits (other than representation) from the agent or attorney and must pay the going rate for the representation. If the individual does not sign a contract with the professional team, the agreement for representation with the agent or attorney must be terminated before full-time collegiate enrollment. *(Adopted: 1/15/16, Revised: 1/19/18, 6/6/25 effective 7/1/25)*

**12.3.1.2 Exception -- NCAA-Certified Agents -- Men's Basketball. [A]**

**12.3.1.2.1 NCAA Certification Requirement -- Men's Basketball.** In men's basketball, any individual who solicits a prospective or enrolled student-athlete to enter into an agency contract or attempts to obtain employment for an individual with a professional sports team or organization or as a professional athlete must be certified and maintain active certification per the policies and procedures of the NCAA agent certification program. (See Bylaw 12.3.1.3.) *(Adopted: 6/6/25 effective 7/1/25)*

**12.3.1.2.1.1 Exception.** A family member of a prospective or enrolled student-athlete or an individual acting solely on behalf of a professional sports team or organization is not required to be certified through the NCAA agent certification program. *(Adopted: 6/6/25 effective 7/1/25)*

**12.3.1.2.1.2 Responsibility of NCAA-Certified Agent.** An NCAA-certified agent is presumed responsible for the actions of all employees who report, directly or indirectly, to the NCAA-certified agent. Improper conduct of an NCAA-certified agent's employees shall subject the agent to disciplinary action pursuant to the NCAA agent certification program. *(Adopted: 6/6/25 effective 7/1/25)*

**12.3.1.2.2 Elite Senior Prospective Student-Athletes. [A]** In men's basketball, on or after July 1 immediately before the prospective student-athlete's senior year in high school, a prospective student-athlete identified as an elite senior in accordance with established policies and procedures may be represented by an NCAA-certified agent (see Bylaw 12.02.1.2). *(Adopted: 8/8/18 Applicability to be determined after NBA and NBPA evaluation of, and determination permitting, the eligibility for high school students to enter the NBA draft., Revised: 6/12/19, 6/6/25 effective 7/1/25)*

**12.3.1.2.3 Enrolled Student-Athletes and Two-Year College Prospective Student-Athletes -- After Request for Evaluation From NBA Undergraduate Advisory Committee. [A]** In men's basketball, after the conclusion of the playing season, a student-athlete or a two-year college prospective student-athlete who has requested an evaluation from the NBA Undergraduate Advisory Committee may be represented by an NCAA-certified agent (see Bylaw 12.02.1.2). *(Adopted: 8/8/18, Revised: 6/6/25 effective 7/1/25)*

**12.3.1.2.4 Expenses From an NCAA-Certified Agent. [A]** *(Revised: 6/6/25 effective 7/1/25)*

**12.3.1.2.4.1 Expenses Before Agreement. [A]** Before signing a written agreement with an NCAA-certified agent, a prospective student-athlete or student-athlete (and family members) who is eligible to be represented by an NCAA-certified agent may receive transportation and meals from an NCAA-certified agent in the locale where the prospective student-athlete or student-athlete is located (e.g., locale of home or institution) in conjunction with the process to select an agent. *(Adopted: 8/8/18 For an elite senior high school prospective student-athlete, effective date to be determined after NBA and NBPA evaluation of, and determination permitting, the eligibility for high school students to enter the NBA draft. Expenses permissible after appropriate changes to the Uniform Athlete Agent Act, Revised Uniform Athlete Agent Act and relevant state laws., Revised: 6/6/25 effective 7/1/25)*

**12.3.1.2.4.2 Expenses After Agreement. [A]** After signing a written agreement with an NCAA-certified agent, the agent may provide the prospective student-athlete or student-athlete (and family members) with transportation, lodging and meals associated with meeting with the agent or a professional team. *(Adopted: 8/8/18 For an elite senior high school prospective student-athlete, effective date to be determined after NBA and NBPA evaluation of, and determination permitting, the eligibility for high school students to enter the NBA draft. For an enrolled student-athlete or two-year college prospective student-athlete, effective immediately., Revised: 6/6/25 effective 7/1/25)*

**12.3.1.2.5 No Missed Class Time. [A]** A prospective or enrolled student-athlete shall not miss class in conjunction with the agent selection process or to meet with an agent or professional team. *(Adopted: 8/8/18, Revised: 6/6/25 effective 7/1/25)*

**12.3.1.2.6 Written Agreement. [A]** An agreement between a prospective student-athlete or student-athlete and an NCAA-certified agent shall be in writing. An agreement that involves a prospective student-athlete shall be disclosed to

the NCAA national office. An agreement that involves a student-athlete shall be disclosed to the student-athlete's institution. If a high school prospective student-athlete does not sign a contract with a professional team, the agreement must be terminated before full-time enrollment. If a student-athlete or two-year college prospective student-athlete does not sign a contract with a professional team, the agreement must be terminated before full-time enrollment in the ensuing regular academic term. *(Adopted: 8/8/18, Revised: 6/6/25 effective 7/1/25)*

### 12.3.1.2.7 Compensation for Representation. [A] A prospective student-athlete or student-athlete is not required to compensate an NCAA-certified agent for services provided. *(Adopted: 8/8/18, Revised: 6/6/25 effective 7/1/25)*

### 12.3.1.3 Representation for Future Negotiations. [A] An individual shall be ineligible per Bylaw 12.3.1 if the individual enters into an oral or written agreement with an agent for representation in future professional sports negotiations that are to take place after the individual has completed eligibility in that sport.

### 12.3.1.4 Benefits from Prospective Agents. [A] An individual (or the individual's family members or friends) shall not accept transportation or other benefits from a professional sports agent. *(Revised: 1/14/97, 1/16/19, 6/6/25 effective 7/1/25)*

### 12.3.1.5 Legal Counsel. [A] Securing advice from a lawyer concerning a proposed professional sports contract shall not be considered contracting for representation by an agent under this rule, unless the lawyer also represents the individual in negotiations for such a contract. *(Revised: 6/6/25 effective 7/1/25)*

#### 12.3.1.5.1 Presence of a Lawyer at Negotiations. [A] A lawyer may not be present during discussions of a contract offer with a professional sports organization or have direct contact (e.g., in person, telephone, electronic correspondence) with a professional sports organization on behalf of the individual. A lawyer's presence during such discussions is considered representation by an agent. *(Revised: 6/6/25 effective 7/1/25)*

## 12.3.2 Professional Sports Counseling Panel. [A] It is permissible for an authorized institutional professional sports counseling panel to: *(Adopted: 1/16/93, Revised: 1/11/94, 1/16/10, 6/6/25 effective 7/1/25)*

(a) Advise a student-athlete about a future professional career;

(b) Assist a student-athlete with arrangements for securing a loan for the purpose of purchasing insurance against a disabling injury or illness and with arrangements for purchasing such insurance;

(c) Review a proposed professional sports contract;

(d) Meet with the student-athlete and representatives of professional teams;

(e) Communicate directly with representatives of a professional athletics team to assist in securing a tryout with that team for a student-athlete;

(f) Assist the student-athlete in the selection of an agent by participating with the student-athlete in interviews of agents, by reviewing written information player agents send to the student-athlete and by having direct communication with those individuals who can comment about the abilities of an agent (e.g., other agents, a professional league's players association); and

(g) Visit with player agents or representatives of professional athletics teams to assist the student-athlete in determining market value (e.g., potential salary, draft status).

### 12.3.2.1 Appointment by President or Chancellor. [A] This panel shall consist of at least three persons appointed by the institution's president or chancellor (or a designated representative from outside the athletics department). *(Revised: 3/8/06, 6/6/25 effective 7/1/25)*

### 12.3.2.2 Composition. [A] The majority of panel members shall be full-time employees outside the institution's athletics department. No sports agent or any person employed by a sports agent or agency may be a member of the panel. All panel members shall be identified to the NCAA national office. *(Revised: 1/11/94, 1/10/05, 1/20/17 effective 8/1/17, 6/6/25 effective 7/1/25)*

## 12.4 Employment Unrelated to Name, Image and Likeness Activities. Compensation for employment unrelated to name, image and likeness activities (see Bylaw 22) may be paid to a student-athlete: [R] *(Revised: 6/6/25 effective 7/1/25)*

(a) Only for work actually performed; and

(b) At a rate commensurate with the going rate in that locality for similar services.

## 12.5 Athletics Eligibility Requirements. *(Revised: 6/6/25 effective 7/1/25)*

**12.5.1 Postseason and Regular-Season Competition.** To be eligible for regular-season competition, NCAA championships, and for postseason football bowl games, the student-athlete shall meet all eligibility requirements. *(Revised: 6/6/25 effective 7/1/25)*

**12.5.1.1 Postseason Competition -- Midyear Enrollees -- Football. [FBS/FCS]** In football, a midyear enrollee (freshman or transfer) is not eligible to participate in postseason competition that occurs before or during the student-athlete's initial term of full-time enrollment at the institution. *(Adopted: 6/13/18, Revised: 6/6/25 effective 7/1/25)*

**12.5.2 Student-Athlete Statement.** *(Revised: 6/6/25 effective 7/1/25)*

**12.5.2.1 Content and Purpose.** Before participation in intercollegiate competition each academic year, a student-athlete shall sign a statement in a form prescribed by the Legislative Committee in which the student-athlete submits information related to eligibility, recruitment, financial aid, previous positive-drug tests administered by any other athletics organization and involvement in organized gambling activities related to intercollegiate or professional athletics competition under the governing legislation. Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition. Violations of this bylaw do not affect a student-athlete's eligibility if the violation occurred due to an institutional administrative error or oversight, and the student-athlete subsequently signs the form; however, the violation shall be considered an institutional violation per Bylaw 8.01.3. *(Revised: 1/10/92 effective 8/1/92, 1/14/97, 2/19/97, 4/24/03, 11/1/07 effective 8/1/08, 8/7/14, 10/4/17, 6/6/25 effective 7/1/25)*

**12.5.2.2 Administration.** The statement shall be administered to each student-athlete by the athletics director or the athletics director's designee before the student's participation in intercollegiate competition each academic year, and the statement shall be available for examination upon request by an authorized representative of the NCAA. *(Revised: 8/4/89, 1/9/06 effective 8/1/06, 7/30/10, 1/23/19, 6/6/25 effective 7/1/25)*

**12.5.2.3 Institutional Responsibility -- Notification of Positive Test.** The institution shall promptly notify the NCAA's chief medical officer, in writing, regarding a student-athlete's disclosure of a previous positive test for banned substances administered by any other athletics organization. *(Adopted: 1/14/97 effective 8/1/97, Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.5.3 Drug-Testing Consent Form.** *(Revised: 6/6/25 effective 7/1/25)*

**12.5.3.1 Content and Purpose.** Each academic year, a student-athlete shall sign a form maintained by the Committee on Competitive Safeguards and Medical Aspects of Sports and approved by the Legislative Committee in which the student consents to be tested for the use of drugs prohibited by NCAA legislation. Failure to complete and sign the consent form before practice or competition, or before the Monday of the fourth week of classes (whichever occurs first) shall result in the student-athlete's ineligibility for participation (practice and competition) in all intercollegiate athletics. *(Adopted: 1/10/92 effective 8/1/92, Revised: 1/16/93, 1/10/95 effective 8/1/95, 1/14/97, 4/24/03, 8/5/04, 11/1/07 effective 8/1/08, 7/30/10, 8/7/14, 10/4/17, 6/6/25 effective 7/1/25)*

**12.5.3.2 Administration.** The following procedures shall be used in administering the form (see Bylaw 20.2.4.8): *(Adopted: 1/10/92 effective 8/1/92, Revised: 4/27/00, 7/30/10, 7/31/14, 1/23/19, 6/6/25 effective 7/1/25)*

(a) The consent form shall be administered individually to each student-athlete by the athletics director or the athletics director's designee each academic year; and

(b) The athletics director or the athletics director's designee shall disseminate the list of banned drug classes to all student-athletes and educate them about products that might contain banned drugs. All student-athletes are to be notified that the list may change during the academic year, that updates may be found on the NCAA website (www.ncaa.org) and informed of the appropriate athletics department procedures for disseminating updates to the list; and

(c) The consent form shall be available for examination upon request by an authorized representative of the NCAA.

**12.5.3.3 Exception -- 14-Day Grace Period.** A student-athlete who is "trying out" for a team is not required to complete the form until 14 days from the first date the student-athlete engages in countable athletically related activities or before the student-athlete participates in a competition, whichever occurs earlier. *(Adopted: 4/27/06 effective 8/1/06, Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.5.3.4 Effect of Violation.** A violation of Bylaw 12.5.3 or its subsections shall be considered institutional violations per Bylaw 8.01.3; however, a violation shall not affect the student-athlete's eligibility, provided the student-athlete signs the consent form. *(Revised: 4/28/05 effective 8/1/05, 7/30/10, 6/6/25 effective 7/1/25)*

**12.5.4 Student-Athlete Health Insurance Portability and Accountability Act (HIPAA) Authorization/ Buckley Amendment Consent Form -- Disclosure of Protected Health Information.** *(Revised: 6/6/25 effective 7/1/25)*

**12.5.4.1 Content and Purpose.** Each academic year, a student-athlete may voluntarily sign a statement in a form maintained by the Committee on Competitive Safeguards and Medical Aspects of Sports and approved by the Legislative Committee in which the student-athlete authorizes/consents to the institution's physicians, athletics directors and health care personnel to disclose the student-athlete's injury/illness and participation information associated with the student-athlete's training and participation in intercollegiate athletics to the NCAA and to its Injury Surveillance Program (ISP), agents and employees for the purpose of conducting research into the reduction of athletics injuries. The authorization/consent by the student-athlete is voluntary and is not required for the student-athlete to be eligible to participate. **[D]** *(Adopted: 4/24/03, Revised: 8/7/03 effective 8/1/04, 11/1/07 effective 8/1/08, 8/7/14, 10/4/17, 6/6/25 effective 7/1/25)*

**12.5.4.2 Administration.** The following procedures shall be used in administering the form: **[D]** *(Adopted: 4/24/03, Revised: 8/7/03 effective 8/1/04, 7/30/10, 1/23/19, 6/6/25 effective 7/1/25)*

(a) The authorization/consent form shall be administered individually to each student-athlete by the athletics director or the athletics director's designee before the student-athlete's participation in intercollegiate athletics each academic year.

(b) Signing the authorization/consent shall be voluntary and is not required by the student-athlete's institution for medical treatment, payment for treatment, enrollment in a health plan or for any benefits (if applicable) and is not required for the student-athlete to be eligible to participate.

**12.5.5 Eligibility Requirements for Male Students to Practice With Women's Teams.** A male student may engage in practice sessions with women's teams subject to the following conditions: *(Revised: 5/12/05, 5/29/08, 7/31/14, 4/26/17, 7/31/23, 6/6/25 effective 7/1/25)*

(a) A male student who practices with an institution's women's team must be verified as eligible for practice in accordance with Bylaw 14.2.1 and must have eligibility remaining under the five-year rule (see Bylaw 12.6.1);

(b) It is not permissible for a recruited male student-athlete who is serving an academic year of residence as a nonqualifier to participate in practice sessions with a women's team. A nonrecruited male student who is serving an academic year of residence as a nonqualifier may participate in practice sessions with a women's team; and

(c) A male student who practices with an institution's women's basketball team may participate in required summer athletic activities, provided the student was enrolled full time at the conclusion of the regular academic term (e.g., spring semester or quarter) immediately preceding the institution's summer term.

## 12.6 Seasons of Competition: Five-Year Rule. A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.3 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the student-athlete completes all seasons of participation in all sports within the time periods specified below. *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent on an official religious mission, in the armed services or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces of the student's home country is considered equivalent to such service in the United States. *(Revised: 4/2/10, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4) when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum full-time program of studies, as determined by the institution, and attends the student's first day of classes for that term (see Bylaw 12.6.2). *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.1.2 Service Exceptions to the Five-Year Rule.** Time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government is excepted from the application of the five-year rule. Among such services that qualify a student-athlete for an extension of the five-year rule are: *(Revised: 4/2/10, 7/31/14, 6/6/25 effective 7/1/25)*

(a) Military Sea Transport Service;

(b) Peace Corps; or

(c) Service as a conscientious objector ordered by the Selective Service Commission (or the equivalent authority in a foreign nation) in lieu of active military duty.

**12.6.1.2.1 Elapsed Time/Service to Enrollment.** If a student-athlete enrolls in a regular term of a collegiate institution at the first opportunity following completion of any one of the commitments described in the exceptions to this bylaw, the elapsed time (the exact number of calendar days) between completion of the commitment and the first

opportunity for enrollment may be added to the exact number of days served on active duty in the armed services, with foreign aid services or on official religious missions and will not count toward the student-athlete's five years of eligibility. It is not permissible to extend the five-year period by any additional time beyond the first opportunity to enroll (the opening day of classes of the first regular term at the institution in which the student-athlete enrolls as a regular student immediately following the termination of the active-duty commitment). *(Revised: 4/2/10, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.1.2.2 Collegiate Enrollment Concurrent With Service Assignment.** Any time in which a student-athlete is enrolled for a minimum full-time load as a regular student in a collegiate institution while simultaneously on active duty in the U.S. military, on an official religious mission or with a recognized foreign aid service of the U.S. government shall count against the five calendar years in which the student-athlete's seasons of eligibility must be completed. *(Revised: 4/2/10, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.1.3 Academic Study Abroad Exception.** Time spent participating in a full-time study-abroad program during a regular term of an academic year may be excepted from the application of the five-year rule, provided: *(Adopted: 1/19/17 effective 8/1/17, Revised: 6/6/25 effective 7/1/25)*

(a) The institution recognizes the student-athlete as a full-time student at the time of participation in the study-abroad program;

(b) At the time of participation in the study-abroad program, the student-athlete is academically eligible for competition and is not subject to an athletically related suspension;

(c) The student-athlete does not participate in practice or competition with the institution's team and does not engage in outside competition while participating in the study-abroad program;

(d) The student-athlete satisfactorily completes the study-abroad program; and

(e) The student-athlete earns a baccalaureate degree within five years or fewer.

