John M. Naylor
Nevada Bar No. 5435
Kelly M. Scarborough
Nevada Bar No. 16979
NAYLOR & BRASTER
10100 W. Charleston Blvd., Suite 120
Las Vegas, NV 89135
(T) (702) 420-7000
(F) (702) 420-7001
jnaylor@nblawnv.com
kscarborough@nblawnv.com

*Attorneys for Defendant*
*National Collegiate Athletic Association*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| COHEN FULLER,<br><br>      Plaintiff,<br><br>  vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>      Defendant. | Case No. 2:26-CV-01974-APG-BW<br><br>**BRIEF OF DEFENDANT NCAA IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

RELEVANT FACTS ............................................................................................2

I.    THE NCAA IS A SELF-GOVERNING ASSOCIATION OF SCHOOLS WORKING TO ENSURE FAIR ATHLETIC COMPETITION FOR ALL STUDENT-ATHLETES .............................................................................2

II.    PLAINTIFF ADMITS THAT HE EXHAUSTED HIS ELIGIBILITY BY COMPETING IN FOUR SEASONS OF COLLEGIATE FOOTBALL .................2

III.    PLAINTIFF WAS AWARE HIS JUCO AND NAIA SEASONS AFFECTED HIS ELIGIBILITY BY 2024 BUT REPEATEDLY DELAYED SEEKING RELIEF ....................................................................................................3

ARGUMENT ........................................................................................................4

I.    PLAINTIFF CANNOT MEET THE HEIGHTENED STANDARDS FOR MANDATORY RELIEF THAT WOULD ALTER THE STATUS QUO ..................4

II.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS ...................................................................................................5

A.    This Matter Should Be Dismissed or Transferred in the Interest of Judicial Economy, Pursuant to the First-to-File Rule. ......................................6

1.    Three Pending Tennessee Cases Were Filed Well Before This Case. ...................................................................................................7
2.    The Parties Are Substantially Similar. ..................................................8
3.    The Issues Are Substantially Similar. ...................................................8

B.    Plaintiff Released His Injunctive Relief Claims Pursuant to the *House* Settlement. .......................................................................................9

C.    Plaintiff Fails to Support His Antitrust Claim. .........................................10

1.    The Five-Year Rule Falls Outside the Purview of Antitrust Law .......10
2.    The Five-Year Rule Survives Rule of Reason Analysis .....................11

a.    Plaintiff Does Not Show Anticompetitive Effects in a Relevant Market. ..........................................................................11

(i)    Plaintiff's Proffered Labor Market Is Unsupported. ................................................................12
(ii)    Plaintiff Offers No Evidence of Anticompetitive Effects. .....................................................................15

3.    The Five-Year Rule Is Procompetitive Because It Creates the "Product" that NCAA Members Offer and Increases Competition Among Member Schools for Athletes. ..........................18
4.    There Exists No Substantially Less Restrictive Means by Which the NCAA Could Achieve the Procompetitive Benefits of the Five-Year Rule. .....................................................................................20

D.    The NCAA Did Not Breach the Covenant of Good Faith and Fair Dealing. .........................................................................................22

i

E.    Plaintiff's Tortious-Interference Claim Likewise Falls with His Antitrust Claim..................................................................................22

III.    PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM. ...................................23
IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT INJUNCTIVE RELIEF ...............................................................24

APPENDIX A – Federal District Court Denials of Preliminary Injunctive Relief in NCAA Eligibility Cases

4906-4275-9611\7

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFMS LLC v. UPS Co.*,
105 F. Supp. 3d 1061 (C.D. Cal. 2015) ...............................................................................12

*American Ad Mgmt., Inc. v. General Tel. Co.*,
190 F.3d 1051 (9th Cir. 1999) ...........................................................................................15

*Arbolida v. NCAA*,
No. 25-2079, 2025 WL 579830 (D. Kan. Feb. 21, 2025).....................................................16

*Banks v. NCAA*,
977 F.2d 1081 (7th Cir. 1992) ...........................................................................................18

*Bassett v. NCAA*,
528 F.3d 426 (6th Cir. 2008) .............................................................................................11

*Bellamy v. NCAA*,
No. 3:25-cv-750. 2025 WL 2267761 (M.D. Tenn. Aug. 7, 2025)..............................13, 16, 23

*Bewley v. CVS Health Corp.*,
No. C17-802, 2017 WL 5158443 (W.D. Wash. Nov. 7, 2017) ................................................8

*Bewley v. NCAA*,
No. 23 CV 15570, 2024 WL 113971 (N.D. Ill. Jan. 10, 2024)................................................24

*Biediger v. Quinnipiac Univ.*,
616 F. Supp. 2d 277 (D. Conn. 2009)...................................................................................24

*Blythe v. NCAA*,
No. 26-1106 (9th Cir. Apr. 8, 2026), ECF No. 26 .............................................................1, 14

*Booker v. Am. Honda Motor Co.*,
No. 2:20-CV-05166, 2020 WL 7263538 (C.D. Cal. Oct. 20, 2020) .........................................8

*Bowers v. NCAA*,
974 F. Supp. 459 (D.N.J. 1997) .........................................................................................19

*Boyd v. NCAA*,
No. 3:25-CV-00729, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025).........................7, 8, 17

*Braham v. NCAA*,
794 F. Supp. 3d 824 (D. Nev. 2025)......................................................................................1

*Brzovic v. NCAA*,
No. 2:25-cv-02885, 2025 WL 1370758 (D.S.C. May 11, 2025) ..............................................5

4906-4275-9611\7

*Cascadia Wildlands v. Scott Timber Co.*,
715 F. App'x 621 (9th Cir. 2017) ................................................................................................24

*Christy Sports, LLC v. Deer Valley Resort Co.*,
555 F.3d 1188 (10th Cir. 2009) ..................................................................................................21

*Coley v. NCAA*,
792 F. Supp. 3d 634 (E.D.N.C. 2025)..............................................................................5, 10, 24

*Corp. v. Hydroblok Grant Int'l Ltd.*,
No. 2:22-cv-00457, 2023 WL 2610164 (D. Nev. Mar. 23, 2023) ..............................................6

*CRU Acquisition Grp., LLC v. Mykey Tech., Inc.*,
No. 3:11-CV-05743, 2012 WL 441293 (W.D. Wash. Feb. 10, 2012).........................................7

*Diamond Speedway LLC v. Kolay Flooring Int'l, LLC*,
No. A-21-844035-B, 2024 Nev. Dist. LEXIS 455 (Clark Cnty. Dist. Ct., Mar. 28,
2024) ..........................................................................................................................................22

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ........................................................................................................5

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ........................................................................................................5

*Elad v. NCAA*,
160 F.4th 407 (3d Cir. 2025) .....................................................................................1, 12, 14, 16

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................................................................20, 21

*Feldman v. Reagan*,
843 F.3d 366 (9th Cir. 2016) (en banc) .......................................................................................4

*Fieler v. Chrysler Corp.*,
No. C 93-3797, 1994 WL 478721 (N.D. Cal. Aug. 17, 1994).....................................................15

*Fourqurean v. NCAA*,
143 F.4th 859 (7th Cir. 2025) .............................................................................................. *passim*

*Fuller v. NCAA*,
No. 2:26-cv-00110 (D. Nev. Jan. 20, 2026), ECF No. 1-1 ..........................................................4

*Gaines v. NCAA*,
746 F. Supp 738 (M.D. Tenn. 1990)...........................................................................................10

*Giles v. NCAA*,
No. 8:25-cv-01488, 2025 WL 2551093 (C.D. Cal. Aug. 18, 2025) ...........................................23

iv

*Goldstein v. NCAA*,
    No. 3:25-cv-00027, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025) ..........................................10

*Hasz v. NCAA*,
    No. 8:25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025)..........................................22, 23

*Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*,
    808 P.2d 919 (Nev. 1991) ...............................................................................................22

*House v. NCAA*,
    No. 4:20-cv-03919 (N.D. Cal. July 26, 2024) ................................................ *passim*

*Johnson v. NCAA*,
    No. CV-25-60, 2025 WL 1790345 (D. Mont. June 26, 2025).................................... *passim*

*Klein v. City of Laguna Beach*,
    381 F. App'x 723 (9th Cir. 2010) ....................................................................................4

*Kohn L. Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*,
    787 F.3d 1237 (9th Cir. 2015) .....................................................................................6, 8

*Leavitt v. Leisure Sports Inc.*,
    103 Nev. 81 (1987) ........................................................................................................23

*Los Angeles Memorial Coliseum Com. v. National Football League*,
    634 F.2d 1197 (9th Cir. 1980) .......................................................................................23

*Manu v. NCAA*,
    No. 2:25-cv-01956, 2025 WL 3140840 (W.D. Wash. Nov. 10, 2025)................................6, 8

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ..........................................................................................5

*Martinson v. NCAA*,
    804 F. Supp. 3d 1109 (D. Nev. 2025)........................................................................ *passim*

*Mayes v. NCAA*,
    No. 25CV045874-590, 2025 NCBC LEXIS 123 (N.C. Sup. Ct. Sep. 11, 2025) ...................23

*McCormack v. NCAA*,
    845 F.2d 1338 (5th Cir. 1988) .......................................................................................19

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) .........................................................................................18

*Minshew v. Donley*,
    911 F. Supp. 2d 1043 (D. Nev. 2012)..............................................................................22

*NCAA v. Alston*,
    594 U.S. 69 (2021)..................................................................................................... *passim*

4906-4275-9611\7

*NCAA v. Bd. of Regents*,
    468 U.S. 85 (1984)..................................................................................................18, 20, 21

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) .......................................................................................12

