WOODROW K. GLASS (ADMITTED PRO HAC VICE)
Oklahoma Bar No. 15690
GEOFFREY A. TABOR (ADMITTED PRO HAC VICE)
Oklahoma Bar No. 32880
CHLOE N. GLASS (ADMITTED PRO HAC VICE)
Oklahoma Bar No. 36646
**GLASS & TABOR, LLP**
1601 36th Avenue NW
Norman, OK 73072
Phone: 405-360-9700
Email: geoffrey@glasstaborlaw.com; woody@glasstaborlaw.com; chloe@glasstaborlaw.com

Timothy R. O'Reilly
Nevada Bar No. 8866
**O'REILLY LAW GROUP, LLC**
325 S Maryland Parkway, Suite 100a
Las Vegas, NV 89101
Phone: 702-812-3339
Email: tor@olglaw.com
**ATTORNEYS FOR PLAINTIFF COHEN FULLER**

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| COHEN FULLER,<br><br>**Plaintiff**,<br><br>vs.<br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>**Defendant**. | Case No. 2:26-cv-01974<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Plaintiff COHEN FULLER, ("Plaintiff"), submits this Reply in Support of his Emergency Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 5]. Plaintiff addresses the following new and unique issues raised in the NCAA's Response [Doc. 22] in turn:

## ARGUMENT & AUTHORITY

I.    **TRANSFERRING THIS CASE TO TENNESSEE OR DISMISSAL VIA THE "FIRST-TO-FILE" RULE IS DISCRETIONARY AND IMPROPER.**

1

The NCAA's first-to-file argument is a veiled attempt to avoid this Court's adjudication of an emergency and time-sensitive injury. This argument should be rejected. The first-to-file rule is an entirely discretionary rule as previously reinforced by this Court. *See* Kutob v. L.A. Ins. Agency Franchising, LLC, No. 2:18-CV-01505-APG-PAL, 2018 WL 4286171, at *1 (D. Nev. Sept. 7, 2018) (*quoting* Cedars-Sinai Med. Ctr. V. Shalala, 125 F.3d 765, 769 (9th Cir. 1997)) ("Under the first-to-file rule, 'when cases **involving the same parties and issues** have been filed in two different districts, the second district court **has discretion** to transfer, stay, or dismiss the second case in the interest of efficiency and judicial economy.'") (Emphasis added).

The discretionary factors behind the first-to-file rule weigh in Plaintiff's favor and do not favor the NCAA's request. First, Plaintiff cannot be punished for the timing of the instant Motion. The NCAA notes in its Response that Plaintiff (before retaining the undersigned) filed a *pro se* lawsuit in this Court, which was then dismissed because Plaintiff could not afford to pay a filing fee. The first-to-file rule does not exist to punish a student-athlete who cannot afford a filing fee. Plaintiff's finances should not be used to punish him and force him to fly to multiple courthouses across the country, all to the detriment and avoidance of obtaining a ruling on his immediate eligibility. Once Plaintiff was in a position to retain counsel, finalize an expert opinion on his Sherman Act claims, and submit all of his information to this Court to fully adjudicate his injunctive relief, it was already June 2026. If Plaintiff did not properly plead his claims or retain expert opinion, surely the NCAA would argue that failure to do so would warrant either the dismissal of this lawsuit or at least the denial of injunctive relief as they have consistently argued in cases across the country.

