WOODROW K. GLASS (ADMITTED PRO HAC VICE)
Oklahoma Bar No. 15690
GEOFFREY A. TABOR (ADMITTED PRO HAC VICE)
Oklahoma Bar No. 32880
CHLOE N. GLASS (ADMITTED PRO HAC VICE)
Oklahoma Bar No. 36646
**GLASS & TABOR, LLP**
1601 36th Avenue NW
Norman, OK 73072
Phone: 405-360-9700
Email: geoffrey@glasstaborlaw.com; woody@glasstaborlaw.com; chloe@glasstaborlaw.com

Timothy R. O'Reilly
Nevada Bar No. 8866
**O'REILLY LAW GROUP, LLC**
325 S Maryland Parkway, Suite 100a
Las Vegas, NV 89101
Phone: 702-812-3339
Email: tor@olglaw.com
**ATTORNEYS FOR PLAINTIFF COHEN FULLER**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| COHEN FULLER,<br><br>**Plaintiff**,<br><br>vs.<br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>**Defendant**. | Case No. 2:26-cv-01974<br><br>**PLAINTIFF'S RENEWED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH MEMORANDUM IN SUPPORT** |

## I. INTRODUCTION AND REQUEST FOR EMERGENCY AND EXPEDITED CONSIDERATION

Plaintiff Cohen Fuller ("Plaintiff" or "Fuller") submits this Renewed Emergency Motion for Temporary Restraining Order and Preliminary Injunction against Defendant National Collegiate Athletic Association ("Defendant" or "NCAA") to enjoin the NCAA from enforcing certain eligibility rules that irreparably harm Plaintiff. Plaintiff seeks to temporarily enjoin the NCAA from enforcing eligibility limitations as to the upcoming 2026-2027 season regarding

Plaintiff's prior JUCO and NAIA seasons. The nature of this emergency, and the certification required by LR 7-4 are set forth in the accompanying Declarations of Cohen Fuller and Geoffrey A. Tabor. Plaintiff respectfully requests that this Court set this matter on an expedited briefing and hearing schedule, given that **UNLV's football season begins on August 29, 2026**. To the extent possible, Plaintiff would request that this Court hear this matter before August 29, 2026.

## II. FACTUAL BACKGROUND

Plaintiff is a college football player who plays on the defensive line at UNLV and resides in Las Vegas, NV. Plaintiff is originally from Ontario, CA. Plaintiff graduated high school in the Spring of 2022. Plaintiff's post-high school career is as follows: (1) 2022 Season: Graceland University (NAIA), (2) 2023 Season: El Camino College (JUCO), (3) 2024 Season: Coastal Carolina University (NCAA), and (4) 2025 Season: UNLV (NCAA). Plaintiff has been deemed ineligible for further NCAA competition by way of his prior seasons at the JUCO and NAIA levels. As outlined fully in the Complaint, Plaintiff challenges the NCAA's Bylaws and enforcement mechanisms regarding (1) the NCAA counting JUCO and NAIA seasons against Division I eligibility, and (2) the recently passed age-based eligibility rule, also known as the NCAA's "5-in-5" Rule. Plaintiff brings this Motion on an emergency basis because fall practice is occurring, Plaintiff is missing NIL and revenue-sharing opportunities through UNLV, UNLV as an institution needs to know and plan for Plaintiff's availability status in the upcoming season, and the UNLV season begins during the NCAA's "Week Zero" on August 29, 2026.

## III. LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

Fed. R. Civ. P. 65 governs preliminary injunctions and temporary restraining orders. The standard for issuing each form of injunctive relief is substantially identical. *See* Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n. 7 (9th Cir. 2001). "An injunction is a

matter of 'equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.' " Earth Island Inst. v. Carlton, 626 F.3d 462, 469 (9th Cir. 2010) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)). To qualify for a preliminary injunction or TRO, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest. Winter, 555 U.S. at 20. After balancing the four factors for injunctive relief, this Court should grant preliminary injunctive relief and permit Plaintiff to be immediately and fully eligible for the upcoming season. Plaintiff has demonstrated a strong likelihood of succeeding on the merits of his claims, which are: (1) antitrust violations under the Sherman Act, (2) breach of contract, and (3) tortious interference with prospective economic advantage. Plaintiff will discuss each claim and factor in turn:

## IV. SHERMAN ACT: GENERAL FRAMEWORK

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Courts typically analyze claims under Section 1 of the Sherman Act under "a three-step, burden-shifting framework." National Collegiate Athletic Ass'n v. Alston, 594 U.S. 69, 96 (2021). First, the plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect" in the relevant market. Id. If a plaintiff meets this burden, "the burden then shifts to the defendant to show a procompetitive rationale for the restraint." Id. If a defendant provides this rationale, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." Id. Within the specific context of sports competition, the Supreme Court has held that the burden-shifting framework applies. *See* Alston, 594 U.S. at 91. However, if the challenged conduct is classified as a horizontal restraint, it can be deemed a per se violation.

