John M. Naylor
Nevada Bar No. 5435
Kelly M. Scarborough
Nevada Bar No. 16979
NAYLOR & BRASTER
10100 W. Charleston Blvd., Suite 120
Las Vegas, NV 89135
(T) (702) 420-7000
(F) (702) 420-7001
jnaylor@nblawnv.com
kscarborough@nblawnv.com

*Attorneys for Defendant*
*National Collegiate Athletic Association*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

COHEN FULLER,

Plaintiff,

vs.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

Case No. 2:26-CV-01974-APG-BW

**BRIEF OF DEFENDANT NCAA IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ....... 1

RELEVANT FACTS ....... 2

I. PLAINTIFF ADMITS THAT HE EXHAUSTED HIS ELIGIBILITY BY COMPETING IN FOUR SEASONS OF COLLEGIATE FOOTBALL ....... 2

II. PLAINTIFF WAS AWARE HIS JUCO AND NAIA SEASONS AFFECTED HIS ELIGIBILITY BY 2024 BUT REPEATEDLY DELAYED SEEKING RELIEF ....... 3

ARGUMENT ....... 4

I. PLAINTIFF CANNOT MEET THE HEIGHTENED STANDARDS FOR MANDATORY RELIEF THAT WOULD ALTER THE STATUS QUO ....... 4

II. PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS ....... 5

A. Plaintiff Released His Injunctive Relief Claims Pursuant to the *House* Settlement. ....... 5

B. Plaintiff Fails to Support His Antitrust Claim. ....... 8

1. The Five-Year Rule Falls Outside the Purview of Antitrust Law. ....... 8

2. The Five-Year Rule Survives Rule of Reason Analysis. ....... 9

a. Plaintiff Does Not Adequately Define a Relevant Market. ....... 10

(i) Plaintiff's Expert Admits His Opinions Lack Sufficient Factual Basis. ....... 10

(ii) Plaintiff's New Evidence is Drawn from Other Cases Where Injunctions Failed. ....... 12

(iii) Plaintiff Argues Non-DI Institutions are Not Substitutes for DI-Institutions, But His Own Path Through Both Types of Institutions Proves Substitutability. ....... 12

(iv) Plaintiff's Argument that Professional Football Leagues Are Not Substitutes Is Not Supported by Sufficient Data and Conflicts with His Own Professional Aspirations. ....... 14

b. Plaintiff Offers No Persuasive Evidence of Anticompetitive Effects. ....... 15

3. The Five-Year Rule Is Procompetitive Because It Creates the "Product" that NCAA Members Offer and Increases Competition Among Member Schools for Athletes. ....... 18

4. There Exists No Substantially Less Restrictive Means by Which the NCAA Could Achieve the Procompetitive Benefits of the Five-Year Rule. ....... 21

C. The NCAA Did Not Breach the Covenant of Good Faith and Fair

Dealing. ....22
D. Plaintiff's Tortious-Interference Claim Likewise Falls with His Antitrust Claim. ....23

III. PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM. ....23
IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT INJUNCTIVE RELIEF ....24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFMS LLC v. UPS Co.*,
105 F. Supp. 3d 1061 (C.D. Cal. 2015) ....................10

*American Ad Mgmt., Inc. v. General Tel. Co.*,
190 F.3d 1051 (9th Cir. 1999) ....................16

*Arbolida v. NCAA*,
No. 25-2079, 2025 WL 579830 (D. Kan. Feb. 21, 2025) ....................18

*Banks v. NCAA*,
977 F.2d 1081 (7th Cir. 1992) ....................19

*Bellamy v. NCAA*,
No. 3:25-cv-750. 2025 WL 2267761 (M.D. Tenn. Aug. 7, 2025) ....................11, 18

*Biediger v. Quinnipiac Univ.*,
616 F. Supp. 2d 277 (D. Conn. 2009) ....................24

*Blythe v. NCAA*,
No. 26-1106 (9th Cir. Apr. 8, 2026), ECF No. 26 ....................1, 2, 9

*Bowers v. NCAA*,
974 F. Supp. 459 (D.N.J. 1997) ....................20

*Braham v. NCAA*,
794 F. Supp. 3d 824 (D. Nev. 2025) ....................2, 9

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ....................11

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ....................17

*Brzovic v. NCAA*,
No. 2:25-cv-02885, 2025 WL 1370758 (D.S.C. May 11, 2025) ....................5

*Coley v. NCAA*,
792 F. Supp. 3d 634 (E.D.N.C. 2025) ....................5, 8, 24

*Diamond Speedway LLC v. Kolay Flooring Int'l, LLC*,
No. A-21-844035-B, 2024 Nev. Dist. LEXIS 455 (Clark Cnty. Dist. Ct., Mar. 28, 2024) ....................22

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ....................................................................................4

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ....................................................................................5

*Eichorn v. AT & T Corp.*,
248 F.3d 131 (3d Cir. 2001)....................................................................................13

*Elad v. NCAA*,
160 F.4th 407 (3d Cir. 2025) ......................................................................2, 11, 18

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ......................................................................21, 22

*Feldman v. Reagan*,
843 F.3d 366 (9th Cir. 2016) (en banc) ...................................................................4

*Fourqurean v. NCAA*,
143 F.4th 859 (7th Cir. 2025) ......................................................................1, 16, 18

*Fuller v. NCAA*,
No. 2:26-cv-00110 (D. Nev. Jan. 20, 2026), ECF No. 1-1 ......................................3

*Giles v. NCAA*,
No. 8:25-cv-01488, 2025 WL 2551093 (C.D. Cal. Aug. 18, 2025) ........................23

*Goldstein v. NCAA*,
No. 3:25-cv-27, 2025 WL 662809 (M.D. Ga., Feb. 28, 2025) .................................8

*Hasz v. NCAA*,
No. 8:25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025)..........................8, 22, 24

*Hernandez-Gutierrez v. U.S. Dist. Ct.*,
868 F.3d 1048 (9th Cir. 2017) ....................................................................................9

*Hilton Hotels Corp. v. Butch Lewis Prods.*,
808 P.2d 919 (Nev. 1991).......................................................................................22

*House v. NCAA (In re College Athlete NIL Legislation)*,
No. 4:20-cv-03919 (N.D. Cal.) ............................................................................ *passim*

*Humphrey v. NCAA*,
No. 2:26-cv-0268, 2026 WL 777192 (C.D. Cal. Feb. 12, 2026) ..........................8, 9

*Johnson v. NCAA*,
No. CV-25-60, 2025 WL 1790345 (D. Mont. June 26, 2025)............................*5,* 8, 20, 22, 23

*Klein v. City of Laguna Beach*,
381 F. App'x 723 (9th Cir. 2010) ..........................................................................4

*L.A. Memorial Coliseum Com. v. National Football League*,
634 F.2d 1197 (9th Cir. 1980) ....................15, 24

*Leavitt v. Leisure Sports Inc.*,
734 P.2d 1221 (Nev. 1987) ....................23

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ....................4

*Martinson v. NCAA*,
804 F. Supp. 3d 1109 (D. Nev. 2025) ....................2, 5, 9, 24

*Mayes v. NCAA*,
No. 25CV045874-590, 2025 ....................23

*McCormack v. NCAA*,
845 F.2d 1338 (5th Cir. 1988) ....................20

*Minshew v. Donley*,
911 F. Supp. 2d 1043 (D. Nev. 2012) ....................22

*NCAA v. Alston*,
594 U.S. 69 (2021) .................... *passim*

*NCAA v. Board of Regents*,
468 U.S. 85 (1984) ....................15, 19, 21, 22

*Newcal Indus., Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ....................10

*NHLPA v. Plymouth Whalers Hockey Club*,
419 F.3d 462 (6th Cir. 2005) ....................13

*O'Bannon v. NCAA*,
802 F.3d 1049 (9th Cir. 2015) ....................8, 9

*Ohio v. Am. Express*,
585 U.S. 529 (2018) ....................9, 10

*Ortega v. NCAA*,
No. 4:25-CV-00496, 2026 WL 1847877 (S.D. Iowa Apr. 23, 2026) ....................19, 21

*Osuna-Sanchez v. NCAA*,
No. 3:25-cv-62, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025) ....................9, 22, 23

*Patterson v. NCAA*,
No. 3:23-cv-00994, 2026 WL 115417 (M.D. Tenn. Jan. 15, 2026) ....................12, 17, 24

*Pavia v. NCAA*,
No. 24-6153 (6th Cir. Mar. 31, 2025), ECF No. 21 ....................20

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010)....................21

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006) ....................6, 7, 8

*Robinson (Jimmori) v. NCAA*,
172 F.4th 271 (4th Cir. 2026) ....................2, 5, 10, 11

*S.A. v. Sioux Falls School Dist. 49-5*,
No. 4:23-CV-04139, 2023 WL 6794207 (D.S.D. Oct. 13, 2023)....................24