**12.6.1.4 Internship or Cooperative Educational Work Experience Program Exception.** Time spent participating in a full-time internship or cooperative educational work experience program during a regular term of an academic year may be excepted from the application of the five-year rule, provided: *(Adopted: 1/19/17 effective 8/1/17, Revised: 6/6/25 effective 7/1/25)*

(a) The institution recognizes the student-athlete as a full-time student at the time of participation in the internship or cooperative educational work experience program;

(b) At the time of participation in the internship or cooperative educational work experience program, the student-athlete is academically eligible for competition and is not subject to an athletically related suspension;

(c) The student-athlete does not participate in practice or competition with the institution's team and does not engage in outside competition while participating in the internship or cooperative educational work experience program;

(d) The student-athlete satisfactorily completes the internship or cooperative educational work experience program; and

(e) The student-athlete earns a baccalaureate degree within five years or fewer.

**12.6.1.5 Pregnancy Exception.** A member institution may approve a one-year extension of the five-year period of eligibility for a female student-athlete for reasons of pregnancy. *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.1.6 Athletics Activity Waiver.** The Committee on Student-Athlete Reinstatement, or a committee designated by it, shall have the authority to waive this provision by a two-thirds majority of its members present and voting to permit student-athletes to participate in: *(Revised: 1/10/91, 1/9/96, 1/14/12, 7/31/14, 10/17/19, 1/22/20, 6/6/25 effective 7/1/25)*

(a) Official Pan American, Parapan American, World Championships, World Cup, World University Games (Universiade), World University Championships, Olympic and Paralympic training, tryouts and competition;

(b) Officially recognized training and competition directly qualifying participants for final Olympic or Paralympic tryouts; or

(c) Official tryouts and competition involving national teams sponsored by the appropriate national governing bodies of the U.S. Olympic and Paralympic Committee (or, for student-athletes representing another nation, the equivalent organization of that nation, or, for student-athletes competing in a non-Olympic or non-Paralympic sport, the equivalent organization of that sport).

**12.6.1.6.1 Junior Level Competition.** The athletics activity waiver does not apply to junior level training, tryouts or competition (e.g., Youth Olympic Games, U20 World Cup, Junior National Teams) that may be associated with the training, tryouts or competition specified in Bylaw 12.6.1.6. *(Adopted: 2/17/17, Revised: 6/6/25 effective 7/1/25)*

**12.6.1.6.2 Athletics Activity Waiver Criteria.** Extensions of the five-year period of eligibility for student-athletes by the Committee on Student-Athlete Reinstatement, or its designated committee, shall be based on the following criteria: The member institution in which the student-athlete is enrolled must establish to the satisfaction of the Committee on Student-Athlete Reinstatement (by objective evidence) that the student-athlete was unable to participate in intercollegiate athletics as a result of participation in one of the activities listed in the above legislation for a specific period of time. Further, such an extension shall be limited to one time and for a period not to exceed one year per student-athlete, per sport. *(Revised: 8/11/98, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.1.7 Five-Year Rule Waiver.** The Committee on Student-Athlete Reinstatement, or its designated committee, by a two-thirds majority of its members present and voting, may approve waivers of the five-year rule as it deems appropriate. *(Revised: 7/30/10, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.1.7.1 Waiver Criteria.** A waiver of the five-year period of eligibility is designed to provide a student-athlete with the opportunity to participate in four seasons of intercollegiate competition within a five-year period. This waiver may be granted, based upon objective evidence under the following circumstances: *(Revised: 4/17/91, 1/11/94, 8/10/94, 10/12/95, 4/27/00, 7/30/10, 7/31/14, 4/25/18, 5/19/22 applicable to a student-athlete who qualifies for a waiver that would provide the opportunity to participate in four seasons of competition within a five-year period, 6/6/25 effective 7/1/25)*

(a) The student-athlete did not use a season of intercollegiate competition due to an institutional decision to redshirt the student-athlete; the student-athlete was listed on the institution's squad list and was eligible for competition during the segment of the season that concludes with the NCAA championship; and the student-athlete was deprived of the opportunity to participate in intercollegiate competition in one other season due to circumstances beyond the control of the student-athlete or institution. (The use of this provision is limited to one time in a student-athlete's period of eligibility); or

(b) The student-athlete is deprived of the opportunity to participate for more than one season in his or her sport within the five-year period of eligibility for reasons that are beyond the control of the student-athlete or the institution.

**12.6.1.7.1.1 Circumstances Beyond Control.** Circumstances considered to be beyond the control of the student-athlete or the institution and do not cause a participation opportunity to be used shall include, but are not limited to, the following: *(Adopted: 8/10/94, Revised: 10/12/95, 8/12/97, 1/9/06, 7/30/10, 7/31/14, 6/6/25 effective 7/1/25)*

(a) Situations clearly supported by contemporaneous medical documentation, which states that a student-athlete is unable to participate in intercollegiate competition as a result of incapacitating physical or mental circumstances;

(b) The student-athlete is unable to participate in intercollegiate athletics as a result of a life-threatening or incapacitating injury or illness suffered by a member of the student-athlete's immediate family, which clearly is supported by contemporaneous medical documentation;

(c) Reliance by the student-athlete upon written, contemporaneous, clearly erroneous academic advice provided to the student-athlete from a specific academic authority from a collegiate institution regarding the academic status of the student-athlete, which directly leads to the student-athlete not being eligible to participate and, but for the clearly erroneous advice, the student-athlete would have established eligibility for intercollegiate competition;

(d) Natural disasters (e.g., earthquake, flood); and

(e) Extreme financial difficulties as a result of a specific event (e.g., layoff, death in the family) experienced by the student-athlete or by an individual upon whom the student-athlete is legally dependent, which prohibit the student-athlete from participating in intercollegiate athletics. These circumstances must be clearly supported by objective documentation (e.g., decree of bankruptcy, proof of termination) and must be beyond the control of the student-athlete or the individual upon whom the student-athlete is legally dependent.

**12.6.1.7.1.2 Circumstances Within Control.** Circumstances that are considered to be within the control of the student-athlete or the institution and cause a participation opportunity to be used include, but are not limited to, the following: *(Adopted: 8/10/94, Revised: 10/12/95, 10/9/96, 7/30/10, 7/31/14, 6/6/25 effective 7/1/25)*

(a) A student-athlete's decision to attend an institution that does not sponsor the student-athlete's sport, or decides not to participate at an institution that does sponsor the sport;

(b) An inability to participate due to failure to meet institutional/conference or NCAA academic requirements, or disciplinary reasons or incarceration culminating in or resulting from a conviction;

(c) Reliance by a student-athlete upon misinformation from a coaching staff member;

(d) Redshirt year;

(e) Ineligibility to participate as a result of a transfer year of residence or fulfilling a condition for restoration of eligibility; and

(f) A student-athlete's lack of understanding regarding the specific starting date of the five-year period of eligibility.

**12.6.1.7.1.3 Circumstances of Extraordinary or Extreme Hardship.** The Committee on Student-Athlete Reinstatement reserves the right to review requests that do not meet the more-than-one-year criteria of this waiver for circumstances of extraordinary or extreme hardship. *(Revised: 4/25/18, 6/6/25 effective 7/1/25)*

**12.6.1.7.1.4 Practice While Waiver is Pending.** A student-athlete who has exhausted five years of eligibility may continue to practice (but not compete) for a maximum of 30 consecutive calendar days, provided the student-athlete's institution has submitted a waiver request. The student-athlete may not commence practice until the institution has filed such a request. Further, if such a request is denied before exhausting the 30-day practice period, the student-athlete must cease all practice activities upon the institution's notification of the denial. *(Revised: 4/25/18, 6/6/25 effective 7/1/25)*

**12.6.2 Additional Applications of the Five-Year Rule.** *(Revised: 6/6/25 effective 7/1/25)*

**12.6.2.1 Athletics Competition.** Even though an individual is enrolled for less than a minimum full-time program of studies at a collegiate institution, the individual's five-year period of eligibility begins if the individual represents the institution in intercollegiate athletics. *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.2.2 Nonrecognized College.** Enrollment in a postsecondary, noncollegiate institution (e.g., technical school, seminary or business college) in the United States that is not accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree, constitutes enrollment in the application of the five-year rule only if: *(Revised: 1/10/90, 8/8/02, 7/31/14, 6/6/25 effective 7/1/25)*

(a) The student is enrolled in a minimum full-time program of studies at such an institution that conducts an intercollegiate athletics program; or

(b) The student, whether enrolled for a minimum full-time program of studies or not, represents the institution in intercollegiate athletics.

**12.6.2.3 Joint College/High School Program.** A student-athlete's eligibility under the five-year rule does not begin while a student is enrolled in a collegiate institution in a joint high school/college academic program for high school students in which the courses count as both high school graduation credit and college credit, provided the student has not officially graduated from high school and does not participate in intercollegiate athletics while enrolled in the joint program. *(Revised: 11/1/01 effective 8/1/02, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.2.4 Vocational Program.** A student-athlete's eligibility under the five-year rule does not begin while the student is enrolled in a minimum full-time program of studies as a part of a special vocational program that combines enrollment in regular college courses and participation in vocational training courses, provided the student is not considered to be regularly matriculated by the institution, does not go through the customary registration and testing procedures required of all regular entering students and is not eligible for the institution's extracurricular activities, including athletics. *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.2.5 Eligibility for Practice.** To be eligible to participate in organized practice sessions, a student-athlete shall have eligibility remaining under the five-year rule (see Bylaws 14.2.1.7 and 14.2.1.8). **[D]** *(Revised: 8/5/04, 7/31/14, 3/27/18, 6/6/25 effective 7/1/25)*

**12.6.3 Criteria for Determining Season of Competition.** *(Revised: 6/6/25 effective 7/1/25)*

**12.6.3.1 Minimum Amount of Competition.** Any competition, regardless of time, during a season in an intercollegiate sport shall be counted as a season of competition in that sport, except as provided in Bylaws 12.6.3.1.1, 12.6.3.1.2, 12.6.3.1.3, 12.6.3.1.4, 12.6.3.1.5 and 12.6.3.1.6. This provision is applicable to intercollegiate athletics competition conducted by a two-year or four-year collegiate institution at the varsity or subvarsity level. *(Revised: 1/11/94, 4/28/05 effective 8/1/05, 5/9/06, 1/16/10 effective 8/1/10, 7/31/14, 8/8/18 effective 8/1/18, 6/6/25 effective 7/1/25)*

**12.6.3.1.1 Two-Year College Scrimmages.** A two-year college prospective student-athlete may compete in a scrimmage as a member of a two-year college team without counting such competition as a season of competition, provided the competition meets all of the following conditions: *(Adopted: 1/11/94, Revised: 5/9/06, 7/31/14, 6/6/25 effective 7/1/25)*

(a) The scrimmage is approved by the two-year college;

(b) No official score is kept;

(c) No admission is charged;

(d) No official time is kept;

(e) The scrimmage is played before the two-year college's first regularly scheduled outside competition; and

(f) The prospective student-athlete participates in not more than two such scrimmages or dates of competition per academic year.

**12.6.3.1.2 Exception -- Nonchampionship Segment Competition -- Field Hockey, Men's Soccer, Women's Soccer, Women's Volleyball and Men's Water Polo.** In field hockey, men's soccer, women's soccer, women's volleyball and men's water polo, a student-athlete may engage in intercollegiate competition during the segment of the playing season that does not conclude with the NCAA championship without using a season of competition, provided the student-athlete was academically eligible during the segment that concludes with the NCAA championship. *(Adopted: 11/1/01, Revised: 8/8/02, 10/31/02, 5/9/06, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.3.1.3 Exception -- Nonchampionship Segment Competition -- Baseball, Women's Beach Volleyball, Lacrosse, Softball, Men's Volleyball and Women's Water Polo.** In baseball, women's beach volleyball, lacrosse, softball, men's volleyball and women's water polo, a student-athlete may engage in intercollegiate competition during the segment of the playing season that does not conclude with the NCAA championship without using a season of competition, provided the student-athlete remains academically eligible during the segment that concludes with the NCAA championship. *(Adopted: 6/28/17, Revised: 6/6/25 effective 7/1/25)*

**12.6.3.1.4 Preseason Exhibitions/Preseason Practice Scrimmages.** A student-athlete may compete in preseason exhibition contests and preseason practice scrimmages (as permitted in the particular sport per Bylaw 17) without counting such competition as a season of competition. *(Revised: 5/9/06, 7/31/14, 4/26/17, 6/6/25 effective 7/1/25)*

**12.6.3.1.5 Alumni Game, Fundraising Activity or Celebrity Sports Activity.** A student-athlete may engage in outside competition in either one alumni game, one fundraising activity or one celebrity sports activity during a season without counting such competition as a season of competition, provided the event is exempted from the institution's maximum number of contests or dates of competition as permitted in the particular sport per Bylaw 17. *(Adopted: 1/16/10 effective 8/1/10, Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.3.1.6 Exception -- Football. [FBS/FCS]** In football, a student-athlete representing a Division I institution may compete in up to four contests in a season without using a season of competition. *(Adopted: 8/8/18 effective 8/1/18 for competition that occurs on or after 8/1/18, Revised: 6/12/19, 6/6/25 effective 7/1/25)*

**12.6.3.1.7 Exception -- Men's Wrestling.** In men's wrestling, a student-athlete representing a Division I institution may compete in up to five dates of competition during the student-athlete's initial year of collegiate enrollment without using a season of competition. Competition in a conference championship tournament, the NCAA Division I Wrestling Championships, or any other season-ending championship event shall not be exempted from counting as a season of competition. *(Adopted: 6/30/22 effective 8/1/22, Revised: 6/6/25 effective 7/1/25)*

**12.6.3.2 Delayed Enrollment -- Seasons of Competition.** *(Revised: 6/6/25 effective 7/1/25)*

**12.6.3.2.1 Sports Other Than Men's Ice Hockey, Skiing and Tennis.** In sports other than men's ice hockey, skiing and tennis, a student-athlete who does not enroll in a collegiate institution as a full-time student in a regular academic term during a one-year period (by October 1 or March 1 immediately after one year has elapsed) after the student-athlete's high school graduation date or the graduation date of the student-athlete's class (as determined by the first year of high school enrollment or the international equivalent as specified in the NCAA Guide to International Academic Standards for Athletics Eligibility and based on the prescribed educational path in the student-athlete's country), whichever occurs earlier, shall be subject to a delayed enrollment condition based on the number of contests (or dates of competition) in which the student-athlete participated as a percentage of the maximum number of permissible contests (or dates of competition) in the sport per NCAA Bylaw 17 for each calendar year after the one-year period and before full-time collegiate enrollment in which the student-athlete has participated in organized competition per Bylaw 12.02.6. (See Figure 12-2.) *(Adopted: 1/9/96 effective 8/1/97, Revised: 4/29/04 effective 8/1/04, 4/20/09, 4/29/10 effective 8/1/11, 7/31/14, 4/26/23, 1/10/24 effective 8/1/24 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/24, 6/6/25 effective 7/1/25)*

**12.6.3.2.1.1 Exception -- Transfer Student.** A student-athlete is not required to fulfill an academic year of residence before being eligible to represent the institution in intercollegiate competition, provided the student-athlete: *(Adopted: 1/23/19, Revised: 6/6/25 effective 7/1/25)*

(a) Attended a collegiate institution (or institutions) as a full-time student for at least two semesters or three quarters (excluding summer terms); and

(b) Satisfactorily completed an average of at least 12 semester or quarter hours of transferable-degree credit for each term of full-time attendance.

**12.6.3.2.1.2 Exception -- National/International Competition.** For a maximum of one year after a prospective student-athlete's first opportunity to enroll full time in a collegiate institution following the one-year time period after the prospective student-athlete's high school graduation date or the graduation date of the prospective student-athlete's class, whichever occurs earlier, participation in the following organized national/international competition is exempt from application of Bylaw 12.6.3.2.1: *(Adopted: 1/15/11 effective 8/1/11, Revised: 1/14/12, 7/31/14, 4/25/18 effective 8/1/18 applicable to a student-athlete who initially enrolls full time in a collegiate institution on or after 8/1/18, 10/17/19, 1/22/20, 6/6/25 effective 7/1/25)*

(a) Official Olympic Games, Paralympic Games, Pan American Games, Parapan American Games, World Championships, World Cup, World University Games (Universiade) and World University Championships and established regional competition (e.g., North American Championships, European Championships) or the junior level equivalents (e.g., Youth Olympic Games, U20 World Cup, junior national teams);

(b) Officially recognized competition from which participants may be selected to a national team that will participate in the Olympic Games, Paralympic Games, Pan American Games, Parapan American Games, World Championships, World Cup or World University Games (Universiade), World University Championships and established regional competition (e.g., North American Championships, European Championships) or the junior level equivalents (e.g., Youth Olympic Games, U20 World Cup, junior national teams) and final tryout competition from which participants are selected for such teams; or

(c) Official competition involving a national team sponsored by the appropriate national governing body of the U.S. Olympic and Paralympic Committee (or, for student-athletes representing another nation, the equivalent organization of that nation).