*NHL Players' Ass'n v. Plymouth Whalers Hockey Club*,
    325 F.3d 712 (6th Cir. 2003) .........................................................................................15

*Ohio v. Am. Express*,
    585 U.S. 529 (2018)...................................................................................................11, 12

*Ortega v. NCAA*,
    No. 4:25-CV-00496, 2026 WL 1847877 (S.D. Iowa Apr. 23, 2026) ...............................18, 20

*Pacesetter Sys., Inc. v. Medtronic, Inc.*,
    678 F.2d 93 (9th Cir. 1982) ............................................................................................6

*Patterson v. NCAA*,
    No. 3:25-cv-994 (M.D. Tenn.)................................................................................ *passim*

*Pavia v. NCAA*,
    154 F.4th 407 (6th Cir. 2025) ................................................................................ *passim*

*Pavia v. NCAA*,
    No. 3:24-cv-1336 (M.D. Tenn.)........................................................................................7

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010)............................................................................................20

*Robinson (Jimmori) v. NCAA*,
    173 F.4th 271 (4th Cir. 2026) ...............................................................................1, 12, 13

*S.A. v. Sioux Falls School Dist. 49-5*,
    2023 WL 6794207 (D. S.D. Oct. 13, 2023)..................................................................24

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ...............................................................................4, 5, 18, 24

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997).........................................................................................................10

*Walker v. NCAA*,
    No. 25-514, 2025 WL 1901907 (M.D. La. July 1, 2025) .........................................23

*Walker v. Progressive Cas. Ins. Co.*,
    No. C03-656R, 2003 WL 21056704 (W.D. Wash. May 9, 2003) ............................8

*Wallerstein v. Dole Fresh Vegetables, Inc.*,
    967 F. Supp. 2d 1289 (N.D. Cal. 2013) ......................................................................6

4906-4275-9611\7

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................................4, 5

*Worldwide Basketball & Sports Tours, Inc. v. NCAA*,
    388 F.3d 955 (6th Cir. 2004) ..............................................................................................10

*Zeigler v. NCAA*,
    No. 3:25-cv-226, 2025 WL 1671952 (E.D. Tenn. June 26, 2025) ....................................2, 24

**Statutes**

15 U.S.C. § 1....................................................................................................................................10

Sherman Act.............................................................................................................. *passim*

**Other Authorities**

2025–2026 NCAA Division I Manual (the "Bylaws")............................................................ *passim*

4906-4275-9611\7

**INTRODUCTION**

Plaintiff Cohen Fuller's extraordinary request for a mandatory injunction against Defendant National Collegiate Athletic Association ("NCAA") lacks merit because (i) Plaintiff admits that he could have pursued his claims through existing litigation in the Middle District of Tennessee, which is the appropriate venue under the first-to-file rule; (ii) Plaintiff's claims were released in the *House* Settlement; (iii) Plaintiff already competed in four full seasons of collegiate football and offers no compelling legal basis or factual record for this Court to conclude Plaintiff has met his burden to prove the Sherman Act invalidates the NCAA's Five-Year Rule; (iv) Plaintiff's implied-covenant and tortious-interference claims fall with his Sherman Act claim; and (v) the harm Plaintiff complains of is the exact harm he asks this Court to inflict on a still-eligible athlete whom Plaintiff will displace if given an extra season. Moreover, Plaintiff has known for years that—like every college athlete—his eligibility would one day run out, but he waited until the eleventh hour to seek an injunction from this Court, a delay that alone justifies denial of his motion.

This is one of over seventy similar cases brought by hundreds of athletes (individually and as class representatives) trying to extend their college careers by challenging the rules that determine who is eligible to compete in college athletics. Most federal district courts have denied preliminary injunctions.[1] Each grant has been appealed. All four federal appellate courts that have reviewed the merits of injunctions have reversed.[2] That includes the Ninth Circuit in *Blythe v. NCAA*, No. 26-1106, which immediately vacated one of three preliminary injunctions issued by judges in this Court the day after oral argument, with an opinion forthcoming. Like Plaintiff, the district court in *Blythe* relied heavily on two prior decisions, *Braham v. NCAA*, 794 F. Supp. 3d 824 (D. Nev. 2025), and *Martinson v. NCAA*, 804 F. Supp. 3d 1109 (D. Nev. 2025), in erroneously awarding preliminary injunctive relief. (The NCAA's appeals of *Braham* and *Martinson* were heard with *Blythe* by the same panel and are

---

[1] Attached hereto as Appendix A is a list of similar cases denying injunctive relief.

[2] *See* Order, *Blythe v. NCAA*, No. 26-1106 (9th Cir. Apr. 8, 2026), ECF No. 26 (vacating preliminary injunction effective immediately, with opinion forthcoming); *Fourqurean v. NCAA*, 143 F.4th 859 (7th Cir. 2025) (reversing preliminary injunction for failure to define the relevant market); *Elad v. NCAA*, 160 F.4th 407 (3d Cir. 2025) (vacating preliminary injunction because the evidence in the record was insufficient to sustain a likelihood of success on the merits); *Robinson (Jimmori) v. NCAA*, 172 F.4th 271 (4th Cir. 2026) (vacating preliminary injunction because the district court "drastically reduced the [student-athletes'] burden of proving anticompetitive effects" and failed to define the relevant market).

under advisement.)

Cases like this one risk the federal courts becoming "the de facto appeals body for eligibility determinations for over half a million student-athletes in all divisions of NCAA sports." *Pavia v. NCAA*, 154 F.4th 407, 418 (6th Cir. 2025) (Thapar, J., concurring) (cleaned up). Appropriate caution necessitates "a careful analysis of market realities," which cannot be performed in "[t]he absence of cold, hard data . . . in a market that is rapidly changing." *Id.* at 417 (quoting *NCAA v. Alston*, 594 U.S. 69, 93 (2021)). Deciding whether the NCAA's members should count all intercollegiate competition toward the period of Division I eligibility presents a policy question for the NCAA's members. But "[t]his Court is a court of law, not policy," and making a judgment about "[w]hat the NCAA ***should do*** as a policy matter . . . is beyond the reach of [antitrust law] and by extension, this Court." *Zeigler v. NCAA*, No. 3:25-cv-226, 2025 WL 1671952, at *5 (E.D. Tenn. June 12, 2025). Here, there is no well-developed factual record that the Five-Year Rule comes anywhere close to violating the Sherman Act, which is a prerequisite for judicial intervention. Plaintiff's motion should be denied.

**RELEVANT FACTS**

**I.    THE NCAA IS A SELF-GOVERNING ASSOCIATION OF SCHOOLS WORKING TO ENSURE FAIR ATHLETIC COMPETITION FOR ALL STUDENT-ATHLETES**

The NCAA is a voluntary, self-governing association of approximately 1,100 member schools spread across three autonomous divisions (Division I, Division II, and Division III – DI, DII, and DIII, respectively). Decl. of J. Vaughn submitted herewith ("Vaughn Decl.") ¶ 6. The NCAA's members are schools, not individual student-athletes. *Id.* ¶ 9. For over a century, NCAA members have adopted rules to govern NCAA intercollegiate athletics to ensure fair and inclusive athletic competition and academic opportunities for student-athletes. *Id.* ¶¶ 9–10, 12.

**II.   PLAINTIFF ADMITS THAT HE EXHAUSTED HIS ELIGIBILITY BY COMPETING IN FOUR SEASONS OF COLLEGIATE FOOTBALL [3]**

The Five-Year Rule that applied to Plaintiff limited a student-athlete to four seasons of competition within a five-year period of eligibility that began with full-time enrollment at a collegiate institution, and it counted any collegiate season towards these limits regardless of whether the seasons

---

[3] As Plaintiff indicates, ECF No. 3 ¶ 146, the NCAA DI Cabinet recently approved a new age-based eligibility model that will become part of the 2026–2027 NCAA DI Manual. Vaughn Decl. ¶ 34. The new eligibility rules do not apply to Plaintiff because he already exhausted his eligibility. *Id.* ¶ 38–39.

occurred at four-year or two-year institutions (such as an NAIA institution or junior college ("JUCO")). *Id.* ¶¶ 17–19 & Ex. A (DI 2025–2026 Manual (the "Bylaws") 12.02.3, 12.6, 12.6.1, 14.02.4). The sections of the Five-Year Rule surrounding these definitions are:

> **12.6 Seasons of Competition: Five-Year Rule.** A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.3 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the student-athlete completes all seasons of participation in all sports within the time periods specified below.

> **12.6.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution . . . .

*Id.*; *see also id.*, Ex. A at 134 (Bylaw 14.02.4 (defining "collegiate institution")).

The Five-Year Rule thus had two components—four seasons of competition and five years of eligibility. Eligibility ran out when a student had either competed in four seasons of competition or five years had passed from the student's enrollment at a collegiate institution, whichever happened first.

Plaintiff admits that he has exhausted his eligibility under the NCAA Bylaws. ECF No. 5 at 3. He competed in four full collegiate football seasons, at Graceland University (NAIA), El Camino College (JUCO), Coastal Carolina University (DI), and the University of Nevada, Las Vegas ("UNLV") (DI). *Id.* Plaintiff's eligibility under the Five-Year Rule thus expired upon the conclusion of the 2025–2026 UNLV football season.

## III. PLAINTIFF WAS AWARE HIS JUCO AND NAIA SEASONS AFFECTED HIS ELIGIBILITY BY 2024 BUT REPEATEDLY DELAYED SEEKING RELIEF

Plaintiff began playing NCAA DI football in 2024, when he enrolled at Coastal Carolina University. At that time, Plaintiff was required to acknowledge his understanding and agreement to the Bylaws, including the Five-Year Rule. *See* Vaughn Decl., Exhibit A at 45 (Bylaw 12.5.2.1). Thus, by the fall of 2024, Plaintiff was aware that his two seasons of competition at the NAIA and JUCO levels would count toward his four seasons of competition.