Second, this lawsuit does not present identical parties or claims to the Pavia, Patterson, and Boyd cases. Plaintiff's claims not only concern JUCO eligibility, but also NAIA eligibility

**for a single student-athlete**. Plaintiff's claims also encompass Nevada state law contract and tortious interference claims, which do not solely rest on antitrust theories. The NCAA argues that Patterson challenges the four-seasons component, Pavia challenges the counting of JUCO seasons, and Boyd challenges NAIA seasons. But that concession demonstrates the mismatch: no single first-filed action presents the exact same parties and the same issues as this case. The NCAA cannot manufacture substantial similarity by cobbling together three different lawsuits. Also, Patterson's putative class allegations are immaterial. Particularly at the preliminary injunction stage, the speculation that Plaintiff could fall into a proposed class definition (which the NCAA surely will contest and argue there should be no certification) does not provide him specific and timely relief for the imminent eligibility issues at hand. The first-to-file rule does not require this Court to send an individual plaintiff into procedural limbo because a different jurisdiction may someday certify a class and address some overlapping federal antitrust issues. Lastly, this matter did not arise in Tennessee and has no relation to Tennessee. *See* In re Bozic, 888 F.3d 1048, 1054 (9th Cir. 2018) (discussing the tension created by the (1) "might have been brought" language from 28 U.S.C.A. § 1404 with (2) arguments by a litigant to transfer a case to a court where the case may not have been able to have been brought to begin with, and recognizing that "§ 1404(a) cabin[s] the exercise of that discretion" under the first-to-file" rule).

Most importantly, the NCAA's requested transfer or dismissal is improper because it would effectively deny Plaintiff's Motion by delay. If this Court were inclined to ultimately transfer this case to Tennessee at a later stage, this Court can still rule on the instant Motion for preliminary injunctive relief. Courts apply the first-to-file rule to avoid duplicative litigation, not to make emergency relief unavailable. Indeed, the "'first to file' rule is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." Pacesetter Sys., Inc. v. Medtronic, Inc., 678 F.2d 93, 95 (9th Cir. 1982).

## II.      **THIS CASE IS NOT PRECLUDED BY THE HOUSE SETTLEMENT.**

The NCAA argues that Plaintiff's claims are released by the House Settlement. This is an erroneous argument because the House Settlement and attendant case law regarding class action releases in this Circuit do not support the NCAA's arguments. When resolving the breadth of a class action settlement release, the Ninth Circuit applies the "identical factual predicate" doctrine. Under this doctrine, a class settlement may release the claims at issue only where the claims at issue are **"based on the identical factual predicate as that underlying the claims in the settled class action."** Williams v. Boeing Co., 517 F.3d 1120, 1133 (9th Cir. 2008). In applying the identical factual predicate doctrine, courts engage in a comparative factual analysis consisting of several overlapping factors: (1) the underlying conduct in each case, (2) whether the injury alleged in the second case is the same injury that was compensated in the settlement, and (3) a consideration of the time period covered by both cases. See Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 748-50 (9th Cir. 2006); Hesse v. Sprint Corp., 598 F.3d 581, 590-92 (9th Cir. 2010); Class Plaintiffs v. City of Seattle, 995 F.2d 1268, 1287-91 (9th Cir. 1992).

The Ninth Circuit case law on this doctrine shows its precise application. In Reyn's Pasta Bella, LLC, 442 F.3d 741, 749 (9th Cir. 2006), the Ninth Circuit affirmed the dismissal of a class action against credit card companies based on the exact same price-fixing facts that were settled in a prior class action, despite the fact that the second lawsuit brought different legal claims. In Class Plaintiffs, 995 F.2d 1268, 1287 (9th Cir. 1992), the Ninth Circuit affirmed the approval of a class settlement regarding bond defaults that released claims by an identical class of plaintiffs in another case that was based on the same bond defaults. Also, in Howard v. Am. Online Inc., 208 F.3d 741 (9th Cir. 2000), the Court held that a state court class settlement of claims for unfair billing practices released later federal RICO claims based on the exact same billing practices.