*See* Ohio v. Am. Express Co., 585 U.S. 529, 138 S. Ct. 2274 (2018). A horizontal restraint is deemed a per se violation if it is "naked" rather than "ancillary". A restraint is naked if it has no purpose except stifling competition. *See generally* Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc., 9 F.4th 1102 (9th Cir. 2021). Ancillary restraints must be (1) subordinate and collateral to a separate, legitimate transaction, and (2) reasonably necessary to achieving the transaction's procompetitive purpose. Id. Where a market would be competitive without the restraint, courts are more likely to classify the restraint as naked. *See* United States v. eBay, Inc., 968 F. Supp. 2d 1030, 1038-39 (N.D. Cal. 2013). A per se violation eliminates the need to analyze the reasonableness of the restraint. *See* Leegin Creative Leather Prods., Inc. v. PSKS, 551 U.S. 877, 127 S. Ct. 2705 (2007). First, Plaintiff submits that the horizontal restraints at issue constitute a per se violation, particularly in light of the HHI analysis submitted *infra*. Second, to the extent the Court disagrees and applies rule-of-reason analysis (which is also presented *infra*), the burden shifting under that framework still yields a Sherman Act violation in Plaintiff's favor.

## V. SHERMAN ACT: THE MATTERS AT ISSUE ARE COMMERCIAL

In the post-Alston and post-House NIL landscape of college football, the NCAA's eligibility rules have been recognized as commercial by this Court. *See* Martinson v. Nat'l Collegiate Athletic Ass'n, 804 F.Supp. 3d 1109, 1124 (D. Nev. 2025); Braham v. Nat'l Collegiate Athletic Ass'n, 794 F. Supp. 3d 824, 833-34 (D. Nev. 2025). Given that the eligibility rules at issue limit the number of years in the applicable labor market, these matters are subject to Sherman Act application. There are no recognized antitrust exemptions to otherwise change this clearly established precedent.

## VI. SHERMAN ACT: THE RELEVANT MARKET

The relevant market is multi-faceted, particularly in the post-Alston and post-House era. The relevant market in the post-Alston and post-House era is the national labor market for NCAA Division I football athletes' services. JUCO, NAIA, lower NCAA divisions, and professional leagues are not substitutes and fall outside the relevant market. Within this framework, the input labor market for competitive college football services creates an output product market for competitive college football events. The geographic location of the market is the United States. It cannot be disputed that within this market framework, the NCAA retains monopsony power to control both input functions and output products.

## VII. SHERMAN ACT: THERE ARE NO REASONABLE MARKET ALTERNATIVES

Once the market is defined, it is an economic reality that there are no reasonable alternatives outside the relevant market. The NCAA's eligibility rules do not merely regulate participation in one of many equivalent football opportunities. Rather, they collectively determine whether an athlete may participate **in the only market** offering the unique bundle of compensation, exposure, competition, institutional resources, and professional-development opportunities associated with Division I football. The question is not whether an athlete can technically play football somewhere else, but whether the proffered alternatives provide reasonably interchangeable opportunities. The data show that those alternatives do not exist. Under Ninth Circuit precedent, the foundational test is whether products are reasonably interchangeable in use and whether there is sufficient cross-elasticity of demand between them. *See* Kaplan v. Burroughs Corp., 611 F.2d 286 (9th Cir. 1979); Coronavirus Rep. v. Apple, Inc., 85 F.4th 948 (9th Cir. 2023); Teradata Corp. v. SAP SE, 124 F.4th 555 (9th Cir. 2024). *See also* Epic Games, Inc. v. Apple, Inc., 67 F.4th 946 (9th Cir. 2023), which applied additional practical indicia to compare the markets at issue.

First, the consumer exposure and commercial platform regarding Division I football are orders of magnitude greater than the lower NCAA divisions. In 2024, NCAA Division I football averaged **26,979 spectators per game**, compared with only **3,006** in Division II and **1,674** in Division III. [Exhibit 7: Alternative Market Analysis Workbook at p. 2]. Thus, average Division I attendance was approximately 9 times greater than Division II and more than 16 times greater than Division III. Those differences bear directly on the visibility, media exposure, sponsorship opportunity, audience reach, and professional-development value associated with the athlete's services.

Second, Division I operates on a materially different economic scale. NCAA financial data shows that Division I institutions generated approximately **$13.1 billion** in athletics revenue in 2023–24, while Division II institutions generated approximately **$365.2 million**, which is a difference of approximately **35.9 to 1**. [Id.]. Division I athletics spending likewise totaled approximately $20.8 billion, compared with approximately $2.7 billion in Division II. [Id. at p. 10]. The commercial distinction is particularly pronounced at the highest levels of Division I football. The College Football Playoff's media-rights agreement beginning in 2026–27 is valued at approximately $1.3 billion annually. [Id.]. These objective differences demonstrate that an opportunity to perform Division II, Division III, NAIA, or JUCO football services is not remotely economically equivalent to supplying those services in Division I.

Third, the compensation architecture is materially different. Following the House settlement, participating Division I schools can make direct payments to athletes from an annual benefits pool that began at approximately $20.5 million per institution. [Id. at p. 11]. Football receives the largest share of that compensation at many institutions. Division II, Division III, NAIA, and JUCO do not provide a comparable institutional revenue-sharing mechanism. Division

II operates under a partial-scholarship equivalency model, with football limited to 36 scholarship equivalencies. Division III prohibits financial aid based upon athletic ability or participation. NAIA and NJCAA institutions operate under materially different aid structures. [Id. at p. 12]. Historical NIL transaction data point in the same direction. Opendorse data through May 2023 reflected average NIL compensation of approximately $7,149 in Division I**,** versus approximately $390 in Division II**,** $416 in Division III**,** and $212 in the NAIA. [Id. at p. 13].