*Stanley v. USC*,
13 F.3d 1313 (9th Cir. 1994) ....................4, 18, 24

*W. Parcel Express v. UPS of Am., Inc.*,
65 F. Supp. 2d 1052 ....................10

*Walker v. NCAA*,
No. 25-514, 2025 WL 1901907 (M.D. La. July 1, 2025) ....................23

*West Virginia v. B.P.J.*,
146 S. Ct. 2356 (2026)....................1, 21, 24

*Williams v. Boeing Co.*,
517 F.3d 1120 (9th Cir. 2008) ....................6

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................4, 5

*Wisne v. NCAA*,
No. 26-1309 (10th Cir. Aug. 21, 2026), ECF No. 28 ....................1, 11, 12, 14

**Statutes**

15 U.S.C. § 1....................8

Sherman Act.................... *passim*

**Other Authorities**

*See Louisiana Court Order Gives Players Signed by NFL Teams a Shot at Returning to College Sports*, AP (Aug. 19, 2026), https://apnews.com/article/ncaa-lawsuit-nfl-players-return-ed1a06804ffb3fdb5d87ecd0a5aef526 ....................14

*See Big 12 Announces Ban on All Professionals from Returning*, ESPN (Aug. 26, 2026), https://www.espn.com/college-football/story/_/id/49735747/big-12-announces-ban-all-professionals-returning....................14

*NCAA Student-Athletes Surpass 520,000, Set New Record*, NCAA (Dec. 5, 2022), https://www.ncaa.org/media-center-ncaa-student-athletes-surpass-520-000-set-new-record/ ....................20

*Undrafted Free-Agent Signings Tracker*, NFL (Apr. 25, 2026), https://www.nfl.com/news/undrafted-free-agent-signings-tracker-every-team-s-udfas-after-the-2026-nfl-draft ....................14

**INTRODUCTION**

Another federal appellate court has rejected an antitrust challenge to the NCAA's limits on eligibility to compete in college athletics. *See* Order, *Wisne v. NCAA*, No. 26-1309 (10th Cir. Aug. 21, 2026), ECF No. 28 (staying class-wide injunction arising from Sherman Act claim by former student-athletes).[1] So Plaintiff returns to this Court seeking an emergency temporary restraining order on two days' notice so that he can compete this weekend.

Plaintiff argues every game he misses is a loss of experience. ECF No. 44 at 22–23. But the same is true for the other properly-eligible athlete whom Plaintiff will displace if Plaintiff is granted a TRO despite being ineligible. Only eleven Rebels at a time can take the field on Saturday—if Plaintiff is among them, someone else will not be. As the Supreme Court recently explained, "[s]ports are highly competitive and generally zero sum. . . . Every player who earns playing time reduces the playing time of a teammate. Every player who makes the starting lineup sidelines another who remains on the bench." *West Virginia v. B.P.J.*, 146 S. Ct. 2356, 2381 (2026). The harm of which Plaintiff complains is the same harm he asks the Court to inflict on someone else. It should not do so.

Plaintiff's renewed request for a mandatory injunction should be denied because it remedies none of the deficiencies the NCAA identified in opposing his prior motion: (i) the Middle District of Tennessee is the appropriate venue under the first-to-file rule; (ii) Plaintiff's injunctive relief claims were released in the *House* Settlement; (iii) Plaintiff offers no compelling legal basis or factual record for this Court to conclude he has met his burden to prove the Sherman Act invalidates the NCAA's Five-Year Rule; (iv) Plaintiff's implied-covenant and tortious-interference claims fall with his Sherman Act claim; and (v) the balance of equities and public interest factors favor the NCAA, including because Plaintiff has known for years that—like every college athlete—his eligibility would one day run out, but he waited until the eleventh hour to seek an injunction from this Court.

All five federal appellate courts to review preliminary injunctions in similar cases have vacated or stayed.[2] That includes the Ninth Circuit in *Blythe v. NCAA*, No. 26-1106, which immediately vacated

---

[1] The *Wisne* stay Order was made available to the Court at ECF No. 42-1.

[2] *See* ECF No. 42-1; Order, *Blythe v. NCAA*, No. 26-1106 (9th Cir. Apr. 8, 2026), ECF No. 26 (vacating preliminary injunction effective immediately, with opinion forthcoming); *Fourqurean v. NCAA*, 143 F.4th 859 (7th Cir. 2025) (reversing preliminary injunction for failure to define the relevant market);

one of three preliminary injunctions issued by judges in this Court the day after oral argument, with an opinion forthcoming. Like Plaintiff, the district court in *Blythe* relied heavily on two prior decisions, *Braham v. NCAA*, 794 F. Supp. 3d 824 (D. Nev. 2025), and *Martinson v. NCAA*, 804 F. Supp. 3d 1109 (D. Nev. 2025), in erroneously awarding preliminary injunctive relief. (The NCAA's appeals of *Braham* and *Martinson* were heard with *Blythe* by the same panel and are under advisement.) Here, there is still no well-developed factual record that the Five-Year Rule violates the Sherman Act, which is a prerequisite for judicial intervention. Plaintiff's motion should be denied.

## RELEVANT FACTS

### I. PLAINTIFF ADMITS THAT HE EXHAUSTED HIS ELIGIBILITY BY COMPETING IN FOUR SEASONS OF COLLEGIATE FOOTBALL [3]

For over a century, NCAA members have adopted rules to govern NCAA intercollegiate athletics to ensure fair and inclusive athletic competition and academic opportunities for student-athletes. Vaughn Decl., ECF No. 22-1 ¶¶ 9–10, 12. Indeed, the Supreme Court's recounting of this history notes that before the founding of what is now the NCAA, "[s]chools regularly had graduate students and paid ringers on their teams." *NCAA v. Alston*, 594 U.S. 69, 75, (2021) (quotation marks omitted). Today, eligibility limits are among the NCAA's rules.

The Five-Year Rule that applied to Plaintiff limited a student-athlete to four seasons of competition within a five-year period of eligibility that began with full-time enrollment at a collegiate institution, and it counted any collegiate season towards these limits regardless of whether the seasons occurred at four-year or two-year institutions (such as an NAIA institution or junior college ("JUCO")). Vaughn Decl., ECF No. 22-1 ¶¶ 17–19 & Ex. A (DI 2025–2026 Manual (the "Bylaws") 12.02.3, 12.6, 12.6.1, 12.6.1.1, 14.02.4). The Five-Year Rule thus had two components—four seasons of competition and five years of eligibility. Eligibility ran out when a student had either competed in four seasons or

*Elad v. NCAA*, 160 F.4th 407 (3d Cir. 2025) (vacating preliminary injunction because the evidence in the record was insufficient to sustain a likelihood of success on the merits); *Robinson (Jimmori) v. NCAA*, 172 F.4th 271 (4th Cir. 2026) (vacating preliminary injunction because the district court "drastically reduced the [student-athletes'] burden of proving anticompetitive effects" and failed to define the relevant market).

[3] As Plaintiff indicates, ECF No. 3 ¶ 146, the NCAA DI Cabinet recently approved a new age-based eligibility model that will become part of the 2026–2027 NCAA DI Manual. Vaughn Decl. ¶ 34. The new eligibility rules do not apply to Plaintiff because he already exhausted his eligibility. *Id.* ¶ 38–39.

competition or five years had passed from the student's enrollment at a collegiate institution, whichever happened first.

Plaintiff admits that he has exhausted his eligibility under the NCAA Bylaws. ECF No. 44 at 2. He competed in four full collegiate football seasons, at Graceland University (NAIA), El Camino College (JUCO), Coastal Carolina University (DI), and the University of Nevada, Las Vegas ("UNLV") (DI). *Id.* Plaintiff's eligibility under the Five-Year Rule thus expired upon the conclusion of the 2025–2026 UNLV football season.

## II. PLAINTIFF WAS AWARE HIS JUCO AND NAIA SEASONS AFFECTED HIS ELIGIBILITY BY 2024 BUT REPEATEDLY DELAYED SEEKING RELIEF

Plaintiff began playing NCAA DI football in 2024, when he enrolled at Coastal Carolina University. At that time, Plaintiff was required to acknowledge his understanding and agreement to the Bylaws, including the Five-Year Rule. *See* Vaughn Decl., ECF No. 22-1, Exhibit A at 45 (Bylaw 12.5.2.1). Thus, by the fall of 2024, Plaintiff was aware that his two seasons of competition at the NAIA and JUCO levels would count toward his four seasons of competition.