**12.6.3.2.1.3 Service Exceptions.** Participation in organized competition during time spent in the armed services, on an official religious mission or with a recognized foreign aid service of the U.S. government is exempt from the application of Bylaw 12.6.3.2.1. Additionally, if a student-athlete enrolls as a full-time student in a regular term of a collegiate institution at the first opportunity following completion of the service commitment, the period between completion of the service commitment and the first opportunity to enroll is exempt from the application of Bylaw 12.6.3.2.1. *(Adopted: 4/25/18, Revised: 1/23/19, 6/12/19, 6/6/25 effective 7/1/25)*

**12.6.3.2.1.4 Track and Field and Cross Country.** A student-athlete who has participated in organized competition after the one-year time period (the next opportunity to enroll after one calendar year has elapsed) and before full-time collegiate enrollment during a cross country, indoor track and field, or outdoor track and field season (as opposed to general road racing events) shall be charged with a season of competition in the sport in which the student-athlete has participated for each calendar year after the one-year time period in which the student-athlete participated in organized competition. *(Adopted: 4/29/10 effective 8/1/11 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/11, Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.3.2.1.5 Road Racing.** A student-athlete who has participated in road racing activities after the one-year time period (the next opportunity to enroll after one calendar year has elapsed) and before full-time collegiate enrollment shall be charged with a season of competition in each of the sports of cross country, indoor track and field, outdoor track and field, and triathlon for each calendar year after the one-year time period in which the student-athlete participates in organized competition. *(Adopted: 4/29/10 effective 8/1/11 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/11, Revised: 1/18/14 effective 8/1/14, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.3.2.2 Tennis.** In tennis, a student-athlete who does not enroll in a collegiate institution as a full-time student in a regular academic term within six months (by October 1 or March 1 immediately after six months have elapsed) after the student-athlete's high school graduation date or the graduation date of the student-athlete's class (as determined by the first year of high school enrollment or the international equivalent as specified in the NCAA Guide to International Academic Standards for Athletics Eligibility and based on the prescribed educational path in the student-athlete's country), whichever occurs earlier, shall be subject to a delayed enrollment condition based on the number of dates of

competition in which the student-athlete participated as a percentage of the maximum number of permissible dates of competition in the sport per NCAA Bylaw 17 for each calendar year after the six-month period and before full-time collegiate enrollment in which the student-athlete has participated in organized competition per Bylaw 12.02.6. (See Figure 12-2.) *(Adopted: 4/29/10 effective 8/1/12, Revised: 7/31/14, 4/26/23, 1/10/24 effective 8/1/24 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/24, 6/6/25 effective 7/1/25)*

**12.6.3.2.2.1 Exception -- Transfer Student.** A student-athlete is not required to fulfill an academic year of residence before being eligible to represent the institution in intercollegiate competition, provided the student-athlete: *(Adopted: 1/23/19, Revised: 6/6/25 effective 7/1/25)*

(a) Attended a collegiate institution (or institutions) as a full-time student for at least two semesters or three quarters (excluding summer terms); and

(b) Satisfactorily completed an average of at least 12 semester or quarter hours of transferable-degree credit for each term of full-time attendance.

**12.6.3.2.2.2 Exception -- National/International Competition.** For a maximum of one year after a prospective student-athlete's first opportunity to enroll full time in a collegiate institution following the six-month time period after the prospective student-athlete's high school graduation date or the graduation date of the prospective student-athlete's class, whichever occurs earlier, participation in the following organized national/international competition is exempt from application of Bylaw 12.6.3.2.2: *(Adopted: 1/15/11 effective 8/1/12, Revised: 1/14/12, 7/31/14, 4/25/18 effective 8/1/18, 10/17/19, 1/22/20, 6/6/25 effective 7/1/25)*

(a) Official Olympic Games, Paralympic Games, Pan American Games, Parapan American Games, World Championships, World Cup, World University Games (Universiade) and World University Championships competition or the junior level equivalents (e.g., Youth Olympic Games, U20 World Cup, junior national teams);

(b) Officially recognized competition from which participants may directly qualify for final tryouts for a national team that will participate in the Olympic Games, Paralympic Games, Pan American Games, Parapan American Games, World Championships, World Cup or World University Games (Universiade), World University Championships or the junior level equivalent (e.g., Youth Olympic Games, U20 World Cup, junior national teams) and final tryout competition from which participants are selected for such teams; or

(c) Official competition involving a national team sponsored by the appropriate national governing body of the U.S. Olympic and Paralympic Committee (or, for student-athletes representing another nation, the equivalent organization of that nation.)

**12.6.3.2.2.3 Service Exceptions.** Participation in organized competition during time spent in the armed services, on an official religious mission or with a recognized foreign aid service of the U.S. government is exempt from the application of Bylaw 12.6.3.2.2. Additionally, if a student-athlete enrolls as a full-time student in a regular term of a collegiate institution at the first opportunity following completion of the service commitment, the period between completion of the service commitment and the first opportunity to enroll is exempt from the application of Bylaw 12.6.3.2.1. *(Adopted: 4/25/18, Revised: 1/23/19, 6/12/19, 6/6/25 effective 7/1/25)*

**12.6.3.2.2.4 Matriculation After 20th Birthday -- Tennis.** In tennis, a student-athlete who is eligible under Bylaw 12.6.3.2.2, but who participates in organized tennis events after the student-athlete's 20th birthday and before full-time enrollment at the certifying institution shall be subject to a delayed enrollment condition based on the number of dates of competition in which the student-athlete participated as a percentage of the maximum number of permissible dates of competition in the sport per NCAA Bylaw 17. (See Figure 12-2.) *(Adopted: 4/29/04 effective 8/1/04, Revised: 6/10/04, 7/31/14, 1/23/19, 1/10/24 effective 8/1/24 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/24, 6/6/25 effective 7/1/25)*

**12.6.3.2.2.4.1 Exception -- Continuous Full-Time Enrollment.** A student-athlete who is eligible under Bylaw 12.6.3.2.2 and who maintained full-time enrollment in a collegiate institution during each regular academic term from initial, full-time enrollment in a collegiate institution to initial, full-time enrollment at the certifying institution is not subject to the application of Bylaw 12.6.3.2.2.4. *(Adopted: 4/25/18, Revised: 6/6/25 effective 7/1/25)*

**12.6.3.2.2.4.2 Exception -- Olympic Games, Paralympic Games, Pan American Games, Parapan American Games, World Championships, World Cup, World University Games (Universiade) and World University Championships Participation.** Participation in the Olympic Games, Paralympic Games, Pan American Games, Parapan American Games, World Championships, World Cup, World University Games (Universiade) and World University Championships or the junior level

equivalents (e.g., Youth Olympic Games, U20 World Cup, junior national teams) is exempt from the application of Bylaw 12.6.3.2.2.4. *(Adopted: 4/26/07 effective 8/1/07, Revised: 1/14/12, 7/31/14, 4/25/18 effective 8/1/18 applicable to a student-athlete who initially enrolls full time in a collegiate institution on or after 8/1/18, 1/22/20, 6/6/25 effective 7/1/25)*

**12.6.3.2.2.4.3 Service Exceptions.** Participation in organized competition during time spent in the armed services, on an official religious mission or with a recognized foreign aid service of the U.S. government is exempt from the application of Bylaw 12.6.3.2.2. Additionally, if a student-athlete enrolls as a full-time student in a regular term of a collegiate institution at the first opportunity following completion of the service commitment, the period between completion of the service commitment and the first opportunity to enroll is exempt from the application of Bylaw 12.6.3.2.1. *(Adopted: 4/25/18, Revised: 1/23/19, 6/12/19, 6/6/25 effective 7/1/25)*

**12.6.3.2.3 Low-level and Minimally Organized Participation.** A student-athlete may be granted relief from delayed enrollment conditions during the athletics eligibility certification process for participation that meets the definition of organized competition (see Bylaw 12.02.) but is determined to be low-level or minimally organized participation. *(Adopted: 1/10/24 effective 8/1/24 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/24, Revised: 6/6/25 effective 7/1/25)*

**12.6.3.3 Participation After 21st Birthday -- Men's Ice Hockey and Skiing.** In men's ice hockey and skiing, any participation as an individual or a team representative in organized sports competition by a prospective student-athlete during each 12-month period after the prospective student-athlete's 21st birthday and before initial, full-time enrollment in a collegiate institution shall result in a delayed enrollment condition based on the number of contests (or dates of competition) in which the prospective student-athlete participated as a percentage of the maximum number of permissible contests (or dates of competition) in the sport per NCAA Bylaw 17. (See Figure 12-2.). Participation in organized competition during time spent on an official religious mission, in the armed services or with recognized foreign aid services of the U.S. government shall be excepted. *(Revised: 1/10/90, 1/16/93, 1/10/95 effective 8/1/95, 1/9/96 effective 8/1/96, 6/10/04, 1/17/09 effective 8/1/10, 4/13/10 effective 8/1/11, 7/31/14, 4/25/18, 1/10/24 effective 8/1/24 applicable to student-athletes who initially enroll full time in a collegiate institution on or after 8/1/24, 6/6/25 effective 7/1/25)*

**12.6.3.4 Foreign-Tour Competition.** A student-athlete who did not compete during the institution's season just completed and who represents the institution in a certified foreign tour after that intercollegiate season and before the start of the next academic year shall not be charged with a season of eligibility (see Bylaw 17.33.1.4). *(Revised: 8/11/98, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.3.5 Participation on an Institution's Club Team.** An individual is charged with a season of competition for participation in intercollegiate competition (see Bylaw 12.02.3) as a member of an institution's club team if that institution sponsored the sport as a varsity intercollegiate sport and as a club sport at the time of participation. *(Adopted: 6/24/09, Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.4 Hardship Waiver.** A student-athlete may be granted an additional year of competition by the conference or the Committee on Student-Athlete Reinstatement for reasons of "hardship." Hardship is defined as an incapacity resulting from an injury or illness that has occurred under all of the following conditions: *(Revised: 1/10/92 effective 8/1/92, 1/14/97, 8/1/97, 4/26/01 effective 8/1/01, 11/1/01, 4/3/02, 8/8/02, 3/10/04, 5/11/05, 9/18/07, 11/1/07 effective 8/1/08, 4/24/08, 7/31/14, 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

(a) The incapacitating injury or illness occurs in one of the four seasons of intercollegiate competition at any two-year or four-year collegiate institutions or occurs after the first day of classes in the student-athlete's senior year in high school;

(b) The injury or illness occurs before the first contest or date of competition of the second half of the playing season that concludes with the NCAA championship in that sport and results in incapacity to compete for the remainder of that playing season; and

(c) The injury or illness occurs when the student-athlete has not participated in more than three contests or dates of competition or 30 percent of the maximum number of contests or dates of competition of the playing season that concludes with the NCAA championship as set forth in Bylaw 17 for the applicable sport plus one contest or date of competition, whichever is greater.

**12.6.4.1 Administration of Hardship Waiver.** The hardship waiver shall be administered by the member conferences or, in the case of an independent member institution, by the Committee on Student-Athlete Reinstatement. *(Revised: 10/28/04, 4/20/09, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.4.1.1 Review of Denied Waiver.** An institution may submit a denied hardship waiver to the Committee on Student-Athlete Reinstatement. The committee shall have the authority to review and determine whether to approve

the waiver based on circumstances that may warrant relief from the application of the legislated waiver criteria. *(Adopted: 4/20/09, Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.4.2 Criteria for Administration of Hardship Waiver.** *(Revised: 6/6/25 effective 7/1/25)*

**12.6.4.2.1 Nature of Injury/Illness.** It is not necessary for the incapacitating injury or illness to be the direct result of the student-athlete's participation in the institution's organized practice or game competition. *(Revised: 11/1/01, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.4.2.2 Medical Documentation.** Contemporaneous or other appropriate medical documentation, from a physician (a medical doctor) who administered care at the time of the injury or illness, that establishes the student-athlete's inability to compete as a result of that injury or illness shall be submitted with any hardship-waiver request. Documentation from an individual other than a physician (e.g., chiropractor, physical therapist) may only be used to support the physician's documentation. For a case involving a psychological or mental illness, the required contemporaneous or other appropriate medical documentation may be provided by an individual (e.g., psychiatrist, psychologist) who is qualified and licensed to diagnose and treat the particular illness. *(Adopted: 4/20/99, Revised: 2/22/01, 7/31/14, 10/17/19, 6/6/25 effective 7/1/25)*

**12.6.4.2.3 First Half and 30 Percent of Season Denominator.** The denominator used to determine the first half and 30 percent of a season is the maximum number of contests or dates of competition of the playing season that concludes with the NCAA championship as set forth in Bylaw 17 for the applicable sport plus one contest or date of competition (see Figure 12-1). *(Revised: 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

**12.6.4.2.3.1 Exception -- Indoor and Outdoor Track and Field.** For an institution that sponsors both indoor and outdoor track and field, the number of completed dates of competition, including postseason competition, in the applicable season (either indoor or outdoor) is used to determine the first half and 30 percent of the season. For an institution that sponsors only indoor or outdoor track and field (but not both), the maximum number of dates of competition of the playing season that concludes with the NCAA championship as set forth in Bylaw 17 plus one date of competition is used to determine the first half and 30 percent of the season. *(Adopted: 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, Revised: 6/6/25 effective 7/1/25)*

**12.6.4.2.3.2 Fraction in the First-Half-of-Season Computation.** A computation of the first-half-of-season that results in a fractional portion of a contest or date of competition shall be rounded up to the next whole number. The first contest or date of competition immediately following the rounded value is the first contest or date of competition in the second half of the season (see Figure 12-1). *(Adopted: 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, Revised: 6/6/25 effective 7/1/25)*

**12.6.4.2.3.3 Fraction in Percent Computation.** Any computation of the percent limitation that results in a fractional portion of a contest or date of competition shall be rounded to the next whole number (e.g., 30-percent of a 29-game basketball schedule -- 8.7 games -- shall be considered nine games). *(Revised: 1/14/97 effective 8/1/97, 4/26/07, 7/31/14, 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

**12.6.4.2.4 Playing Season that Concludes with the NCAA Championship.** In sports in which the playing season may be divided into two segments, but championship selection is based on competition throughout the season (e.g., golf, ice hockey), completed competition for the entire season (e.g., nonchampionship and championship segments) shall be used when identifying the first contest or date of competition in the second half of the season and the number of contests or dates of competition in which the student-athlete has participated. In sports in which the playing season may be divided into two segments, but championship selection is based on competition during only one segment of the season (e.g., baseball, soccer), completed competition for only the championship segment shall be used when identifying the first contest or date of competition in the second half of the season and the number of contests or dates of competition in which the student-athlete has participated. *(Adopted: 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, Revised: 6/6/25 effective 7/1/25)*

**12.6.4.2.5 Exclusions from the First Half and 30 Percent of Season.** In identifying the first contest or date of competition in the second half of the season and the number of contests or dates of competition in which the student-athlete has participated, the following competitions shall be excluded: *(Adopted: 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, Revised: 6/6/25 effective 7/1/25)*

(a) Preseason exhibition contests and preseason practice scrimmages that do not count toward the use of a season of competition per Bylaw 12.6.3.1.4; and

(b) Annual exemptions (e.g., alumni game, foreign team in the United States) as specified in Bylaw 17 for the applicable sport, except for a conference championship and other postseason competition.

**12.6.4.2.6 Reinjury in Second Half of Season.** A student-athlete who suffers an injury in the first half of the season that concludes with the NCAA championship or who suffers an injury after the first day of classes in the student-athlete's senior year of high school, attempts to return to competition during the second half of that season and then is unable to participate further as a result of aggravating the original injury does not qualify for the hardship waiver. *(Revised: 11/1/01, 8/8/02, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.4.2.7 Outside Competition in Second Half of Season.** An individual who engages in outside competition during the second half of the institution's playing season that concludes with the NCAA championship, including competition while not representing the institution, does not qualify for a hardship waiver. *(Adopted: 10/17/19, Revised: 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

**12.6.4.2.8 Transfer Student-Athletes.** The application of the hardship legislation for a transfer student-athlete may be based on the method that would be most beneficial to the student-athlete (the rule applicable to the division in which the injury or illness occurred or the Division I rule). The application of a particular division's legislation must include all the applicable elements of that division's legislation. It is not permissible to use selected elements of the legislation of more than one division. *(Adopted: 11/12/97, Revised: 4/26/01 effective 8/1/01, 9/17/09, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.4.2.9 Foreign-Tour Competition.** A student-athlete who qualifies for a hardship for the previous academic year would not use a season of competition if the student-athlete represents the institution on a certified foreign tour during the summer-vacation period at the conclusion of that academic year. *(Adopted: 1/10/92, Revised: 4/26/01, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.5 Season-of-Competition Waiver -- Competition While Ineligible.** In conjunction with a request for restoration of eligibility and any conditions imposed thereon per Bylaw 12.10, a student-athlete may be granted an additional season of competition by the Committee on Student-Athlete Reinstatement when the student-athlete participated in a limited amount of competition as a result of a good-faith, erroneous formal declaration of eligibility by the institution's appropriate certifying authority; or the student-athlete's good-faith, erroneous reliance on a coaching staff member's decision to put the student-athlete into competition before the coaching staff member receiving a formal declaration of the student-athlete's eligibility from the institution's appropriate certifying authority. The competition must have occurred under all of the following conditions: *(Adopted: 1/16/93, Revised: 1/14/97 effective 8/1/97, 4/20/99, 4/25/02 effective 8/1/02, 8/4/05, 7/31/14, 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

(a) The competition occurred while the student-athlete was representing an NCAA member institution;

(b) The competition occurred within 60 days of the date the student-athlete first reported for athletics participation;

(c) The student-athlete did not participate in more than two events or 10 percent (whichever number is greater) of the maximum number of contests or dates of competition of the playing season that concludes with the NCAA championship as set forth in Bylaw 17 for the applicable sport plus one contest or date of competition. All competition against outside participants that triggers the use of a season of competition shall be countable under this limitation in determining the number of events in which the student-athlete participated;

(d) The student-athlete was involved innocently and inadvertently in the erroneous determination or declaration of eligibility, which permitted the student-athlete to compete while ineligible; and

(e) In the case of a coaching staff member's erroneous decision, the student-athlete had reason to believe the student-athlete would be eligible to participate, and the student-athlete did not contribute to the coaching staff member's erroneous decision to allow the student-athlete to participate.