On December 30, 2025, a week after its football season ended and Plaintiff's eligibility expired, UNLV submitted to the NCAA a "Legislative Relief Waiver" on Plaintiff's behalf. ECF No. 5 at 95–101. The waiver request did not seek in earnest to restore any eligibility for Plaintiff. Instead, UNLV indicated that it filed the request because "[Plaintiff] would like to exhaust all administrative remedies

3

4906-4275-9611\7

prior to adding his name to Patterson/Pavia pending litigation." *Id.* at 97. The NCAA denied the waiver request on January 13, 2026. *Id.* at 101.

On January 20, 2026, Plaintiff filed a *pro se* complaint in this Court seeking declaratory and injunctive relief against the NCAA under the Sherman Act that would allow him to "continue competing in collegiate football." Complaint, *Fuller v. NCAA*, No. 2:26-cv-00110 (D. Nev. Jan. 20, 2026), ECF No. 1-1 at 1–2. Plaintiff's motion to proceed *in forma pauperis* was denied and the case was subsequently dismissed on March 30, 2026, after he failed to pay the filing fee. *See* Minute Order, *id.*, ECF No. 10.

Plaintiff then retained counsel. On May 14, 2026, Plaintiff's counsel contacted the NCAA's counsel concerning Plaintiff and his allegations against the NCAA. Tabor Decl., ECF No. 5 at 92. Plaintiff filed this lawsuit and accompanying motion for emergency injunctive relief more than six weeks later, on June 29, 2026.

## ARGUMENT

### I.   PLAINTIFF CANNOT MEET THE HEIGHTENED STANDARDS FOR MANDATORY RELIEF THAT WOULD ALTER THE STATUS QUO

Plaintiff demands a personal exemption from the Bylaws, arguing that the NCAA's eligibility rules violate antitrust law. His motion should be denied because courts across the country—including the Ninth Circuit and three other federal circuit courts—have rejected nearly identical motions.

Because a preliminary injunction is an "extraordinary remedy," the standard to obtain such relief is "stringent." *Feldman v. Reagan*, 843 F.3d 366, 375 (9th Cir. 2016) (en banc). A plaintiff seeking such relief must clearly demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits must be based on admissible evidence in the record, rather than surmise or speculation concerning what evidence could be produced at trial." *Klein v. City of Laguna Beach*, 381 F. App'x 723, 726 (9th Cir. 2010).

Injunctions may be mandatory or prohibitory. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994). "A prohibitory injunction preserves the status quo. A mandatory injunction 'goes well

4

4906-4275-9611\7

beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'" *Id.* (alteration in original) (citation omitted) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (quoting same). This standard is high. *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks omitted).

Plaintiff requests a mandatory injunction because he seeks to alter the status quo by requiring the NCAA to grant him extra seasons of competition and a year of eligibility that he does not have.[4] Other federal district courts have denied substantially similar requests for preliminary injunctive relief on the grounds that such requests were for mandatory relief. *See Johnson v. NCAA*, No. CV-25-60, 2025 WL 1790345, at *7 (D. Mont. June 26, 2025); *Coley v. NCAA*, 792 F. Supp. 3d 634, 648 (E.D.N.C. 2025); *Brzovic v. NCAA*, No. 2:25-cv-02885, 2025 WL 1370758, at *3 (D.S.C. May 11, 2025). Here, Plaintiff does not satisfy any of the four *Winter* factors, let alone the heightened standard for a mandatory injunction. Accordingly, his motion should be denied.

## II.  PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

The first *Winter* factor, likelihood of success on the merits, "is a threshold inquiry and is the most important factor." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 631 (9th Cir. 2023). Plaintiff's motion fails at the threshold for at least three reasons: First, this case should be dismissed or transferred to the Middle District of Tennessee pursuant to the first-to-file rule, where Plaintiff admits his claims could have been added to pending litigation. Second, his claims are barred by the *House* Settlement, a judicially approved class-action settlement wherein a class of student-athletes including Plaintiff released all injunctive claims against the NCAA's enforcement of its eligibility rules. Finally, Plaintiff has not offered sufficient facts to establish a likelihood of success on the merits of any of his claims.

---

[4] Plaintiff relies on *Martinson* for the proposition that he seeks "somewhat of a hybrid" injunction that is neither mandatory nor prohibitive. ECF No. 5 at 5:11–14 (quoting *Martinson*, 804 F. Supp. 3d at 1123). But there is no question that Plaintiff seeks relief beyond the status quo, which is that he is not eligible under the Five-Year Rule, as it has applied to countless other student-athletes for years. *See, e.g.*, *Johnson v. NCAA*, No. CV-25-60, 2025 WL 1790345, at *7 (D. Mont. June 26, 2025).

4906-4275-9611\7

**A.** **This Matter Should Be Dismissed or Transferred in the Interest of Judicial Economy, Pursuant to the First-to-File Rule.**

Plaintiff is far from the first student-athlete to sue the NCAA seeking to participate in extra seasons of collegiate sports based on the allegedly anticompetitive nature of the NCAA's eligibility rules. Indeed, when UNLV submitted a waiver request on Plaintiff's behalf in December 2025, the school indicated it was filing the request because Plaintiff "would like to exhaust all administrative remedies prior to adding his name to Patterson/Pavia pending litigation." ECF No. 5 at 97. Judicial economy will be served by dismissing this case or transferring it to the Middle District of Tennessee, where those and another materially similar suits are all currently pending before the same judge. Another court in this Circuit has found transfer appropriate in similar circumstances. *See Manu v. NCAA*, No. 2:25-cv-01956, 2025 WL 3140840 (W.D. Wash. Nov. 10, 2025) (transferring NCAA-eligibility-rules case to Middle District of Tennessee).

The first-to-file rule "permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir. 1982). "The rule is primarily meant to alleviate the burden placed on the federal judiciary by duplicative litigation and to prevent the possibility of conflicting judgments." *Wallerstein v. Dole Fresh Vegetables, Inc.*, 967 F. Supp. 2d 1289, 1292 (N.D. Cal. 2013) (citing *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979)).

In determining whether the first-to-file rule applies, courts analyze three factors: (1) chronology of the lawsuits, (2) similarity of the parties, and (3) similarity of the issues. *Kohn L. Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015). Although a court may "decline to apply the first-to-file rule in the interests of equity or where the Section 1404(a) balance of convenience weighs in favor of the later-filed action . . . [t]he Ninth Circuit has cautioned that relaxing the first-to-file rule on the basis of convenience is a determination best left to the court in the first-filed action." *Wallerstein*, 967 F. Supp. 2d at 1293. As this District has previously recognized, the rule "serve[s] the purpose of promoting efficiency well and should not be disregarded lightly." *wedi Corp. v. Hydroblok Grant Int'l Ltd.*, No. 2:22-cv-00457, 2023 WL 2610164, at *2 (D. Nev. Mar. 23, 2023) (quoting *Kohn*

4906-4275-9611\7

*L. Grp.*, 787 F.3d at 1239). Departures from the rule are thus warranted "only under limited circumstances." *CRU Acquisition Grp., LLC v. Mykey Tech., Inc.*, No. 3:11-CV-05743, 2012 WL 441293, at *1 (W.D. Wash. Feb. 10, 2012).

### 1.    Three Pending Tennessee Cases Were Filed Well Before This Case.

*Pavia v. NCAA*, No. 3:24-cv-1336 (M.D. Tenn.), was the first of the current wave of eligibility suits filed against the NCAA. Although the original plaintiff is pursuing a career in the NFL, the suit continues, with more than two dozen additional plaintiffs now seeking injunctive relief on materially similar claims—that the NCAA has violated the Sherman Act by counting the plaintiffs' years of competition at JUCO institutions toward their four seasons of competition within five years. *See* Second Amended Complaint, *id.*, ECF No. 74 (Jan. 6, 2026) (Ex. A to Naylor Decl.).[5] *Pavia* is in discovery, with a motion for preliminary injunction pending and the pleadings still open. Order, *id.* ECF No. 109 (July 2, 2026) (Ex. B to Naylor Decl.).

In *Patterson v. NCAA*, No. 3:25-cv-994 (M.D. Tenn.), a similar group of student-athletes who have exhausted their eligibility seek, under the Sherman Act, to restrain the NCAA from applying the four-seasons-of-competition limit on behalf of the following class of student-athletes:

> All [DI] college athletes who first enrolled in college in the fall of 2022 or beyond who (i) have not taken a redshirt year; (ii) have received or will receive at least 50% of "full grant-in-aid," which is defined by NCAA Bylaw 15.02.5; and (iii) will have at least one of their five years of eligibility available for the 2026-27 academic year.

Amended Complaint ¶ 170, *id.*, ECF No. 35 (Nov. 10, 2025) (Ex. C to Naylor Decl.). Plaintiff is a member of the putative *Patterson* class. He enrolled in college in the fall of 2022, he has not taken a redshirt, he is a scholarship athlete, *see* ECF No. 5 at 17, and he has a year remaining on his five-year eligibility clock for the 2026–2027 academic year (but has used all four seasons of competition, thus exhausting his eligibility).

In addition to *Pavia* and *Patterson*, in *Boyd v. NCAA*, No. 3:25-cv-729 (M.D. Tenn.), a student-athlete is challenging the application of the Five-Year Rule to his time at an NAIA school as violative of the Sherman Act and seeks an additional season of eligibility. Amended Complaint, *id.*, ECF No. 59 (Oct. 27, 2025) (Ex. D to Naylor Decl.). *Pavia*, *Patterson*, and *Boyd* are all assigned to Chief Judge

---

[5] For the Court's convenience, true and accurate copies of the court filings from related cases referenced herein have been provided as exhibits to the Declaration of John Naylor submitted herewith.