An important Ninth Circuit case on the identical factual predicate doctrine demonstrating what claims fall outside of the doctrine is Hesse, 598 F.3d 581 (9th Cir. 2010). In Hesse, the Ninth Circuit held that customers' claims challenging Sprint's statewide surcharge to recoup the cost of a Washington state business and occupation (B&O) tax were not released by a prior Kansas class settlement that resolved claims regarding Sprint's nationwide surcharges to recoup the costs of compliance with federal programs. The Court found that the "superficial similarity" between the two class actions, which both involved claims that Sprint improperly billed government taxes or fees, was insufficient to show an identical factual predicate. Id. at 591. The Court explained that the two actions concerned "different surcharges, imposed to recoup different costs, that were alleged to be improper for different reasons." Id. at 590. Lastly, it is also worth noting that the Court applied the doctrine as "a mixed question of law and fact." Id. Thus, this is yet another reason why summarily disposing of these issues at the preliminary injunction stage is improper.

House and the instant case concern completely different factual predicates, and Plaintiff's JUCO and NAIA eligibility claims were not represented or at issue in House. House had nothing to do with whether the instant eligibility rules were anticompetitive. Rather, House challenged the NCAA's compensation restrictions, scholarship caps, and NIL revenue distribution rules. *See* In re Coll. Athlete NIL Litig., No. 20-cv-03919 (N.D. Cal. 2025) at ECF No. 448-1, Compl. at ¶¶ 8, 95-113. Furthermore, the House Opinion Granting Motion for Final Approval of Settlement Agreement addressed "four types of NCAA restraints on student-athlete compensation", not eligibility limits. *See* Id. at ECF No. 978 at 5-6. The instant case concerns **a completely separate eligibility restraint that determines whether Plaintiff may compete to begin with**. Eligibility claims arise from different rules, different conduct, different market effects, and different injuries.

The plain text of the House Settlement, while not dispositive, is instructive. [*See* Doc. 22-2, Exhibit F]. Indeed, the Recitals described the subject claims as "(a) compensation and benefits which may be provided to student-athletes" and "(b) NCAA roster and scholarship limits." [Id. at p. 2]. The Settlement defines "Released Injunctive Class Claims" as claims concerning NCAA or conference rules on three subjects: "(1) monies and benefits" provided to student-athletes, "(2) NCAA roster and scholarship limits," or "(3) the subjects addressed by the Related Injunctive Relief NCAA & Conference Rules…" [Id. at p. 11-12]. The "Related Injunctive Relief NCAA & Conference Rules" encompass solely NIL, scholarship, degree progress, and financial benefit matters. [*See* Id. at p. 12-14]. The released claims concern only financial and scholarship aspects. It is also important to note that there is a "Future Division I Student-Athlete Proceedings" section, which limits future challenges by student-athletes to the House Settlement's structure or "alleg[e] antitrust or other violations of law based on Defendant's implementation of the Injunctive Relief Settlement…". [Id. at p. 38]. There is also an "Other Litigations" section, which reads, in pertinent part, that "[t]he Parties shall work cooperatively to ensure that…other lawsuits that have been or may be brought **challenging NCAA compensation or benefit rules** addressed by this Settlement Agreement are enjoined…pending final approval of this Settlement Agreement. [Id. at pp. 38-39] (emphasis added).

However, the House Settlement Agreement ultimately is not dispositive or controlling. The identical factual predicate doctrine operates as an **external constraint** on any release language in a class action settlement. Indeed, the interplay of the identical factual predicate doctrine and what the Court described as an "expansive release of liability" in the class action settlement in Hesse, where the Ninth Circuit found no release of the second case at issue, cleanly demonstrates this external constraint. *See* 598 F.3d at 586. The **underlying facts** at issue for each case (House and the instant case) are the controlling analyses under the doctrine as an external

constraint on any purported release language. Furthermore, to the extent that any part of the House Settlement Agreement is deemed ambiguous, this is further indicative of why disposing of this issue at the preliminary injunction stage is improper, given that Nevada law dictates that extrinsic evidence may have to be used if the ambiguity cannot be ascertained by reviewing the contract in its entirety. *See* N. Las Vegas Infrastructure Inv. & Constr., LLC v. City of N. Las Vegas, 139 Nev. 46, 49, 525 P.3d 836, 840 (2023); *see also* Ringle v. Bruton, 120 Nev. 82, 93, 86 P.3d 1032, 1039 (2004). Lastly, it is worth noting that no Court has squarely addressed this issue. To Plaintiff's knowledge, the only court in a locatable decision to address this exact issue **specifically declined to resolve it at the preliminary injunction stage**. *See* Patterson v. Nat'l Collegiate Athletic Ass'n, No. 3:25-CV-00994, 2026 WL 115417, at *3 (M.D. Tenn. Jan. 15, 2026).