Nor is the NFL a reasonably available substitute. The NCAA estimated approximately 7,764 Division I football players were draft-eligible in connection with the 2025 NFL Draft. Only 257, approximately **3.3%,** were selected. All 257 NCAA-origin draft picks came from Division I. [Id. at p. 4]. Thus, approximately 96.7% of estimated draft-eligible Division I players were not selected in the NFL Draft. The professional market may be more lucrative for the small subset of athletes actually hired, but an athlete cannot respond to loss of NCAA eligibility simply by electing an NFL roster position. Professional football is a highly selective future opportunity, not a generally available substitute for present Division I employment.

Professional football leagues other than the NFL are also not adequate substitutes. The question is not whether another employer or league theoretically exists. Rather, the question is whether the outside employment opportunities are sufficiently available and interchangeable that workers would switch to them in meaningful numbers if the terms offered by the proposed market worsened. Indeed, labor markets in antitrust scrutiny may be relatively narrow because employees face search and switching costs, geographic constraints, employer-specific qualifications, non-wage differences, and the critical factor that both the worker and employer agree to the match. Measured against those principles, neither the Canadian Football League ("CFL"), the United Football League ("UFL"), nor the smaller indoor, arena, or foreign leagues provide sufficient

alternative employment capacity. Plaintiff's economic analysis uses the NCAA's own estimate of approximately 7,764 draft-eligible Division I football players as a conservative measure of only one annual cohort of Division I labor. [Exhibit 8: Other Professional Leagues Analysis Workbook at p. 2]. The analysis then intentionally biases every capacity assumption in favor of the NCAA by comparing that annual cohort against the entire existing roster stock of alternative professional leagues, as if every professional roster position became vacant simultaneously. Actual annual hiring opportunities are clearly much more limited.

The CFL consists of only nine teams. Its own recruiting materials state that a 45-player dressed roster may contain up to 23 American players**,** yielding no more than 207 American roster positions across the entire league. Those 207 positions represent only approximately 2.7% of the NCAA's estimated annual Division I draft-eligible cohort. [Id. at pp. 2-3]. Of course, 207 substantially overstates actual opportunities. Those are existing roster positions, many occupied by veteran CFL players, rather than annual vacancies available to displaced Division I athletes. Access to even those positions is not frictionless. The CFL expressly states that it conducts no general league-wide tryout. American players generally enter through free agency or a team's Negotiation List. Each CFL club may maintain exclusive CFL negotiating rights to as many as 45 players on its Negotiation List. Thus, an American athlete does not simply respond to lost NCAA eligibility by choosing among nine CFL employers. He must be identified by a particular club, satisfy that club's position-specific demand, navigate the CFL's player-rights system, obtain one of a limited number of American roster positions, displace an incumbent, and relocate internationally.

The United Football League ("UFL") is also not a substitute market. The UFL has only eight teams, and each finalized a 50-player roster for the 2026 season, which equates to only 400

active roster positions league-wide. Even if all 400 existing jobs were assumed vacant, they would equal only approximately 5.2% of one annual Division I cohort. The actual entry opportunity is smaller. UFL training camps evaluate up to 64 players per club before cutting to 50, meaning a fully populated league camp would contain 512 players competing for only 400 final positions. The UFL also employs a structured selection process involving quarterback drafts, regional college allocations, league drafts, existing player rights, and free-agent mechanisms. [Id. at p. 4].

Combined, the CFL and UFL, which are the two most plausible non-NFL outdoor professional alternatives for an American college football player, provide at most 607 gross U.S.-relevant roster positions under Plaintiff's deliberately generous assumptions: 207 maximum American CFL positions plus all 400 UFL positions. That equals only approximately 7.8% of one annual Division I draft-eligible cohort. [Id.]. Again, the 607 figure assumes the impossible: every incumbent professional player disappears, every roster position becomes vacant simultaneously, every vacancy matches the displaced player's position and skill set, and every player is willing and able to accept the league's geography and employment terms.

A simple capacity stress test illustrates the economic significance. If only 5% of one annual Division I cohort sought professional alternatives, approximately 388 players would seek outside jobs. Accommodating those workers in the CFL and UFL would require openings equal to approximately 64% of the entire existing 607-position CFL/UFL roster stock. At a 10% switching rate, approximately 776 athletes would seek outside employment, which would already exceed the number of workers of every American CFL position and every UFL roster position combined. At 15% and 20%, the number of potential switchers rises to approximately 1,165 and 1,553, respectively. [Id.] These figures demonstrate the basic capacity mismatch. A market

comprising hundreds of Division I purchasers cannot plausibly be disciplined by alternative leagues **whose entire existing roster stock** could not absorb even modest switching.

Adding smaller professional leagues does not cure that mismatch. Plaintiff tested an intentionally expansive sensitivity scenario that adds an Indoor Football League roster proxy, the announced Arena Football One roster structure, and even the maximum number of foreign-player positions potentially available in Mexico's Liga de Fútbol Americano Profesional. Under assumptions deliberately favorable to the NCAA, the resulting total reaches approximately 1,237 positions, or only 15.9% of a single annual Division I cohort. That figure still assumes every existing professional job becomes vacant simultaneously and ignores incumbents, roster churn, positional requirements, import restrictions, work authorization, international relocation, compensation differences, and player preferences. [Id. at pp. 4-5].