On December 30, 2025, a week after its football season ended and Plaintiff's eligibility expired, UNLV submitted to the NCAA a "Legislative Relief Waiver" on Plaintiff's behalf. ECF No. 44-5 at 2–8. The waiver request did not seek in earnest to restore any eligibility for Plaintiff. Instead, UNLV indicated that it filed the request because "[Plaintiff] would like to exhaust all administrative remedies prior to adding his name to Patterson/Pavia pending litigation." *Id.* at 4. The NCAA denied the waiver request on January 13, 2026. *Id.* at 8.

On January 20, 2026, Plaintiff filed a *pro se* complaint in this Court seeking declaratory and injunctive relief against the NCAA under the Sherman Act that would allow him to "continue competing in collegiate football." Complaint, *Fuller v. NCAA*, No. 2:26-cv-00110 (D. Nev. Jan. 20, 2026), ECF No. 1-1 at 1–2. Plaintiff's motion to proceed *in forma pauperis* was denied and the case was subsequently dismissed on March 30, 2026, after he failed to pay the filing fee. *See* Minute Order, *id.*, ECF No. 10.

Plaintiff then retained counsel. On May 14, 2026, Plaintiff's counsel contacted the NCAA's counsel concerning Plaintiff and his allegations. Tabor Decl., ECF No. 44-4 ¶ 8. Plaintiff filed this

lawsuit and his original motion for emergency injunctive relief more than six weeks later, in June 2026.

## ARGUMENT

### I. PLAINTIFF CANNOT MEET THE HEIGHTENED STANDARDS FOR MANDATORY RELIEF THAT WOULD ALTER THE STATUS QUO

Plaintiff demands a personal exemption from the Bylaws, arguing that the NCAA's eligibility rules violate antitrust law. His motion should be denied because courts across the country—including the Ninth Circuit and four other federal circuit courts—have stayed or rejected nearly identical motions.

Because a preliminary injunction is an "extraordinary remedy," the standard to obtain such relief is "stringent." *Feldman v. Reagan*, 843 F.3d 366, 375 (9th Cir. 2016) (en banc). A plaintiff seeking such relief must clearly demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits must be based on admissible evidence in the record, rather than surmise or speculation concerning what evidence could be produced at trial." *Klein v. City of Laguna Beach*, 381 F. App'x 723, 726 (9th Cir. 2010).

Injunctions may be mandatory or prohibitory. *Stanley v. USC*, 13 F.3d 1313, 1320 (9th Cir. 1994). "A prohibitory injunction preserves the status quo. A mandatory injunction 'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'" *Id.* (alteration in original) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (quoting same). This standard is high. *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks omitted).

Plaintiff requests a mandatory injunction because he seeks to alter the status quo by requiring the NCAA to grant him extra seasons of competition and a year of eligibility that he does not have. Other federal district courts have denied substantially similar requests for preliminary injunctive relief

on the grounds that such requests were for mandatory relief. *See Johnson v. NCAA*, No. CV-25-60, 2025 WL 1790345, at *7 (D. Mont. June 26, 2025); *Coley v. NCAA*, 792 F. Supp. 3d 634, 648 (E.D.N.C. 2025); *Brzovic v. NCAA*, No. 2:25-cv-02885, 2025 WL 1370758, at *3 (D.S.C. May 11, 2025); *Robinson*, 172 F.4th at 286. Here, Plaintiff does not satisfy any of the four *Winter* factors, let alone the heightened standard for a mandatory injunction. Accordingly, his motion should be denied.

## II. PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

The first *Winter* factor, likelihood of success on the merits, "is a threshold inquiry and is the most important factor." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 631 (9th Cir. 2023). Plaintiff's motion fails at the threshold for at least three reasons: First, this case should be dismissed or transferred to the Middle District of Tennessee pursuant to the first-to-file rule, where Plaintiff admits his claims could have been added to pending litigation.[4] Second, his injunctive relief claims are barred by the *House* Settlement. Finally, Plaintiff's renewed motion fails to provide sufficient evidence to establish a likelihood of success on the merits of any of his claims.

### A. Plaintiff Released His Injunctive Relief Claims Pursuant to the *House* Settlement.

In June 2025, the NCAA reached a landmark settlement in *House v. NCAA (In re College Athlete NIL Legislation)*, No. 4:20-cv-03919 (N.D. Cal.), to resolve class-action claims brought by current and former DI athletes who alleged that the NCAA violated federal antitrust law by limiting college athletes' earning power. Plaintiff is a member of the class in *House*, and that bars his claims.

In addition to providing retroactive payments to class members, the Fourth Amended Stipulation and Settlement Agreement, *House*, ECF No. 958-1 ("*House* Settlement") (Ex. F to Naylor Decl., ECF No. 22-2), created a mechanism for NCAA DI schools to revenue share with their student-athletes, if they opt into the settlement. *See also id.*, ECF No. 979 (Order approving settlement) (ECF No. 22-2, Ex. G). Most DI schools have opted in, including UNLV. *See Martinson*, 804 F. Supp. 3d at 1123. Plaintiff thus benefited from the *House* Settlement making revenue sharing available to his team in the 2025–2026 season, but now he seeks to avoid the aspect of the settlement in which the class of which he is a part agreed not to pursue the exact claim he now asserts.

[4] On August 10, 2026, the NCAA filed a motion to transfer this matter to the Middle District of Tennessee pursuant to the first-to-file rule. ECF No. 40. Plaintiff responded on August 24, ECF No. 43, and the NCAA's optional reply is due August 31.

The "Injunctive Relief Settlement Class" in *House* includes, as relevant here, "[a]ll student-athletes who compete on, competed on, or will compete on a Division I athletic team" after "June 15, 2020." *House* Settlement at 8 (Definition aa). The *House* Settlement defines the "Released Injunctive Class Claims" to include any and all challenges to "the subjects addressed by the Related Injunctive Relief NCAA & Conference Rules." *Id.* at 11–12 (Definition qq). The category of "Related Injunctive Relief NCAA & Conference Rules" includes: "NCAA and conference rules governing the number of seasons/length of time student-athletes are eligible to receive benefits, including scholarships and payments pursuant to the Injunctive Relief Settlement, including without limitation any rule capping the number of years a student-athlete may receive payments at four years, and providing that all four of those years must be played within a consecutive five-year period." *Id.* at 12–13 (Definition rr(2)). That description encompasses the eligibility rules, including the Five-Year Rule Plaintiff challenges.

Plaintiff competed on a DI athletic team after June 15, 2020. ECF No. 44 at 2. He received notice and an opportunity to object, *see House* Settlement at 22 (requiring notice be provided to class), which he did not exercise, *see* Berman Decl., *House*, ECF No. 717-1 (ECF No. 22-2. Ex. H). Moreover, the NCAA adopted a rule in connection with the approval of the *House* Settlement making clear that any benefits agreements with student-athletes cannot run past their period of NCAA eligibility. *See* Vaughn Decl., ECF No. 22-1, Ex. A at 187 (Bylaw 16.13.1.1); *see also House* Settlement at 74 (Injunctive Relief Settlement Article 4, Section 3(a)). Plaintiff directly challenges that structure—he seeks injunctive relief for the purpose of obtaining settlement-created benefits he is ineligible to receive. Plaintiff released the object of his desired injunction—additional revenue sharing. *See* Release of Injunctive Claims, *House* Settlement at 25–26.

A settlement may release claims "based on the identical factual predicate as that underlying the claims in the settled class action"—including claims that were never pled and claims under different legal theories. *Williams v. Boeing Co.*, 517 F.3d 1120, 1133–34 (9th Cir. 2008); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748–49 (9th Cir. 2006). Plaintiff's theory of injury—lost NIL and revenue-share compensation—was the issue litigated in *House*. Compare Compl., ECF No. 3 ¶¶ 5, 10, 14, 16, 74, 86, 91, 99 & ECF No. 44-3 ¶ 9 with Third Amended Complaint, *House*, ECF No. 533-1 ¶ 3.

In his original Reply, Plaintiff asserted that *House* and this case have "completely different factual predicates" because "*House* challenged the NCAA's compensation restrictions, scholarships caps, and NIL revenue distribution rules" while he is challenging the NCAA's application of the Five-Year Rule to former JUCO or NAIA athletes. ECF No. 29 at 5. But that inverts the factual predicate of Plaintiff's challenge, particularly in the antitrust context. As explained below, the NCAA's eligibility rules are not commercial rules under controlling Ninth Circuit precedent and thus not subject to antitrust scrutiny. *See infra* subpart II.B.1. But, to the extent the Court credits Plaintiff's assertion to the contrary, that argument is reliant on the indirect economic *effect* the Five-Year Rule has by excluding ineligible athletes from his proffered labor market and the opportunities for revenue-sharing and NIL compensation created and controlled by the *House* settlement. *See* ECF No. 44 at 4.[5] Although Plaintiff challenges a different Bylaw than those addressed in *House*, his argument that the Court should even subject the Five-Year Rule to antitrust scrutiny (let alone find it an unreasonable restraint) necessarily *depends* on the financial opportunities that form the factual predicate for that case and are controlled by the settlement. He cannot argue that the Five-Year Rule is commercial because it restricts his access to NIL and revenue-sharing income while disclaiming a shared factual predicate with the settlement that allowed (for eligible student-athletes) the very monetary benefits he seeks in exchange for the release that bars his claim.