**12.6.5.1 Ten Percent Calculation.** The requirements specified in Bylaw 12.6.4.2.3 shall apply to the 10 percent calculation specified in this waiver. *(Adopted: 1/16/93, Revised: 7/31/14, 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

**12.6.6 Season-of-Competition Waiver -- Competition While Eligible.** A student-athlete may be granted an additional season of competition by the Committee on Student-Athlete Reinstatement in a case in which the student-athlete participated in a limited amount of competition while eligible due to a coach's documented misunderstanding of the legislation or other extenuating circumstances. In cases in which a student-athlete does not meet the criteria of this waiver, the Committee on Student-Athlete Reinstatement shall have authority to review and grant a waiver based on additional documented extenuating circumstances. *(Adopted: 4/25/02 effective 8/1/02, Revised: 10/28/04, 7/31/14, 6/6/25 effective 7/1/25)*

**12.6.6.1 Coach's Documented Misunderstanding.** The student-athlete participated as a result of good faith, reliance on a coaching staff member's decision to put the student-athlete in an alumni contest, exhibition contests, scrimmages, or

nonchampionship segment contests based on the coach's documented misunderstanding of NCAA legislation and the competition occurred under the following conditions: *(Adopted: 10/28/04, Revised: 8/4/05, 7/31/14, 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

(a) The competition occurred while the student-athlete was representing an NCAA institution;

(b) The competition occurred before the completion of the first 20 percent of the playing season that concludes with the NCAA championship in that sport; and

(c) The student-athlete did not compete in more than two events or 10 percent (whichever number is greater) of the maximum number of contests or dates of competition of the playing season that concludes with the NCAA championship as set forth in Bylaw 17 for the applicable sport plus one contest or date of competition. All competition against outside participants that triggers the use of a season of competition shall be countable under this limitation in determining the number of events in which the student-athlete participated.

**12.6.6.1.1 Percent Calculation.** The requirements specified in Bylaw 12.6.4.2.3 shall apply to the percent calculation specified in this waiver. *(Adopted: 10/20/04, Revised: 7/31/14, 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

**12.6.6.2 Extenuating Circumstances.** Extenuating circumstances include, but are not limited to, the following: *(Adopted: 4/25/02 effective 8/1/02, Revised: 10/28/04, 7/31/14, 6/6/25 effective 7/1/25)*

(a) The student-athlete failed to complete the entire season of competition at the institution as a result of a life-threatening injury or illness suffered by a member of the student-athlete's immediate family, that clearly is supported by contemporaneous medical documentation;

(b) The student-athlete failed to complete the entire season of competition at the institution as a result of extreme financial difficulties as a result of a specific event (e.g., layoff, death in family) experienced by the student-athlete or an individual upon whom the student-athlete is legally dependent and prohibited the student-athlete from participating in intercollegiate athletics. These circumstances must be clearly supported by objective documentation (e.g., decree of bankruptcy, proof of termination) and must be beyond the control of the student-athlete or the individual upon whom the student-athlete is legally dependent;

(c) The student-athlete's institution dropped the sport (in which the student-athlete practiced or competed) from its intercollegiate program.

**12.6.6.2.1 Conditions of Competition.** The competition must have occurred under all of the following conditions: *(Adopted: 10/28/04, Revised: 8/4/05, 1/14/08 effective 8/1/04, 7/31/14, 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

(a) The competition occurred before the first contest or date of competition of the second half of the playing season that concludes with the NCAA championship in the sport; and

(b) The student-athlete did not compete in more than three contests or dates of competition or 30 percent of the maximum number of contests or dates of competition of the playing season that concludes with the NCAA championship as set forth in Bylaw 17 for the applicable sport plus one contest or date of competition, whichever is greater.

**12.6.6.2.1.1 Percent Calculation.** The requirements specified in Bylaws 12.6.4.2.3, 12.6.4.2.4 and 12.6.4.2.5 shall apply to the percent calculation specified in this waiver. *(Adopted: 4/25/02 effective 8/1/02, Revised: 10/28/04, 1/14/08, 7/31/14, 6/30/22 effective 8/1/22 for injuries and illnesses occurring on or after 8/1/22, 6/6/25 effective 7/1/25)*

## 12.7 U.S. Service Academy Exceptions, Special Eligibility Provisions. *(Revised: 6/6/25 effective 7/1/25)*

**12.7.1 Five-Year Rule.** The Committee on Student-Athlete Reinstatement, by a two-thirds majority of its members present and voting, may approve waivers to the five-year rule (see Bylaw 12.6) for student-athletes of the national service academies who have exhausted eligibility in one sport but wish to compete in another sport or sports in which they have eligibility remaining. *(Revised: 4/24/03 effective 8/1/03, 7/31/14, 6/6/25 effective 7/1/25)*

**12.7.2 Transfer Status.** A student who has attended as a freshman (plebe) only in the official summer-enrollment program of one of the four national service academies is not considered a transfer in the application of the transfer regulations of Bylaw 14.5. *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

## 12.8 Certification of Eligibility. *(Revised: 6/6/25 effective 7/1/25)*

**12.8.1 Institutional Responsibility for Eligibility Certification.** The president or chancellor is responsible for approving the procedures for certifying the eligibility of an institution's student-athletes under NCAA legislation. The president or chancellor may designate an individual on the institution's staff to administer proper certification of eligibility. Certification of eligibility must occur before allowing a student-athlete to represent the institution in intercollegiate competition (see Bylaw 14.01.1). A violation of this bylaw in which the institution fails to certify a student-athlete's eligibility before allowing the student-athlete to represent the institution in intercollegiate competition shall be considered an institutional violation per Bylaw 8.01.3; however, such a violation shall not affect the student-athlete's eligibility, provided all the necessary information to certify the student-athlete's eligibility was available to the institution and the student-athlete otherwise would have been eligible for competition. *(Revised: 3/8/06, 1/14/08, 7/31/14, 6/6/25 effective 7/1/25)*

**12.8.2 Squad-List Form.** The institution's athletics director shall compile on a form approved by the Legislative Committee a list of the squad members in each sport on the first day of competition and shall indicate thereon the status of each member in the designated categories. A student-athlete's name must be on the official institutional form in order for the student-athlete to be eligible to represent the institution in intercollegiate competition. Violations of this bylaw do not affect a student-athlete's eligibility if the violation occurred due to an institutional administrative error or oversight and the student-athlete is subsequently added to the form; however, the violation shall be considered an institutional violation per Bylaw 8.01.3. (See Bylaw 17.2.6 for details about the administration of the squad list.) *(Revised: 1/14/97, 11/1/07 effective 8/1/08, 7/31/14, 8/7/14, 10/4/17, 6/6/25 effective 7/1/25)*

## 12.9 Ineligibility. *(Revised: 6/6/25 effective 7/1/25)*

**12.9.1 Obligation of Member Institution to Withhold Student-Athlete From Competition.** If a student-athlete is ineligible under the provisions of the constitution, bylaws or other regulations, the institution shall be obligated to apply immediately the applicable rule and to withhold the student-athlete from all intercollegiate competition. The institution may appeal for restoration of the student-athlete's eligibility as provided in Bylaw 12.10 if it concludes that the circumstances warrant restoration. *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.9.2 Ineligibility Resulting From Recruiting Violation.** An institution shall not enter a student-athlete (as an individual or as a member of a team) in intercollegiate competition if it is acknowledged by the institution or established through the infractions process that the institution or a representative of its athletics interests violated the legislation in the recruiting of the student-athlete. The institution may appeal for restoration of the student-athlete's eligibility as provided in Bylaw 12.10 if it concludes that circumstances warrant restoration. *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.9.2.1 Payment of Legal Fees During Appeal. [A]** An institution may provide actual and necessary expenses for a prospective student-athlete to attend proceedings conducted by the institution, its athletics conference or the NCAA that relate to the prospective student-athlete's eligibility to participate in intercollegiate athletics, provided the prospective student-athlete has signed the institution's written offer of admission and/or financial aid or the institution has received the individual's financial deposit in response to its offer of admission. The cost of legal representation in such proceedings also may be provided by the institution (or a representative of its athletics interests). *(Revised: 7/31/14, 10/9/24, 6/6/25 effective 7/1/25)*

**12.9.3 Application of Ineligibility Ruling Pending Appeal.** Once an interpretation (per Bylaw 9.3.1.2) applicable to a member institution has been issued and results in the ineligibility of a student-athlete, it is necessary for the institution to apply the rule to the eligibility of the student-athlete, even if review of the interpretation (per Bylaw 9.3.1.2.1.1 or 9.3.1.2.2) at the request of the institution is pending. Failure to withhold such a student-athlete from competition is a violation of the conditions and obligations of membership. *(Revised: 12/22/08, 7/31/14, 6/6/25 effective 7/1/25)*

**12.9.4 Ineligible Participation.** *(Revised: 6/6/25 effective 7/1/25)*

**12.9.4.1 Loss of Eligibility.** A student-athlete shall be denied eligibility for intercollegiate competition in a sport if the student-athlete participates in intercollegiate competition in that sport while ineligible under this bylaw or other applicable NCAA legislation. The certifying institution may appeal for restoration of the student-athlete's eligibility if it concludes that the circumstances warrant restoration (see Bylaw 12.10). *(Revised: 7/31/14, 6/6/25 effective 7/1/25)*

**12.9.4.2 Restitution.** If a student-athlete who is ineligible under the terms of the bylaws or other legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions: *(Revised: 4/26/01 effective 8/1/01, 11/1/07 effective 8/1/08, 8/1/22, 8/31/22 effective 1/1/23, 6/6/25 effective 7/1/25)*

(a) Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b) Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c) Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;

(d) Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e) Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f) Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g) Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

## 12.10 Restoration of Eligibility. *(Revised: 6/6/25 effective 7/1/25)*

**12.10.1 Basis for Appeal.** When a student-athlete is determined to be ineligible under an applicable provision of the constitution, bylaws or other regulations, the member institution, having applied the applicable rule and having withheld the student-athlete from all intercollegiate competition, may appeal to the Committee on Student-Athlete Reinstatement for restoration of the student-athlete's eligibility, provided the institution concludes that the circumstances warrant restoration of eligibility. *(Revised: 6/6/25 effective 7/1/25)*

**12.10.2 Participation in Appeal Hearing.** Any appeal to restore a student-athlete's eligibility shall be submitted in the name of the institution by the president or chancellor (or an individual designated by the president or chancellor), faculty athletics representative, senior woman administrator or athletics director (for the men's or women's program). At least one of those individuals must participate in any hearing of the appeal that involves direct participation by the student-athlete or other individuals representing the institution or the student-athlete. *(Revised: 1/11/94, 3/8/06, 7/31/14, 6/6/25 effective 7/1/25)*

**12.10.3 Student Responsibility, Relationship to Restoration of Eligibility.** A student-athlete is responsible for the student-athlete's involvement in a violation of NCAA regulations (as defined in Bylaw 19), and the Committee on Student-Athlete Reinstatement may restore the eligibility of a student-athlete involved in a violation only when circumstances clearly warrant restoration. The eligibility of a student-athlete involved in a major violation shall not be restored other than through an exception authorized by the Committee on Student-Athlete Reinstatement in a unique case on the basis of specifically stated reasons. *(Revised: 6/6/25 effective 7/1/25)*

**FIGURE 12-1**
**Hardship Waiver Criteria**
*For injuries and illnesses occurring on or after August 1, 2022*

Use the figure below to identify the values for first half and 30 percent of the season for the applicable sport. Then apply the values to the institution's completed schedule for the playing season that concludes with the NCAA championship[1] as follows:

1.  When counting on the schedule to identify the first contest in the second half of the season, exclude the following:

    a.  Preseason exhibition contests and preseason practice scrimmages that do not count toward use of a season of competition per Bylaw 12.6.3.1.4; and

    b.  Bylaw 17 annual exemptions (e.g., alumni game, foreign team in the United States) except for the conference championship and other postseason competition which must be counted.

2.  When counting the number of contests or dates of competition in which the student-athlete has participated, exclude the following:

    a.  Preseason exhibition contests and preseason practice scrimmages that do not count toward use of a season of competition per Bylaw 12.6.3.1.4; and

    b.  Bylaw 17 annual exemptions (e.g., alumni game, foreign team in the United States) except for the conference championship and other postseason competition which must be counted.

3.  Please note, an individual who engages in outside competition during the second half of the playing season that concludes with the NCAA championship, including competition while not representing the institution (e.g., unattached), does not qualify for a hardship waiver per Bylaw 12.6.4.2.7.

| Sport | Denominator[2] | 30 Percent of Denominator | First Half of Playing Season |
|---|---|---|---|
| Acrobatics and Tumbling | 13 | 4 | Before the start of the 8th date of competition |
| Baseball | 57 | 18 | Before the start of the 30th contest |
| Basketball | No QRSMTE = 30 With QRSMTE = 32 | No QRSMTE = 9 With QRSMTE = 10 | No QRSMTE = Before the start of the 16th contest With QRSMTE = Before the start of the 17th contest |
| Beach Volleyball | 17 | 6 | Before the start of the 10th date of competition |
| Bowling, Women's | 33 | 10 | Before the start of the 18th date of competition |
| Cross Country | 8 | 3 | Before the start of the 5th date of competition |
| Equestrian, Women's | 16 | 5 | Before the start of the 9th date of competition |
| Fencing | 12 | 4 | Before the start of the 7th date of competition |
| Field Hockey | 21 | 7 | Before the start of the 12th contest |
| Football -- FBS [3] | 13 | 4 | Before the start of the 8th contest |
| Football -- FCS [3,4] | 12 or 13 | 4 | Before the start of the 7th or 8th contest |
| Golf | 25 | 8 | Before the start of the 14th date of competition |
| Gymnastics | 14 | 5 | Before the start of the 8th date of competition |
| Ice Hockey | 35 | 11 | Before the start of the 19th contest |
| Lacrosse, Men's | 18 | 6 | Before the start of the 10th date of competition |
| Lacrosse, Women's | 18 | 6 | Before the start of the 10th contest |
| Rifle | 14 | 5 | Before the start of the 8th date of competition |

| | | | |
|---|---|---|---|
| Rowing, Women's | 21 | 7 | Before the start of the 12th contest |
| Rugby, Women's | 17 | 6 | Before the start of the 10th contest |
| Skiing | | | |
|    Alpine | 33 | 10 | Before the start of the 18th date of competition |
|    Nordic | 33 | 10 | Before the start of the 18th date of competition |
| Soccer | 21 | 7 | Before the start of the 12th contest |
| Softball | 57 | 18 | Before the start of the 30th contest |
| Stunt | 17 | 6 | Before the start of the 10th date of competition |
| Swimming and Diving | 21 | 7 | Before the start of the 12th date of competition |
| Tennis | 26 | 8 | Before the start of the 14th date of competition |
| Track and Field (Indoor/Outdoor) | Completed dates of competition[5] | Will vary[5] | Based on the institution's completed dates of competition.[5] |
| Track and Field (Indoor Only) | 19 | 6 | Before the start of the 11th date of competition |
| Track and Field (Outdoor Only) | 19 | 6 | Before the start of the 11th date of competition |
| Triathlon, Women's | 7 | 3 | Before the start of the 5th date of competition |
| Volleyball, Men's | 29 | 9 | Before the start of the 16th date of competition |
| Volleyball, Women's | 33 | 10 | Before the start of the 18th contest |
| Water Polo | 22 | 7 | Before the start of the 12th date of competition |
| Wrestling, Men's | 17 | 6 | Before the start of the 10th date of competition |
| Wrestling, Women's | 17 | 6 | Before the start of the 10th date of competition |

[1] Nonchampionship segment competition is not considered for purposes of hardship waiver eligibility.

[2] Bylaw 17 maximum for the sport plus one pursuant to Bylaw 12.6.4.2.3.

[3] A Division I football student-athlete may compete in up to four contests without using a season of competition.

[4] See Bylaw 17.12.6.1. Twelve football contests shall be permissible during those years in which there are 14 Saturdays from the first permissible playing date through the last playing date in November.

[5] See Bylaw 12.6.4.2.3.1 for additional information regarding the first half and 30 percent of season calculations for indoor and outdoor track and field.