4906-4275-9611\7

William L. Campbell, Jr. and have been consolidated for the purposes of discovery, which remains ongoing. Order Consolidating Discovery, *id.*, ECF No. 67 (Feb. 28, 2026) (Ex. E to Naylor Decl).

### 2.    The Parties Are Substantially Similar.

The first-to-file rule requires that the parties be "substantially" similar; it "does not require exact identity of the parties." *Kohn L. Grp.*, 787 F.3d at 1240. That standard is satisfied here. The NCAA is the sole named defendant in this matter and each of *Pavia*, *Patterson*, and *Boyd*. Plaintiff is a member of the putative class in *Patterson*, which courts consider when applying the first-to-file rule. *Bewley v. CVS Health Corp.*, No. C17-802, 2017 WL 5158443, at *2 (W.D. Wash. Nov. 7, 2017) ("In the context of class actions, the district court should compare the putative classes rather than the named plaintiffs to see whether the classes represent at least some of the same individuals."); *see also Booker v. Am. Honda Motor Co.*, No. 2:20-CV-05166, 2020 WL 7263538, at *3 (C.D. Cal. Oct. 20, 2020) (holding that consideration of putative classes is appropriate in first-to-file analysis). Moreover, although *Pavia* is not a class action, it includes more than a dozen plaintiffs with materially similar claims and an operative scheduling order that explicitly allows for adding additional parties. And Plaintiff admits that he intended to join the *Pavia* litigation as early as December 2025.

### 3.    The Issues Are Substantially Similar.

As with the second factor, the first-to-file rule requires only that the issues are "substantially similar." *Kohn L. Grp.*, 787 F.3d at 1240. "[S]light differences in the claims asserted do not prevent application of the rule where the underlying complained-of conduct is almost identical." *Walker v. Progressive Cas. Ins. Co.*, No. C03-656R, 2003 WL 21056704, at *3 (W.D. Wash. May 9, 2003). Here, the issues are substantially similar to those raised in *Patterson*, *Pavia*, and *Boyd*. Indeed, collectively those three suits encompass each aspect of the Five-Year Rule that Plaintiff challenges. *Patterson* challenges the "four years of competition" aspect of the rule, *Pavia* the counting of JUCO seasons toward those four years, and *Boyd* challenges NAIA seasons. Each lawsuit raises Sherman Act claims challenging substantially similar aspects of the Five-Year Rule under substantially similar facts. Plaintiff's assertion of two state-law claims stemming from the same facts does not defeat this element. *See Manu*, 2025 WL 3140840, at *3 (collecting cases) ("Manu's assertion of an additional state law claim does not defeat [the third] element.")

8

4906-4275-9611\7

Allowing Plaintiff's action to proceed in this Court while three related actions—including a class action in which Plaintiff is a putative class member with no opt-out rights—are pending in another district (and assigned to the same judge with consolidated discovery) would be a significant waste of judicial resources and risks inconsistent rulings on common questions of law and fact. Accordingly, this Court should dismiss this case or transfer it to the U.S. District Court for the Middle District of Tennessee, pursuant to the first-to-file rule. That court should adjudicate Plaintiff's motion, just as Plaintiff's December 2025 waiver request sought. *See* ECF No. 5 at 97 (stating Plaintiff seeks to "exhaust all administrative remedies prior to adding his name to Patterson/Pavia pending litigation").

**B.      Plaintiff Released His Injunctive Relief Claims Pursuant to the *House* Settlement.**

In June 2025, the NCAA reached a landmark settlement in *House v. NCAA (In re College Athlete NIL Legislation)*, No. 4:20-cv-03919 (N.D. Cal.), to resolve class-action claims brought by current and former DI athletes who alleged that the NCAA violated federal antitrust law by limiting college athletes' earning power. Plaintiff is a member of the class in *House*, and that bars his claims here.

In addition to providing retroactive payments to class members, the Fourth Amended Stipulation and Settlement Agreement, *House*, ECF No. 958-1 ("*House* Settlement") (Ex. F to Naylor Decl.), created a mechanism for NCAA DI schools to revenue share with their student-athletes, if they opt into the settlement. *See also id.*, ECF No. 979 (Order approving settlement) (Ex. G to Naylor Decl.). Most DI schools have opted in, including UNLV. *See Martinson*, 804 F. Supp. 3d at 1123. Plaintiff thus benefited from the *House* Settlement making revenue sharing available to his team in the 2025–2026 season, but now he seeks to avoid the aspect of the settlement in which the class of which he is a part agreed not to pursue the exact claim he now asserts.

The "Injunctive Relief Settlement Class" in *House* includes, as relevant here, "[a]ll student-athletes who compete on, competed on, or will compete on a Division I athletic team" after "June 15, 2020." *House* Settlement at  (Definition aa). The *House* Settlement defines the "Released Injunctive Class Claims" to include any and all challenges to "the subjects addressed by the Related Injunctive Relief NCAA & Conference Rules." *Id.* at 11–12 (Definition qq). The category of "Related Injunctive Relief NCAA & Conference Rules" includes: "NCAA and conference rules governing the number of

9

4906-4275-9611\7

seasons/length of time student-athletes are eligible to receive benefits, including scholarships and payments pursuant to the Injunctive Relief Settlement, including without limitation any rule capping the number of years a student-athlete may receive payments at four years, and providing that all four of those years must be played within a consecutive five-year period." *Id.* at 12–13 (Definition rr(2)). That description encompasses the eligibility rules, including the Five-Year Rule that Plaintiff now challenges.

Plaintiff competed on a DI athletic team after June 15, 2020. ECF No. 5 at 3. He received notice and an opportunity to object, *see House* Settlement at 22 (requiring notice be provided to class), which he did not exercise, *see* Berman Decl., *House*, ECF No. 717-1 (Ex. H to Naylor Decl.). Moreover, the NCAA adopted a rule in connection with the approval of the *House* Settlement making clear that any benefits agreements with student-athletes cannot run past their period of NCAA eligibility. *See* Vaughn Decl., Ex. A at 187 (Bylaw 16.13.1.1); *see also House* Settlement at 74 (Injunctive Relief Settlement Article 4, Section 3(a)). Plaintiff directly challenges that structure—he seeks injunctive relief for the purpose of obtaining settlement-created benefits he is ineligible to receive. Because Plaintiff has released his claims as part of the *House* Settlement's injunctive class, *see* Release of Injunctive Claims, *House* Settlement at 25–26, he cannot pursue them now.

### C. Plaintiff Fails to Support His Antitrust Claim.

#### 1. The Five-Year Rule Falls Outside the Purview of Antitrust Law

The Sherman Act prohibits only unreasonable restraints of trade or commerce. 15 U.S.C. § 1; *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). As the Ninth Circuit observed in *O'Bannon v. NCAA*, NCAA member institutions enact both commercial rules (e.g., regulating player compensation) and noncommercial rules (e.g., determining player eligibility). 802 F.3d 1049, 1066 (9th Cir. 2015). As *O'Bannon* explained, rules "*limiting the number of years that student-athletes may play collegiate sports*" are "*true eligibility rule[s]*" that do not raise antitrust concerns. *Id.* (emphasis added) (internal quotation marks omitted).

*O'Bannon*'s reasoning is consistent with decisions by other courts addressing eligibility rules. *See Coley*, 792 F. Supp. 3d at 644 ("[T]he Sherman Act does not apply to the [Five-Year Rule]."); *Goldstein v. NCAA*, No. 3:25-cv-00027, 2025 WL 662809, at *6 (M.D. Ga. Feb. 28, 2025); *Johnson*,

4906-4275-9611\7

2025 WL 1790345, at \*10; *Gaines v. NCAA*, 746 F. Supp 738, 744–45 (M.D. Tenn. 1990) (rules denying eligibility to student-athletes who entered a professional sports draft or hired an agent were not "subject to scrutiny" under the Sherman Act). It is well-settled that the rule itself must be commercial to fall within the ambit of the Sherman Act. *See Worldwide Basketball & Sports Tours, Inc. v. NCAA*, 388 F.3d 955, 959 (6th Cir. 2004). Thus, the "appropriate inquiry is 'whether the rule itself is commercial, not whether the entity promulgating the rule is commercial.'" *Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) (quoting *Worldwide Basketball*, 388 F.3d at 959). Accordingly, the Ninth Circuit has long recognized a line of demarcation between the NCAA's compensation rules, which are within the purview of the Sherman Act, and its eligibility rules, which are not. *See O'Bannon*, 802 F.3d at 1065.

### 2. The Five-Year Rule Survives Rule of Reason Analysis

If the Sherman Act applies, Plaintiff concedes that his claim is subject to the burden-shifting framework known as the rule of reason. *See* ECF No. 5 at 6 (citing *Alston*, 594 U.S. at 91). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express*, 585 U.S. 529, 541 (2018). Thus, Step 1 of the rule-of-reason analysis requires a fact-specific assessment of market structure, market power, and actual effects on competition to assess anticompetitive effects. *Id.* If the plaintiff carries its burden at Step 1, then the burden shifts to the defendant at Step 2 to show a procompetitive rationale for the restraint. *Id.* at 542. If the defendant makes this showing, then the burden shifts back to the plaintiff at Step 3 to show that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Id.*

#### a. Plaintiff Does Not Show Anticompetitive Effects in a Relevant Market.

Plaintiff's obligation to present evidence of substantial anticompetitive effects at Step 1 of the rule-of-reason analysis is "no slight burden." *Alston*, 594 U.S. at 97. *Alston* noted that "courts have disposed of nearly all rule of reason cases in the last 45 years on the ground that the plaintiff failed to show a substantial anticompetitive effect"—in fact, "courts decided 90% (809 of 897) on this ground." *Id.* Courts around the country have denied ineligible athletes' requests for preliminary injunctions based on their failure to satisfy Step 1 of the rule of reason. *See generally* Appendix A.