### III. PLAINTIFF HAS CLEARLY SATISFIED THE FACTORS TO OBTAIN A PRELIMINARY INJUNCTION.

Given the limited space that Plaintiff has to address the myriad of arguments raised by the NCAA in its Response, Plaintiff would simply reiterate that he has clearly met his burden for preliminary injunctive relief. On this point, it is also worth noting that the NCAA casts Plaintiff's request as one seeking mandatory injunctive relief, which the NCAA argues alters the status quo and should be an additional basis for denial. This is not true. The Martinson Court, which addressed similar claims, squarely rejected this argument and stated that student-athlete injunctive eligibility claims are a hybrid of prohibitory and mandatory relief. *See* Martinson v. Nat'l Collegiate Athletic Ass'n, 804 F. Supp. 3d 1109, 1123 (D. Nev. 2025).

Plaintiff's market evidence is not limited to legal conclusions or prior cases. First, Plaintiff has also attached a paper supplied by Dr. Maxcy, which has been scheduled for publication by the Marquette Sports Law Review in Fall 2026 (Vol. 37, Issue 1). [*See* Ex. 1]. Dr. Maxcy's forthcoming paper provides context as to how NCAA eligibility rules operate as horizontal

restraints and group-boycott-style exclusions in the labor market for college athletes. Dr. Maxcy explains that these rules restrict who may participate in Division I athletics and for how long, thereby reducing labor-market output, suppressing compensation, and excluding athletes who followed nontraditional developmental pathways such as JUCO or NAIA participation. The paper also identifies less restrictive alternatives, including counting only NCAA or Division I participation, individualized waiver systems, and academic eligibility standards rather than rigid temporal limits. This scholarship is useful because it confirms that Plaintiff's challenge is not merely an individualized eligibility dispute and is not merely reciting Alston's market definition. Rather, it is a market-wide antitrust challenge to coordinated NCAA rules that restrict the supply, mobility, and compensation of Division I football labor in the post-Alston and post-House landscape.

Along with the materials previously filed, independent economic literature confirms the market realities underlying Plaintiff's claims. The St. Louis Federal Reserve explains that college athletes sell their labor to NCAA schools and lack another viable buyer, giving NCAA schools monopsony power capable of depressing athlete compensation. This is disinterested, neutral analysis from the Federal Reserve. [Ex. 2]. Additional scholarship has long described the NCAA as a cartel or monopsony that creates rents by limiting athlete compensation, output, and mobility, while acknowledging that the NCAA's amateurism-demand justification lacks evidentiary support. Although some of this scholarship predates Alston and House, the monopsony realities observed by decades of NCAA control are still well in place. [Ex. 3]. As observed in the Journal of Legal Aspects of Sport, the rapidly-changing landscape has fractured the NCAA's once monopsony on compensation and transfer before Alston and House. However, the current realities still show horizontal restraints on labor amidst what would otherwise be a highly competitive market and what the authors see as a future of a true (but not yet attained) free market. [Ex. 4].

Even more recent literature since <u>House</u> synthesizes that the NCAA can be understood as a monopsony or a cartel exercising monopsonistic power, with suppressed athlete wages as the result. It also confirms that antitrust-labor analysis does not depend on formal employment status, but on market power, market structure, and actual competitive effects. [Ex. 5]. Together, these sources further support Plaintiff's showing that NCAA eligibility rules operate in a commercial labor market, restrict output by excluding experienced athlete labor, and suppress compensation by limiting access to Division I football, NIL, and revenue-sharing opportunities.