The nature of the jobs further distinguishes the alleged alternatives. NCAA Division I football is not simply an occupation involving the act of playing with a football. It offers a distinctive bundle of compensation and non-wage benefits: scholarship and educational benefits, degree progress, NIL opportunities, direct institutional compensation at participating institutions, coaching and development, national exposure, and a platform from which athletes compete for subsequent professional employment. By contrast, professional leagues provide cash employment only if the athlete obtains one of their scarce roster positions. The employment calendars, geography, rules, and human-capital requirements also differ. Canadian football, for example, uses three downs, twelve players per side, and a materially larger playing field. For example, the IFL, another arena football league, plays eight-man football on a 50-yard indoor field. [Id. at p. 3]. Those differences reinforce the individualized matching problem recognized in labor-market analysis: a Division I athlete's football skills do not make every roster position in every form of

professional football interchangeable. Nor does the possibility that some players prefer professional football establish substitution at the market level. The CFL itself reports average salaries exceeding C$100,000. [Id. at p. 18]. Plaintiff therefore does not contend that a CFL or UFL opportunity is economically unattractive to an athlete fortunate enough to obtain one. The point is different. A desirable but highly rationed job in another country is not a market substitute merely because a small number of workers obtain it. Market definition asks whether enough alternative employment exists to constrain the purchasers in the proposed market. Here, the numbers demonstrate that it does not. This distinction is especially important in Plaintiff's case. If NCAA eligibility rules prevent Plaintiff from competing in Division I, he cannot simply “choose the CFL” or “choose the UFL.”

The economic evidence supports excluding the CFL, UFL, indoor, and arena leagues, and other foreign professional leagues from the relevant market. They may provide opportunities to the relatively small number of athletes who actually obtain those jobs. But they do not remotely provide reasonably interchangeable, sufficiently available employment alternatives capable of disciplining Division I purchasers. For a full review of why the proposed alternative markets are not sufficient, see Exhibit 7: Alternative Market Analysis Workbook and Exhibit 8: Other Professional Leagues Analysis Workbook.

## VIII. SHERMAN ACT: THE NCAA RULES AT ISSUE HAVE SUBSTANTIAL ANTICOMPETITIVE EFFECTS ON THE MARKET

### *A. General Anticompetitive Conduct and Considerations*

The eligibility rules at issue have substantial anticompetitive effects on the labor market for competitive college football players and services. The NCAA’s monopsony power along with the horizontal structure of the NCAA and member schools categorically excludes qualified former JUCO and NAIA athletes such as Plaintiff who now play at the NCAA Division I football level.

In fact, "[a]s the Alston Court explained, the NCAA admits that it participates in 'horizontal price fixing in a market where the defendants exercise monopoly control.'" Ohio v. Nat'l Collegiate Athletic Ass'n, 706 F.Supp. 3d 583, 591 (N.D.W. Va. 2023) (quoting Alston, 594 U.S. at 86). Indeed, the eligibility rules at issue amount to no more than an agreement to limit the amount of time athletes may play Division I football because they have chosen to attend a non-NCAA institution before transferring to a Division I NCAA college. These same restrictions are not placed on athletes who choose to delay entry to a Division I NCAA college to attend prep school, serve in the military, or even compete professionally in another sport. The eligibility rules at issue harm former JUCO and NAIA football players in at least four main areas of the relevant markets: (1) when an athlete is deciding whether to attend a JUCO or NAIA institution after high school graduation; (2) when an athlete is deciding whether to play a sport while attending a JUCO or NAIA institution; (3) when an athlete is deciding whether to transfer to an NCAA Division I college; and (4) when an athlete has transferred from a JUCO or NAIA institution to an NCAA Division I college and has eligibility limited to two or at most three years. Removing players from completing their eligibility with the JUCO and NAIA rules distorts the labor market by reducing competition, depressing the prices at which Division I schools can acquire athletes, and the pay athletes can earn in NIL agreements.

Regarding the output factor of the market, which is the nationwide market for consumption of college football, that relevant secondary market is also harmed by the NCAA's same anticompetitive conduct. Indeed, the NCAA's eligibility rules at issue cause negative downstream effects on consumers who attend college football games or watch on television. When college athletes are prevented from competing simply because they previously attended a JUCO or NAIA institution, the value of the product that the NCAA provides to consumers is clearly diminished. Regarding Plaintiff and UNLV, these dynamics are on full display. UNLV, which is an entity

within the defined labor market, has sought Plaintiff's services as a football player and has also offered him the resources a football program such as UNLV can provide. However, due to the anticompetitive eligibility rules promulgated by the NCAA within the horizontal member-school framework, UNLV has been prevented from retaining Plaintiff in the market. This shows that Plaintiff and similar student-athletes are qualified and could otherwise compete in the market. For a full discussion of this and related dynamics, see Exhibit 11: NCAA Restraint Analysis Workbook.

Players are not purely fungible and are not simply replaced by other players who are eligible. Not all players are the same, perform the same, or impact their teams and the market the same. As a result, all players are not simply paid the same or entitled to the same NIL opportunities year in and year out. Furthermore, it nearly goes without saying that the unique performance and contributions to the football team's strategy and team makeup by each athlete, even on the same team and at the same position, are unique. No football fan would argue that Lamar Jackson (a "dual threat" quarterback who is known to make plays running and scrambling) is a fungible replacement for Tom Brady (a traditional "pro style" pocket passer quarterback who rarely scrambled) or that Jerome Bettis (a large, strong, power running back) is a fungible replacement for Barry Sanders (a small, undersized "scat" back). Unique human athletic performance is not fungible similar to a hard commodity, industrial component, financial instrument, or other standardized good. These athletes each carry their own unique strengths and weaknesses, even within the exact same position on the field. Not only are these athletes completely different in terms of their physical attributes and what they offer to their teams in real game time, but their performance, personalities, or other characteristics impact their media presence and image in terms of advertisements, NIL deals, and other pop culture presence.