In *Reyn's Pasta*, the Ninth Circuit confronted a nearly identical situation—subsequent plaintiffs pressing Sherman Act claims under a different theory of antitrust liability but the same set of facts. *See Reyn's Pasta*, 442 F.3d at 748–49. In a prior case, Visa and Mastercard had settled a class action antitrust suit alleging that they "obtained excessive discount fees . . . by 'tying' their debit cards to their credit cards and conspiring to monopolize the debit-card market," in exchange for a release of "all antitrust liability arising out of conduct . . . that is related to the claims asserted" in the class action. *Id.* at 745 (citing *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 507–08 (E.D.N.Y. 2003)). The *Reyn's Pasta* plaintiffs sought antitrust liability on the theory that Visa and Mastercard

[5] Plaintiff's argument that the Five-Year Rule is commercial is underdeveloped, but his Complaint makes clear his reliance on the NIL and revenue-sharing opportunities created by *House* to establish commerciality. *See* ECF No. 3 ¶ 153 (relying on revenue-sharing and NIL payments to student-athletes to argue eligibility rules are commercial).

were engaged in price-fixing of the interchange rate between the defendants and their member banks. *Id.* at 744. Despite the alternate theories of anti-competitive conduct, the Ninth Circuit concluded that the subsequent claims were barred by the prior release. *Id.* at 749. The same logic applies here. Plaintiff posits a different theory of anti-competitive conduct, but he seeks the same access to NIL and revenue-sharing compensation under the same set of governing documents (the Bylaws) and seeks to avoid an expressly contemplated and explicitly targeted release of his claim.

**B. Plaintiff Fails to Support His Antitrust Claim.**

**1. The Five-Year Rule Falls Outside the Purview of Antitrust Law.**

The Sherman Act prohibits only unreasonable restraints of "trade or commerce." 15 U.S.C. § 1. Commercial activity is "activity from which the actor anticipates economic gain." *O'Bannon v. NCAA*, 802 F.3d 1049, 1065 (9th Cir. 2015). Per *O'Bannon*, NCAA member institutions enact both commercial rules (e.g., regulating player compensation) and noncommercial rules (e.g., determining player eligibility). *Id.* at 1066. The Bylaws Plaintiff challenges are non-commercial eligibility rules. As *O'Bannon* put it, rules "*limiting the number of years that student-athletes may play collegiate sports*" are "*true eligibility rule[s]*" that do not raise antitrust concerns. *Id.* (emphasis added); *see also NCAA v. Alston*, 594 U.S. 69, 110 (2021) (Kavanaugh, J., concurring) ("Everyone agrees that the NCAA can require student athletes to be enrolled students in good standing.").

*O'Bannon*'s reasoning is consistent with decisions by other courts addressing eligibility rules. *See Coley*, 792 F. Supp. 3d at 642 ("[T]he Sherman Act does not apply to the [Five-Year Rule]."); *Goldstein v. NCAA*, No. 3:25-cv-27, 2025 WL 662809, at *4 (M.D. Ga., Feb. 28, 2025); *Johnson*, 2025 WL 1790345, at *9; *Humphrey v. NCAA*, No. 2:26-cv-0268, 2026 WL 777192, at *3 (C.D. Cal. Feb. 12, 2026) (collecting cases); *see also Hasz v. NCAA*, No. 8:25CV398, 2025 WL 2083853, at *3 (D. Neb. July 24, 2025).

Plaintiff nevertheless argues that the Five-Year Rule, which limits the amount of time student-athletes can compete, is necessarily "commercial" because it "limit[s] the number of years in the applicable labor market." ECF No. 44 at 4. But the Ninth Circuit has long recognized a line of demarcation between the NCAA's compensation rules, which are within the purview of the Sherman Act, and its eligibility rules, which are not. *See O'Bannon*, 802 F.3d at 1065.

Plaintiff makes no attempt to distinguish *O'Bannon*, which remains binding authority on this Court. "Nor did *Alston* call into question the Ninth Circuit's decision in *O'Bannon*." *Osuna-Sanchez v. NCAA*, No. 3:25-cv-62, 2025 WL 684271, at *3 (E.D. Tenn. Mar. 3, 2025). Plaintiff seeks to evade *O'Bannon*'s clear distinction between noncommercial eligibility rules and commercial compensation rules by relying on *Braham*'s and *Martinson*'s conclusions to the contrary. ECF No. 44 at 4 (citing *Braham*, 794 F. Supp. 3d at 833–34; *Martinez*, 804 F. Supp. 3d at 1124). But *Braham* and *Martinson* are not binding on the Court. *O'Bannon* is. *See Hernandez-Gutierrez v. U.S. Dist. Ct.*, 868 F.3d 1048, 1052 (9th Cir. 2017) ("A published decision of this court constitutes binding authority which must be followed unless and until overruled by a body competent to do so." (cleaned up)); *see also Humphreys*, 2026 WL 777192 at *4 (finding that *Alston* did not abrogate *O'Bannon*). Moreover, the Ninth Circuit made it clear in vacating *Blythe* that *Braham*'s and *Martinson*'s reasoning (which the *Blythe* court followed) is fundamentally flawed. *See* Order, *Blythe v. NCAA*, ECF No. 26 (vacating preliminary injunction effective immediately, with opinion forthcoming).

**2. The Five-Year Rule Survives Rule of Reason Analysis.**

If the Sherman Act applies, Plaintiff concedes that, under Supreme Court precedent, his claim is subject to the burden-shifting framework known as the rule of reason. *See* ECF No. 44 at 3 (citing *Alston*, 594 U.S. at 91).[6] "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express*, 585 U.S. 529, 541 (2018). Thus, Step 1 of the rule-of-reason analysis requires a fact-specific assessment of market structure, market power, and actual effects on competition to assess anticompetitive effects. *Id.* If the plaintiff carries its burden at Step 1, then the burden shifts to the defendant at Step 2 to show a procompetitive rationale for the restraint. *Id.* at 542. If the defendant makes this showing, then the burden shifts back to the plaintiff at Step 3 to show that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Id.*

[6] Plaintiff argues that the Five-Year Rule constitutes a per se violation of the antitrust law, "particularly in light of the [Herfindahl-Hirschman Index] analysis" submitted with his renewed motion. ECF No. 44 at 4. This argument cannot be squared with *Alston*, which held that even NCAA Bylaws *directly* constraining the compensation available to student-athletes were subject to the rule of reason. 594 U.S. at 91–92. No court has ever held the NCAA's eligibility rules to constitute per se antitrust violations.

### a. Plaintiff Does Not Adequately Define a Relevant Market.

Before a district court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market." *Am. Express*, 585 U.S. at 542. Without defining the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* at 543 (cleaned up). The validity of a proposed relevant market is a factual determination, and Plaintiff bears the burden of proving the scope of the relevant market. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044-45 (9th Cir. 2008).

For antitrust purposes, the relevant market is "the area of effective substitution" for products or labor, often expressed as the "arena within which significant substitution . . . occurs." *Am. Express*, 585 U.S. at 543 (citations omitted). Defining a relevant market involves such considerations as "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," *AFMS LLC v. UPS Co.*, 105 F. Supp. 3d 1061, 1077 (C.D. Cal. 2015) (quoting *Newcal Indus.*, 513 F.3d at 1045), and the "area of effective competition where buyers can turn for alternate sources of supply." *W. Parcel Express v. UPS of Am., Inc.*, 65 F. Supp. 2d 1052, 1058 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology Ltd.*, 924 F.2d 1484, 1489–90 (9th Cir. 1991)). "In the labor market context, the market is comprised of those employers seen by workers as reasonably good substitutes." *Robinson*, 172 F.4th at 293 (citing *Fourqurean*, 143 F.4th at 869).

Given the limited time afforded the NCAA to respond to Plaintiff's renewed motion, the NCAA is unable to provide additional evidence countering the new evidence offered by Plaintiff.[7] The NCAA will instead focus the Court to several unsupported and illogical conclusions Plaintiff and Dr. Maxcy advance to theorize about alleged market definition and anticompetitive effects.