8/30/25

**FIGURE 12-2 Delayed Enrollment Conditions**

| Sport | Max | Contests | | Dates of Competition | |
|---|---|---|---|---|---|
| | | 20% | 50% | 20% | 50% |
| Acrobatics and Tumbling | 12 | | | 3 | 6 |
| Baseball | 56 | 12 | 28 | | |
| Basketball | 29 | 6 | 15 | | |
| Bowling, Women's | 32 | | | 7 | 16 |
| Cross Country | 7 | | | 2 | 4 |
| Equestrian, Women's | 15 | | | 3 | 8 |
| Fencing | 11 | | | 3 | 6 |
| Field Hockey | 20 | 4 | 10 | | |
| Football | | | | | |
|     FBS | 12 | 3 | 6 | | |
|     FCS | 11 | 3 | 6 | | |
| Golf | 24 | | | 5 | 12 |
| Gymnastics | 13 | | | 3 | 7 |
| Ice Hockey | 34 | 7 | 17 | | |
| Lacrosse | 17 | | | 4 | 9 |
| Rifle | 13 | | | 3 | 7 |
| Rowing, Women's | 20 | | | 4 | 10 |
| Rugby, Women's | 11 | 3 | 6 | | |
| Beach Volleyball, Women's | 16 | | | 4 | 8 |
| Skiing | 32 | | | 7 | 16 |
| Soccer | 20 | 4 | 10 | | |
| Softball | 56 | 12 | 28 | | |
| Stunt | 16 | | | 4 | 8 |
| Swimming and Diving | 20 | | | 4 | 10 |
| Tennis | 25 | | | 5 | 13 |
| Track and Field | | | | | |
|     Indoor | 9 | | | 2 | 5 |
|     Outdoor | 9 | | | 2 | 5 |
| Triathlon, Women's | 6 | | | 2 | 3 |
| Volleyball, Men's | 28 | | | 6 | 14 |
| Volleyball, Women's | 32 | 7 | 16 | | |
| Water Polo | 21 | | | 5 | 11 |
| Wrestling, Men's | 16 | | | 4 | 8 |
| Wrestling, Women's | 16 | | | 4 | 8 |

| Percentage of Maximum Number of Contests/Dates of Competition | | |
|---|---|---|
| (Applied to each 12-month period after the legislated grace period and before initial full-time collegiate enrollment, or for purposes of Bylaw 12.6.3.2.2.4, initial full-time enrollment at the certifying institution.) | | |
| ≤20% | >20% and ≤ to 50% | >50% |
| Apply a one-for-one withholding condition when the student-athlete competed in 20% or less of the maximum number of contests or dates of competition. | Charge one season of competition when the student-athlete competed in greater than 20% and less than or equal to 50% of the maximum number of contests or dates of competition. | Require an academic year of residence and charge one season of competition when the student-athlete competed in greater than 50% of the maximum number of contests or dates of competition. (See note.) |

**Note**: The academic year of residence does not apply to Bylaw 12.6.3.3 (participation after 21st birthday – men's ice hockey and skiing) or to student-athletes who meet the exception in Bylaw 12.6.3.2.2.4 (matriculation after 20th birthday – tennis). Further, relief of the academic year of residence will not be provided if the individual engaged in more than 50% of the maximum number of contests (dates of competition) in the applicable sport during any 12-month period of the delay.

## 14.02 Definitions and Applications.

**14.02.1 Academic Progress Rate.** The Committee on Academics shall have the authority to determine the minimum acceptable academic progress rate (APR), which shall include a calculation that accounts for currently enrolled student-athletes. The rate shall account for the institution's success in retaining and graduating all such student-athletes. Further, the rate shall account for the academic eligibility of the student-athletes, including all applicable NCAA, conference and institutional academic eligibility requirements. The committee shall publish an explanation of the APR calculation to the membership annually. *(Adopted: 4/29/04, Revised: 8/6/09, 7/31/13, 8/7/14)*

**14.02.2 Branch School.** A branch school is an educational institution that usually offers two years of college work, does not award degrees independently, and is wholly controlled and operated by a four-year, degree-granting parent institution.

**14.02.3 Business Day.** A business day is any weekday that is not recognized as a national holiday, including any weekday during which an institution is closed for other reasons (e.g., holiday break). *(Adopted: 4/29/10 effective 8/1/10)*

**14.02.4 Collegiate Institution.** A collegiate institution (for purposes of NCAA legislation) is an institution of higher education that: *(Revised: 1/10/90, 8/8/02)*

 (a) Is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree;

 (b) Conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree; or

 (c) Is located in a foreign country.

**14.02.5 Education-Impacting Disability.** An education-impacting disability is a current impairment that has a substantial educational impact on a student's academic performance and requires accommodation. *(Adopted: 8/8/08)*

**14.02.6 Exception.** An exception is the granting of relief from the application of a specific regulation (e.g., the residence requirement for a transfer student from a two-year college to become eligible for competition). The action granting the exception may be taken solely by the certifying institution, based on evidence that the conditions on which the exception is authorized have been met (see Bylaw 14.02.14). *(Revised: 11/1/07 effective 8/1/08, 4/18/24)*

**14.02.7 Good Academic Standing and Progress Toward Degree.** The phrases "good academic standing" and "progress toward degree" are to be interpreted at each member institution by the academic officials who determine the meaning and application of such phrases for all students, subject to the controlling regulations of the institution; the conference (or a similar association), if any, of which the institution is a member; and applicable NCAA legislation (see Bylaw 14.4).

**14.02.8 Graduation Success Rate.** The Committee on Academics shall determine the minimum acceptable graduation success rate (GSR). The committee shall publish an explanation of the GSR calculation to the membership annually. *(Adopted: 4/29/04, Revised: 7/31/13, 8/7/14)*

**14.02.9 Participation in Intercollegiate Athletics.** Participation in intercollegiate athletics occurs when a student-athlete either practices in a sport (see Bylaw 17.02.1) or competes in a sport, as defined in Bylaw 17.02.10. Eligibility rules for competition may differ from those for practice.

**14.02.10 Qualification Status.**

**14.02.10.1 Qualifier.** A qualifier is a student who, for purposes of determining eligibility for financial aid, practice and competition, has met the requirements of Bylaw 14.3.1.1. *(Revised: 1/12/23 effective 8/1/23 for student-athletes initially enrolling full time in a collegiate institution on or after August 1, 2023)*

**14.02.10.2 Academic Redshirt.** An academic redshirt is defined as one who has met the requirements of Bylaw 14.3.1.2 but not the requirements of Bylaw 14.3.1.1. *(Adopted: 10/27/11, Revised: 4/26/12 effective 8/1/16 for student-athletes initially enrolling full time in a collegiate institution on or after 8/1/16, 1/12/23 effective 8/1/23 for student-athletes initially enrolling full time in a collegiate institution on or after August 1, 2023)*

**14.02.10.3 Nonqualifier.** A nonqualifier is a student who has not graduated from high school or who, at the time specified in the regulation (see Bylaw 14.3), has not successfully completed the required core curriculum or has not presented the required minimum core-curriculum grade-point average for a qualifier or academic redshirt. *(Revised: 10/27/11, 4/26/12 effective 8/1/16 for student-athletes initially enrolling full time in a collegiate institution on or after 8/1/16, 1/12/23 effective 8/1/23 for student-athletes initially enrolling full time in a collegiate institution on or after August 1, 2023)*

**14.02.11 Residence.** Residence is enrollment in a full-time academic program (as defined by the institution) at a collegiate institution during a regular term of an academic year. A summer term may not be used to satisfy an academic term of residence. Any student-athlete (e.g., qualifier, nonqualifier, transfer student from a two-year college) admitted after the 12th class day may not use that semester or quarter for the purpose of satisfying an academic term or year of residence. *(Revised: 4/14/10, 4/18/24)*

**14.3.3 Seasons of Competition -- Nonqualifiers.** Nonqualifiers, recruited or nonrecruited, shall not engage in more than three seasons of competition in any one sport. A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I.

**14.3.3.1 Application of Delayed Enrollment Legislation.** A student-athlete who is charged with a season (or seasons) of eligibility due to the application of delayed enrollment legislation (Bylaws 12.6.3.2 and 12.6.3.3) is considered to have used that season (or seasons) of competition for purposes of Bylaw 14.3.3. *(Revised: 7/15/15)*

**14.3.3.2 Fourth Season of Competition -- Nonqualifiers.** A fourth season of intercollegiate competition shall be granted to a student-athlete who is a nonqualifier, provided that at the beginning of the fifth academic year following the student-athlete's initial, full-time collegiate enrollment, the student-athlete has completed at least 80 percent of the student-athlete's designated degree program. *(Revised: 4/28/05 effective 8/1/05, 1/3/06, 10/27/11, 4/26/12 effective 8/1/16)*

**14.3.3.2.1 Waiver.** The Progress-Toward-Degree Waivers Committee shall have the authority to grant a fourth season of intercollegiate competition to a student-athlete who is a nonqualifier based on objective evidence of extraordinary circumstances that warrant a waiver of the normal application of this regulation. *(Adopted: 1/13/98 effective 8/1/98, Revised: 4/27/00 effective 8/1/00, 8/4/05, 1/3/06, 11/1/07 effective 8/1/08, 1/16/10 effective 5/1/10, 10/27/11, 4/26/12 effective 8/1/16 for student-athletes initially enrolling full time in a collegiate institution on or after 8/1/16)*

**14.3.4 Residence Requirement -- Academic Redshirts and Nonqualifiers.** An academic redshirt must fulfill an academic year of residence in order to be eligible to compete and to practice away from the institution. A nonqualifier must fulfill an academic year of residence in order to be eligible for practice, competition and athletically related financial aid (see Bylaw 14.3.2.1.1). *(Revised: 1/10/90 effective 8/1/90, 1/10/95 effective 8/1/96, 1/3/06, 4/14/10, 10/27/11, 4/26/12 effective 8/1/16 for student-athletes initially enrolling full time in a collegiate institution on or after 8/1/16)*

**14.3.5 Determination of Freshman Eligibility.**

**14.3.5.1 Participation Prior to Certification.** If a student-athlete reports for athletics participation or initial enrollment at the certifying institution before his or her qualification status has been certified, the student may practice, but not compete, during a 45-day period, provided the student meets all other requirements to be eligible to practice. An institution may provide athletically related financial aid to the student during this period, provided the student meets all other requirements to receive athletically related financial aid. After the 45-day period, the student shall have established minimum requirements (as certified by the Eligibility Center) to continue practicing, to continue receiving athletically related financial aid or to compete. *(Revised: 1/11/89, 10/7/05, 5/9/07, 9/18/07, 1/15/11 effective 8/1/11, 1/19/13 effective 8/1/13, 6/30/22 effective 8/1/22)*

**14.3.5.1.1 Effect of Violations.** A violation of Bylaw 14.3.5.1 in which the student-athlete is subsequently certified as a qualifier shall be considered an institutional violation per Bylaw 8.01.3 but shall not affect the student-athlete's eligibility. *(Adopted: 10/29/15)*

**14.3.5.2 High School Graduate.** In order to be considered a high school graduate, a prospective student-athlete shall meet all graduation requirements, including academic and nonacademic (e.g., state exit exams, community service, senior project) requirements, as defined for all students by the high school or secondary school. *(Adopted: 4/23/08)*

**14.3.5.2.1 Equivalency Test/Diploma.** A prospective student-athlete who does not graduate from high school but completes a state high school equivalency test [e.g., General Educational Development (GED)] and obtains a state high school equivalency diploma may satisfy the graduation requirement, provided the equivalency test is completed on or after the high school graduation date of the prospective student-athlete's class [as determined by the first year of enrollment in high school (ninth grade) or the international equivalent as specified in the NCAA Guide to International Academic Standards for Athletics Eligibility]. *(Revised: 6/16/04, 1/10/05 effective 8/1/05, 6/15/15)*

**14.3.5.3 Advanced Placement.** If the student-athlete is admitted with a minimum of 24 semester hours or a minimum of 36 quarter hours of advanced placement from a College Entrance Examination Board (CEEB) examination (or from a similar proficiency examination) and/or concurrent high school/college credit without previous enrollment at a collegiate institution, the student-athlete shall be immediately eligible. Credits earned from extension or summer-session courses may not be counted in satisfaction of this requirement. A "similar proficiency examination" must be an advanced or higher level, nationally administered proficiency exam with a uniform grading scale that is taken after high school graduation. *(Revised: 1/14/12 effective 8/1/12)*

**14.3.5.3.1 International Certification.** An institution shall use the Eligibility Center to determine whether a "similar proficiency examination" taken by an international student-athlete is an advanced or higher level, nationally administered proficiency exam with a uniform grading scale that is taken after high school graduation. In addition, the

# EXHIBIT "B"

Woodrow K. Glass (Pro Hac Vice Pending)
Oklahoma Bar No. 15690
Geoffrey A. Tabor (Pro Hac Vice Pending)
Oklahoma Bar No. 32880
Chloe N. Glass (Pro Hac Vice Pending)
Oklahoma Bar No. 36646
**GLASS & TABOR, LLP**
1601 36th Avenue NW
Norman, OK 73072
Phone: 405-360-9700
Email: geoffrey@glasstaborlaw.com; woody@glasstaborlaw.com; chloe@glasstaborlaw.com

Timothy R. O'Reilly
Nevada Bar No. 8866
**O'REILLY LAW GROUP**
325 S Maryland Parkway
Las Vegas, NV 89101
Phone: 702-382-2500
Email: efile@oreillylawgroup.com

**ATTORNEYS FOR PLAINTIFF COHEN FULLER**

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| COHEN FULLER,<br><br>**Plaintiff**,<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>**Defendant**. | Case No.<br><br>**DECLARATION OF JOEL MAXCY, PH.D.** |

1

I, Joel Maxcy, Ph,D., declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

## I. INTRODUCTION AND ASSIGNMENT

My name is Joel G. Maxcy. I have been retained by Plaintiff Cohen Fuller to provide expert economic opinion regarding the anticompetitive effects of National Collegiate Athletic Association ("NCAA") eligibility rules that count seasons of athletic competition at non-NCAA institutions — specifically those governed by the National Junior College Athletic Association ("NJCAA") and the National Association of Intercollegiate Athletics ("NAIA") — toward a student-athlete's total allotment of NCAA Division I eligibility. I have been asked to assess, from an economic standpoint, whether these rules constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

This Declaration sets forth my qualifications, the materials I considered, a preliminary statement of my opinions, and the bases and reasons for each opinion. I reserve the right to supplement or modify my opinions in response to any expert opinions offered by the NCAA or additional materials obtained during this litigation.

## II. QUALIFICATIONS

I am an economist with expertise in the fields of sports business, industrial organization, and labor economics. I hold a Ph.D. in economics from Washington State University. I also hold an M.A. and a B.A. in Economics from the University of Maine, Orono. I am currently a full professor in the LeBow College of Business at Drexel University in Philadelphia, Pennsylvania. I have previously held full-time academic positions at Temple University, The University of Georgia, and Ithaca College, and I have held visiting faculty positions at CDES-Limoges University (France), the Executive Masters in European Sports Governance (EU), and the Russian International Olympic University (Russia). I serve as Department Head of the Department of

2

Sport Business and the Department of General Business at Drexel University's LeBow College of Business, positions I have held since 2018. I also serve as a Visiting Professor at the Russian International Olympic University and at CDES-Limoges University, where I have held a visiting appointment since 2009.

My research expertise includes labor relations in sports, antitrust economics, industrial organization, and sport finance. I am regarded by my research peers in economics as an expert in sport economics. I have conducted significant economic research specific to college sports and the National Collegiate Athletic Association. I co-authored a 2023 book on intercollegiate athletics, *The NCAA and the Exploitation of College Profit Athletes*, publisher: University of South Carolina Press. I am, since 2015, the President of the International Association of Sports Economists (IASE). I was invited to deliver a keynote presentation "The Economics of College Sports" to the Federal Reserve Bank of Atlanta's prestigious Public Affairs Forum in October 2016. I also delivered a Research Seminar to Federal Reserve Bank of Atlanta Economists, titled "The Law and Economics of College Sports." I am a signer and co-author of a Brief of Amici Curiae, Sports Economists in Support of Respondents regarding *National Collegiate Athletic Association (Petitioner) v. Shawne Alston et al. (Respondents)*, to the Supreme Court of the United States. I also co-wrote a Brief of Amici Curiae in support of the Northwestern University Football players' petition to the National Labor Relations Board.

I have served as an economics expert and consultant on numerous legal cases, most often involving labor and antitrust issues in the sport industry and NCAA sports. I have submitted expert Declarations in *Pavia v. NCAA*, *Elad v. NCAA*, *Brzovic v. NCAA*, *Zeigler v. NCAA*, and *Coley v. NCAA*, and several others pending. I testified in-person at hearings for *Elad v. NCAA*, *Brzovic v. NCAA*, *Moore v. NCAA*, and submitted two depositions in *Fourqurean v. NCAA*.

I teach courses at the graduate and undergraduate levels in sports economics, labor relations, intercollegiate athletics, and related topics. At Drexel, I developed and teach a class on NCAA Compliance. Evaluation of the NCAA manuals and its bylaws are central to the course content. A true and correct copy of my Curriculum Vitae, which contains a complete list of my publications and prior testimony, is included in the appendix.

I am an expert in economics, not the law. My work and research in antitrust economics and labor relations overlays the intersection of the two disciplines. I write here on the to the economic substance of the arguments relative to this and similar cases. I offer no opinion on the law.

## III. PUBLICATIONS IN THE PRECEDING TEN YEARS

The following is a list of publications I have authored or co-authored in the preceding ten years. A complete publication list is contained in my Curriculum Vitae.

- Maxcy, Joel G. (Forthcoming, Fall 2026). *The NCAA's Eligibility Rules as Unlawful Restraints of Trade*. Marquette Sports Law Review, 37(1).

- Maxcy, J. (2026). Sport Economics Research, Sport Economics and Sport Finance. Sport Management Digest, 5(1) (March).

- Butler, D., Butler, R., Maxcy, J. and Woodworth, S. (2024). Outcome Uncertainty and Viewer Demand for Basic Cable Boxing in the United States of America. Journal of Sports Economics.