11

4906-4275-9611\7

Plaintiff's Sherman Act claim fails at Step 1 because he has not presented necessary market evidence or economic data to support his alleged labor market. His claim also fails because his allegations of anticompetitive effect caused by the Five-Year Rule in that labor market are mere conjecture, unsupported by sound analysis or *any* relevant data.

### (i)       Plaintiff's Proffered Labor Market Is Unsupported.

Before a district court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market." *Am. Express Co.*, 585 U.S. at 542. Without defining the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* at 543 (cleaned up). The validity of a proposed relevant market is a factual determination, and Plaintiff bears the burden of proving the scope of the relevant market. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044–45 (9th Cir. 2008). Defining a relevant market involves such considerations as "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," *AFMS LLC v. UPS Co.*, 105 F. Supp. 3d 1061, 1077 (C.D. Cal. 2015) (quoting *Newcal Indus.*, 513 F.3d at 1045), and the "area of effective competition where buyers can turn for alternate sources of supply." *W. Parcel Express v. UPS of Am., Inc.*, 65 F. Supp. 2d 1052, 1058 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology Ltd.*, 924 F.2d 1484, 1489–90 (9th Cir. 1991)).

Plaintiff asserts that the relevant market for his antitrust claim is "the national labor market for NCAA Division I football athletes' services." ECF No. 5 at 7. He further claims, without support, that "JUCO, NAIA, lower NCAA divisions, and professional leagues are not substitutes and fall outside the relevant market." *Id.* In support of his proffered market, Plaintiff cites to *Martinson* and to the declaration of Dr. Joel Maxcy,[6] which he incorporates by reference "regarding the establishment of the relevant market." *Id.* at 7–8. This exact type of conclusory, fact-devoid market definition has been rejected by every federal appellate court that has confronted similar Sherman Act claims at the preliminary injunction stage. *See Elad*, 160 F.4th at 416–17; *Fourqurean*, 143 F.4th at 870; *Robinson*, 172 F.4th at 293–94.

In *Elad*, the Third Circuit explained why Plaintiff's exclusive reliance on *Martinson* and Dr.

---

[6] If the Court is inclined to rely on Dr. Maxcy, the NCAA respectfully requests the opportunity to present a rebuttal expert and an evidentiary hearing, so the Court can hear live expert testimony.

12

4906-4275-9611\7

Maxcy's declaration were insufficient to establish the relevant market. The *Elad* Court discounted Dr. Maxcy's opinion, noting that his market definition "cite[d] no market evidence or economic data" and "exclusively relie[d] on *Alston* to define the relevant market." 160 F.4th at 416. Following that rebuke, Dr. Maxcy appears to have made some cosmetic updates to his opinion, *see* ECF No. 5 at 69 ("The relevant market in the post-*Alston* and post-*House* landscape is the national labor market for NCAA Division I football athletes' services."), but his declaration does little to address the fundamental flaw identified by the Third Circuit—his proffered market is still not supported by any market evidence or economic data. The *only* data that Dr. Maxcy supplies is a statement that "[t]he NAIA has lost more than 50% of its membership since the mid-1970s, with most former NAIA institutions converting to NCAA Division II or Division III affiliations." *Id.* at 87. But Dr. Maxcy fails to explain how a decrease in NAIA membership has any effect on the relevant market for Plaintiff's claim or otherwise provide relevant data analysis or evidence of current market conditions. *See Robinson*, 172 F.4th at 294 (observing that plaintiff-athletes offered only "an economist's interpretation of legal opinions—rather than any analysis of data or current market conditions"); *see also Bellamy v. NCAA*, No. 3:25-cv-750. 2025 WL 2267761, at *6 (M.D. Tenn. Aug. 7, 2025) (noting Dr. Maxcy's concession "that his opinions are based on his 'intuition' or 'experience' rather than on any economic modeling or analysis").

Dr. Maxcy also fails to examine, much less explain, whether professional football leagues are sufficiently interchangeable substitutes for DI football to warrant inclusion in the relevant market. Every year, dozens of student-athletes with remaining NCAA eligibility declare for and are selected in the NFL draft. *See, e.g.*, *Full List of Underclassman Declaration for 2026 NFL Draft*, ESPN (Jan. 15, 2026), https://www.espn.com/nfl/draft2026/story/_/id/47600173/underclassmen-declaring-2026-nfl-draft (providing list of 63 players with remaining collegiate eligibility who entered the 2026 NFL draft). Hundreds more are selected after exhausting their eligibility under the same eligibility rules Plaintiff contends violate the Sherman Act. *See* ECF No. 3 ¶¶ 28–29. And United Football League ("UFL") rosters[7] are similarly filled with former DI football players who, like Plaintiff, are seeking to extend

---

[7] The UFL, which Plaintiff fails to even mention, is a professional football league formed in 2024 by the merger of other leagues. Its rosters are filled with athletes who, like Plaintiff, have exhausted the NCAA eligibility but haven't been able to catch on with an NFL team. *See, e.g.*, *Roster*, UFL: Houston Gamblers, https://www.theufl.com/teams/houston/roster (last visited July 24, 2026).

4906-4275-9611\7

their football careers, be compensated for that endeavor, and chase their dreams of playing in the NFL. *See* ECF No. 5 at 18 ("Plaintiff has a reasonable expectation . . . to prospectively be drafted in the NFL."); *see also 23 Players Sign NFL Contracts in First Week of UFL Offseason*, UFL (June 23, 2026), https://www.theufl.com/news/23-players-sign-nfl-contracts-in-first-week-of-ufl-offseason.    Neither Dr. Maxcy nor Plaintiff undertakes any meaningful inquiry into whether these leagues—which employ football players of similar backgrounds and skill sets for pay—compete for labor within the same market as NCAA DI member schools.

The *Elad* Court also explained why Plaintiff's reliance on *Martinson* is insufficient to establish the relevant market for his antitrust claim. "Reliance on a previously accepted market, without inspection of current market realities, is antithetical to antitrust legal principles." *Elad*, 160 F.4th at 417 (citing *Alston*, 594 U.S. at 93); *accord Fourqurean*, 143 F.4th at 870. Thus, Plaintiff cannot establish a likelihood of success on the merits of his antitrust claim by relying on a prior judicial opinion's market definition without factual analysis of how market conditions have changed since that opinion. Plaintiff may argue that no further analysis is required because less than a year has passed since *Martinson*, but that contention would belie the rapidly changing nature of college athletics in the face of a "seemingly endless wave of litigation," *see Pavia*, 154 F.4th at 418 (Thapar, J., concurring), challenging the Five-Year Rule and other NCAA rules related to athlete eligibility and compensation. For instance, the *House* Settlement became effective on July 1, 2025, less than three months before *Martinson* was decided. *Martinson*, 804 F. Supp. 3d at 1122–23. That settlement allows DI member schools "to pay their athletes up to $20.5 million per academic year" in direct compensation and also authorized the NCAA to adopt roster limits for DI sports. *Id.* at 1123. The *House* Settlement—which Plaintiff does not challenge—thus dramatically altered any labor market for DI athletics (including football). Yet Plaintiff makes no attempt to explain its effect on the contours of his proffered labor market since *Martinson* was decided. Moreover, the Ninth Circuit made it clear in vacating *Blythe* that *Martinson*'s reasoning (which the *Blythe* court followed) is fundamentally flawed. *See* Order, *Blythe v. NCAA*, No. 26-1106 (9th Cir. Apr. 8, 2026), ECF No. 26 (vacating preliminary injunction effective immediately, with opinion forthcoming).

For *at least* these reasons, Plaintiff has failed to carry his burden of proving the scope of the

14

relevant market. The Court should decline to do so for him.

### (ii) Plaintiff Offers No Evidence of Anticompetitive Effects.

Plaintiff asserts that the aspects of the Five-Year Rule he challenges "harm JUCO, NAIA, and former JUCO and NAIA football players" and "distort[] the labor market by reducing competition, depressing the prices at which DI schools can acquire athletes, and the pay athletes can earn in NIL agreements." ECF No. 5 at 8–9 (citing *Pavia*, 760 F. Supp. 3d 527, 541 (M.D. Tenn. 2024)).[8] The first contention misunderstands the focus of antitrust scrutiny and the second is pure conjecture that ignores basic economic theory.

The Sherman Act protects "competition, not competitors." *American Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999). To show anticompetitive effects, Plaintiff "would need to show that the Five-Year Rule creates, protects, or enhances the NCAA's dominant position in the market—and thus the NCAA's ability to depress student-athlete compensation below the competitive level—by making it more difficult for the NCAA's existing or potential rivals to compete against the NCAA." *Fourqurean*, 143 F.4th at 870.