## IV. THE APPELLATE AUTHORITY PRESENTED BY THE NCAA DOES NOT SUPPORT ITS ARGUMENTS FOR DENYING PRELIMINARY INJUNCTIVE RELIEF.

There is a critical detail missing in the NCAA's presentation of the appellate cases that overturned or dissolved injunctive relief in other antitrust student-athlete cases: the appellate Courts did so because of a lack of any post-<u>Alston</u> market analysis for the alleged antitrust harms. Plaintiff has submitted to this Court direct expert testimony through Dr. Maxcy's Declaration, which few other plaintiffs have done at the preliminary injunction stage. In fact, the prior antitrust cases in this Court (<u>Martinson</u>, <u>Blythe</u>, and <u>Braham</u>) involved little independent market analysis. In other words, the inclusion of expert testimony via Dr. Maxcy's Declaration in Plaintiff's Complaint and Motion already addresses and cures the reasons for reversal in the appellate cases cited by the NCAA. Plaintiff will address these in turn.

In <u>Elad v. Nat'l Collegiate Athletic Ass'n</u>, 160 F.4th 407 (3d Cir. 2025), the Third Circuit vacated and remanded a preliminary injunction premised on Sherman Act violations. It is first vital to note that the Third Circuit held that the challenged JUCO rules were commercial because they interfered with Elad's ability to compete in Division I athletics and profit from that participation. <u>Id.</u> at 415. However, the Court vacated the injunction on two main grounds. First,

the District Court erred by failing to make requisite fact-finding of the relevant market despite the parties' differing opinions on the topic. Id. at 416. Instead of making factual findings, the District Court merely recited Elad's expert testimony without any independent analysis or fact-finding. Second, the Court held that Elad did not properly define the market. **Elad simply relied on the Alston Court's market definition**. The Court reasoned that since Alston changed the landscape of college sports, this would in turn change the future market and attendant antitrust analyses that would exist in the post-Alston era. *See* Id. at 417.

That is not the case here. Dr. Maxcy's materials directly address the issue that drove reversal in Elad: a **(1) precise market definition and (2) current market realities in the post-Alston, post-House landscape**. Dr. Maxcy's market analysis specifically factors in the realities of Alston and House applied to this new era of collegiate athletics. He explains why the NCAA alternatives do not offer comparable compensation, exposure, NIL opportunities, or professional pathways. He also identifies specific JUCO participation data, including 1,062 NJCAA alumni on Division I football rosters as of October 2025, with 552 on FBS rosters and 178 on Power Four rosters. That data supports actual market effects rather than relying solely on prior judicial market definitions from Alston.

In Fourqurean v. Nat'l Collegiate Athletic Ass'n, 143 F.4th 859 (7th Cir. 2025), the Seventh Circuit reversed the District Court's preliminary injunction for two main reasons. First, the Seventh Circuit held that Alston alone did not decide market definition and that Fourqurean had to independently define the relevant market, which he failed to do. The Court emphasized that market realities had changed after Alston, including revenue sharing and NIL opportunities. Id. at 870. Second, the Court held that Fourqurean **relied only on his own exclusion** as the basis for a Sherman Act violation and did not link his exclusion to a broader showing that the challenged

eligibility rules creates, protects, or enhances the NCAA's dominant market position and depresses student-athlete compensation below competitive levels. Id.