**Absent the challenged rule**, an experienced JUCO or NAIA athlete who remains academically eligible and capable of competing at the Division I level may offer his services to the numerous Division I programs that comprise this structurally decentralized market. Those schools decide independently whether the athlete's productivity, experience, and anticipated contribution justify a roster position, scholarship, direct compensation, NIL opportunity, or other consideration. The competitive process determines whether, where, and on what terms the athlete participates. **With the challenged rule**, once the NCAA counts the athlete's JUCO or NAIA seasons against his permissible eligibility and declares that eligibility exhausted, the athlete's Division I buyer set does not merely become smaller. It becomes zero. Every Division I institution is simultaneously prevented from purchasing the athlete's competitive football services, irrespective of whether individual schools continue to value and demand those services. The resulting foreclosure is therefore not caused by the natural operation of a properly functioning market.

### *B. The Herfindahl-Hirschman Index Observations on Market Concentration Within the NCAA's Horizontal Restraints Also Demonstrate Anticompetitive Conduct*

Plaintiff has examined the structure of the present-day football labor market. The market is populated by a large number of schools that have the capacity and incentive to compete against one another for athlete labor. This distinction is critical. The NCAA's anticompetitive power arises from the common restraint imposed across competing purchasers, not from the market share of any single school**.** However, with the challenged eligibility rules in place, these otherwise-competing purchasers lock up the entire labor market at issue through the NCAA's challenged rules and categorically exclude players such as Plaintiff.

The Herfindahl-Hirschman Index ("HHI") is a conventional measure of market concentration. It is calculated by squaring the percentage market share of each market participant

and summing the resulting figures. A market controlled by a single participant has an HHI of 10,000. The HHI approaches zero as purchasing becomes increasingly dispersed among market participants. The Department of Justice and Federal Trade Commission identify an HHI above 1,800 as indicative of a highly concentrated market for purposes of structural merger analysis. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, 2023 Merger Guidelines 5–6 (2023). Plaintiff's initial market analysis produces the following results:

| Specification | HHI |
|---|---|
| P4 + Notre Dame spend-weighted | 156.5 |
| All FBS spend-proxy | 137.4 |
| All FBS equal-buyer benchmark | 72.5 |
| All Division I equal-buyer benchmark | 37.6 |

*See* Exhibit 6: HHI Analysis Workbook at p. 7. For a full review of the HHI framework encompassing all 266 Division I teams, the HHI robustness, the top FBS buyers, and a breakdown by conference, see Exhibit 6 for Plaintiff's analysis.

These figures are important, but not because they establish conventional structural monopsony through buyer concentration. Instead, they establish something directly relevant to Plaintiff's Sherman Act theory: the underlying purchasing market is decentralized **at the individual-school level**. There is therefore no single school capable of dictating the rules of the labor market through unilateral purchasing power. Hundreds of institutions separately demand football talent, recruit athletes, evaluate differentiated skills, and compete over the economic and non-economic terms that will induce particular athletes to supply their services. That is what a competitively structured buyer market should look like. The challenged restraint arises because, on one critical dimension of that competition, the schools do not make independent decisions and cannot make independent decisions on the challenged eligibility rules. The rules at issue **categorically exclude all players at issue from the entire market share that otherwise has a**

**competitive HHI landscape**. It is this two-pronged relationship that is key to understanding the precise anticompetitive harm: (1) the football programs in the relevant market collectively capture the entire relevant market for labor (to which there are no viable alternatives), and (2) **within this otherwise competitive landscape between programs**, the NCAA has locked down the entirety of the relevant market in a monolithic horizontal exclusion of laborers (such as Plaintiff). Thus, the low HHI shows that in the absence of the categorical exclusion of the subject labor, the market would otherwise function lawfully and employ Plaintiff and similarly situated parties.

Courts across the country have addressed the HHI in cases involving markets that are structurally competitive yet are alleged to be restrained by horizontal or collective anticompetitive conduct. The central legal proposition these cases illuminate is that a low or competitive HHI (reflecting a market with many participants and dispersed market shares) does not immunize a market from antitrust harm when competitors collectively agree to suppress competition. Rather, a low HHI serves as evidence of the competitive baseline: it demonstrates that, absent the challenged conduct, the market would operate competitively. Indeed, the Supreme Court's seminal decision in Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 104 S. Ct. 2948 (1984) illustrates how courts analyze horizontal restraints in competitive markets. The Court applied rule-of-reason analysis to the NCAA's television plan, which constituted horizontal price-fixing and output limitation among schools. The Court found that the plan was anticompetitive because it restricted price and output in a market where, absent the restraint, competition among member institutions would prevail. Id. at 105. The Tenth Circuit applied this framework in Law v. Nat'l Collegiate Athletic Ass'n, 134 F.3d 1010 (10th Cir. 1998), holding that the NCAA's restriction on assistant coaches' salaries constituted horizontal price-fixing among competitive purchasers of coaching services. The Court held that the salary cap was

anticompetitive because it fixed the price of one component used by NCAA members to produce college basketball, and the relevant labor market for coaches was competitive absent the restraint.