#### (i) Plaintiff's Expert Admits His Opinions Lack Sufficient Factual Basis.

Plaintiff asserts that the relevant market for his antitrust claim is "the national labor market for NCAA Division I football athletes' services." ECF No. 44 at 5. And that "JUCO, NAIA, lower NCAA

[7] If the Court is inclined to rely on Plaintiff's new evidence, the NCAA respectfully requests that the Court give the NCAA the opportunity to present a rebuttal expert and hold an evidentiary hearing, so the Court can hear live expert testimony, including cross-examination of Dr. Maxcy.

divisions, and professional leagues are not substitutes and fall outside the relevant market." *Id.* In support of his market definition, Plaintiff provides a renewed declaration from Dr. Joel Maxcy. ECF 44-2. At the outset, Dr. Maxcy admits that he lacks the data necessary to define the relevant market:

> As a matter of economic practice and institutional access, ***a full competitive effects analysis cannot be responsibly conducted without data*** that is primarily in the NCAA's control. This includes internal information on JUCO, NAIA, and NCAA Lower Division (II &III) -to-NCAA Division I transfers, waiver grants and denials, and all athlete compensation. As a preliminary measure, this report aims to provide a high-level economic framework and direct evidence including illustration of the direct effects of NCAA monopsony to support the likelihood of anticompetitive harm, as well as analysis of the limited accessible data and information, some of which has been offered by myself and other economists in declarations submitted in relevant cases.

ECF 44-2 ¶ 48 (emphasis added). In short, Dr. Maxcy concedes not having the data he says is necessary to define the relevant market. There is no legal principle that permits entry of an injunction because an expert witness thinks data he does not have will support opinions he has already formed. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."); *Elad*, 160 F.4th at 416 (discounting Dr. Maxcy's opinion for lack of "market evidence or economic data"); *see also Bellamy v. NCAA*, No. 3:25-cv-750. 2025 WL 2267761, at *6 (M.D. Tenn. Aug. 7, 2025) (noting Dr. Maxcy's concession "that his opinions are based on his 'intuition' or 'experience' rather than on any economic modeling or analysis"). "'The absence of cold, hard data is especially glaring in a market that is rapidly changing' and courts are put in difficult positions, even on motions for preliminary injunctions, where the parties have not established even a coherent theory that grapples with recent changes to the market." *Robinson*, 172 F.4th at 295 n.15 (cleaned up) (reversing injunction in which Dr. Maxcy was proffered as expert) (quoting *Pavia*, 154 F.4th at 417 (Thapar, J., concurring)).

Plaintiff attempts to fill this gap with a forthcoming *Marquette Sports Law Review* article authored by Dr. Maxcy, and several "workbooks" analyzing various aspects of his proffered market and relevant substitutes. ECF Nos. 44-2, 44-6–8, 44-10, 44-13. Plaintiff also provides a declaration filed in *Wisne* from Dr. David Berri, ECF No. 44-12, that was relied on by the *Wisne* court in granting a preliminary injunction in favor of a class of athletes (including Plaintiff)[8] who were not given the

[8] In opposing the NCAA's first-to-file motion, Plaintiff asserts that his claims also challenge "his exclusion for the upcoming 2026-2027 season by way of the 5-in-5 Rule" at issue in *Wisne*. ECF No. 43 at 5–6. But the Complaint contains no allegations to that effect. The *only* mention of the new

benefit of the NCAA's newly-implemented age-based eligibility model. The *Wisne* injunction has been stayed by the Tenth Circuit, which found that the NCAA had "made a strong showing that [it] is likely to succeed on the merits" of its appeal. ECF No. 42-1 at 1.

**(ii) Plaintiff's New Evidence is Drawn from Other Cases Where Injunctions Failed.**

Although Plaintiff has attempted to address some of the evidentiary failings identified by the NCAA in its original Opposition, he has again presented the Court with an incomplete and fundamentally flawed analysis of the relevant market for football services and the complex interplay between DI college football, lower divisions of college football, the NFL, and other professional football leagues including the UFL and CFL. Dr. Maxcy's renewed declaration does not change this conclusion. His market definition relies heavily on the Berri Declaration submitted in *Wisne* and a declaration by economist Daniel Rascher submitted in *Patterson v. NCAA*, No. 3:23-cv-00994, 2026 WL 115417 (M.D. Tenn. Jan. 15, 2026). ECF No. 44-2 ¶¶ 55, 66–68. But *Wisne* has been stayed and the *Patterson* Court denied the plaintiffs' motion for preliminary injunction, 2026 WL 115417, at *9.[9] Plaintiff has not provided evidence sufficient to distinguish this case from the myriad others that have been either denied in the first instance or (without exception) stayed or vacated at the appellate level.

**(iii) Plaintiff Argues Non-DI Institutions are Not Substitutes for DI-Institutions, But His Own Path Through Both Types of Institutions Proves Substitutability.**

Plaintiff asserts that DII, DIII, NAIA, and JUCO football are not substitutes for Division I football because they have significantly less attendance and revenue than DI football. ECF No. 44 at 6–7. But in arguing that the Five-Year Rule has anticompetitive effects in his proffered market, Plaintiff asserts that former JUCO and NAIA athletes are injured by the rule when deciding whether to attend a JUCO or NAIA institution after high school and whether to transfer to a DI institution. *Id.* at 12. Similarly, Dr. Maxcy argues that the Five-Year Rule "distort[s] allocation" because "[a]thletes who

---

eligibility model in the Complaint is in support of Plaintiff's argument that the Five-Year Rule "served no legitimate pro-competitive purpose and that less restrictive means clearly existed." *See* ECF No. 3 ¶¶ 146–49. The Court should examine Plaintiff's claims under the facts alleged in his complaint, which relate exclusively to the Five-Year Rule. *See e.g.*, *Id.* ¶ 2 (describing challenged Bylaws).

[9] Indeed, the month *before* the *Patterson* injunction was denied, Plaintiff's waiver request described his intent "to add[] his name to Patterson/Pavia pending litigation," ECF No. 44-5 at 4, but five days *after* the *Patterson* injunction was denied, Plaintiff filed his first lawsuit in this district. Plaintiff's resort to evidence from *Patterson* highlights why the Court should transfer this case.

would benefit from JUCO or other programs may instead enroll prematurely at NCAA institutions to preserve eligibility." ECF No. 44-2 ¶ 75. In other words, Plaintiff alleges that the Five-Year Rule *affects substitution* between DI institutions and JUCO or NAIA institutions. Plaintiff cannot define his market to exclude those football leagues while simultaneously relying on the Five-Year Rule's effect on substitution between DI and those leagues as evidence of anticompetitive effects.

Plaintiff also cannot define his proposed market around the supposedly unique benefits he sees in competing within DI. In *NHLPA v. Plymouth Whalers Hockey Club*, 419 F.3d 462 (6th Cir. 2005), the plaintiffs tried to limit the relevant labor market for hockey players to the Canadian Hockey League based on the "unique developmental opportunities" that the league provides. *Id.* at 470–71. The Sixth Circuit rejected this definition, holding that "the harm alleged is to athletic and not economic competition." *Id.* at 471. Similarly, in *Eichorn v. AT & T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001), as amended (June 12, 2001), the plaintiffs advanced a narrow market definition limited to employers who could "provide continuity of the pension benefits," among other criteria. The Third Circuit called this definition "inappropriate," and refocused the market analysis on reasonable interchangeability of use or cross-elasticity of demand. *Id.* That is, examination of these economic principles identifies a market. Picking a set of employers, ascribing something unique to their benefits, and then labeling them a market based on those benefits is not grounded in antitrust law.

Plaintiff's focus on the supposedly unique benefits he might attain if granted extra eligibility also suggests his market definition may be over-inclusive. When arguing there are available roster spots, Plaintiff takes a broad focus to include every DI athlete at every DI institution. But Dr. Maxcy opines that "[e]ligibility rules remove experienced, higher-productivity athletes—those most capable of commanding higher NIL and revenue-sharing compensation—from the market." ECF 44-2 ¶ 71. This opinion undermines the inclusion of these athletes in a broad market for all DI athletes. Plaintiff argues this broad market lacks substitutability but that harm is driven by a narrow subset of athletes—it cannot be both.

Similarly, Plaintiff makes no distinction between FBS and FCS football programs, despite Dr. Maxcy stating that the gap in average revenue between an FBS football program ($117,862,762) and an FCS program ($28,091,369) is significant. ECF No. 44-2 ¶ 55. The arguments Plaintiff asserts for

excluding DII, DIII, JUCO, and NAIA programs from the proffered market, ECF No. 44 at 6–7, apply with much the same force to FCS programs, yet Plaintiff is silent on that distinction.