- Maxcy, J. (2024). Sport Economics Research. Sport Management Digest, 4(1) (March).

- Maxcy, J. (2023). Sport Economics Research: New Perspectives on the Demand for Sport. Sport Management Digest, 3(2) (November).

- Maxcy, J. (2023). Sport Economics: The Demand for Sport. Sport Management Digest, 3(1) (March).

4

- Maxcy, J. (2022). Sport Economics. Sport Management Digest, 2(2) (November).

- Butler, D., Butler, R., Maxcy, J. (2022). New insights on the Louis-Schmeling paradox: determinants of demand for subscription and pay-per-view boxing. European Sport Management Quarterly, 22(4), 588–608.

- Won, D. and Maxcy, J.G. (2021). University stakeholders' priorities concerning athletic budget allocations. Journal for the Study of Sports and Athletes in Education, 16(3), 243–261.

- Rascher, D.A., Maxcy, J.G. and Schwarz, A. (2021). The Unique Economic Aspects of Sports. Journal of Global Sport Management, 6:1, 111–138.

- Nagle, M., Southall, R., Staurowsky, E.J., Karcher, R., Maxcy, J. (2023). *The NCAA and the Exploitation of College Profit Athletes*. Columbia, SC: University of South Carolina Press.

- Maxcy, J. (2019). Multi-Period Contracts as Risk Management in Professional Sports. In N. Longley (Ed.), *Personnel Economics in Sport*. Northampton, Massachusetts: Edward Elgar.

- Fort, R., Maxcy, J., and Diehl, M. (2016). Uncertainty by Regulation: Is Rottenberg's Invariance Principle Subject to Policy and Circumstance? Research in Economics, 70(3), 454–467.

- Diehl, M., Drayer, J., and Maxcy, J. (2016). On the Demand for Live Sport Contests: Insights from the Secondary Ticket Market for National Football League Games. Journal of Sport Management, 30(1), 82–94.

- Diehl, M., Maxcy, J., and Drayer, J. (2015). Price Elasticity of Demand in the Secondary Market: Evidence from the National Football League. Journal of Sports Economics, 16(6), 557–575.

- Maxcy, J.G. & Larson, D.J. (2015). Reversal of Fortune or Glaring Misallocation: Is a New Stadium Worth the Cost to a University? International Journal of Sport Finance, 10(1), 62–86.

## IV. PRIOR TESTIMONY (PRECEDING FOUR YEARS)

The following is a list of all cases in which I have testified as an expert at trial or by deposition during the preceding four years:

| Case | Court | Role | Date |
|---|---|---|---|
| *Diego Pavia et al. v. NCAA*, No. 3:24-cv-01336 (M.D. Tenn.) | U.S. District Court, Middle District of Tennessee | Written Report; Oral Testimony February 10, 2026 | Report: December 24, 2025 |
| *Brody Robinson v. NCAA*, 6th Circuit Court for the County of Oakland, Michigan | State of Michigan | Affidavit | April 2, 2026 |
| *Akachi Onyedika Okereke v. NCAA*, Chancery Court for Davidson County, Tennessee | Tennessee Chancery Court | Affidavit | April 9, 2026 |
| *Shannon Ray, et al. v. NCAA*, U.S. District Court, Eastern California, Sacramento Division | U.S. District Court | Written Report: statistical analysis, market definition, market power, competitive effects, competitive equity, and financial implications regarding the NCAA Volunteer Coach rule | Pending |
| *Rashaun Agee v. NCAA*, District Court, 472nd Judicial District, Brazos County, Texas | Texas District Court | Written Declaration; Testified at hearing October 13, 2025 | October 7, 2025 |
| *Louis Moore v. NCAA*, U.S. District Court Northern Texas | U.S. District Court | Written Declaration; Testified at hearing September 24, 2025 | August 22, 2025 |

| Case | Court | Role | Date |
|---|---|---|---|
| *Derrin Boyd v. NCAA*, U.S. District Court, Middle Tennessee | U.S. District Court | Written Declaration | July 18, 2025 |
| *N. Fourqurean v. NCAA*, U.S. District Court, Western Wisconsin | U.S. District Court | Written Declarations (2); Oral Depositions September 3 and September 16, 2025 | July 29 and August 30, 2025 |
| *Walker v. NCAA*, U.S. District Court, Middle Louisiana | U.S. District Court | Written Declaration | July 1, 2025 |
| *Zeigler v. NCAA*, U.S. District Court, Eastern Tennessee | U.S. District Court | Written Declaration; Written Response to NCAA declaration | May 20 and June 3, 2025 |
| *Ante Brzovic v. NCAA*, U.S. District Court, South Carolina | U.S. District Court | Written Declaration; Testified at hearing May 6, 2025 | April 18, 2025 |
| *Corey Coley v. NCAA*, U.S. District Court, Eastern North Carolina | U.S. District Court | Written Declaration | April 10, 2025 |
| *Jett Elad v. NCAA*, U.S. District Court, New Jersey | U.S. District Court | Written Declaration; Testified at hearing April 16, 2025 | March 31, 2025 |
| *Diego Pavia v. NCAA*, U.S. District Court, Middle Tennessee | U.S. District Court | Written Declaration | December 3, 2024 |

## V. COMPENSATION

I am being compensated at a rate of $600 per hour for all tasks performed in connection with this matter. My compensation is not contingent on any action or event resulting from my analyses, conclusions, or opinions in this matter, the outcome of this case, or any other issue.

7

## VI. MATERIALS CONSIDERED

In forming my opinions, I have reviewed and relied upon the following categories of materials, in addition to my prior research and expertise in sports economics, antitrust economics, and labor economics:

- The NCAA Division I Manual, 2025-26

- The Declaration of Daniel A. Rascher, *Patterson et al. v. NCAA*, November 10, 2025

- NCAA filings and expert declarations from other recent eligibility challenge cases

- Judicial opinions in *NCAA v. Alston*, 594 U.S. 69 (2021); *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85 (1984); *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015); *House v. NCAA*, No. 4:20-cv-09122 (N.D. Cal. 2024); *Elad v. NCAA*, No. 25-1870 (3d Cir. Nov. 25, 2025) and other cases

- Relevant economic and legal scholarship, including research on monopsony theory, antitrust economics, and the economics of the NCAA

- Publicly available data on NJCAA alumni on NCAA Division I football rosters

- U.S. Department of Education college graduation statistics

- My own peer-reviewed published research, including publications listed in Section III above

## VII. SUMMARY OF OPINIONS

I offer the following opinions, each of which is explained in detail in the sections below:

1. **Relevant Market.** The relevant market in the post-*Alston* and post-*House* era is the national labor market for NCAA Division I football athletes' services. JUCO, NAIA, lower NCAA divisions, and professional leagues are not substitutes and fall outside the relevant market established here.

2. **Market Power.** The NCAA and its member institutions exercise substantial monopsony power in the relevant market. No practical alternatives provide the unique combination of attributes offered by NCAA Division I football programs.

3. **The Challenged Rules are Horizontal Restraints.** The NCAA Bylaws regarding JUCO, NAIA, and five-year eligibility constraints constitute horizontal agreements among NCAA member institutions — direct competitors for athlete labor — that restrict output in the relevant labor market.

4. **The Challenged Rules are Commercial in Nature.** In the post-*Alston*, NIL-compensation, and post-*House* revenue-sharing era, eligibility rules that determine access to the Division I labor market are inherently commercial and subject to Sherman Act scrutiny.

5. **Anticompetitive Effects.** The Challenged Rules produce substantial anticompetitive effects in the relevant market, including: (a) output restriction by removing the most productive and experienced athletes from the market; (b) compensation suppression by systematically replacing higher-value athletes with lower-cost entrants; and (c) allocative distortion by inefficiently deterring athletes from choosing JUCO or NAIA developmental pathways that may be in their best interest.

6. **Procompetitive Justifications Fail.** The NCAA's asserted justifications — preserving amateurism, promoting competitive balance, and maintaining the educational character of intercollegiate athletics — do not withstand scrutiny and are not served by the specific rules challenged here.

7. **Less Restrictive Alternatives Exist.** The NCAA's legitimate interests, to whatever extent they exist, could be achieved by less restrictive means. The most obvious alternative is to count only seasons of competition at NCAA institutions against the eligibility limit.

## VIII. DETAILED STATEMENT OF OPINIONS AND BASES

### A. The NCAA and Its Governance Structure

The NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, organized into three divisions. Division I includes over 350 schools. Since 1997, each of the three divisions is responsible for its own governance and has independent rules and bylaws. The NCAA's bylaws are jointly adopted and enforced by member institutions that are independent economic actors. Because institutions compete for the same pool of athletes, these coordinated rules function as agreements that limit rivalry along key dimensions of competition, including the duration and availability of athlete services. As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations. Failure to abide by these rules risks subjecting sports programs to punitive measures from the NCAA that include reduced athletic scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."

### The Challenged Bylaws

The most frequently challenged bylaws in antitrust litigation are Bylaws of the NCAA Division I Manual regarding JUCO and NAIA eligibility and the Five-Year rule. Bylaw 12.6, the "Five-Year – Four Seasons of Competition" rule, establishes that student-athletes "shall not engage in more than four seasons of intercollegiate competition in any one sport." Subordinate parts of the Bylaw further provide that a student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution.

10

Bylaw 12.02.3 defines "intercollegiate competition" as occurring when "a student-athlete in either a two-year or a four-year collegiate institution" represents the institution in a contest against outside competition, competes in the uniform of the institution, or competes and receives expenses from the institution for competition. Critically, Bylaw 14.02.4 defines "collegiate institution" as an institution of higher education that is accredited at the college level or that conducts an intercollegiate athletics program and is authorized to offer at least a one-year program of study creditable toward a degree. This definition expressly encompasses non-NCAA institutions, including JUCO and NAIA programs.

By operation of these Bylaws, a defined collegiate institution need not be an NCAA member institution. Nevertheless, the NCAA considers participation in athletics at such institutions equivalent to NCAA participation with respect to eligibility standards. Accordingly, every season an athlete competes at a JUCO or NAIA program is counted against that athlete's total allotment of NCAA Division I eligibility.

Bylaw 14.3.3 imposes an additional restriction specific to junior college transfers: student-athletes who transfer to a Division I institution from another collegiate institution shall not engage in more than four seasons of competition, with no more than three of those seasons in Division I. This provision explicitly limits all junior college attendees to a maximum of three years of NCAA Division I competition — regardless of whether they competed in a junior college sport. Under the Three-Year Transfer Limitation, the NCAA has disadvantaged former JUCO players by limiting them to three seasons of Division I competition, compared to the four seasons granted to all other football players.

11

**B. Relevant Market**

The relevant market in the post-*Alston* and post-*House* landscape is the national labor market for NCAA Division I football athletes' services. This market excludes JUCO, the National Association of Intercollegiate Athletics ("NAIA"), lower NCAA Divisions, and professional leagues because all these football-playing possibilities offer meaningfully different compensation, exposure, and advancement opportunities. There are zero practical alternatives that provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletics services for the payment of the partial or full cost of an education plus room and board; (ii) high quality academic educational services; (iii) top-of-the-line training facilities; (iv) high quality coaches that will best be able to launch players to professional careers; (v) national publicity through national championships and nationwide broadcasting contracts; (vi) opportunities to profit from NIL agreements; and (vii) competition at the highest level of collegiate athletics.

JUCO athletics is tied to the NCAA, though the relationship is not formal. JUCOs often serve as an educational and athletic developmental service for the NCAA. For example, an academically ineligible player at the time of high school graduation id granted NCAA eligibility by earning a JUCO degree. Likewise, a potential NCAA football player may develop or hone athletic skills in JUCO to be better prepare for NCAA football.

Despite no formal arrangement, JUCO presents both an economic complementary and substitutability effect to the NCAA, and for potential NCAA athletes. NCAA policies regarding eligibility may harm JUCO members and potential JUCO athletes even though these institutions, and their football programs, are not by any reasonable economic evaluation competitors in a relevant labor market with Division I NCAA football.

12

The NAIA has lost more than 50% of its membership since the mid-1970s, with most former NAIA institutions converting to NCAA Division II or Division III affiliations. The level of competition in the NAIA corresponds to the lower-level NCAA divisions. The NAIA is not a realistic challenger to the NCAA monopsony on Division I football talent any more than the Canadian Football League is an economic threat to the NFL.

The absence of close substitutes for NCAA Division I football is critical. Alternative systems — JUCO, NAIA, or lower NCAA divisions — do not provide comparable exposure, NIL opportunities, or professional pathways. Consequently, access to Division I is economically unique, and NCAA eligibility rules function as strict gatekeeping restrictions on entry to that labor market.

The Supreme Court has confirmed this market definition. As stated in *Alston*, "NCAA's Division I essentially is the relevant market for elite college . . . football." The Court further accepted "the uncontested premise that the NCAA enjoys monopsony control in the relevant market — such that it is capable of depressing wages below competitive levels for student-athletes and thereby restricting the quantity of student-athlete labor."

**C. NCAA Market Power**

The NCAA exercises substantial market power in the specifically defined relevant market for elite college football players. Through its member institutions' collective agreements on eligibility rules, the NCAA controls and limits exactly who may participate in Division I FBS football, and under what conditions.

Economic research has consistently determined that the NCAA holds significant monopsony power over its labor markets. Nobel Laureate Gary Becker in 1987 characterized the NCAA as a

"cartel in sheepskin clothing." Formal economic inquiries since the early 1990s have consistently determined that the NCAA holds significant monopsony power over its labor markets.

Eligibility rules serve as a primary mechanism for exercising that power. By limiting the duration of participation and by counting non-NCAA competition — including JUCO and NAIA competition — toward eligibility limits, the NCAA artificially constrains labor supply. The immediate effect is a reduction in the number of experienced and productive athletes available in the market. The downstream effect is a weakening of competitive pressure among schools to offer higher compensation.

The NCAA dominates the labor market for incoming college football players and has created an economic monopsony in the labor market for elite college football players, especially those with professional aspirations and the athletic skills needed to compete at the level represented by NCAA Division I, and the FBS level in particular. The NFL does not permit new entrants until a time at least three years beyond their high school graduation date, pushing talented players toward some form of higher education for at least three years.

On cross-examination in a related case (*Elad v. NCAA*), the NCAA's own economics expert, Dr. Flyer, testified that "he did not object to defining the relevant market in this case as 'the labor market for college football athletes in general and NCAA Division I football players in particular.'" Dr. Flyer conceded that the Supreme Court's decision in *Alston*, and the NIL deals that have emerged after it, have introduced a commercial aspect to collegiate athletics. He agreed that *Alston* had changed the landscape and that NCAA rules on compensation and eligibility are commercial.

**D. The Challenged Rules Are Horizontal Restraints**

14

The NCAA is an organization comprised of member institutions that represent very separate legal entities. The NCAA collectively, through cooperative agreements among its members, determines what constitutes the eligibility rules for student athletes. The rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among the NCAA member institutions. The regulations imposed by the NCAA that restrict competition for the services of athletes represent horizontal agreements that violate the Sherman Act. Horizontal restraints involve agreements between direct competitors, at the same level in a particular industry, to reduce competition. NCAA eligibility rules are most accurately characterized as horizontal restraints that regulate entry into and participation within the market for student-athlete labor. Member institutions — direct competitors for athletic talent — collectively agree to limit both who may participate and the duration of that participation. In antitrust terms, this is coordinated conduct that restricts output in a labor market.

These rules exhibit the defining characteristics of a group boycott. A group boycott arises where competitors jointly refuse to deal with a category of market participants. Here, NCAA institutions collectively decline to offer roster positions, scholarships, and NIL opportunities to athletes who have exhausted eligibility under NCAA-defined criteria — even where those athletes remain capable of competing and whose services are clearly in demand. This exclusion is not based on competitive merit, but on prior participation and the operation of an eligibility clock. Athletes who begin their careers at junior colleges, NAIA programs, or other non-NCAA institutions are systematically disadvantaged and ultimately excluded earlier than similarly situated athletes who begin within the NCAA system.

Because the challenged eligibility restrictions are targeted directly at athletes who participated at the JUCO or NAIA level, and not those who competed at a prep school, in other sports, joined the

Armed Services, or otherwise delayed their NCAA participation, this rule represents a "group boycott," which is a per se antitrust violation of the Sherman Act.

**E. The Challenged Rules Are Commercial in Nature**

The NCAA's frequent contention that the Challenged Rules are not "commercial" in nature and therefore are not subject to the Sherman Act does not reflect current market realities whereby, pursuant to the provisions of express contracts between the NCAA's member institutions and athletes, athletes now earn compensation from NIL compensation, which is typically administered through NIL collectives tied to their university's athletic departments. The Supreme Court's decision in *Alston* marked the decisive shift in the antitrust treatment of NCAA regulations. Rejecting the NCAA's longstanding claim to judicial deference, the Court held that limits on education-related benefits violated Section 1 of the Sherman Act and must be evaluated under ordinary antitrust principles. The Court emphasized that "the NCAA is not above the law." In the wake of *Alston* and with the advent of NIL compensation, and now with the *House*-mandated revenue sharing, NCAA eligibility rules that determine who can participate in the market are inherently commercial in nature. An eligibility rule directly determines who has access to a commercial marketplace; the rule is thus commercial and must pass Rule of Reason analysis to survive under the Sherman Act.