The Five-Year Rule does not injure competition among football players by excluding a whole set of athletes who, like Plaintiff, are no longer eligible. The outgoing set of now-ineligible athletes will be replaced by an incoming set of eligible athletes entering those DI programs, and the level of competition will remain the same. The Five-Year Rule cannot affect the amount of compensation and opportunities to participate that are available in the relevant market. The *House* Settlement both caps the revenue sharing payments (i.e., price) and the number of roster spots (i.e., output) available in the market. *See Patterson v. NCAA*, No. 3:25-cv-00994, 2026 WL 115417, at *6 (M.D. Tenn. Jan. 15, 2026). A firm's decision to change suppliers may injure some suppliers, but it does not injure competition. *Fieler v. Chrysler Corp.*, No. C 93-3797, 1994 WL 478721, at *2 (N.D. Cal. Aug. 17, 1994); *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 720 (6th Cir. 2003)

[8] Plaintiff's reliance on Judge Campbell's initial *Pavia* opinion is misplaced. *Pavia* predates the *House* Settlement. Judge Campbell later declined to issue a preliminary injunction in *Patterson*, noting that the *House* Settlement "caps direct player payment and by doing so creates an artificial economic environment in which the overall market compensation stays the same and is reallocated amongst the market participants" and finding that the plaintiff-athletes had not shown substantial economic harm stemming from the Five-Year Rule. *Patterson v. NCAA*, No. 3:25-cv-00994, 2026 WL 115417, at *6 (M.D. Tenn. Jan. 15, 2026).

4906-4275-9611\7

(explaining that a rule which "merely substitutes one arguably less skilled player for another arguably more skilled player" "does not result in any economic injury to" a labor market for "player services"); *Johnson*, 2025 WL 1790345, at *13. Plaintiff fails to offer evidence to support a different conclusion.

The effect of the Five-Year Rule is to limit the number of athletes who can participate in college football, while leaving the number of NCAA members schools the same. When supply increases relative to demand, prices tend to fall—because there is less demand-side competition relative to supply. The Five-Year Rule thus tends to increase competition among member schools for eligible student-athletes. *See Fourqurean*, 143 F.4th at 871 ("Under ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation."); *Arbolida v. NCAA*, No. 25-2079, 2025 WL 579830, at *3 (D. Kan. Feb. 21, 2025) ("By placing eligibility limits on students, the NCAA member institutions are increasing competition between themselves by imposing a limit on the potential labor supply.").

Indeed, the Five-Year Rule is not a competition-reducing restraint by which NCAA schools cause anticompetitive effects—like producing less college football or paying athletes less money. *Fourqurean*, 143 F.4th at 871. Plaintiff does not allege that the Five-Year Rule ever deprived athletes of the opportunity, during their periods of eligibility, from competing for DI opportunities. Nor does he allege that the Five-Year Rule prevented DI schools from competing for these athletes' services while they were eligible. The only "injury" is that, by virtue of their loss of eligibility, the athletes have lost an opportunity to play a fifth (or sixth, etc.) season and thus earn NIL money. This is not an injury that arises from any reduction in competition.

Dr. Maxcy's declaration does not resolve these deficiencies. First, as noted above, multiple courts, including the Third Circuit, have discounted Dr. Maxcy's opinions for his failure to cite market evidence or economic data. *Elad*, 160 F.4th at 416 (discounting Dr. Maxcy's opinion for lack of evidence); *Bellamy*, 2025 WL 2267761, at *6 (same). Second, in addition to being speculative, Dr. Maxcy's asserted "categories of substantial anticompetitive harm in the relevant labor market: output restriction, compensation suppression, and allocative distortion," ECF No. 5 at 74, are logically flawed. The first is addressed above. The *House* Settlement, *not* the Five-Year Rule, caps the number of spots on DI rosters. Limiting the number of athletes eligible to participate actually *increases* competition

16

among member schools for those athletes. *See Fourqurean*, 143 F.4th at 871; *Arbolida*, 2025 WL 579830, at *3.

This increased competition for athletes in the labor market renders Dr. Maxcy's second theory of anticompetitive harm—compensation suppression—unsupportable. He posits that the NCAA eligibility rules work in conjunction with the *House* Settlement's roster limits to "systematically remove higher-value, more experienced athletes and replace them with lower-cost entrants." ECF No. 5 at 76. But Dr. Maxcy ignores that the *House* Settlement also created a revenue-sharing model that caps DI member schools' spending on student-athletes. *Patterson*, 2026 WL 115417, at *6. And he offers zero evidence or analysis that excluding one group of ineligible athletes—former NAIA and JUCO student-athletes who competed at that level for one or more of their four seasons of competition—leads DI schools to spend less money in the aggregate on their football teams. Indeed, Dr. Maxcy's contention that the Five-Year Rule, as challenged by Plaintiff here, "targets precisely those athletes who command the highest market value," ECF No. 5 at 75, is not credible on its face. The highest market value college football players are drafted into the NFL each year, often with eligibility remaining. *See* ECF No. 3 ¶¶ 28–29; *Full List of Underclassman Declaration for 2026 NFL Draft*, *supra*. Dr. Maxcy offers no *evidence* that players who have exhausted their eligibility due to their seasons at NAIA or JUCO schools collectively command more money than the players who replace them on DI rosters to that effect. *See Boyd v. NCAA*, No. 3:25-CV-00729, 2025 WL 2432200, at *6 (M.D. Tenn. Aug. 22, 2025) (observing that Dr. Maxcy offered "almost nothing about the effect of 'counting' time at NAIA colleges on the market or NCAA Division I basketball players").

Dr. Maxcy's third theory, "allocative distortion," is equally speculative and logically inconsistent. He speculates, without evidentiary support, that the NCAA's eligibility rules "discourage efficient development pathways" by encouraging "[a]thletes who would benefit from JUCO or NAIA programs" to "enroll prematurely at NCAA institutions to preserve eligibility." ECF No. 5 at 76. But in defining the relevant market, both Plaintiff and Dr. Maxcy assert that JUCO and NAIA football programs are *not* substitutes for DI football. ECF No. 5 at 7, 69. This belies the assertion that student-athletes would choose to join a JUCO or NAIA football program despite the opportunity to join a DI team. Moreover, Plaintiff and Dr. Maxcy do not provide (and the NCAA cannot find) any legal

17

authority recognizing Dr. Maxcy's theory of "allocative distortion" as a cognizable antitrust harm.

Plaintiff's other arguments are also without merit. He asserts that "the value of the product that the NCAA provides to consumers is clearly diminished" when former JUCO and NAIA athletes are not given extra years of eligibility, ECF No. 5 at 9, but offers no evidentiary support. *See Patterson*, 2026 WL 115417, at *7 (rejecting similar claim for lack of evidentiary support). As explained above, his allegations of personal injury, ECF No. 5 at 9–10, cannot establish anticompetitive effects *in the market. See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988) ("The elimination of a single competitor, without more, does not prove anticompetitive effect."). Nor do his confusing statements about player fungibility, ECF No. 5 at 10–11, say anything about the effects of the challenged aspects of the Five-Year Rule on competition in Plaintiff's (inadequately) proffered market. Ultimately, Plaintiff fails to sustain his burden to demonstrate anticompetitive effects. *See Fourqurean*, 143 F.4th at 871 (reversing injunction for lack of evidence of anticompetitive effects).

**3.      The Five-Year Rule Is Procompetitive Because It Creates the "Product" that NCAA Members Offer and Increases Competition Among Member Schools for Athletes.**

Plaintiff has failed to produce any evidence to meet his burden at Step 1, let alone meet his burden that the facts in support thereof "clearly favor" him, as required for a mandatory injunction. *See Stanley*, 13 F.3d at 1320. Nevertheless, the NCAA satisfies its burden at Step 2 by showing that the procompetitive effects of the Five-Year Rule are both substantial and obvious in: (1) preserving college athletics as a unique product that is differentiated from professional sports; (2) promoting the purposes of the educational institutions student-athletes attend; (3) balancing the interests and opportunities of all student-athletes, and (4) better aligning athletics and academics.

First, courts have recognized that eligibility rules are procompetitive as they expand output by creating and preserving college athletics as a unique offering from professional sports. Eligibility rules go to the crux of what it means to be a student-athlete and are therefore essential to the very existence of the product of college football. *See Alston*, 594 U.S. at 90; *NCAA v. Bd. of Regents*, 468 U.S. 85, 101 (1984); *Banks v. NCAA*, 977 F.2d 1081, 1089 (7th Cir. 1992) (most NCAA bylaws "are procompetitive because they enhance public interest in intercollegiate athletics"). Without eligibility rules defining what it means to be a "student-athlete," the NCAA would just be another minor league

18

or feeder system to professional sports leagues, reducing fan interest and the resources invested in (and financial opportunities available to) student-athletes. *See Banks*, 977 F.2d at 1090. "If the effect of striking down the five-year rule is a less valuable product which fewer consumers seek out, this harms both consumers who have lost a product of value, and the athletes employed in the labor market for the product." *Ortega v. NCAA*, No. 4:25-CV-00496, 2026 WL 1847877, at *9 (S.D. Iowa Apr. 23, 2026).

Second, eligibility rules promote collegiate athletics and advance the fundamental purposes of the educational institutions where the student-athletes attend. Vaughn Decl. ¶ 12. NCAA member schools have adopted eligibility rules to ensure fair competition in sports, to enhance the product of collegiate sports, to maintain a balance between academics and athletics for collegiate student-athletes, and to ensure that collegiate sporting events continue to attract the interests of consumers/fans. *Id.* The eligibility requirements promote collegiate athletics and advance the purposes of the educational institutions the student-athletes attend. *Id.* ¶¶ 20–21.