The instant case is clearly distinguishable from the bases of reversal in Fourqurean. First, Plaintiff has done much more than baldly assert that the relevant market is how the Alston Court defined it as discussed in Elad, *supra*. Second, Plaintiff has supplied precisely the economic theory and evidence the Seventh Circuit found absent. Dr. Maxcy identifies three broadly applicable anticompetitive effects that go beyond Plaintiff's sole exclusion: output restriction, compensation suppression, and allocative distortion. Dr. Maxcy explains that the challenged rules artificially constrain the Division I labor market by excluding older student-athletes and counting JUCO and NAIA competition toward NCAA eligibility limits. He further explains that the rules target athletes who command higher market value, remove the most "expensive" players from the market, and replace them with lower-cost entrants. Unlike the bare record criticized in Fourqurean, Plaintiff's record directly addresses why the exclusion of experienced athletes **broadly, and not just individually**, constitutes unlawful anticompetitive conduct.

In Robinson v. Nat'l Collegiate Athletic Ass'n, 172 F.4th 271 (4th Cir. 2026), the Fourth Circuit held the appeal of a granted preliminary injunction to multiple football players was not moot under the "capable of repetition, yet evading review" exception. Id. at 285. On the merits, the Fourth Circuit vacated and remanded, yet agreed that the challenged eligibility rules were commercial and subject to Sherman Act scrutiny. Id. at 287. However, it held that the District Court erred by applying quick-look or "twinkling of an eye" analysis instead of full rule-of-reason analysis. Id. at 291. It also held that the players failed to show anticompetitive effects or put forward a coherent economic theory of harm. Finally, it faulted the District Court for adopting a market definition without factual findings and held that the players presented no factual evidence

supporting market definition and simply "failed to point to any record evidence showing that the JUCO Rule or the Five-Year Rule reduced output, increased prices, decreased wages, or decreased quality in the relevant market." Id. at 292. As stated above, Plaintiff's record is developed and contains the necessary information to grant preliminary injunctive relief.

## V.      INDEX OF EXHIBITS

In support of this Reply, Plaintiff has attached the following exhibits:

1. Maxcy, J., *The NCAA's Eligibility Rules as Unlawful Restraints of Trade*, Marquette Sports Law Review (Vol. 37, Issue 1, Fall 2026) (forthcoming);

2. Geiger, A., *What Should College Athletes Be Paid? Market Structure and the NCAA*, The St. Louis Federal Reserve, Last Accessed July 30, 2026;

3. Kahn, L., *Cartel Behavior and Amateurism in College Sports*, Journal of Economic Perspectives (Vol. 21, No. 1, Winter 2007);

4. Otto, K. and Parrish, C., *Monopsony Fracture: An Exploration of College Athletes' Freedom to Move and Freedom to Capitalize Through the Lens of Push-Pull Theory*, Journal of Legal Aspects of Sport (2024, 34, 145-164); and

5. Krais, E., *All I See is Dolla Signs: Using the Supreme Court's Rule of Reason Analysis of the NCAA's Monopsony Power in Other Industries*, George Mason Law Review (Vol. 32, No. 3, October 2025).

## VI.     CONCLUSION AND RELIEF REQUESTED

For the reasons stated in Plaintiff's Motion and herein, Plaintiff respectfully requests that this Court grant his Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

DATED JULY 31, 2026.

Respectfully Submitted:

**/s/ Geoffrey A. Tabor**
Woodrow K. Glass, Oklahoma Bar. No. 15690
Geoffrey A. Tabor, Oklahoma Bar. No. 32880
Chloe N. Glass, Oklahoma Bar. No. 36646
(ADMITTED PRO HAC VICE)
**GLASS & TABOR, LLP**
1601 36th Ave. NW
Norman, OK 73072
Phone: 405-360-9700
woody@glasstaborlaw.com
geoffrey@glasstaborlaw.com
chloe@glasstaborlaw.com

**/s/ Timothy R. O'Reilly**
Timothy R. O'Reilly, Nevada Bar No. 8866
**O'REILLY LAW GROUP, LLC**
325 S Maryland Parkway, Suite 100a
Las Vegas, NV 89101
Phone: 702-812-3339
tor@olglaw.com
**ATTORNEYS FOR PLAINTIFF**
**ATTORNEY LIEN CLAIMED**

13