The broader labor market cases provide some of the clearest examples of horizontal restraints operating in structurally competitive markets. In In re High-Tech Emp. Antitrust Litig., 856 F. Supp. 2d 1103 (N.D. Cal. 2012), employees of technology companies alleged a conspiracy among Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar to suppress employee compensation through "Do Not Cold Call" agreements. The Northern District of California held that the plaintiffs sufficiently alleged a per se violation of the Sherman Act, accepting as true the allegation that defendants succeeded in lowering the compensation and mobility of their employees below what would have prevailed in a lawful and properly functioning labor market. Similarly, in United States v. eBay, Inc., 968 F. Supp. 2d 1030 (N.D. Cal. 2013), the Court sustained the government's allegations that eBay and Intuit entered into a horizontal market allocation agreement covering the labor market for skilled employees. The Court held that a horizontal market allocation typically constitutes a per se violation of the Sherman Act, and that the government adequately stated a claim even though the competitive effects of the agreement on the broader labor market had not yet been fully analyzed. In Hunter v. Booz Allen Hamilton, Inc., 418 F. Supp. 3d 214 (S.D. Ohio 2019), the Southern District of Ohio sustained Sherman Act claims by employees alleging that defense contractors entered into no-poach agreements that eliminated all competition in the market for skilled labor. The plaintiffs alleged that through these agreements, defendants exploited their collective market power and suppressed wages and competition. The Court found that the plaintiffs plausibly alleged that the conspiracy reduced competition for labor and caused antitrust injury. Similarly, in In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d 464 (W.D. Pa. 2019), the Western District of Pennsylvania held

that alleged no-poach agreements among railway equipment suppliers constituted horizontal restraints of competition that could support a per se violation of the Sherman Act.

The Supreme Court also made a similar point in the sports context in American Needle, Inc. v. NFL, 560 U.S. 183, 130 S. Ct. 2201 (2010). NFL teams remained separate economic actors because they were independently owned entities pursuing separate economic interests, notwithstanding their need to cooperate to produce NFL football. Cooperation necessary to produce the product does not give competitors blanket authority to eliminate competition on matters for which independent decisionmaking remains possible. Id. at 199–203; see also Alston, 594 U.S. at 90 ("That some restraints are necessary to create or maintain a league sport does not mean all 'aspects of elaborate interleague cooperation are.'") (quoting American Needle, 560 U.S. at 199 n.7). So too here. Schools plainly must agree that a football field is 100 yards long, that eleven players may participate at a time, and that common rules will determine scoring and game play. But nothing about producing a football game inherently requires competing universities collectively to exclude qualified classes of labor from an otherwise robust market.

## IX. SHERMAN ACT: THERE ARE NO PROCOMPETITIVE JUSTIFICATIONS FOR THE NCAA RULES AT ISSUE

If rule-of-reason applies, the burden shifts to the NCAA to prove a procompetitive justification for the conduct at issue. Here, the NCAA lacks any such procompetitive justification due to the development of NIL compensation as an opportunity available to NCAA Division I football players. Based on historical arguments, the NCAA may attempt to repeat three potential justifications for the JUCO and NAIA eligibility Bylaws at issue. First, the NCAA may argue that the conduct at issue promotes the academic well-being of college athletes. Second, as in Alston, the NCAA may argue that its conduct preserves the amateurism model of the NCAA. *See* Alston, 594 U.S. at 82. However, as previously noted by the Federal District Court for the Northern

District of West Virginia, "[t]hese arguments [including academic well-being and the amateurism model] are justifications in name only because they are pretextual and, even if valid, which they are not, could be accomplished through less restrictive alternatives as proposed by Plaintiff." Ohio v. Nat'l Collegiate Athletic Ass'n, 706 F.Supp. 3d 583, 595 (N.D.W. Va. 2023). Third, the NCAA may posit the procompetitive justifications of providing a differentiated product from professional offerings such as the NFL and preserving the student-athlete experience for freshman students who might be unable to compete for positions with older, more experienced athletes. Indeed, this Court previously recognized that the NCAA's proffered procompetitive justifications were unavailing. *See* Martinson, 804 F. Supp. 3d 1109, 1129-30 (D. Nev. 2025), for a full discussion of the rejection of the NCAA's purported justifications.

The NCAA's procompetitive justifications fail on the evidence. The contention that counting JUCO/NAIA seasons is necessary to protect incoming freshmen assumes a fixed, fully utilized, zero-sum roster market, but the data show otherwise. After the NCAA broadly expanded eligibility during the COVID period, football participation increased by roughly 6,377 athletes (9%). [Exhibit 9: ProCompetitive Justifications Workbook at p. 2]. The NCAA's own post-House rules undermine its scarcity rationale by increasing roster limits from an 85-scholarship limit to a 105-player roster, while its newly adopted five-year eligibility model expressly contemplates expanded eligibility alongside continued access for incoming high-school athletes. Furthermore, the House settlement's approximate $20.5 million institutional benefits cap is merely an aggregate ceiling, not an athlete-specific wage schedule. Indeed, **House does not cap third-party NIL compensation**. Thus, the challenged eligibility restraint is neither necessary to preserve freshman opportunities nor rendered harmless by House. The NCAA already possesses less restrictive tools: roster limits, scholarship rules, age/enrollment standards, and the House cap itself, to address concerns without categorically excluding experienced JUCO and NAIA athletes. For a full review