**(iv) Plaintiff's Argument that Professional Football Leagues Are Not Substitutes Is Not Supported by Sufficient Data and Conflicts with His Own Professional Aspirations.**

Plaintiff also asserts that the NFL is not a reasonably available substitute because only 3.3% of draft eligible DI players were drafted in the 2025 NFL Draft. ECF No. 44 at 7. Even if this underlying data is accurate, the *conclusion* Plaintiff draws from that data is infirm for several reasons. First, the NFL draft is not the only way players enter the NFL. Every year, hundreds of former college athletes are signed to NFL rosters as undrafted free agents ("UDFAs"). *See* Around the NFL Staff, *Undrafted Free-Agent Signings Tracker*, NFL (Apr. 25, 2026), https://www.nfl.com/news/undrafted-free-agent-signings-tracker-every-team-s-udfas-after-the-2026-nfl-draft. And recent events show that those UDFAs *are* viewing DI football and the NFL as reasonable substitutes. On August 19, 2026, a state court in Louisiana granted an injunction similar to that issued by the Court in *Wisne* to 33 individual athletes seeking a fifth year of eligibility. *See Louisiana Court Order Gives Players Signed by NFL Teams a Shot at Returning to College Sports*, AP (Aug. 19, 2026), https://apnews.com/article/ncaa-lawsuit-nfl-players-return-ed1a06804ffb3fdb5d87ecd0a5aef526. Sixteen of the prevailing plaintiffs were football players and at least 4 of those 16 were 2026 NFL UDFAs *on active NFL rosters* at the time relief was granted. *Id.*; *see also Undrafted Free-Agent Signings Tracker*. In fact, the substitution between NFL rosters and DI rosters threatened by the current wave of preliminary injunctions against the NCAA's new eligibility model has led the Big Ten, SEC, Big 12 (three of DI's "Power 4" conferences) to pass rules banning athletes who have previously signed contracts with professional sports leagues from returning to college to compete for NCAA institutions in those conferences. *See Big 12 Announces Ban on All Professionals from Returning*, ESPN (Aug. 26, 2026), https://www.espn.com/college-football/story/_/id/49735747/big-12-announces-ban-all-professionals-returning. Plaintiff's failure to even *acknowledge*[10] this highly relevant and rapidly developing

[10] Plaintiff's failure to address the UDFA market and its effect on DI football is compounded by examining the source of his NFL draft data. Plaintiff's "Alternative Market Analysis Workbook" identifies that the data presented on the 2025 NFL Draft "do[es] not imply that undrafted athletes have no possibility of becoming undrafted free agents . . . ." ECF No. 44-7 at 5.

dynamic exemplifies the problems with his market analysis.

Plaintiff also demonstrates substitutability by arguing that he is entitled to an injunction "and to increase his chances of earning a contract to play professional football following the season at issue." ECF No. 44 at 23. Those professional aspirations are Plaintiff's only basis for seeking an injunction because his claim to lost NIL compensation and revenue sharing cannot support irreparable harm. *See L.A. Memorial Coliseum Com. v. National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). He cannot simultaneously argue that the path from DI to the NFL—which he aspires to take—does not exist for purposes of defining the relevant market.

**b. Plaintiff Offers No Persuasive Evidence of Anticompetitive Effects.**

As an initial matter, Plaintiff alleges that the Five-Year Rule, in counting seasons at JUCO and NAIA schools the same as seasons at NCAA schools, "amount[s] to no more than an agreement to limit the amount of time athletes may play Division I football because *they have chosen* to attend a non-NCAA institution before transferring to a Division I NCAA college." ECF No. 44 at 12 (emphasis added). But, as explained above, Plaintiffs' proffered market explicitly *excludes* JUCO and NAIA football as a reasonable substitute for DI football. By Plaintiff's own definition of the relevant market, a football player would not *choose* to attend a JUCO or NAIA school over a DI school. Rather, student-athletes begin their college careers at a JUCO or NAIA because they cannot secure a spot on a DI roster. Viewed through that lens, it becomes apparent that the Five-Year Rule does not "exclude[] qualified former JUCO and NAIA athletes" any more than it excludes *every* former student-athlete from continuing to play college sports after his or her eligibility has expired. The Five-Year Rule treat athletes *equally*, allowing them to compete for limited roster spots on merit within their period of eligibility. That is inherently ***procompetitive***. Plaintiff's arguments to the contrary are self-serving and could apply with equal force to *any* NCAA eligibility rule that limits (in any way) the pool of athletes eligible for college sports. But the Supreme Court has recognized that college athletics is an industry in which "restraints on competition are essential if the product is to be available at all." *NCAA v. Board of Regents*, 468 U.S. 85, 101 (1984). Few restraints could be more essential to defining college football than those defining eligibility and cabining eligibility to *student* athletes. Any theory of antitrust liability that would undermine *all* eligibility rules necessarily runs afoul of *Board of Regents*, which

the Court reaffirmed in *Alston*. *See Alston*, 594 U.S. at 91 ("Our analysis today is fully consistent with [*Board of Regents*].").

That foundational issue aside, Plaintiff has not provided evidence establishing that the Five-Year Rule has substantial anticompetitive effects within his proffered market. The Sherman Act protects "competition, not competitors." *American Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999). To show anticompetitive effects, Plaintiff "would need to show that the Five-Year Rule creates, protects, or enhances the NCAA's dominant position in the market—and thus the NCAA's ability to depress student-athlete compensation below the competitive level—by making it more difficult for the NCAA's existing or potential rivals to compete against the NCAA." *Fourqurean*, 143 F.4th at 870. Plaintiff's focus remains on the former JUCO and NAIA football players who, like him, are no longer eligible under the Five-Year Rule following four seasons of college football competition (or five seasons of eligibility). ECF No. 44-12. Thus, Plaintiff's focus is on "competitors" not "competition." He cannot show anticompetitive effects through that lens. *See American Ad Mgmt.*, 190 F.3d at 1055; *Fourqurean*, 143 F.4th at 870. And Plaintiff's arguments that the Five-Year Rule's exclusion of those athletes "distorts the labor market by reducing competition, depressing the prices at which Division I schools can acquire athletes, and the pay athletes can earn in NIL agreements," ECF No. 44 at 12, are speculative and unsupported.

Plaintiff argues that the Five-Year Rule harms output because "the nationwide market for consumption of college football" is "harmed by the NCAA's [] anticompetitive conduct." ECF No. 44 12–13. As Plaintiff explains it, applying the Five-Year Rule to treat former JUCO or NAIA athletes the same as other college football players diminishes the value of the NCAA football product to consumers. *Id.* In support of this broad claim, he points the Court generally to an attached "NCAA Restraint Analysis Workbook." *Id.* at 13. But that Workbook does not support Plaintiff's conclusion. At most, it suggests that some former JUCO or NAIA football players granted a waiver to play an additional season had productive seasons and/or earned NIL money in that season. *See* ECF No. 44-11. That says nothing about how consumers of NCAA football (i.e. fans) value the product with or without those players.

Plaintiff attempts to cure this deficiency by arguing that "[n]ot all players are the same, perform

the same, or impact their teams and the market the same." *Id.* at 13. But distinctions among athletes do not define the effect that exclusion of one in favor of another would have on the labor market. Again, Plaintiff's focus is on the effect *to* individual athletes by their exclusion from the market, not the effect of that exclusion *on the market as a whole*. *See id.* at 14 (the athlete's Division I buyer set . . . becomes zero."); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (noting antitrust focus is on "*competition, not competitors*").

Plaintiff's inability to establish anticompetitive effects *in the market* for DI football is particularly problematic given his market definition. Plaintiff's proffered market excludes all professional football leagues as substitutes—despite similar financial opportunities—on the basis that opportunities in those leagues are limited when compared to the breadth of the NCAA DI football market. ECF No. 44 at 10. Yet Plaintiff attempts to show substantial anticompetitive effects in his proffered market by focusing on NIL opportunities or differentiating skills among only a handful of players. This incongruity is not solved by Plaintiff's long exposition on the Herfindahl-Hirshman Index ("HHI"). Plaintiff argues that the HHI shows that NCAA institutions have roughly equal purchasing power within the market and that the Five-Year Rule "categorically exclude[s] all players at issue from the entire market share that otherwise has a competitive HHI landscape." *Id.* at 15–16. But Plaintiff against fails to tie his evidence to *anticompetitive effects within the market*. The *House* Settlement both caps the revenue sharing payments (i.e., price) and the number of roster spots (i.e., output) available in the market. *See Patterson v. NCAA*, No. 3:25-cv-00994, 2026 WL 115417, at *6 (M.D. Tenn. Jan. 15, 2026). As Plaintiff's own data shows, there only 107 open roster spots *total* in FBS football, less than 1% of total available roster spots. ECF No. 44-10 at 3.[11] Thus, with few exceptions, the Five-Year Rule's exclusion of ineligible athletes from the market doesn't depress participation in that market, because the market is essentially at full participation. Dr. Maxcy's conclusion that the Five-Year rule restricts labor output, ECF No. 44-2 ¶ 70, is thus disproved by the same data Plaintiff relies on in his renewed motion.