As of the 2025-26 seasons, the top NCAA football and basketball players earned up to nearly $7 million, with many players earning more than $1 million in NIL payments. The commercial nature of eligibility rules was confirmed on November 25, 2025, by the *Elad v. NCAA* Appeals Court, which issued an opinion finding that the JUCO rule was commercial and therefore subject to antitrust law. With athletes now free to transfer from school to school as many times as they wish and to therefore negotiate new contracts with other schools, the Challenged Rules that arbitrarily

limit a student-athlete to five years of competition, even if the student was still enrolled in college and making progress towards obtaining a degree, are without question commercial in nature.

**F. The Challenged Rules Produce Substantial Anticompetitive Effects**

The Challenged Rules produce three categories of substantial anticompetitive harm in the relevant labor market: output restriction, compensation suppression, and allocative distortion.

*1. Output Restriction*

The Challenged Rules artificially constrain the labor market by categorically excluding older student-athletes from competition — removing as much as 20% of potential participants from the collegiate football labor market. This constraint operates as a horizontal restraint through the collective agreement of NCAA member institutions to refuse the labor of a specific group of student-athletes.

By capping the number of seasons an athlete may compete and by counting participation at non-NCAA institutions — including JUCO and NAIA programs — toward that cap, the NCAA reduces the total quantity of labor available in Division I athletics. This reduction is not offset by alternative opportunities of comparable value; JUCO, NAIA, and lower-division programs do not provide equivalent exposure, NIL opportunities, or professional pathways. The exclusion of athletes from Division I therefore represents a net decrease in market output.

Junior college football players historically have made up two-thirds of the market for transfers to the highest level of Division I FBS schools, with 10% of NCAA Division I's FBS new roster spots attributable to junior college transfers in 2019. There were 1,062 NJCAA alumni on NCAA Division I football rosters as of October 2025; FBS rosters include 552 of those players, with 178 of those on elite Power Four conference rosters. Removing or curtailing these athletes'

participation based on prior time at JUCO or NAIA programs represents a demonstrable reduction in the quantity of experienced labor available in the relevant market.

### 2. Compensation Suppression

The NCAA's arguments that eligibility rules are a zero-sum or economically neutral game — that when one player's eligibility ends, a roster spot opens for a new player, so the net welfare benefit is exactly zero — are wrong. There is quantifiable harm placed on the entire group of newly ineligible athletes. As the Supreme Court recognized in *Alston*, the NCAA causes anticompetitive harms to the labor market for student-athletes by "depressing wages below competitive levels and restricting the quantity of student-athlete labor" through the exercise of monopsony power.

This restraint is particularly problematic because it targets precisely those athletes who command the highest market value. In effect, the NCAA and its member institutions have implemented a system that automatically removes their most "expensive" players from the market each year, creating an artificial ceiling on compensation that would not exist in a competitive market.

Crucially, the restriction of labor supply and the suppression of compensation are not independent phenomena; they are jointly determined outcomes. As standard economic models predict, a reduction in employment levels enables the buyer to set wages below competitive benchmarks. Eligibility rules therefore do not merely correlate with lower compensation — they function as a mechanism for producing it.

Moreover, the NCAA membership benefits financially from the churn of athletes entering and exiting. Incoming players are less expensive than their departing replacements, particularly in the current NIL era where the highest level of NCAA football conferences, the Power 4, directly

18

provide athletes compensation. There is doubtless a financial advantage in moving older players out and replacing them with younger players. It is not a zero-sum proposition.

The interaction between eligibility rules and other NCAA policies further reinforces this dynamic. Roster limits — formalized in the *House* settlement — cap the number of available positions, while eligibility rules determine which athletes may fill those positions. Together, these constraints systematically remove higher-value, more experienced athletes and replace them with lower-cost entrants. This pattern is consistent with monopsonistic control over both the quantity and composition of labor.

### 3. Allocative Distortion

The rules distort allocation. Athletes adjust educational and athletic decisions in response to eligibility constraints. By penalizing participation at non-NCAA institutions, the rules discourage efficient developmental pathways. Athletes who would benefit from JUCO or NAIA programs may instead enroll prematurely at NCAA institutions to preserve eligibility, reflecting regulatory distortion rather than efficient sorting of talent.

The NCAA's eligibility rules tip the recruiting advantage for those at the academic and athletic margins to the NCAA. This comes at the expense of many potential football players considering their best athletic and educational options. NCAA Division I competition offers a football player significant advantages over JUCO football — greater exposure, better coaching, and considerable financial advantages from NIL. Thus, when confronted with a choice of four years to play in the NCAA versus two years in JUCO or NAIA and only two more in the NCAA, the four-year NCAA option is often the better choice for those fresh from high school who qualify both academically and in terms of athletic potential. Notwithstanding, the option of two JUCO or NAIA years followed by four years at an NCAA institution may be the best option for many high school

19

athletes who are at the academic and athletic margins. The rule requiring the forfeiture of NCAA eligibility given JUCO or NAIA participation discounts that choice.

The twofold requirement that NCAA athletes be properly disposed for athletic competition and academically qualified per the NCAA's Proposition 16 provides an important cooperative function for JUCOs and NAIA programs. A potential college football player may not, at age 18, be athletically ready for the highest level of college competition. Athletic skills and physiques can be developed playing JUCO or NAIA football so that an undersized and under-skilled eighteen-year-old player may upgrade athletically to Division I ability. This is particularly important in football, where size and strength — which can be significantly augmented for males after age 18 — are critical components of a player's capacity for success. Many football players who started their college careers in JUCO have moved to NCAA Division I and then to the NFL, including current and recent stars like Aaron Rodgers, Tyreek Hill, LaVonte Davis, and Cam Newton.

Non-NCAA institutions function as developmental complements, yet NCAA rules treat their participation as equivalent to Division I competition for eligibility purposes. This misalignment impairs talent development and reduces overall welfare.

**G. The NCAA's Procompetitive Justifications Fail**

The NCAA's purported justifications for the Challenged Rules fail to withstand scrutiny in the post-*Alston* landscape. The traditional justifications of preserving amateurism, promoting competitive balance, and integrating athletics and education are not served by these rules.

*1. Amateurism*

The preservation of amateurism does not require categorical exclusion of athletes based on prior participation at non-NCAA institutions. As the Supreme Court made clear in *Alston*, the NCAA's

conception of amateurism is not a free-standing defense to antitrust liability. Even if some limits on compensation or participation could be justified to maintain a distinct product, eligibility rules that penalize alternative developmental pathways do not meaningfully advance that objective. They do not preserve amateurism; they restrict access to a commercial marketplace.

### 2. Competitive Balance

The NCAA's claim that eligibility rules promote competitive balance is unpersuasive. Excluding experienced athletes does not inherently equalize competition and may instead advantage programs with superior recruiting pipelines by forcing turnover among established players. More importantly, competitive balance — assuming it is a legitimate objective — can be pursued through less restrictive mechanisms, such as scholarship allocation, revenue-sharing rules, or conference-level regulation, none of which require excluding athletes from participation. The claim that maintenance of the eligibility rules is procompetitive because forcing out older players creates new academic and athletic opportunities for their incoming replacements is undermined by the *House*-imposed roster limits, which surely indicate that creating opportunities for new athletes is not actually a concern of the NCAA.

### 3. Educational Integration

The asserted goal of integrating athletics and education is weakly connected to the challenged restraints. Eligibility limits are tied to the passage of time rather than academic progress. Athletes may remain enrolled, in good standing, and advancing toward a degree, yet be barred from participation solely because their eligibility has expired. This temporal restriction is therefore poorly tailored to educational objectives. The argument that the challenged rules better preserve the alignment of academic and athletic careers ignores that the U.S. Department of Education's college graduation statistics are based on a six-year period from entrance date to graduation. The

six-year period an athlete requires to complete both a JUCO associate degree and a bachelor's degree from an NCAA institution is precisely the same time a typical student takes to earn the same bachelor's degree. Furthermore, to diminish the contribution of a JUCO education contradicts NCAA policy itself — under Proposition 16, academic non-qualifiers are required to graduate from their two-year JUCO program to become eligible for NCAA participation, which implies the NCAA believes the value of a JUCO education is not only satisfactory but necessary to demonstrate academic capability.

### 4. Product Differentiation

The NCAA's argument that the eligibility rules differentiate the NCAA football product from professional football and thereby protect consumer demand lacks empirical support. Empirical studies have shown that when amateur rules were relaxed to allow some compensation, demand for NCAA football was not diminished as the NCAA claimed would be the case. For example, the COVID waiver policy granted an extra year for many athletes with no apparent reduction in demand for NCAA football. There is no reason to believe that reduced demand would follow if the challenged rules were abolished.

### H. Less Restrictive Alternatives Exist

The third step in Rule of Reason analysis requires the court to determine if the desired effect could be achieved through an alternative means that is less restrictive on competition. A simple, readily available alternative is to count only seasons of competition at NCAA institutions against the four-season competition limit. This alternative would be consistent with the treatment of other non-NCAA experiences. Athletes who attend prep schools, join the Armed Services, serve on official religious missions, or otherwise delay NCAA participation do not have those years counted against their eligibility clock. There is no principled reason why years spent at JUCO or

22

NAIA institutions should be treated differently. The NCAA could also limit eligibility based solely on participation at Division I institutions rather than counting time spent at non-NCAA schools; it could adopt individualized waiver systems that account for academic progress or developmental circumstances; or it could rely more directly on academic eligibility standards rather than rigid temporal limits. Each of these approaches would maintain the NCAA's stated objectives without excluding a defined class of athletes from the market. The NCAA's failure to adopt such alternatives is probative. It suggests that the challenged rules are not narrowly tailored but instead reflect a preference for administratively simple restrictions that suppress the labor market.

This alternative extension of eligibility seems to be a minor change that would benefit a subset of NCAA athletes at little cost, and there is no history to suggest that omitting junior college and NAIA seasons from the NCAA eligibility count would have any impact on consumer behavior.

## I. The *House* Settlement Reinforces the Antitrust Analysis

The *House v. NCAA* settlement alters the form, but not the substance, of NCAA control over the labor market for student-athletes. While the settlement authorizes direct revenue sharing between athletes and their institutions (commencing at $20.5 million per institution in the 2025-26 season), it simultaneously imposes roster limits that cap the number of athletes who may participate on each team.

From an antitrust perspective, roster limits are an explicit output restriction. By fixing the number of available positions and capping compensation, the NCAA reduces the total quantity of labor that can be employed and the amount of payment for athlete services in Division I athletics. This quantity constraint operates alongside eligibility rules, which determine which athletes may fill the limited slots.

23

The interaction between the *House* settlement and the eligibility rules creates a dual constraint on labor supply: (1) fewer total positions through roster caps and (2) fewer eligible workers through eligibility limits. Together, these constraints enable coordinated control over both the quantity and composition of labor in the market — the textbook definition of monopsony behavior. The *House* settlement should not be understood as a procompetitive correction. It is better viewed as an adaptation of the regulatory regime — one that continues to rely on output restriction and labor exclusion. Far from undermining the antitrust critique, the settlement provides additional evidence that NCAA rules are designed to control labor supply in a manner consistent with coordinated monopsony behavior.

**IX. CONCLUSION**

The Challenged Rules which count JUCO and NAIA participation toward the NCAA limits on seasons of eligibility represent a horizontal restraint among competing buyers of labor that artificially suppresses wages by mandating systematic replacement of the most valuable workers with the least valuable ones. This creates market-wide anticompetitive effects that extend far beyond individual harm to any one athlete. NCAA eligibility rules are not neutral administrative provisions; they are coordinated restraints imposed by horizontal competitors that restrict output, suppress compensation, and exclude a defined class of labor from a commercial marketplace. Whether analyzed under a rigorous rule-of-reason framework or as a form of group boycott, NCAA eligibility rules should not withstand scrutiny under Section 1 of the Sherman Act.

The NCAA fundamentally mischaracterizes the economic issues at stake. It ignores binding Supreme Court precedent regarding the NCAA's monopsony power, relies on economic theories that contradict its own stated conclusions, and advances consumer welfare arguments that lack

empirical support. Recognizing this would do more than resolve the disputes at issue; it would align antitrust doctrine with the economic realities of modern, commercialized college athletics.

## X. CERTIFICATION

I certify that, to the best of my knowledge and belief:

A.  The statements of fact in this report are true and correct.

B.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and are my personal, unbiased, and professional analyses, opinions, and conclusions.

C.  I have no personal interest or bias with respect to the parties involved.

D.  My compensation is not contingent on an action or event resulting from the analyses, conclusions, or opinions of this Declaration.

E.  I reserve the right to modify and/or supplement my opinions based on any additional information and as this litigation progresses.

_____

**Joel G. Maxcy, Ph.D.**

Professor, LeBow College of Business, Drexel University

Philadelphia, Pennsylvania

Date: ____15 May 2026_____

25

# EXHIBIT "C"

Woodrow K. Glass (Pro Hac Vice Pending)
Oklahoma Bar No. 15690
GEOFFREY A. TABOR (Pro Hac Vice Pending)
Oklahoma Bar No. 32880
CHLOE N. GLASS (Pro Hac Vice Pending)
Oklahoma Bar No. 36646
**GLASS & TABOR, LLP**
1601 36th Avenue NW
Norman, OK 73072
Phone: 405-360-9700
Email: geoffrey@glasstaborlaw.com; woody@glasstaborlaw.com; chloe@glasstaborlaw.com

Timothy R. O'Reilly
Nevada Bar No. 8866
**O'REILLY LAW GROUP**
325 S Maryland Parkway
Las Vegas, NV 89101
Phone: 702-382-2500
Email: efile@oreillylawgroup.com

**ATTORNEYS FOR PLAINTIFF COHEN FULLER**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| COHEN FULLER,<br><br>**Plaintiff,**<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>**Defendant**. | Case No.<br><br>**DECLARATION OF COHEN FULLER** |

I, Cohen Fuller, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**1.** I am the Plaintiff in the above-captioned matter and make this declaration in support of my Emergency Motion for a Temporary Restraining Order and Preliminary Injunction.

1

**2.** I am most recently have been a student-athlete at the University of Nevada, Las Vegas, and have been a member of the school's Division I football team, where I play on the defensive line.

**3.** I began my collegiate football career at Graceland University in Lamoni, Iowa, a member institution of the National Association of Intercollegiate Athletics ("NAIA"), where I did not compete in any NCAA Division I football games.

**4.** After completing my time at Graceland University, I transferred to El Camino College in Torrance, California, a junior college ("JUCO"), where I also did not compete in any NCAA Division I football games. Following El Camino College, I transferred to Coastal Carolina University in Myrtle Beach, South Carolina, where I participated in my first NCAA Division I football season in 2024, playing in eleven games. I then transferred to the University of Nevada, Las Vegas, where I participated in my second NCAA Division I football season in 2025, playing in twelve games.

**5.** In total, I have only participated in two of the four seasons of NCAA Division I football that I am eligible to compete in.

**6.** The NCAA has informed me that I am ineligible to compete in any further NCAA Division I seasons due to my JUCO and NAIA seasons.

**7.** I have not yet exhausted my four seasons of NCAA Division I eligibility. The NCAA's denial is based on my prior participation at non-NCAA institutions, not on any misconduct or ineligibility due to academic or athletic performance.

**8.** The NCAA denied my eligibility, and both UNLV and I exhausted my administrative remedies with the NCAA before filing this lawsuit.

2

9. As a result of the NCAA's decision, I stand to lose pending NIL opportunities and available revenue-sharing compensation through UNLV's athletic program, which UNLV has made available to me contingent on my eligibility. As a result of my current status, I have already missed out on several NIL opportunities, including participation in UNLV's revenue-sharing structure and practice.

10. In addition to these financial harms, I will lose my remaining opportunities to play in front of NFL scouts and professional teams, which could permanently derail my goal of playing professional football.

11. I have complied with all academic and conduct requirements and have done everything within my power to remain eligible.

12. While playing at the NAIA and JUCO levels, I had no reasonable opportunity to earn any Name, Image, and Likeness ("NIL") compensation, and in fact earned no NIL money during that time.

13. I have dreamed of playing in the NCAA and National Football League ("NFL") my entire life. The opportunity to play at the NCAA Division I level provides the only viable route to help me achieve that goal, as it serves as the principal pathway to professional football opportunities.

14. If this Court does not grant my emergency relief request, my athletic career at the NCAA Division I level will be over and I will suffer irreparable harm that cannot be undone, because the opportunities to play, develop, and participate in NIL and revenue-sharing arrangements will be lost forever.

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on MAY _____14_____, 2026

COHEN FULLER

4

# EXHIBIT "D"

Woodrow K. Glass (Pro Hac Vice Pending)
Oklahoma Bar No. 15690
Geoffrey A. Tabor (Pro Hac Vice Pending)
Oklahoma Bar No. 32880
Chloe N. Glass (Pro Hac Vice Pending)
Oklahoma Bar No. 36646
**GLASS & TABOR, LLP**
1601 36th Avenue NW
Norman, OK 73072
Phone: 405-360-9700
Email: geoffrey@glasstaborlaw.com; woody@glasstaborlaw.com; chloe@glasstaborlaw.com

Timothy R. O'Reilly
Nevada Bar No. 8866
**O'REILLY LAW GROUP**
325 S Maryland Parkway
Las Vegas, NV 89101
Phone: 702-382-2500
Email: efile@oreillylawgroup.com

**ATTORNEYS FOR PLAINTIFF COHEN FULLER**

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| COHEN FULLER,<br><br>**Plaintiff,**<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>**Defendant**. | Case No.<br><br>**DECLARATION OF GEOFFREY A. TABOR, ESQ.** |

I, Geoffrey A. Tabor, Esq., declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney licensed to practice law in the State of Oklahoma and am counsel of record for Plaintiff Cohen Fuller ("Plaintiff" or "Fuller") in the above-captioned matter, appearing pro

1

hac vice. Timothy R. O'Reilly, Nevada Bar No. 8866, of the O'Reilly Law Group, LLC, serves as local Nevada counsel for Plaintiff in this action.