Third, the eligibility requirements allow NCAA member schools to serve hundreds of thousands of student-athletes. *Id.* ¶ 13. A substantial majority of student-athletes who enter DI athletics (including college football) each year matriculate to member institutions from high school. *Id*. Opportunities to compete in DI athletics for new student-athletes arise because athletes whose eligibility has ended move on to the next phase of their lives, and those opportunities would be limited if eligibility were expanded. *Id.* Moreover, NCAA DI football rosters are fixed at 105 for those DI member institutions participating in the *House* Settlement. For a class of graduating high school senior student-athletes to have the opportunity to enter NCAA DI rosters, there must be a corresponding exiting class of graduates to open up opportunities. *Id.* While Plaintiff focuses on how the Five-Year Rule impacts *him*, he does so to the detriment of entering student-athletes who have DI football dreams. By asking the Court to give him a DI football roster spot, Plaintiff is necessarily asking the Court to take that limited spot away from someone else.

Finally, the Five-Year Rule also improves quality of output by fostering better alignment between athletics and academics. *See McCormack v. NCAA*, 845 F.2d 1338, 1345 (5th Cir. 1988) ("The goal of the NCAA is to integrate athletics with academics. [Eligibility] requirements reasonably further this goal."); *Johnson*, 2025 WL 1790345, at *15 ("[L]inking eligibility to compete in college athletics

19

4906-4275-9611\7

with academic progress—thereby integrating athletics with academics—is a legitimate procompetitive rationale for the [rules].”); *Bowers v. NCAA*, 974 F. Supp. 459, 461 (D.N.J. 1997) (initial eligibility requirements are designed “to assure proper emphasis on educational objectives”); *see also* Amicus Br. of Am. Council on Ed., *Pavia v. NCAA*, No. 24-6153 (6th Cir.), ECF No. 21.

### 4.    There Exists No Substantially Less Restrictive Means by Which the NCAA Could Achieve the Procompetitive Benefits of the Five-Year Rule.

*Alston* underscored that courts should not lightly second-guess NCAA rules: “We agree with the NCAA’s premise that antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes.” 594 U.S. at 98; *Bd. of Regents*, 468 U.S. at 120 (NCAA needs “ample latitude” to play its role); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) (“[S]ports-related organizations should have the right to determine for themselves the set of rules that they believe best advance their respective sport.”). Therefore, at Step 3 of the rule of reason analysis, Plaintiff bears a heavy burden to demonstrate that (1) the Five-Year Rule is “patently and inexplicably stricter than is necessary to achieve the procompetitive benefits,” *Alston*, 594 U.S. at 101 (cleaned up), and (2) Plaintiff’s alternatives are “substantially less restrictive” and “virtually as effective in serving the defendant’s procompetitive purposes without significantly increased cost.” *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) (cleaned up). Plaintiff fails to show either.

The Five-Year Rule is not patently and inexplicably stricter than necessary. It is reasonable to count non-DI athletics toward the four seasons of competition allotted by the Five-Year Rule because this ensures that student-athletes’ athletic careers align with their college enrollment and progress toward a four-year degree from an NCAA member institution. Plaintiff proffers a handful of “less restrictive alternatives,” ECF No. 5 at 13–14, but fails to explain how any is “virtually as effective” at achieving the NCAA’s procompetitive aims. For instance, by “limiting eligibility to Division I participation only,” the NCAA would undermine each of its procompetitive aims. It would make eligible “student-athletes” of nearly any age and experience. Under Plaintiff’s proposed framework, an athlete could play two years at an NAIA school, two more at a JUCO, four at a DII school, and then matriculate to a DI university with five years of remaining eligibility, thus playing college sports into

20

4906-4275-9611\7

his thirties. Such a rule would undermine the connection between education and college athletics, risk undermining college football's unique place in American culture, and do a disservice to every college freshman who now has to compete for a roster spot with an athlete 10 years his senior. *See Ortega*, 2026 WL 1847877, at *9 ("Any eligibility rule which protected such a product likely would, by necessity, exclude a twenty-eight-year-old from competing against an opponent a decade his junior.").

Plaintiff also argues that the NCAA's newly-approved age-based eligibility rules, *see* Vaughn Decl. ¶¶ 34–39, show that the Five-Year Rule as applied to him "served no legitimate pro-competitive purpose and that less restrictive means clearly existed." ECF No. 5 at 14–15. But Plaintiff's conclusion suffers from multiple logical deficiencies. First, the new rules are not necessarily less restrictive than the Five-Year Rule. For instance, Plaintiff argues elsewhere that the current rules are anticompetitive because they favor individuals who attend prep school or compete professionally in another sport. *Id.* at 8. The new rules will be *more* restrictive as to those individuals, not less, as their eligibility clocks will now trigger the year they turn 19. *See* Vaughn Decl. ¶ 35. Second, the fact that the NCAA sought to streamline its eligibility rules as a reasonable response to a "seemingly endless wave of litigation" does not establish that the Five-Year rule served no procompetitive purpose. The Sherman Act does not require the NCAA to craft a *perfect* eligibility rule. *See Alston*, 594 U.S. at 84 ("[Plaintiffs] may not use antitrust laws to make marginal adjustments to broadly reasonable market restraints."); *Epic Games*, 67 F.4th at 990 ("Courts must give wide berth to defendants' business judgments." (cleaned up)); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1198 (10th Cir. 2009) ("The antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path."). Indeed, the NCAA's decision not to apply the new rules retroactively to athletes who, like Plaintiff, had already exhausted their eligibility was borne out of precisely the kind of practical considerations that courts recognize as reasonable and lawful. *See* Vaughn Decl. ¶¶ 38–40 & Ex. B. Plaintiff asks the Court to second guess rational decisions made by the NCAA in the face of multiple competing considerations and inconsistent and irreconcilable decisions from courts around the country. The Sherman Act does not authorize the Court to do so. *See Alston*, 594 U.S. at 84; *Epic Games*, 67 F.4th at 990; *Bd. of Regents*, 468 U.S. at 120.

21

4906-4275-9611\7

**D.        The NCAA Did Not Breach the Covenant of Good Faith and Fair Dealing.**

As a threshold matter, the NCAA Manual, which encompasses the NCAA Bylaws, is a governance document, not a contract. The Bylaws contain a suite of regulatory provisions that the NCAA member institutions have adopted through a democratic, legislative process. The Bylaws provide a comprehensive governance framework for the conduct of intercollegiate athletics among member institutions. Even if treated as a contract, Plaintiff identifies no Bylaw language suggesting he is a third-party beneficiary of the Bylaws. *See Minshew v. Donley*, 911 F. Supp. 2d 1043, 1060 (D. Nev. 2012); *Diamond Speedway LLC v. Kolay Flooring Int'l, LLC*, No. A-21-844035-B, 2024 Nev. Dist. LEXIS 455, at *3 (Clark Cnty. Dist. Ct., Mar. 28, 2024). Those threshold issues aside, Plaintiff cannot establish a likelihood of success on the merits of his implied-covenant claim because it necessarily relies on his unsupported antitrust claim.

A party to a contract breaches Nevada's version of the implied covenant where it literally complies with the terms of the contract but "deliberately countervenes the intention and spirit of the contract." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991). Plaintiff asserts that "[c]ontracts cannot be carried out for an unlawful purpose." ECF No. 5 at 16. And that he is likely to succeed on his implied covenant claim because the NCAA's eligibility rules are "unlawful as a matter of law under the Sherman Act principles addressed herein." *Id.* at 16–17. In other words, Plaintiff's contract claim is derivative of his antitrust claim. *See Hasz v. NCAA*, No. 8:25CV398, 2025 WL 2083853, at *2 n.1 (D. Neb. July 24, 2025). Because, as explained above, Plaintiff has not established a likelihood of success on his antitrust claims, his breach of the implied covenant of faith and fair dealing claim premised on the same conduct and legal theory necessarily fails. *See id.*; *see also Osuna Sanchez*, No. 3:25-cv-62, 2025 WL 684271, at *8 (E.D. Tenn. Mar. 3, 2025) (denying preliminary injunction on similar state-law claim); *Johnson*, 2025 WL 1790345, at *18 (same).

**E.        Plaintiff's Tortious-Interference Claim Likewise Falls with His Antitrust Claim.**

Plaintiff asserts that he "has a reasonable expectation of prospective business relations with UNLV and other third parties." ECF No. 5 at 18. But Plaintiff has known for years that his eligibility would expire at the conclusion of his fourth season of collegiate football. Thus, Plaintiff had no reasonable expectation of any prospective business relationship with any party based on his eligibility

22

4906-4275-9611\7

for the 2026–2027 football season. The NCAA's application of its Bylaws to Plaintiff cannot form the basis of a tortious interference with prospective economic advantage claim, particularly without a finding that those bylaws were unlawfully applied. *See Osuna Sanchez*, 2025 WL 684271, at *8; *Johnson*, 2025 WL 1790345 at *17. Moreover, to recover for tortious interference, Plaintiff must establish that the NCAA's actions had no privilege or justification. *See* ECF No. 5 at 18 (citing *In re Amerco Deriv. Litig.*, 127 Nev. 196, 226 (2011)). And actions are privileged "when the defendant acts to protect [its] own interest. *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1226 (Nev. 1987). The NCAA's evenhanded application of its eligibility rules to Plaintiff was privileged. Plaintiff makes no attempt to establish otherwise; nor does he provide any other evidence to support his claim.

## III.    PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM.

Plaintiff argues that he faces threats of irreparable harm in the form of exclusion from the upcoming DI football season and economic harm from the loss of "any NIL deal he is offered" and decreased "chances of earning a contract to play professional football following the seasons at issue." ECF No. 5 at 19–20. These contentions do not establish that Plaintiff will suffer irreparable harm absent preliminary-injunctive relief.