of why the NCAA's procompetitive justifications fail, see Exhibit 2: Declaration of Joel Maxcy, Ph.D. and Exhibit 9: ProCompetitive Justifications Workbook. Furthermore, the "roster replacement" argument is a common argument made by the NCAA that tries to distract from the issues of this case. The NCAA tries to argue that Plaintiff's relief takes away a roster spot from an upcoming athlete. However, **the case law is clear that a defendant cannot engage in pretextual conduct or rely on justifications that are themselves the product of unlawful conduct**. *See* Epic Games, Inc., 67 F.4th 946, 986 (9th Cir. 2023). Furthermore, a significant number of FBS and FCS schools have open roster spots as of August 23, 2026, based on public data. *See* Exhibit 10: Roster Availability Workbook for more information.

## X. SHERMAN ACT: ANY PROCOMPETITIVE JUSTIFICATIONS OFFERED BY THE NCAA FOR THE RULES AT ISSUE COULD BE ACCOMPLISHED BY LESS RESTRICTIVE MEANS

If rule-of-reason applies, any procompetitive justifications presented by the NCAA are not well taken and should be rejected. To the extent any proposed justifications are accepted by the Court, there are numerous less restrictive alternatives that the NCAA could use to achieve such procompetitive effects. These less restrictive alternatives include, but are not limited to, (1) counting only NCAA seasons for eligibility, (2) limiting eligibility to Division I participation only, (3) individualized waiver systems, (4) academic eligibility standards in lieu of temporal limits, and (5) alternative competitive balance mechanisms (such as additional rules regarding scholarship allocation, revenue-sharing, or conference-level regulation). *See also* Exhibit 2: Declaration of Joel Maxcy, Ph.D. at ECF pp. 19-20, ¶¶ 75-80; Exhibit 9: Procompetitive Justifications Workbook.

## XI. BREACH OF CONTRACT

Under Nevada law, every contract contains an implied covenant of good faith and fair dealing, which prohibits arbitrary or unfair acts by one party that disadvantage the other. A breach of this covenant may give rise to either a contract claim (available in all cases) or, in rare circumstances involving a "special relationship," a tort claim. *See* Ins. Co. of the W. v. Gibson Tile Co., 122 Nev. 455, 461, 134 P.3d 698, 702 (2006). Nevada has long recognized that a non-signatory may have the right to enforce a contract as a third-party beneficiary. The Nevada Supreme Court established in Acoustics, Inc. v. Am. Sur. Co. of N.Y., 74 Nev. 6, 9, 320 P.2d 626, 627 (1958) that "[w]here a contract contains a promise for the benefit of one not a party to the contract, the third party beneficiary has a direct right of action against the promisor." This principle has been consistently reaffirmed. *See also* Canfora v. Coast Hotels & Casinos, Inc., 121 Nev. 771, 779, 121 P.3d 599, 605 (2005).

Contracts cannot be carried out for an unlawful purpose. The eligibility rules at issue are unlawful as a matter of law under the Sherman Act. Plaintiff, a student-athlete subject to NCAA rules and regulations, is an intended third-party beneficiary of the contractual relationship between UNLV and the NCAA. Plaintiff also has a scholarship and/or revenue-sharing agreement to play football at UNLV, which is a member school of the NCAA. The NCAA has a contractual obligation to Plaintiff, as an intended third-party beneficiary and separately as a scholarship athlete, to enforce its rules and regulations fairly, consistently, and reasonably.

## XII. TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Under Nevada law, interference with prospective economic advantage requires the plaintiff to show: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the

defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." In re Amerco Derivative Litig., 127 Nev. 196, 226, 252 P.3d 681, 702 (2011) (citations omitted). Plaintiff has a reasonable expectation of prospective business relations with UNLV and other third parties, including but not limited to NIL compensation, revenue-sharing opportunity with UNLV, and increased draft stock in the NFL. The NCAA knew or should have known of these expectancies. By denying additional eligibility through its unlawful and anticompetitive activities described herein, the NCAA knew that its actions were certain or substantially certain to prevent Plaintiff's ability and opportunity to pursue these prospective business relations and opportunities.

## XIII. LIKELIHOOD OF IRREPARABLE HARM

A plaintiff must show a likelihood of irreparable harm in the absence of preliminary relief, the analysis of which is shown by "immediate threatened injury." *See* Caribbean Marine Servs. Co. v. Baldridge, 844 F.2d 668, 675 (9th Cir. 1988) (citations omitted). Plaintiff meets this standard on multiple fronts. Plaintiff's harm is clear. Playing any Division I sport is a once-in-a-lifetime opportunity that cannot be reclaimed later. Under the NCAA's current unlawful enforcement rules, Plaintiff has no opportunity to continue playing NCAA Division I football. Courts have repeatedly found that "[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." S.A. v. Sioux Falls School Dist. 49-5, 2023 WL 6794207 at *9 (D.S.D. Oct. 13, 2023) (quoting Portz v. St. Cloud State Univ., 401 F. Supp. 3d 834, 868 (D. Minn. 2019)); *see also* Biediger v. Quinnipiac Univ., 616 F. Supp. 2d 277, 291 (D. Conn. 2009). Missing out on these opportunities to play and to benefit from the numerous NIL opportunities presented to him is the very definition of irreparable harm.