The effect of the Five-Year Rule is to limit the number of athletes who can participate in college

[11] 105 roster spots on 138 FBS programs totals 14,490 total FBS DI athletes. 107 open roster spots represent 0.7% of the total.

football, while leaving the number of NCAA members schools (and number of available roster spots) the same. When supply increases relative to demand, prices tend to fall—because there is less demand-side competition relative to supply. The Five-Year Rule thus tends to increase competition among member schools for eligible student-athletes. *See Fourqurean*, 143 F.4th at 871 ("Under ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation."); *Arbolida v. NCAA*, No. 25-2079, 2025 WL 579830, at *3 (D. Kan. Feb. 21, 2025) ("By placing eligibility limits on students, the NCAA member institutions are increasing competition between themselves by imposing a limit on the potential labor supply.").

To establish substantial anticompetitive effects, Plaintiff would need to show that inclusion of the athletes deemed ineligible by the Five-Year Rule would substantially increase wages within the market, *even when accounting for the student-athletes whose roster spots are displaced*. Plaintiff does not even attempt this necessary analysis. Dr. Maxcy asserts that the Five-Year Rule suppresses compensation because it "remove[s] experienced, higher-productivity athletes—those most capable of commanding higher NIL and revenue-sharing compensation—from the market." ECF No. 44-2 ¶ 71. But he presents no *data* supporting this conclusion. *See Elad*, 160 F.4th at 416; *Bellamy*, 2025 WL 2267761, at *6; *see also Fourqurean*, 143 F.4th at 871 (rejecting similar theory for lack of evidence).

Plaintiff has failed to provide a cogent argument for anticompetitive effects within his proffered market, let alone to support his theory of anticompetitive effect with relevant "market evidence or economic data." *See Elad*, 160 F.4th at 416; *Fourqurean*, 143 F.4th at 870–71.

### 3. The Five-Year Rule Is Procompetitive Because It Creates the "Product" that NCAA Members Offer and Increases Competition Among Member Schools for Athletes.

Plaintiff has failed to produce any evidence to meet his burden at Step 1, let alone meet his burden that the facts in support thereof "clearly favor" him, as required for a mandatory injunction. *See Stanley*, 13 F.3d at 1320. Nevertheless, the NCAA satisfies its burden at Step 2 by showing that the procompetitive effects of the Five-Year Rule are both substantial and obvious in: (1) preserving college athletics as a unique product that is differentiated from professional sports; (2) promoting the purposes of the educational institutions student-athletes attend; (3) balancing the interests and opportunities of all student-athletes, and (4) better aligning athletics and academics.

First, courts have recognized that eligibility rules are procompetitive as they expand output by creating and preserving college athletics as a unique offering from professional sports. Eligibility rules go to the crux of what it means to be a student-athlete and are therefore essential to the very existence of the product of college football. *See Alston*, 594 U.S. at 90; *Bd. of Regents*, 468 U.S. at 101; *Banks v. NCAA*, 977 F.2d 1081, 1089 (7th Cir. 1992) (most NCAA bylaws "are procompetitive because they enhance public interest in intercollegiate athletics"). Without eligibility rules defining what it means to be a "student-athlete," the NCAA would just be another minor league or feeder system to professional sports leagues, reducing fan interest and the resources invested in (and financial opportunities available to) student-athletes. *See Banks*, 977 F.2d at 1090. "If the effect of striking down the five-year rule is a less valuable product which fewer consumers seek out, this harms both consumers who have lost a product of value, and the athletes employed in the labor market for the product." *Ortega v. NCAA*, No. 4:25-CV-00496, 2026 WL 1847877, at *9 (S.D. Iowa Apr. 23, 2026).

Second, eligibility rules promote collegiate athletics and advance the fundamental purposes of the educational institutions where the student-athletes attend. Vaughn Decl., ECF No. 22-1 ¶ 12. NCAA member schools have adopted eligibility rules to ensure fair competition in sports, to enhance the product of collegiate sports, to maintain a balance between academics and athletics for collegiate student-athletes, and to ensure that collegiate sporting events continue to attract the interests of consumers/fans. *Id.* The eligibility requirements promote collegiate athletics and advance the purposes of the educational institutions the student-athletes attend. *Id.* ¶¶ 20–21.

Third, the eligibility requirements allow NCAA member schools to serve hundreds of thousands of student-athletes. *Id.* ¶ 13. A substantial majority of student-athletes who enter DI athletics (including college football) each year matriculate to member institutions from high school. *Id.* Opportunities to compete in DI athletics for new student-athletes arise because athletes whose eligibility has ended move on to the next phase of their lives, and those opportunities would be limited if eligibility were expanded. *Id.* Moreover, NCAA DI football rosters are fixed at 105 for those DI member institutions participating in the *House* Settlement. *Id.*, Ex. A at 206–07 (Bylaw 17.2). For a class of graduating high school senior student-athletes to have the opportunity to enter NCAA DI rosters, there must be a corresponding exiting class of graduates to open up opportunities. *Id.* While

Plaintiff focuses on how the Five-Year Rule impacts *him*, he does so to the detriment of entering student-athletes who have DI football dreams. By asking the Court to give him a DI football roster spot, Plaintiff is necessarily asking the Court to take that limited spot away from someone else.

Finally, the Five-Year Rule also improves quality of output by fostering better alignment between athletics and academics. *See McCormack v. NCAA*, 845 F.2d 1338, 1345 (5th Cir. 1988) ("The goal of the NCAA is to integrate athletics with academics. [Eligibility] requirements reasonably further this goal."); *Johnson*, 2025 WL 1790345, at *15 ("[L]inking eligibility to compete in college athletics with academic progress—thereby integrating athletics with academics—is a legitimate procompetitive rationale for the [rules]."); *Bowers v. NCAA*, 974 F. Supp. 459, 461 (D.N.J. 1997) (initial eligibility requirements are designed "to assure proper emphasis on educational objectives"); *see also* Amicus Br. of Am. Council on Ed., *Pavia v. NCAA*, No. 24-6153 (6th Cir. Mar. 31, 2025), ECF No. 21.

Plaintiff argues that the NCAA's procompetitive justifications fail because data shows that college football participation rose by roughly 6,377 athletes after the NCAA issued a blanket waver for the season interrupted by the COVID pandemic. ECF No. 44 at 19. This data is inapposite for several reasons. First, it predates the *House* Settlement, which caps DI football rosters at 105 athletes. Second, the source Plaintiff relies on makes clear that the 6,377 additional college football players includes increases in both DII and DIII—two leagues that Plaintiff explicitly excludes from his proffered market. *See* NCAA Staff, *NCAA Student-Athletes Surpass 520,000, Set New Record*, NCAA (Dec. 5, 2022), https://www.ncaa.org/media-center-ncaa-student-athletes-surpass-520-000-set-new-record/. And while the source document does not specify how much of the increase in participation is attributable to each league, it *does* state that, across all sports, increased participation at the DI level accounted for only 4,488 of the nearly 30,000 additional student-athletes year-over-year. *Id.* As stated above, his argument that "FBS and FCS schools have open roster spots," ECF No. 44 at 20, is also misleading. There are only 107 *total* open roster spots at FBS schools, less than one per school. Plaintiff is presenting hastily compiled data, misrepresenting the data, and using it to draw unsupported conclusions. Moreover, regardless of roster spots, each DI football team can only field 11 competitors at a time—in this "highly competitive and generally zero sum" context, expanding Plaintiff's eligibility takes competition time from someone else. *See B.P.J.*, 146 S. Ct. at 2381.

**4. There Exists No Substantially Less Restrictive Means by Which the NCAA Could Achieve the Procompetitive Benefits of the Five-Year Rule.**

*Alston* underscored that courts should not lightly second-guess NCAA rules: "We agree with the NCAA's premise that antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes." 594 U.S. at 98; *Bd. of Regents*, 468 U.S. at 120 (NCAA needs "ample latitude" to play its role); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("[S]ports-related organizations should have the right to determine for themselves the set of rules that they believe best advance their respective sport."). Therefore, at Step 3 of the rule of reason analysis, Plaintiff bears a heavy burden to demonstrate that (1) the Five-Year Rule is "patently and inexplicably stricter than is necessary to achieve the procompetitive benefits," *Alston*, 594 U.S. at 101 (cleaned up), and (2) Plaintiff's alternatives are "substantially less restrictive" and "virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) (cleaned up). Plaintiff fails to show either.