2. I am a Partner at the law firm Glass & Tabor, LLP in Norman, Oklahoma, attorneys for Plaintiff in this action.

3. I am familiar with the facts and procedural posture of this case and submit this Declaration in support of Plaintiff's Emergency Motion for a Temporary Restraining Order and/or Preliminary Injunction enjoining the NCAA from enforcing certain eligibility rules that bar Fuller from competing in the 2026-2027 and 2027-2028 NCAA Division I football seasons:

A. NCAA Bylaw 12.02.3 ("Definitions and Applications: Intercollegiate Competition");

B. NCAA Bylaw 12.1 and all applicable subparts ("Athletics Eligibility");

C. NCAA Bylaw 12.6 and all applicable subparts ("Seasons of Competition: Five-Year Rule");

D. NCAA Bylaw 12.9 and all applicable subparts ("Ineligibility");

E. NCAA Bylaw 14.02.4 ("Definitions and Applications: Collegiate Institution");

F. NCAA Bylaw 14.3.3 ("Seasons of Competition – Nonqualifiers");

G. NCAA Bylaws, Article 12 ("Athletics Eligibility") regarding the eligibility calculations, qualifications, or standards regarding student-athletes who have competed at JUCO or NAIA schools and/or who have eligibility matters regarding the administration of four years of competition within the five-year window; and

2

**H.** Any other Bylaws, Articles, or enforcement mechanisms regarding the eligibility calculations, qualifications, or standards regarding student-athletes who have competed at JUCO or NAIA schools and/or who have eligibility matters regarding the administration of four years of competition within the five-year window

4. Attached to Plaintiff's Complaint and Emergency Motion are true and correct excerpts of the pertinent NCAA Division I Bylaws and Rules at issue in this case.

5. Pursuant to LR 7-4, this matter is submitted on an emergency basis. Plaintiff requests that the briefing schedule and hearing schedule for this matter regarding Plaintiff's preliminary injunctive relief be placed on an expedited schedule. The contact information for all parties and their counsel is as follows: (a) Counsel for Plaintiff: Woodrow K. Glass, Geoffrey A. Tabor, and Chloe N. Glass, Glass & Tabor, LLP, 1601 36th Avenue NW, Norman, OK 73072, Phone: 405-360-9700, Email: geoffrey@glasstaborlaw.com; woody@glasstaborlaw.com; chloe@glasstaborlaw.com (PRO HAC VICE PENDING); and Timothy R. O'Reilly, O'Reilly Law Group, LLC, 325 S Maryland Parkway, Suite 100a, Las Vegas, NV 89101, Phone: 702-812-3339, Email: tor@olglaw.com; (b) Defendant, National Collegiate Athletic Association: Plaintiff will provide immediate notice to the NCAA and its counsel upon filing of this Motion. I do not know with certainty what counsel will represent the NCAA in this matter once it is filed, but I have already made contact with local counsel of record for the NCAA who served on recent similar student-athlete eligibility cases filed in this Court (the Martinson, Braham, and Blythe cases), who is John M. Naylor (Nevada Bar No. 5435) of Naylor & Braster (10100 W Charleston Blvd., Las Vegas, NV 89135). I informed Mr. Naylor of our intent to file this lawsuit and injunctive relief, and also informed him that I would forward the filed pleadings to him after this action is initiated.

3

6. This matter is urgent because Division I spring practice for the 2026-2027 season has already occurred and summer workouts are currently happening, summer/fall camp for formal preparation for the 2026-2027 season is soon approaching, and Fuller is being denied the opportunity to participate, practice, and ultimately play in the 2026-2027 season. Fuller is a student-athlete enrolled at the University of Nevada, Las Vegas ("UNLV") and plays on the defensive line for the UNLV football team. His eligibility status will directly determine whether he may participate in spring practice, summer training camp, and the 2026-2027 football season. Delays in relief irreparably prejudice his ability to integrate into the team's defensive scheme, develop a rapport with coaching staff and teammates, and prepare for competition.

7. The loss of eligibility has resulted in the forfeiture of Fuller's pending NIL opportunities and available revenue-sharing compensation through UNLV's athletic program, which UNLV has made available to Fuller contingent on his eligibility. Fuller has already missed out on several NIL opportunities, including participation in UNLV's revenue-sharing structure, as a direct result of the NCAA's current eligibility determination. The loss of these opportunities cannot be undone. Delays in judicial relief will irreparably damage Fuller's ability to secure athletic, financial, and academic opportunities within his limited remaining eligibility window.

8. I have met and conferred with local counsel for the NCAA (John M. Naylor) from the prior recent student-athlete cases noted above to address this dispute. I have been unable to resolve this matter without court action. I met and conferred with counsel for the NCAA over a phone call on May 14, 2026 at 11:22 AM CST regarding Fuller, this lawsuit, and the forthcoming Emergency Motion before filing this Declaration and Emergency Motion with the Court.

4

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED JUNE 25, 2026

GEOFFREY A. TABOR

# EXHIBIT "E"

 **Requests/Self-Reports Online**

| | | |
|---|---|---|
| Institution: University of Nevada, Las Vegas | Division: I | Case ID: 1255828 |
| Case Type: Legislative Relief Waiver | Cohen Fuller | Date: 03/02/2026 |

Page 1 - General Information

# General Information

## Institution Information

| | |
|---|---|
| Institution Information | University of Nevada, Las Vegas |
| Division of Institution | I |
| Conference | Mountain West Conference |
| Phone Number | 702/895-3011 |
| Academic year related to this request | 2025-26 |
| Did you receive a phone waiver from NCAA staff for this request?* | No |
| Is this request coming from a NCAA Committee? * | No |
| Have you contacted AMA or your conference office regarding the specific facts for this request? | No |

## Sub Case Types

### Please check all the Legislative Relief Waiver sub-case types and conditions that apply*

Request for a Prospective Student-Athlete or Student-Athlete

**Request for a Prospective Student-Athlete or Student-Athlete Sub-Case Types**
Amateurism; Financial Aid; Awards, Benefits and Expenses (DI Only)

## Legislation Related to this Request

| | |
|---|---|
| Select a primary sport associated with this request.* | Football |

| | |
|---|---|
| Identify any additional sport(s) associated with this request. | DI Football |
| Describe the institution's request for relief.* | Exhaust SA's administrative remedies prior to seeking to add name to Pavia/Patterson litigation. |

| Provide cite(s) of applicable legislation or interpretation * | Type | Division | ID | Text |
|---|---|---|---|---|
| | Bylaw | I | 12.6 | Seasons of Competition: Five-Year Rule. |

Provide case numbers of any precedent relevant to this request

## Student-Athlete Information

Is this request for multiple student-athletes?    Yes

Please enter the student-athlete NCAA ID's that are part of this request.

| | NCAA ID | Student Information | |
|---|---|---|---|
| 1. | 2401194041 | Cohen Fuller | |

## Affected Sport(s) and Competition Information

Institution's Next Date of Competition for this Sport*    08/22/2026

Institution's Next Location of Competition for this Sport*    Away

Date of departure*    08/22/2026

## Case Prioritization Information

### Cases are prioritized based on next date of competition/date of event and requests for expedited review

Does this case require expedited review?*    No

## Student-Athlete Enrollment Information

Page 2 - Case Information

# Case Information

Provide information pertinent to this case

# Case Information

## All Requests

| | |
|---|---|
| Describe the facts associated with this request* | SA is a true senior in 25-26 and used four seasons of competition in four years. SA initially enrolled at Graceland Community College in Fall 2022 and used a season of competition. SA transferred to El Camino in Fall 2023 and used a second season of competition. SA transferred to Coastal Carolina in Fall 2024 and used a third season of competition. SA transferred to applicant institution in Spring 2025 and used his final season of competition in Fall 2025. SA utilized a season of competition at a junior college, exhausted eligibility in Fall 2025 and has an additional year remaining in his five year clock. SA would like to exhaust all administrative remedies prior to adding his name to Patterson/Pavia pending litigation. |
| What are any relevant mitigating circumstances that should be considered when reviewing the request?* | SA does not meet the 2024 Pavia Blanket Waiver because he did not exhaust all eligibility in Fall 2024. SA exhausted his eligibility in Fall 2025 and would otherwise meet a Pavia blanket waiver if it were extended an additional year. In the event that a Pavia blanket waiver is not extended an additional year, SA would like to exhaust all administrative remedies prior to adding his name to the Patterson/Pavia pending litigation. SA does not meet extension of eligibility waiver criteria as the NCAA's Pavia waiver, at this time, has not been extended an additional year. Institution is submitting legislative relief wavier request to codify SA's exhaustion of administrative remedies. |
| Have you previously contacted any NCAA staff regarding this request?* | No |

# Student-Athlete Information

## All Requests

| | |
|---|---|
| Indicate whether the individual is a prospective or enrolled student-athlete* | Enrolled Student-Athlete |
| Provide the final academic and amateurism certification report (PSA Details Report)* | [Final Certification from Eligibility Center](#) |
| Was the student-athlete recruited by institutions previously attended?* | Yes |
| What are the names of the institutions the student-athlete previously attended and which recruited him or her?* | Graceland, El Camino, Coastal Carolina, UNLV |

| | |
|---|---|
| Will or has the student-athlete been offered or received athletically related financial aid? | Yes |
| Please provide a statement from student-athlete regarding the circumstances of this request. | [NCAA_Statement.docx](#) *(Uploaded on 12/30/2025 by Justin Campbell)* |
| Was the student-athlete recruited?* | Yes |
| When did recruitment begin?* | 01/01/2025 |

Page 3 - Case Documentation

# *Case Documentation*

Upload supporting case documentation

*(Maximum individual file size is 10MB.)* Upload each document individually.

## *Recommended Documentation*

### *All Requests*

Provide a written statement(s) from any other individuals involved in the circumstances of this request

Provide any documentation not previously specified that substantiates any assertions made in this request

Page 4 - Signatures

# *Signatures*

Upload and review any signature documents

## *Select Required Signatories*

### STOP! IF USING E-SIGN OPTION:

- The signatory email address (in the NCAA Directory) MUST match the email address in NCAA Business Applications (e.g., Single-Source Sign On).
- The signatory MUST have been granted access to Requests/Self-Reports Online by the on-campus Single-Source Sign On administrator in the NCAA Business Application Administrative tool.

- If the signatories do not meet these qualifications, select UPLOAD. Do NOT select e-sign unless the above criteria is met.

## Institutional Authority Outside of Athletics Department*

Signatory                    Approved  by Tony Terrell on 12/30/2025

## Institutional Authority Inside of Athletics Department*

Signatory                    Approved  by Justin Campbell on 12/30/2025

## Buckley Statement - Student-Athlete*

Signatory

Signed_Buckley_Statement.pdf *(Uploaded on 12/30/2025 by Justin Campbell)*

## Download Unsigned Signature Documents

- Institutional Authority Outside of Athletics Department
- Institutional Authority Inside of Athletics Department
- Conference Personnel
- Buckley Statement *A Buckley Statement form is required for submission for all cases involving a student-athlete or prospective student-athlete.*
- *A Third Party Buckley Statement must be completed in order for a third party individual (e.g., parent, attorney) to discuss a student-athlete's case with the NCAA staff. The Third Party Buckley Statement has been placed in the General Case Information section located on the Resources tab.*

Page 5 - Case Contacts and Submission

# Case Contacts and Submission

Select case contacts and submit your request

## Select Contacts for this Case

Primary Contact              Justin Campbell (justin.campbell@unlv.edu ) Phone: 704/989-9440 Cell: 704/989-9440

Secondary Contact            Jonathan Pyke (jonathan.pyke@unlv.edu ) Phone: 614/804-5948 Cell: 614/804-5948

## Additional Case Contacts

Additional contacts with a valid email address from the conference or member institution will receive selected e-mails related to the case.

| Email Delivery | First Name | Last Name | Title | E-mail Address | |
|---|---|---|---|---|---|

*Terms and Conditions*

## Disclaimer Terms and Conditions

By submitting information related to this request, I affirm that I have read and understand the application of NCAA Bylaw 10.1 and the information provided is accurate and complete to the best of my knowledge.

Agreement by Justin Campbell on 12/30/2025

# Activity After Case Submission

## *Responses to Requests for Additional Information*

 **Requests/Self-Reports Online**

Institution: University of Nevada, Las Vegas

Case Type: Legislative Relief Waiver

Division: I

Cohen Fuller

Case ID: 1255828

Date: 02/24/2026

[Decision PDF](#) 🔗

## *Decision*

Your feedback is important. Would you like to give praise, report a problem or share an idea? With your help and input, we can continue to improve Governance and Member Service's service and the RSRO submission process.

**Provide Feedback**

**Decision**

Denied

**Decision Date**

01/13/2026

## Conditions

## Rationale

Case precedent.:

(Sub)Committee for Legislative Relief Guideline(s).:

NCAA Division I Committee for Legislative Relief February 2022 guideline regarding waivers involving requests for an additional season of competition.


Circumstances do not warrant relief of the legislation.:

Specifically, staff noted: (1) The NCAA Division I Board of Directors blanket waiver was not extended for student-athletes who exhausted eligibility in 2025-26 to remain eligible and compete in 2026-27; and, (2) Student-athlete is being treated in a manner consistent with all student-athletes who did not exhaust eligibility during the 2024-25 academic year.

If you accept this decision, click "I Accept" below. Once you accept the decision the case will be closed. Do not click "I Accept" if your institution intends to appeal the decision. An appeal must be submitted within 30 days of the decision issued date and shall be submitted via the case "Withdraw/Appeal/Reconsideration" tab.

**I Accept**

# EXHIBIT "F"

# NCAA.org



Division I adopts age-based eligibility model
Single standard replaces sport-specific rules and waivers; changes will be fully implemented for fall 2027 incoming class
Meghan Durham Wright
Media Center
Posted: 6/23/2026 5:46:00 PM

The Division I Cabinet on Tuesday unanimously approved a sweeping overhaul of eligibility rules for student-athletes, permitting Division I student-athletes up to five years of eligibility if they enroll in college no later than the academic year after their 19th birthday. The new rule streamlines a significant portion of the Division I rule book by eliminating season-of-competition limits, sport-specific eligibility and redshirt rules, and eligibility extension waivers.

The changes are not final until the Cabinet meeting concludes Wednesday.

"With these changes, the Cabinet has taken decisive action for the benefit of student-athletes and the system of NCAA Division I athletics," said Josh Whitman, athletics director at Illinois and chair of the Cabinet. "For many student-athletes who enroll in college immediately after high school, these changes will result in the opportunity to potentially compete for an additional season in their chosen sport. For campus officials and coaches, this change provides rules that are simpler to administer and easier to predict for roster management decisions."

The reforms will align athletics eligibility with enrollment and graduation patterns for the general student population.

"While previous NCAA rules have served college sports well for a long time, we heard also loud and clear from NCAA members and student-athletes that eligibility rules should be easier to understand," NCAA President Charlie Baker said. "This change to an age-based model eliminates aspects of the rules that have proven difficult to administer in the current litigious environment and clearly defines the exceptions available in limited circumstances, while preserving the long-intended alignment of eligibility with typical college enrollment and graduation patterns, because 98% of the 550,000 NCAA student-athletes will go pro in something other than sports."

The Division I Student-Athlete Advocacy Committee leadership team also issued a statement supporting the rule change.

"The Student-Athlete Advocacy Committee has met with student-athlete leaders across Division I, and we consistently heard that student-athletes want an eligibility model that is simple to understand, transparent to administer, and applied fairly across all sports and schools. This rule change, which clearly establishes an individual's period of eligibility, provides student-athletes with greater certainty as they plan for college and make important decisions regarding enrollment, competition and degree completion."

## Implementation

The rule change will be effective for all prospects initially enrolling full time in college in fall 2027 or later.

For students enrolling full time in college for the first time in fall 2026 and current student-athletes with eligibility remaining after the 2025-26 academic year, Division I schools will apply the previous rules (allowing four seasons of competition within five years) or the age-based model, whichever results in the most favorable outcome for each individual.

| Student-athletes | Which eligibility rules apply |
| --- | --- |
| Student-athletes who used their final season of competition (under previous rules) during 2025-26. | No additional eligibility. |
| Current student-athletes with eligibility remaining (under previous rules) after the 2025-26 academic year. | Either the previous rules OR the new age-based model, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university during 2026-27. | Either the previous rules OR the new age-based model, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university in fall 2027 or later. | The age-based model only. |

## Exceptions

The Cabinet defined the exceptions that could delay or pause an individual's period of eligibility under the age-based rules, which include pregnancy, active-duty military service and official religious missions. These exceptions will only be available if the student-athlete does not participate in organized competition for the duration of the exception.

For consistency throughout Division I, the NCAA Eligibility Center will administer the use of the exceptions.

## Waivers under previous rules

Under the age-based eligibility model, waivers will not be available — including clock extensions and waivers previously granted for hardships, seasons of competition and delayed enrollment.

For current student-athletes with eligibility remaining under the previous rules, schools must submit any season-of-competition or eligibility clock extension waiver requests based on circumstances that occurred during or before the 2025-26 academic year — and all supporting documentation — to the national office no later than July 31, 2026. After that date, waivers of the previous rules will no longer be available.

Copyright ©2026 NCAA.org