First, Plaintiff cannot show irreparable harm for the simple reason that he knew years ago that his eligibility would end at the conclusion of the 2025–2026 season. Yet, he waited until the eve of the 2026–2027 season to petition this Court for an additional season of competition. This "excessively long and unjustified" delay is grounds for denying his motion. *See Walker v. NCAA*, No. 25-514, 2025 WL 1901907, at *7 (M.D. La. July 1, 2025); *see also Giles v. NCAA*, No. 8:25-cv-01488, 2025 WL 2551093, at *8 (C.D. Cal. Aug. 18, 2025) ("[T]he Court is wary to find irreparable harm where Plaintiffs delayed in seeking a preliminary injunction."); *Mayes v. NCAA*, No. 25CV045874-590, 2025 NCBC LEXIS 123, at *7 (N.C. Sup. Ct. Sep. 11, 2025) ("Most vexingly, while [Plaintiff] contends that the irreparable harm in this case is primarily his inability to play college football, [Plaintiff] willingly exacerbated this purported harm.").

Second, Plaintiff's primary alleged injury is a financial loss—i.e., the loss of NIL earnings. Indeed, although Plaintiff labels only a portion of his alleged harm as "economic," he refers to NIL opportunities repeatedly throughout. *See* ECF No. 5 at 19–21. This type of injury can be quantified and

23

4906-4275-9611\7

compensated by a damages award and is not irreparable. *L.A. Memorial Coliseum Com. v. National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). Plaintiff's allegation of diminished chances to earn a professional contract is also (1) financial, and (2) "too speculative to warrant an injunction." *See Hasz*, 2025 WL 2083853 at *6 (noting absence of evidence that athlete was scouted professionally).

Third, Plaintiff's cited irreparable-harm cases are also largely distinguishable. They do not involve antitrust claims and the plaintiffs therein suffered unequal treatment in violation of Title IX. *See S.A. v. Sioux Falls School Dist. 49-5*, No. 4:23-CV-04139, 2023 WL 6794207, at *9 (D. S.D. Oct. 13, 2023); *Biediger v. Quinnipiac Univ.,* 616 F. Supp. 2d 277, 291 (D. Conn. 2009).

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT INJUNCTIVE RELIEF

Plaintiff, like the dozens before him, urges the Court to suspend longstanding eligibility rules that apply to over 500,000 NCAA student-athletes just for himself.

On one side of the scale, Plaintiff risks missing extra seasons not contemplated by the NCAA rules. On the other side of the scale, granting the relief that Plaintiff requests would adversely impact the decisions and collegiate careers of tens of thousands of student-athletes. *See Coley*, 792 F. Supp. 3d at 648. The balance of equities therefore weighs against granting Plaintiff's motion, especially on the extremely slim record he presented. *See Bewley v. NCAA*, No. 23 CV 15570, 2024 WL 113971, at *3 (N.D. Ill. Jan. 10, 2024); *Brantmeier*, 2024 WL 4433307, at *1. Even if the Court were to balance only the effect of granting individual relief to Plaintiff and to ignore the precedential effect on others, Plaintiff would still gain at the expense of another player who would otherwise fill his spot. *See Patterson*, 2026 WL 115417, at *9; *Zeigler*, 2025 WL 1671952, at *5. Plaintiff needs to show that the scales tip dramatically in his favor to alter the status quo. *Stanley*, 13 F.3d at 1320; *Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 623–24 (9th Cir. 2017). He cannot do so.

The public interest likewise goes beyond Plaintiff's personal interests and extends to the up-and-coming athletes whom Plaintiff and those like him will displace. This fall, a young athlete will be the last competitor picked for the college football team Plaintiff seeks to join. Plaintiff's victory will be that athlete's defeat. *See West Virginia v. B.P.J.*, 225 L.Ed.2d 1040, 1066 (U.S. 2026) ("Every athlete who makes a team takes a roster spot from another athlete.").

24

4906-4275-9611\7

WHEREFORE, for the reasons set forth herein, Defendant respectfully requests that this Court DENY Plaintiff's Motion.

Respectfully submitted,

Dated:  July 24, 2026.

NAYLOR & BRASTER

By: */s/ John M. Naylor*
  John M. Naylor
  Nevada Bar No. 5435
  Kelly M. Scarborough
  Nevada Bar No. 16979
  10100 W. Charleston Blvd., Suite 120
  Las Vegas, NV 89135

  *Attorneys for Defendant National Collegiate Athletic Association*

25

4906-4275-9611\7

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 4(b), I hereby certify that I am an employee of NAYLOR & BRASTER and that on this 24th day of July 2026, I caused the document entitled "**Brief of Defendant NCAA in Opposition to Plaintiff's Motion for Preliminary Injunction**" to be served through the Court's CM/ECF No. system to those persons designated by the parties that have appeared in the matter.

/s/ Halee A. Mennear
An Employee of NAYLOR & BRASTER

26

4906-4275-9611\7

# APPENDIX A

27

4906-4275-9611\7

**Federal District Court Denials of Preliminary Injunctive Relief in NCAA Eligibility Cases**

*Wade v. NCAA*, No. 24-cv-196, 2024 WL 5212665 (S.D. Miss. Dec. 23, 2024);

*Ciulla-Hall v. NCAA*, No. 25-cv-10271, 2025 WL 438707 (D. Mass. Feb. 7, 2025);

*Arbolida v. NCAA*, No. 25-2079, 2025 WL 579830 (D. Kan. Feb. 21, 2025);

*Goldstein v. NCAA*, No. 25-cv-27, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025);

*Osuna Sanchez v. NCAA*, No. 25-cv-62, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025);

*Brzovic v. NCAA*, No. 25-cv-2885, 2025 WL 1370758 (D.S.C. May 11, 2025);

*Coley v. NCAA*, 792 F. Supp. 3d 634 (E.D.N.C. 2025);

*Zeigler v. NCAA*, No. 25-cv-226, 2025 WL 1671952 (E.D. Tenn. June 12, 2025);

*Johnson (Kai) v. NCAA*, No. 25-cv-60, 2025 WL 1790345 (D. Mont. June 26, 2025);

*Walker v. NCAA*, No. 25-CV-514, 2025 WL 1901907 (M.D. La. July 1, 2025);

*Hill v. NCAA*, No. 25-cv- 591, 2025 WL 3252322 (E.D. Ark. July 24, 2025);

*Hasz v. NCAA*, No. 25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025);

*Larry v. NCAA*, No. 25-cv-1761, 2025 WL 2725188 (D. Colo. Aug. 6, 2025);

*Bellamy v. NCAA*, No. 24-cv-750, 2025 WL 2267761 (M.D. Tenn. Aug. 7, 2025);

*Giles v. NCAA*, No. 25-cv-1488, 2025 WL 2551093 (C.D. Cal. Aug. 18, 2025);

*Robinson (Kaedin) v. NCAA*, No. 25-cv-6454, 2025 WL 2551093 (C.D. Cal. Aug. 18, 2025);

*Wingfield v. NCAA*, No. 25-cv-6875, 2025 WL 2551093 (C.D. Cal. Aug. 18, 2025);

*Boyd v. NCAA*, 25-cv-729, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025);

*Hamilton v. NCAA*, No. 25-cv-924, 2025 WL 2481363 (E.D. La. Aug. 28, 2025);

*Johnson (Donovan) v. NCAA*, No. 25-cv-1288, 2025 WL 3145866 (S.D. Ohio Nov. 11, 2025);

*Patterson v. NCAA*, No. 25cv-994, 2026 WL 115417 (M.D. Tenn. Jan. 15, 2026);

*Stedman v. NCAA*, No. 25-cv-25095, 2026 WL 637660 (S.D. Fla. Jan. 22, 2026) (Plaintiff dismissed case following Report & Recommendation recommending denial)

*Humphreys v. NCAA*, No. 26-cv-268, 2026 WL 777192, (C.D. Cal. Feb. 12, 2026);

*Coly v. NCAA*, No. 26-CV-8, 2026 WL 799225 (N.D. Ind. Mar. 23, 2026);

*Feistel v. NCAA*, No. 26-CV-1034, 2026 U.S. Dist. LEXIS 154631 (N.D. Tex. Apr. 9, 2026)

*Ortega v. NCAA*, No. 25-cv-496, 2026 WL 1847877 (S.D. Iowa Apr. 23, 2026);

*Schiff v NCAA*, No. 1:26-cv-00316 (E.D. Va. Feb. 18, 2026), ECF No. 5 (denying TRO and dismissing Complaint);

*Murtha v. NCAA*, No. 1:26-cv-719 (D. Md. Mar. 5, 2026), ECF No. 32  (denying TRO).


**Federal District Court Grants of Preliminary Injunctive Relief in NCAA Eligibility Cases**

*Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024); *appeal dismissed as moot*, 154 F.4th 407 (6th Cir. 2025);

*Fourqurean v. NCAA*, 771 F. Supp. 3d 1043 (W.D. Wis. 2025), *rev'd*, 143 F.4th 859 (7th Cir. 2025);

*Elad v. NCAA*, No. 25-CV-1981, 2025 WL 1202014 (D.N.J. Apr. 25, 2025), *vacated*, 160 F.4th 407 (3d Cir. 2025);

*Braham v. NCAA*, 794 F. Supp. 3d 824 (D. Nev. 2025) (appeal pending);

4906-4275-9611\7

*Robinson (Jimmori) v. NCAA*, 803 F. Supp. 3d 481 (N.D.W. Va. 2025), *vacated*, 172 F.4th 217 (4th Cir. 2026);

*Martinson v. NCAA*, 804 F. Supp. 3d 1109 (D. Nev. 2025) (appeal pending);

*Blythe v. NCAA*, No. 26-cv-100-ART-CSD, 2026 WL 483345 (D. Nev. Feb. 20, 2026); *vacated*, No. 26-1106 (9th Cir. Apr. 8, 2026), ECF No. 26.

4906-4275-9611\7