Plaintiff's missed opportunities due to his inability to participate in any NCAA Division I practice continue to mount. Missing workouts "constitutes a significant impact on the student-

athletes' opportunities to develop as players in gametime conditions, develop in-game experience with their teammates, showcase their abilities to potential employers." Ohio, 706 F. Supp. 3d at 599. The absence of student-athletes from teams on gamedays may also negatively impact their team, and the athlete's development and mental health. *See* id. The timing of this harm to Plaintiff is irreparable. Clearly, if the Court does not grant Plaintiff the requested injunctive relief, he will be unable to play during the 2026 season. He will thus be denied the opportunity to take advantage of any NIL deal he is offered, and to increase his chances of earning a contract to play professional football following the season at issue. Missing out on these clear, specific, and once-in-a-lifetime economic opportunities is also the very definition of irreparable harm. On all of these items, the Martinson Court also previously sided with the student-athlete, who was also a defensive lineman just like Plaintiff. *See* Martinson, 804 F. Supp. 3d 1109, 1131 (D. Nev. 2025).

## XIV. BALANCE OF EQUITIES AND PUBLIC INTEREST

The injunction analysis next requires that the Court weigh the balance of equities and public interest together. "To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." Univ. of Haw. Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1108 (9th Cir. 1999). The balance of equities supports Plaintiff. *See* Ohio, 706 F. Supp. 3d at 600. As set forth above, Plaintiff is likely to suffer substantial, immediate, and irreparable harm should he be prevented from playing this upcoming season. The NCAA, by contrast, would suffer little harm should it later succeed on the merits. Here, the NCAA faces no substantial harm from the granting of preliminary injunctive relief. Requiring the NCAA to comply with federal antitrust laws cannot constitute harm. Again, this Court previously in Martinson sided with the student-athlete on this front. *See* Martinson, 804 F. Supp. 3d 1109, 1132 (D. Nev. 2025). Preliminary injunctive relief serves the public interest in promoting free and fair competition in labor markets guaranteed by

antitrust laws. *See* Ohio, 706 F. Supp. 3d at 600. There is a compelling public interest in promoting fair competition and equal opportunities for all collegiate athletes. In order to prevent illegal antitrust acts, free and fair competition in the labor markets is essential to the American economy.

## XV. THE RULE OF RESTITUTION

The Rule of Restitution allows the NCAA to retroactively punish a student-athlete, their school, and teammates with no affiliation with the Court decision if the student-athlete and school rely on a TRO or preliminary injunction and the TRO or injunction is later overturned. The clear purpose and effect of the Rule of Restitution is to deter challenges to the NCAA's conduct by making it impossible for student-athletes and schools to rely on valid court orders. As a result, courts have enjoined the NCAA from enforcing the Rule of Restitution. *See* Williams v. Nat'l Collegiate Athletic Ass'n, 2024 WL 397760 (D.N.J. Feb. 2, 2024); Pavia v. Nat'l Collegiate Athletic Ass'n, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), appeal dismissed as moot, 154 F.4th 407 (6th Cir. 2025). This Court has done the same in prior NCAA litigation. *See, e.g.*, Martinson, 804 F. Supp. 3d 1109, 1133 (D. Nev. 2025). Plaintiff requests that this Court do the same here.

## XVI. CONCLUSION AND RELIEF REQUESTED

Plaintiff respectfully requests that this Court grant this Renewed Emergency Motion for Temporary Restraining Order and Preliminary Injunction. Specifically, Plaintiff requests that the NCAA be enjoined from (1) counting Plaintiff's prior JUCO and NAIA seasons against his NCAA eligibility; (2) deeming Plaintiff ineligible for the 2026-2027 season; and (3) enforcing the Rule of Restitution at a later date if this current injunctive relief is granted, but later overturned, reversed, or vacated. Plaintiff also requests any other relevant, equitable, just, or related relief to effectuate the injunctive relief supported by Plaintiff's Complaint or this Motion.

DATED AUGUST 26, 2026.

Respectfully Submitted:

**/s/ Geoffrey A. Tabor**

Woodrow K. Glass, Oklahoma Bar No. 15690
Geoffrey A. Tabor, Oklahoma Bar No. 32880
Chloe N. Glass, Oklahoma Bar No. 36646
(ADMITTED PRO HAC VICE)
**GLASS & TABOR, LLP**
1601 36th Ave. NW
Norman, OK 73072
Phone: 405-360-9700
woody@glasstaborlaw.com
geoffrey@glasstaborlaw.com
chloe@glasstaborlaw.com

**/s/ Timothy R. O'Reilly**

Timothy R. O'Reilly, Nevada Bar No. 8866
**O'REILLY LAW GROUP, LLC**
325 S Maryland Parkway, Suite 100a
Las Vegas, NV 89101
Phone: 702-812-3339
tor@olglaw.com
**ATTORNEYS FOR PLAINTIFF**
**ATTORNEY LIEN CLAIMED**

**CERTIFICATE OF SERVICE**

I certify that on the date this document was filed with the Court's CM/ECF system, I caused it to be served on all persons designated by the parties that have appeared of record in this matter.

**/s/ Geoffrey A. Tabor**
Geoffrey A. Tabor, Oklahoma Bar No. 32880