The Five-Year Rule is not patently and inexplicably stricter than necessary. It is reasonable to count non-DI athletics toward the four seasons of competition allotted by the Five-Year Rule because this ensures that student-athletes' athletic careers align with their college enrollment and progress toward a four-year degree from an NCAA member institution. Plaintiff proffers a handful of "less restrictive alternatives," ECF No. 44 at 20, but fails to explain how any is "virtually as effective" at achieving the NCAA's procompetitive aims. For instance, by "limiting eligibility to Division I participation only," the NCAA would undermine each of its procompetitive aims. It would make eligible "student-athletes" of nearly any age and experience. Under Plaintiff's proposed framework, an athlete could play two years at an NAIA school, two more at a JUCO, four at a DII school, and then matriculate to a DI university with five years of remaining eligibility, thus playing college sports into his thirties. Such a rule would undermine the connection between education and college athletics, risk undermining college football's unique place in American culture, and do a disservice to every college freshman who now has to compete for a roster spot with an athlete 10 years his senior. *See Ortega*, 2026 WL 1847877, at *9 ("Any eligibility rule which protected such a product likely would, by

necessity, exclude a twenty-eight-year-old from competing against an opponent a decade his junior.”).

Plaintiff asks the Court to second guess rational decisions made by the NCAA in the face of multiple competing considerations and the needs of hundreds of thousands of student athletes. The Sherman Act does not authorize the Court to do so. *See Alston*, 594 U.S. at 84; *Epic Games*, 67 F.4th at 990; *Bd. of Regents*, 468 U.S. at 120.

**C. The NCAA Did Not Breach the Covenant of Good Faith and Fair Dealing.**

As a threshold matter, the NCAA Manual, which encompasses the NCAA Bylaws, is a governance document, not a contract. The Bylaws contain a suite of regulatory provisions that the NCAA member institutions have adopted through a democratic, legislative process. Even if treated as a contract, Plaintiff identifies no Bylaw language suggesting he is a third-party beneficiary of the Bylaws. *See Minshew v. Donley*, 911 F. Supp. 2d 1043, 1060 (D. Nev. 2012); *Diamond Speedway LLC v. Kolay Flooring Int’l, LLC*, No. A-21-844035-B, 2024 Nev. Dist. LEXIS 455, at *3 (Clark Cnty. Dist. Ct., Mar. 28, 2024). Those threshold issues aside, Plaintiff cannot establish a likelihood of success on the merits of his implied-covenant claim because it necessarily relies on his unsupported antitrust claim.

A party to a contract breaches Nevada’s version of the implied covenant where it literally complies with the terms of the contract but “deliberately countervenes the intention and spirit of the contract.” *Hilton Hotels Corp. v. Butch Lewis Prods.*, 808 P.2d 919, 922–23 (Nev. 1991). Plaintiff asserts that “[c]ontracts cannot be carried out for an unlawful purpose.” ECF No. 44 at 21. And that he is likely to succeed on his implied covenant claim because the NCAA’s eligibility rules are “unlawful as a matter of law under the Sherman Act.” *Id.* In other words, Plaintiff’s contract claim is derivative of his antitrust claim. *See Hasz v. NCAA*, No. 8:25CV398, 2025 WL 2083853, at *2 n.1 (D. Neb. July 24, 2025). Because, as explained above, Plaintiff has not established a likelihood of success on his antitrust claims, his breach of the implied covenant of faith and fair dealing claim premised on the same conduct and legal theory necessarily fails. *See id.*; *see also Osuna-Sanchez*, 2025 WL 684271, at *8 (denying preliminary injunction on similar state-law claim); *Johnson*, 2025 WL 1790345, at *18 (same).

**D. Plaintiff's Tortious-Interference Claim Likewise Falls with His Antitrust Claim.**

Plaintiff asserts that he "has a reasonable expectation of prospective business relations with UNLV and other third parties." ECF No. 44 at 22. But Plaintiff has known for years that his eligibility would expire at the conclusion of his fourth season of collegiate football. Thus, Plaintiff had no reasonable expectation of any prospective business relationship with any party based on his eligibility for the 2026–2027 football season. The NCAA's application of its Bylaws to Plaintiff cannot form the basis of a tortious interference with prospective economic advantage claim, particularly without a finding that those bylaws were unlawfully applied. *See Osuna-Sanchez*, 2025 WL 684271, at *8; *Johnson*, 2025 WL 1790345 at *17. Moreover, to recover for tortious interference, Plaintiff must establish that the NCAA's actions had no privilege or justification. *See* ECF No. 44at 21–22 (citing *In re Amerco Deriv. Litig.*, 127 Nev. 196, 226 (2011)). And actions are privileged "when the defendant acts to protect [its] own interests." *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1226 (Nev. 1987). The NCAA's evenhanded application of its eligibility rules to Plaintiff was privileged. Plaintiff makes no attempt to establish otherwise; nor does he provide any other evidence to support his claim.

**III. PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM.**

Plaintiff argues that he faces threats of irreparable harm in the form of exclusion from the upcoming DI football season and economic harm from the loss of "numerous NIL opportunities presented to him" and decreased "chances of earning a contract to play professional football following the season at issue." ECF No. 44 at 22–23. These contentions do not establish that Plaintiff will suffer irreparable harm absent preliminary-injunctive relief.

First, Plaintiff cannot show irreparable harm because he knew years ago that his eligibility would end at the conclusion of the 2025–2026 season. Yet, he waited until the eve of the 2026–2027 season to petition this Court for an additional season of competition. This "excessively long and unjustified" delay is grounds for denying his motion. *See Walker v. NCAA*, No. 25-514, 2025 WL 1901907, at *7 (M.D. La. July 1, 2025); *see also Giles v. NCAA*, No. 8:25-cv-01488, 2025 WL 2551093, at *8 (C.D. Cal. Aug. 18, 2025) ("[T]he Court is wary to find irreparable harm where Plaintiffs delayed in seeking a preliminary injunction."); *Mayes v. NCAA*, No. 25CV045874-590, 2025 NCBC LEXIS 123, at *7 (N.C. Sup. Ct. Sep. 11, 2025) ("Most vexingly, while [Plaintiff] contends

that the irreparable harm in this case is primarily his inability to play college football, [Plaintiff] willingly exacerbated this purported harm.").

Second, Plaintiff's primary alleged injury is a financial loss—i.e., the loss of NIL earnings. This type of injury can be quantified and compensated by a damages award and is not irreparable. *L.A. Memorial Coliseum Com.*, 634 F.2d at 1202. Plaintiff's allegation of diminished chances to earn a professional contract is also (1) financial, and (2) "too speculative to warrant an injunction." *See Hasz*, 2025 WL 2083853, at *6 (noting absence of evidence that athlete was scouted professionally).

Third, Plaintiff's cited irreparable-harm cases are distinguishable. They do not involve antitrust claims and the plaintiffs therein suffered unequal treatment in violation of Title IX. *See S.A. v. Sioux Falls School Dist. 49-5*, No. 4:23-CV-04139, 2023 WL 6794207, at *1 (D.S.D. Oct. 13, 2023); *Biediger v. Quinnipiac Univ.,* 616 F. Supp. 2d 277, 278–79 (D. Conn. 2009). And the NCAA has explained why Plaintiff's reliance on *Martinson* is misplaced. *See supra* subpart II.B.1. at 9.

## IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT INJUNCTIVE RELIEF

Plaintiff needs to show that the scales tip dramatically in his favor to alter the status quo. *Stanley*, 13 F.3d at 1320. On one side of the scale, Plaintiff risks missing extra seasons not contemplated by the NCAA rules. On the other side of the scale, granting the relief that Plaintiff requests would adversely impact the decisions and collegiate careers of tens of thousands of student-athletes. *See Coley*, 792 F. Supp. 3d at 648.

The public interest goes beyond Plaintiff's personal interests and extends to the up-and-coming athletes whom Plaintiff and those like him will displace. *See Patterson*, 2026 WL 115417, at *9; *Zeigler*, 2025 WL 1671952, at *5. Every time Plaintiff takes the field Saturday, he will displace another athlete. *See B.P.J.*, 146 S. Ct. at 2381. Plaintiff's victory will be that athlete's defeat. The balance of equities therefore weighs against granting Plaintiff's renewed motion. *See Patterson*, 2026 WL 115417, at *9; *Zeigler*, 2025 WL 1671952, at *5.

WHEREFORE, for the reasons set forth herein, Defendant respectfully requests that this Court DENY Plaintiff's renewed motion.

Respectfully submitted,

Dated: August 27, 2026.

NAYLOR & BRASTER

By: */s/ John M. Naylor*

John M. Naylor
Nevada Bar No. 5435
Kelly M. Scarborough
Nevada Bar No. 16979
10100 W. Charleston Blvd., Suite 120
Las Vegas, NV 89135

*Attorneys for Defendant National Collegiate Athletic Association*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 4(b), I hereby certify that I am an employee of NAYLOR & BRASTER and that on this 27th day of August 2026, I caused the document entitled "**Brief of Defendant NCAA in Opposition to Plaintiff's Renewed Motion for Temporary Restraining Order and Preliminary Injunction**" to be served through the Court's CM/ECF No. system to those persons designated by the parties that have appeared in the matter.

*/s/ Halee A. Mennear*
An Employee of NAYLOR & BRASTER