John M. Naylor
Nevada Bar No. 5435
Kelly M. Scarborough
Nevada Bar No. 16979
NAYLOR & BRASTER
10100 W. Charleston Blvd., Suite 120
Las Vegas, NV 89135
(T) (702) 420-7000
(F) (702) 420-7001
jnaylor@nblawnv.com
kscarborough@nblawnv.com

*Attorneys for Defendant*
*National Collegiate Athletic Association*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| COHEN FULLER,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>Defendant. | Case No. 2:26-CV-01974-APG-BW<br><br>**DEFENDANT NCAA'S OPPOSITION TO PLAINTIFF'S THIRD MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## INTRODUCTION

Plaintiff Cohen Fuller asks the Court *for the third time* to compel the National Collegiate Athletic Association ("NCAA") to treat him as eligible for the 2026 football season—a season that is well underway—despite that he already completed four full seasons of collegiate football and thus exhausted his eligibility under the rules applicable to him the entire time he attended college. His

attempts to bolster his motion with ever more unsubstantiated statistics and incomplete analysis are still insufficient to meet his significant Sherman Act burden. Plaintiff's motion should be denied.

Plaintiff has failed to remedy the many deficiencies the NCAA identified in opposing his prior two motions.[1] Plaintiff focuses almost solely on his shortcomings in proving anticompetitive effects in his proffered Division I football labor market, as identified by the Court during the August 28, 2026, hearing, ECF 59 at 2, but otherwise Plaintiff "incorporate[s] prior briefing by reference." *Id.* Therefore, the NCAA also incorporates its prior briefing by reference and addresses only Plaintiff's new arguments and the impact of the Ninth Circuit's opinion in *Blythe v. NCAA*, No. 26-1106, 2026 WL 2653349 (9th Cir. Sept. 9, 2026), on Plaintiff's attempts to define the relevant market and prove anticompetitive effects within that market.

Plaintiff's latest attempt fails. He submits unauthenticated compilations of data purporting to show that competitors classified as seniors produce more football statistics and receive higher estimated name, image, and likeness ("NIL") valuations than younger, non-senior competitors. But that data does not bear on the question that the Court must address: what effect the Five-Year Rule had on a relevant market by limiting football athletes to four seasons of competition at any collegiate institution. And, as recently confirmed by the Ninth Circuit in *Blythe*, the requisite market analysis involves "numerous critical questions" that Plaintiff has not answered. *Id.* at *5 n.4. These questions include, but are not limited to:

> [I]s the correct market definition that of all college football (i.e., including NCAA Division I, II, and III as well as JUCOs) or is it just NCAA Division I? Are players from Division II and III schools reasonable substitutes, such

[1] The NCAA identified the following deficiencies in Plaintiff's last two motions: (i) the Middle District of Tennessee is the appropriate venue under the first-to-file rule; (ii) Plaintiff's injunctive relief claims were released in the *House* Settlement; (iii) Plaintiff offers no compelling legal basis or factual record for this Court to conclude he has met his burden to prove the Sherman Act invalidates the NCAA's Five-Year Rule; (iv) Plaintiff's implied-covenant and tortious-interference claims fall with his Sherman Act claim; and (v) the balance of equities and public interest factors favor the NCAA. ECF 47 at 13-32. The NCAA maintains these arguments.

> that these schools should be part of the market definition? What about JUCOs? Are any athletes choosing JUCOs over Division I schools and, if not, is it because of the JUCO Rule? How does the availability of revenue-sharing change the market's recruitment? How does foreclosing experienced former JUCO players from their would-be third and fourth years of NCAA competition affect the Division I football labor market? Do NCAA Division I football teams compete with NFL teams for players post-*Alston*?

*Id.* (quoting *Robinson v. NCAA*, 172 F.4th 271, 294 n.15 (4th Cir. 2026)). Plaintiff's evidence—old and new—fails to answer these necessary prerequisites to defining the market. That alone is dispositive of his Sherman Act claim. But Plaintiff also fails to show anticompetitive effects within his proffered market, relying on evidence that fails to isolate the athletes excluded from additional competition by the Five-Year Rule and fails to demonstrate any relevant *economic* impact on the labor market. Plaintiff here "must submit substantive, concrete evidence sufficient for the Court to define the relevant market and perform a careful analysis of market realities." *Ramirez v. NCAA*, 4:26-cv-00553, 2026 WL 2838553, at *10 (D. Idaho Sep. 22, 2026). Plaintiff still has not done so.

## ARGUMENT

### I. PLAINTIFF CANNOT MEET THE HEIGHTENED STANDARD FOR THE MANDATORY PRELIMINARY INJUNCTION HE SEEKS.

In his third motion for injunctive relief, Plaintiff renews his demand for a personal exemption from the NCAA's eligibility rules. Courts across the country—including in the Ninth Circuit and other federal circuit courts—have rejected nearly identical claims. Because a preliminary injunction is an "extraordinary remedy," the standard to obtain such relief is "stringent." *Feldman v. Reagan*, 843 F.3d 366, 375 (9th Cir. 2016) (en banc). A plaintiff seeking such relief must clearly demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits must be based on admissible evidence in the record, rather than surmise or speculation concerning what

evidence could be produced at trial." *Klein v. City of Laguna Beach*, 381 F. App'x 723, 726 (9th Cir. 2010).

Injunctions may be mandatory or prohibitory. *Stanley v. USC*, 13 F.3d 1313, 1320 (9th Cir. 1994). "A prohibitory injunction preserves the status quo. A mandatory injunction 'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'" *Id.* (alteration in original) (citations omitted) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (quoting same). This standard is high. *Doe v. Snyder*, 28 F.4th 103, 111–12 (9th Cir. 2022). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks omitted).

Although *Blythe* did not resolve this issue, 2026 WL 2653349, at *3 n.1, the NCAA maintains that Plaintiff is requesting a mandatory injunction because he seeks to alter the status quo by requiring the NCAA to grant him an extra season of competition to which he is not entitled. Other federal district courts have denied substantially similar requests for preliminary injunctive relief on the grounds that such requests were for mandatory relief. *See Johnson v. NCAA*, No. CV-25-60, 2025 WL 1790345, at *7, 18 (D. Mont. June 26, 2025); *Coley v. NCAA*, 792 F. Supp. 3d 634, 648–49 (E.D.N.C. 2025); *Brzovic v. NCAA*, No. 2:25-cv-02885, 2025 WL 1370758, at *3–5 (D.S.C. May 11, 2025); *Robinson*, 172 F.4th at 286. Here, Plaintiff does not satisfy any of the four *Winter* factors, let alone the heightened standard for a mandatory injunction. Accordingly, his third motion should be denied.

## II. THE COURT SHOULD NOT CONSIDER PLAINTIFF'S UNRELIABLE EVIDENCE, INCLUDING THAT OF HIS PROFFERED EXPERT.

Plaintiff's motion relies on a collection of exhibits—including compilations concerning football statistics and estimated NIL valuations—to support his theories of anticompetitive effects.

Indeed, Plaintiff submitted twenty-nine exhibits with his latest request for preliminary relief, nineteen of which are purported data.[2] Plaintiff's retained expert Dr. Maxcy mentions Exhibit 7 and Exhibit 8. ECF 59-24 ¶¶ 61-62, 65. But no witness identifies or authenticates any other Purported Data Exhibit. No declarant with personal knowledge explains what the exhibits are, where their information originated, who prepared them, how they were created, or whether they accurately reflect the underlying information they purport to summarize. This violates Federal Rule of Evidence 901, which requires "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).[3]

Dr. Maxcy does not cure the problem. FRE 703 may permit an expert to base an opinion on otherwise inadmissible facts or data if experts in the field would reasonably rely on information of that kind. But Plaintiff has not used Dr. Maxcy to establish that predicate. Dr. Maxcy references an Exhibit 7 and Exhibit 8, but he does not meaningfully explain what the exhibits are, identify their sources or methodology, or testify that experts in his field reasonably rely on such materials. ECF 59-24 ¶¶ 61–62, 65. Moreover, Dr. Maxcy's own reliability is in question, given his sourcing of supposed NIL data from ChatGPT in another litigation. *See* Declaration of Matthew Backus ("Backus Decl."), § III.B–C, ¶ 56; *see* Declaration of Ben Kappelman ("Kappelman Decl."), Ex. A.

This lack of foundation is particularly consequential because the challenged exhibits appear to function as substantive evidence, not merely illustrations of an independently supported expert opinion. Plaintiff relies on them to establish the composition, performance, and asserted economic value of

[2] Exhibits 1–13, 15–18, and 28–29 compose what NCAA will refer to as the "Purported Data Exhibits."

[3] To the extent the exhibits are offered as summaries, charts, or calculations, the foundational gap is broader still. Federal Rule of Evidence 1006 permits a summary to prove the contents of voluminous materials only where the underlying materials are admissible and have been made available for examination or copying. Fed. R. Evid. 1006 (a), (b). Plaintiff has made no such materials available.

groups of college football competitors. The Court therefore should decline to consider Plaintiff's unauthenticated exhibits.

## III. PLAINTIFF REMAINS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

### A. The Five-Year Rule Survives Rule-of-Reason Analysis.

Under the Sherman Act, Plaintiff's claim is subject to the burden-shifting framework known as the Rule of Reason.[4] *NCAA v. Alston*, 594 U.S. 69, 91 (2021). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express*, 585 U.S. 529, 541 (2018). Thus, step one of the rule-of-reason analysis requires a fact-specific assessment of market structure, market power, and actual effects on competition to assess anticompetitive effects. *Id.* If a plaintiff cannot establish that the Five-Year Rule imposes anticompetitive effects in a relevant market, then the plaintiff's claim fails.

If the plaintiff carries its initial burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. *Id.* at 542. If the defendant makes this showing, then the burden shifts back to the plaintiff to show that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Id.*

Plaintiff previously has not met—and still cannot meet—his burden of establishing an anticompetitive effect in a relevant market. His claims fail because he has not answered the critical questions required to define the relevant market. *Alston*'s directive that evaluation of antitrust claims "necessarily depends on a careful analysis of market realities" cannot be satisfied by generalized NIL

---

[4] The Ninth Circuit treats the Five-Year Rule as a commercial restraint subject to federal antitrust laws under the Sherman Act. *See Blythe*, 2026 WL 2653349, at *4. The NCAA maintains that its eligibility rules are noncommercial and fall outside the purview of the Sherman Act and preserves that argument here.

data and football statistics that fail to even isolate the class of football competitors excluded from Plaintiff's alleged market, let alone provide any insight into the effects of that exclusion on that alleged market as a whole. 594 U.S. at 93.

**1. Plaintiff Has Not Adequately Defined a Relevant Market.**

Before a district court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market." *Am. Express*, 585 U.S. at 542. Without defining the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* at 543 (cleaned up). The validity of a proposed relevant market is a factual determination, and Plaintiff bears the burden of proving the scope of the relevant market. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044–45 (9th Cir. 2008); *see also Blythe*, 2026 WL 2653349 at *5.

For antitrust purposes, the relevant market is "the area of effective substitution" for products or labor, often expressed as the "arena within which significant substitution . . . occurs." *Am. Express*, 585 U.S. at 543 (citations omitted). Defining a relevant market involves such considerations as "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," *AFMS LLC v. UPS Co.*, 105 F. Supp. 3d 1061, 1077 (C.D. Cal. 2015) (quoting *Newcal Indus.*, 513 F.3d at 1045), and the "area of effective competition where buyers can turn for alternate sources of supply." *W. Parcel Express v. UPS of Am., Inc.*, 65 F. Supp. 2d 1052, 1058 (internal quotations omitted) (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology Ltd.*, 924 F.2d 1484, 1489–90 (9th Cir. 1991)). "In the labor market context, the market is comprised of those employers seen by workers as reasonably good substitutes." *Robinson*, 172 F.4th at 293 (citing *Fourqurean v. NCAA*, 143 F.4th 859, 869 (7th Cir. 2025)).

Plaintiff's' third motion for injunctive relief makes no attempt to define the relevant market. Although Plaintiff recognizes that the Court accepted his market definition "for purposes of the hearing only," ECF 59 at 2, he apparently rests on his prior arguments and evidence as to the relevant market.

But as the NCAA has explained, Plaintiff's evidence is insufficient to define the market for multiple reasons. ECF 47 at 18–23. Plaintiff's inability to address these deficiencies is especially problematic in the wake of *Blythe*, which articulated a non-exhaustive list of the "numerous critical questions" that must be answered in order to define the relevant market. 2026 WL 2653346, at *5 n.4 (citing *Robinson*, 172 F.4th at 294 n.15). Because Plaintiff has not provided the Court with evidence sufficient to resolve many of those questions, he has failed to define the relevant market.

**i. Plaintiff Failed to Define a Relevant Market for Collegiate Football**

Plaintiff continues to assert that "the Division I football labor market" is the relevant focus of the Court's analysis. ECF 59 at 2, 12. *Blythe* explained that to establish a relevant market in college football, a plaintiff must adequately answer the following questions in defining that market:

- [I]s the correct market definition that of all college football (i.e. including NCAA Division I, III, and III as well as JUCOs) or is it just NCAA Division I?
- Are athletes from Division II and III schools reasonable substitutes, such that these schools should be part of the market definition?
- What about JUCOs? Are any athletes choosing JUCOs over Division I schools and, if not, is it because of the JUCO Rule?
- How does the availability of revenue-sharing change the market's recruitment?
- Do NCAA Division I football teams compete with NFL teams for players post-*Alston*?

2026 WL 2653349, at *5 n.4 (bullet points added). Plaintiff fails to address any of these questions. Nor does his expert Dr. Maxcy, who signed his declaration sixteen days *before* the *Blythe* opinion issued. ECF 59-24 at 26. Even before *Blythe*, Dr. Maxcy conceded that he lacks the data necessary to adequately answer these questions. *See* ECF 47 at 19; ECF 59-24 ¶ 48. That should end the inquiry.

Even the modest evidence that Plaintiff relies on through Dr. Maxcy does not support Plaintiff's proffered market. Rather than address football revenue specifically, his revenue data includes average revenue across *all* collegiate athletic programs. ECF 59-24 ¶¶ 55–59, 61. The Ninth Circuit made clear that the markets for different collegiate sports "are not interchangeable." *Blythe*, 2026 WL 2653349, at *6; *see also* Backus Decl. ¶ 20 (Even within NCAA Division I football, "not all teams are substitutes for each other"). Plaintiff cannot use generalized revenue data across all sports to establish a relevant labor market for football.

Dr. Matthew Backus, an economist and expert in the field of industrial organization whom the NCAA offers in opposition to Plaintiff's motion, concluded that Dr. Maxcy failed to establish a relevant antitrust market because he performed "no standard market definition tests of the boundaries of [Plaintiff's] alleged relevant market." Backus Decl. ¶ 18. Dr. Backus further concluded that Dr. Maxcy did not "perform a hypothetical monopolist / monopsonist test ('HMT') or any empirical test of substitutability of alternatives on the margin, or otherwise calculate cross-price elasticities that would measure the degree of substitution between alternative options for the student-athletes in his asserted relevant markets." *Id.*

And while Dr. Maxcy does present evidence on football attendance, his data undermines his conclusions. According to Dr. Maxcy, FBS football teams averaged more than five times as many fans as FCS football teams, while FCS teams averaged less than three times as many as DII teams. ECF 59-24 ¶ 60. But Dr. Maxcy's purported evidence also "fails to note the significant differences [in attendance] within NCAA Division I. …" Backus Decl. ¶ 43. The relative gap between FBS and FCS football attendance (which are both contained within Plaintiff's proffered market) is thus significantly greater than the gap between FCS and DII programs. Accordingly, to the extent attendance data constitutes a meaningful measure of substitutability (a theory for which Dr. Maxcy offers no support),

the data Dr. Maxcy presents undermines a conclusion that FBS and FCS schools are within the same market but FCS and DII schools are not.

On *Blythe*'s question of how the availability of revenue sharing changes a market's recruitment, Plaintiff previously recognized the seismic effect the *House* Settlement had on the college athletics market by creating a revenue-sharing model for DI schools that opt into revenue sharing and trading scholarship limits for roster caps. ECF 44 at 6–7. But what about the DI schools with football programs that chose to opt out of the *House* Settlement? If the *House* Settlement is the basis for bifurcating the market for college football, should the DI schools that opted out not be excluded from the market? Dr. Maxcy and Plaintiff's briefs (all of them) fail to address this fundamental division in Plaintiff's proffered market.

Moreover, the data Plaintiff has provided regarding revenue sharing again undermines his proffered market. Plaintiff previously argued that Power Four programs allocated, on average, $13.448 million to its football program for the 2025–26 season. ECF 44-7 at 3.[5] For Group-of-Six programs (which include UNLV), that amount drops to $2.662 million, with another drop to $1.310 million for the remaining DI programs. *Id.* The *gap* in available revenue between a Power Four football program and a Group-of-Six program was thus $10.786 million, which itself is more than *four times greater* than the total revenue being shared by an average Group-of-Six program. Why does the (average of) $2.662 million shared between all UNLV football team members isolate it from DII programs but the additional $10.786 million available at a Power Four program does not distinguish it from lower-tier FBS programs (let alone FCS programs)?

---

[5] Plaintiff's exhibit cited "Opendorse" without supplying the underlying data. ECF 44-7 at 12, 18, 20. Information from Opendorse was among the evidence the Ninth Circuit held was insufficient to meet the plaintiff's burden in *Blythe*, 2026 WL 2653349, at *6 ("Blythe attached as an exhibit the 2024–25 Opendorse Report which provides some generalized statistics about the current state of the collegiate NIL market at large.")

Further, even though evidence indicates that a subset of elite student-athletes playing football have alternative options in professional leagues, such as the National Football League, "not every football player is a good substitute for another, and neither is every school a good substitute for another, even within Division I." Backus Decl. ¶ 47. Plaintiff and Dr. Maxcy do not consider whether there is a market for high-end players that is distinct from the market for the broader set of players not earning NIL or revenue sharing compensation. *Id.* Even within Division I football, a "benchwarmer" is not a substitute for a starting quarterback. *Id.* And Dr. Maxcy fails to consider whether various types of players (such as starters vs. non-starters or players recognized as All-American or All-Conference vs. non-recognized players) are good substitutes for one another within the Division I college football market. *Id.*

Moreover, Plaintiff's evidence is silent on how the advent of revenue-sharing—and the significant disparities between programs—has affected labor *recruitment* in the market or markets for football players. Did revenue sharing make players more or less likely to seek out DI or FBS or Power Four programs? Did it make them more or less likely to start their football careers at a JUCO or NAIA school? More or less likely to stay? Plaintiff leaves these questions unanswered as well.

Finally, on *Blythe's* question regarding whether NCAA DI teams compete with NFL teams for players post-*Alston,* the NCAA has already explained at length Plaintiff's failure to present evidence sufficient to establish whether the NFL or other professional football leagues like the UFL are reasonable substitutes for DI programs in the football labor market. ECF 22 at 21–22; ECF 47 at 14–15. In *Blythe*, the Ninth Circuit confirmed the importance of careful consideration of the substitution between professional and college football programs and how that substitution is changing in the wake of both *Alston* and *House*. *Blythe*, 2026 WL 2653349, at *7. But Plaintiff remains largely silent on the issue, even in the face of a constantly-evolving relationship between NFL and FBS programs playing out publicly. *See, e.g.*, Brad Crawford, *LSU Roster Finalized: Lane Kiffin Doesn't Add Ex-NFL Players*

*Dae'Quan Wright, Zxavian Harris to Team*, CBS SPORTS (Sep. 8, 2026), https://www.cbssports.com/college-football/news/lsu-roster-ex-nfl-players-lane-kiffin-daequan-wright-zxavian-harris/; Kappelman Decl., Ex. B; *NFL Reminds Teams Harris, Wright Ineligible to Sign in 2026*, ESPN (Sep. 17, 2026), https://www.espn.com/nfl/story/_/id/49966817/nfl-reminds-teams-harris-wright-ineligible-sign-2026; Kappelman Decl., Ex C. Plaintiff's silence may be because, contrary to his contentions, evidence is consistent that there is meaningful substitution on the margin between college and professional options for elite players. Backus Decl. ¶ 45.

Plaintiff's proffered evidence, to the extent it is even relevant to his proffered market, barely begins to scratch the surface of the "many aspects of the market that should be considered when finalizing a market definition." *Blythe*, 2026 WL 2653349, at *5 n.4 (quoting *Robinson*, 172 F.4th at 294 n.15). For these reasons, as well as those laid out in the NCAA's prior briefing, Plaintiff has failed to define the relevant market and thus his claim fails.

**2. Plaintiff's New Evidence Does Not Show Anticompetitive Effects.**

Plaintiff's renewed motion focuses predominantly on arguing that the Five-Year Rule, in counting seasons at JUCO and NAIA schools the same as seasons at NCAA schools, creates anticompetitive effects in the relevant market by: (1) reducing output and quality; (2) suppressing wages and compensation; and (3) creating, protecting, and enhancing the NCAA's position in the market by harming JUCO and NAIA football programs. ECF 59 at 3–12. Although Plaintiff has now framed his arguments in antitrust terms, he still does not offer sufficient evidence to show he is likely to succeed in proving anticompetitive effects.

Plaintiff's new evidence focuses entirely on statistical output and valuation for seniors in Division I college football comparative to underclassmen. *See* ECF 59 at 5–7, 9–10. But the Five-Year Rule does not exclude seniors from competition. On the contrary, the Five-Year Rule expressly allows for four seasons of competition in a five-year period. Thus, both true seniors and fifth-year seniors (if

they took a redshirt year) are expressly eligible under the Five-Year Rule. What Plaintiff is seeking is an exception to the Five-Year Rule allowing for a fifth (or sixth) year of competition for athletes who competed at a JUCO or NAIA school for one or more of those seasons. His new evidence comparing seniors generally (who, by common-sense definition are typically competing in their *fourth* season of competition) to underclassmen says nothing at all about the effects of the exclusion of Plaintiff and former student-athletes similarly situated on the market for Division I football players. *See id.* at 3–10. And as to Plaintiff's third theory of anticompetitive effects (that the Five-Year Rule harms potential NCAA competitors in JUCO and NAIA schools), he offers no evidence at all. *See id.* at 10–12. Despite offering the Court twenty-nine exhibits to his third motion, Plaintiff still "presents no evidence to establish either directly or indirectly that the student-athlete sellers/laborers are substantially anticompetitively harmed by the Five-Year Rule 'as a whole' in the relevant market." *Blythe*, 2026 WL 2653349, at *7 (quoting *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985 (9th Cir. 2023)).

Dr. Maxcy's proffered evidence demonstrates neither a reduction in output nor a market-wide suppression of wages that would be indicative of anticompetitive harm. Backus Decl. ¶ 21. Even though Dr. Maxcy asserts the NCAA has implemented a system that automatically removes their most expensive players from the market each year, creating an artificial ceiling on compensation that would not exist in a competitive market, Dr. Maxcy provides no evidence for this proposition. *Id.* Indeed, the entirety of Dr. Maxcy's "Anticompetitive Effects" section of his declaration contains neither supporting empirical analysis nor citations. *Id.*; *see also* ECF 59-24 ¶¶ 69–77.

**i. Plaintiff's Football-Statistics Compilations Do Not Measure the Five-Year Rule's Effect on Competition.**

Plaintiff's new output theory incorrectly equates selected on-field statistics with antitrust output. His data compares "listed seniors" with other roster classes and concludes that seniors account for a disproportionate share of passing yards, rushing yards, tackles, sacks, and similar performance statistics.

ECF 59 at 4–6.[6] Plaintiff's focus on football statistics is relevant only to "athletic competition, which is not protected by the antitrust laws." *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 720 (6th Cir. 2003). In other words, he misunderstands the standard for quality and output under the antitrust laws.

Plaintiff's comparison also does not isolate any effect of the challenged rule. "Listed seniors" are not the same as athletes excluded by the Five-Year Rule. The identified group necessarily includes athletes who remain eligible, athletes completing their ordinary final season, and athletes whose eligibility circumstances are unknown. Plaintiff does not demonstrate how many athletes in his data would have sought another season, obtained a roster position, displaced another athlete, or produced comparable statistics in an additional year. As Plaintiff's own expert asserts, more than 250 college football competitors are selected in the NFL draft every year. ECF 59-24 ¶ 64. Hundreds more are signed to NFL rosters as undrafted free agents. ECF 47 at 14. It stands to reason that NCAA players who can compete for NFL roster spots account for a disproportionate percentage of the statistical output of NCAA upperclassmen. Yet, Plaintiff makes no distinction between those athletes—who logically have no interest in a fifth season of collegiate competition—and athletes like himself who are seeking additional seasons of college football precisely because they lack the opportunity to compete professionally, *see* ECF 59-22 ¶ 10.

Nor does Plaintiff's analysis establish that the Five-Year Rule reduces the amount of Division I football produced, i.e. *output*. His new data concerns how existing production is distributed among roster classes, *not* whether applying the rule causes fewer contests, fewer teams, fewer roster positions, or less competition among schools for eligible competitors. Plaintiff previously submitted data indicating that only 107 FBS roster positions were open—less than one percent of the total positions

[6] All of Plaintiff's data in this section of his brief is attributed to the Purported Data Exhibits that no one has authenticated.

included in that analysis. *See* ECF 47 at 25 (citing ECF 44-10 at 3). And his present motion does not show that excluding athletes who have exhausted their eligibility leaves material roster capacity unused. That seniors (who are older and more experienced) tend to produce a higher percentage of the statistics garnered during football season is hardly revelatory. But the overall output of *product* (football contests) and *labor* (competitors on the field) remain the same no matter how snaps and statistics are distributed between underclassmen, seniors, or those seeking a fifth year of collegiate football competition like Plaintiff here.[7]

Plaintiff's claim is disproved by both Supreme Court precedent and common sense. As the Court recently observed, "[e]very player who earns playing time reduces the playing time of a teammate." *West Virginia v. B.P.J.*, 146 S. Ct. 2356, 2381 (2026). That is the *only* thing that Plaintiff's data tends to show. Certainly, if more older athletes like Plaintiff are allowed to remain college athletes longer, they will likely take playing time from younger athletes. But the *output* in the market will stay the same. Games will still be 60 minutes. They will still be played with 11 men per side. There will not be more DI schools employing athletes in the market (nor appreciably more athletes being rostered, given roster caps), nor more games being played. Plaintiff invokes *NCAA v. Board of Regents*, 468 U.S. 85 (1984), but *Board of Regents* proves the point. There, the Supreme Court held that an NCAA rule heavily restricting *the number of football games that could be televised* violated the Sherman Act because it restricted output by limiting consumers' ability to view games. *Id.* at 91–94, 120. The Five-Year Rule creates no such restriction on output.

[7] Dr. Maxcy asserts the Five-Year Rule causes "premature exits" of older athletes. ECF 59-24 ¶ 120. But Plaintiff's own "senior replacement" dataset shows no systemic output decline when seniors depart—56 of 68 reported "declines" are statistically indistinguishable from zero and non-seniors met or exceeded seniors' output in 57% of pairings. Backus Decl., § VI.A, ¶¶ 97–102. Whole-position metrics likewise show minimal change after seniors exit (e.g., FBS rushing yards +1.1%, total tackles +0.6%), indicating output is absorbed by other competitors rather than lost. *Id.* ¶ 102.

The analysis also does not establish reduced quality attributable to the Five-Year Rule. That senior competitors often outperform younger competitors may reflect experience, selection, playing time, position, team quality, or many other variables. Plaintiff's motion supplies no rule-specific counterfactual showing the quality of Division I football with and without athletes who have exhausted four seasons of collegiate competition. At most, the materials show that some experienced competitors produce more of certain statistics than some less-experienced competitors. That observation does not establish substantial injury to competition. In addition to saying nothing at all about the exclusion of athletes similarly situated to Plaintiff, Plaintiff's evidence fails to address how consumers measure the quality of a collegiate football game. As *Board of Regents* recognized, some level of competitive restriction is essential to ensuring that college sports are "a unique and valuable product." *Id.* at 122; *see also* ECF 47 at 27 (collecting cases recognizing procompetitive benefits of preserving college athletics as unique). Plaintiff's evidence says nothing about whether consumers prefer college football to be played by older, more experienced competitors like Plaintiff, or by student-athletes who fall within the traditional freshman–senior paradigm of collegiate endeavors.

**iii. Plaintiff's Selected NIL Valuations Do Not Show that the Five-Year Rule Suppresses Compensation.**

Plaintiff's NIL data suffers from the same fatal flaw. *See* ECF 59 at 8–10. Every class of student-athlete Plaintiff identifies, from juniors to redshirt seniors, *is explicitly eligible under the Five-Year Rule*. Plaintiff asks the Court to assume, without evidence, that former JUCO or NAIA athletes like himself are representative of "senior and late-career Division I football players" as a whole. *See* ECF 59 at 8. But Plaintiff's evidence (and his own expert) contradicts that assumption. As Dr. Backus points out, Dr. Maxcy cited *Elad* (a case in which he was the economic expert for the Plaintiff), but there, Dr. Maxcy "*included* JUCO in the relevant market for 'college football athletes in general and NCAA Division I football specifically,' where in this matter he specifically excludes JUCO." Backus Decl. ¶ 19 (emphasis in original). Further, the most recent NIL data do not support any "senior

premium"—in 2026, seniors' average NIL was lower than other classes by 4.93%. Backus Decl., § VI.B, ¶ 105.

Further, Plaintiff's "analyzed football sample" shows that the highest NIL valuations for football competitors no longer in school is dominated by student-athletes who were drafted into the NFL. *See* ECF 59-15 at 4.[8] And of the 21 athletes on that list, *not a single one* played at a JUCO or NAIA school. Average NIL compensation within a particular sport is insufficient to define the relevant market, let alone anticompetitive effects within it. *See Blythe*, 2026 WL 2653349, at *6. Plaintiff's proffered NIL data brings the Court no closer to understanding what effects, if any, the Five-Year Rule's treatment of JUCO or NAIA seasons as equivalent to NCAA seasons has on the relevant market.

Plaintiff's data also does not address whether higher-NIL-earning athletes *create* those economic opportunities or simply benefit from them. As Plaintiff admits, his ability to earn NIL opportunities is directly tied to his status on UNLV's football team. ECF 59-22 ¶ 9. That suggests that it is his *status* as a collegiate athlete, rather than any personal characteristic, that creates NIL opportunities, at least for most athletes.[9] This in turn suggests that NIL opportunities afforded to athletes like Plaintiff, if declared eligible, would be at the expense of other UNLV student-athletes. Regardless, Plaintiff has presented no evidence that the Five-Year Rule's treatment of former JUCO and NAIA football competitors depresses NIL compensation or revenue-sharing compensation within the relevant market. *See Fourqurean*, 143 F.4th at 871.

---

[8] Shedeur Sanders, Travis Hunter, Quinn Ewers, Jalen Milroe, Carson Beck, Jaxson Dart, Cam Ward, Will Howard, and Garrett Nussmeier are all NFL draftees. *See NFL and AFL Draft History*, PRO FOOTBALL REFERENCE, https://www.pro-football-reference.com/draft/ (last visited Sep. 24, 2026). The remaining players on the list are current NCAA athletes.

[9] The two highest-valued athletes in Plaintiff's data set are the son (Shedeur Sanders of Deion Sanders) and the nephew (Arch Manning of Peyton and Eli Manning) of legendary collegiate and NFL football players. This suggests that individual name recognition may create NIL opportunities for a select group of college athletes, but there is no evidence to suggest that would extend to athletes similarly situated to Plaintiff.

**iii. Plaintiff's Potential-Rival Theory Lacks Evidence of Harm to Competition.**

Plaintiff separately contends that counting NAIA and JUCO seasons pressures athletes to leave or avoid those programs, thereby harming them as potential rivals. ECF 59 at 10–12. But the motion provides no market evidence measuring that alleged effect. It identifies no reduction in NAIA or JUCO participation, output, compensation, quality, or competitive significance caused by the Five-Year Rule.

The theory also does not fit Plaintiff's asserted Division I football labor market. Plaintiff maintains that NAIA and JUCO programs are not reasonable substitutes for Division I programs, yet he asks the Court to find injury to his asserted market from effects allegedly experienced by those outside programs. His personal path—from NAIA and JUCO football into Division I—shows that the rule did not prohibit that pathway. It counted his collegiate seasons on equal terms and permitted him to compete in four full seasons, two of them in Division I. The Seventh Circuit explained the flaw in logic like Plaintiff's succinctly:

> Even if men's NCAA Division I FBS football is the relevant market, Fourqurean has a more fundamental problem. To establish the theory of anticompetitive effects in cases such as Dentsply, Fashion Originators' Guild, and Radovich, Fourqurean would need to show that the Five-Year Rule creates, protects, or enhances the NCAA's dominant position in the market—and thus the NCAA's ability to depress student-athlete compensation below the competitive level—by making it more difficult for the NCAA's existing or potential rivals to compete against the NCAA. But Fourqurean relies solely on his own exclusion from participating in college football as proof of anticompetitive effects. He is not a rival of the NCAA, and he has not drawn a link from his exclusion to an adverse effect on an existing or potential rival of the NCAA.

*Fourqurean*, 143 F.4th at 870 (internal citations omitted).

Plaintiff's theory also does not establish that the NCAA's position in the asserted Division I market is created, protected, or enhanced by counting JUCO years under the Five-Year Rule. Plaintiff's allegation that some athletes may alter the timing of a transfer does not demonstrate substantial harm to competition as a whole. The Ninth Circuit noted this critical piece was missing in Blythe's evidence—and such evidence is missing here, too. *Blythe*, 2026 WL 2653349, at *7.

**iv. Plaintiff Cannot Replace the Required Showing with Evidence He Hopes to Obtain Later.**

Plaintiff acknowledges that he lacks complete NIL and earnings information and promises a proper market analysis following discovery. *See* ECF 59 at 10 ("Once the full discovery process is afforded, Fuller will be in a position to provide a more robust analysis on this front."). That concession confirms that the present record does not establish the market-wide effects necessary for preliminary relief. Further, Plaintiff has not sought expedited discovery in this matter, nor does he cite any case law suggesting that he is relieved from his evidentiary burdens by seeking expedited relief. Plaintiff cites *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n. 5 (9th Cir. 2013), and *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), for the proposition that evidentiary standards are relaxed at the preliminary injunction stage. ECF 59 at 22–23. But the problem here is not just that Plaintiff has merely provided hearsay or other inadmissible evidence to establish his Sherman Act claim. The problem is that he has not provided evidence *in any form* sufficient to establish a relevant market or substantial anticompetitive effects within that market, as the Sherman Act demands. And the present issue is not whether Plaintiff *might* develop a different record later—the issue is whether the evidence now before the Court establishes likely success and clearly favors immediate, mandatory relief. Plaintiff's evidence falls far short. His motion must be denied.

**3. Plaintiff Misunderstands Rule-of-Reason Analysis at Steps Two (Procompetitive Justification) and Three (Less Restrictive Means).**

Plaintiff devotes substantial attention to disputing the NCAA's procompetitive justifications and proposing alternatives to the Five-Year Rule. *See* ECF 59 at 12–22. But each of his arguments flows from a fundamental misunderstanding of rule-of-reason analysis at steps two and three. Plaintiff asserts that "[a]ll of the NCAA's proffered reasons fail for a simple reason: none explain why the NCAA must count JUCO and NAIA seasons as if they were Division I seasons and categorically exclude qualified athletes from the Division I football labor market." *Id.* at 12. But the NCAA is not

required to show that the challenged rule is *necessary* to achieve its procompetitive aims.[10] It is merely required "to show a procompetitive rationale for the restraint." *Alston*, 594 U.S. at 96. As the NCAA has previously explained, ECF 22 at 20, *Alston* expressly forecloses the standard Plaintiff seeks to impose: "We agree with the NCAA's premise that antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes." *Id.* at 98; *see also id.* at 102 ("[A]ntitrust courts must give wide berth to business judgments before finding liability."). Plaintiff's arguments fail to address the latitude antitrust law affords reasonable business decisions and cannot withstand scrutiny under that standard.

**i. Plaintiff Asks the Court to Require the NCAA to Craft an Eligibility Rule to Suit *His* Needs.**

Plaintiff attacks each of the NCAA's previously established procompetitive aims, *see* ECF 22 at 26–28; ECF 47 at 26–28, but his arguments are self-serving and lack any limiting principle. First, he argues that "[c]oncerns about JUCO athletes crowding out less experienced freshman is facially not procompetitive because it artificially shrinks the playing field for competition to obtain roster spots a Division I programs."[11] ECF 59 at 12. To the contrary, as the NCAA has explained, the Five-Year Rule merely treats Plaintiff and other JUCO athletes the same as their peers. That is procompetitive because it enables student-athletes of similar age and experience to compete for limited roster spots, playing time, and revenue-sharing payments on as level a playing field as practicable. "The Five-Year Rule also serves an important purpose in protecting the viability of collegiate sports and teams so that

---

[10] As explained above, Plaintiff's claim fails at the outset (step one) because he cannot establish a relevant market. The NCAA responds briefly to his additional arguments solely for the sake of completeness.

[11] The facts support the NCAA's concerns. Real-world evidence from the COVID blanket waiver confirms crowding out. Texas FBS programs' high school signees fell from 289 (2019) and 263 (2020) to 203 (2021) and 210 (2022), with decisionmakers reporting "pushback on freshmen" and older rosters. Backus Decl., § V.D–E, ¶¶ 92–96.

collegiate sports remain attractive to consumers/fans." ECF 22-1 ¶ 25. "Collegiate athletics remain popular in part due to the non-professional nature of athletic competition and some level of competitive balance." *Id.*; *see also Ortega v. NCAA*, No. 4:25-CV-00496-RGE-SBJ, 2026 WL 1847877, at *8–9 (S.D. Iowa Apr. 23, 2026) (concluding that these proffered procompetitive justifications meant the athlete was not likely to succeed for purposes of the preliminary injunction standard).

Plaintiff argues later that he does not "urge that the NCAA should have **zero** eligibility rules," but ignores that his arguments have no limiting principle. ECF 59 at 17 (emphasis in original). Plaintiff's desire for a fifth (and sixth) season of collegiate football is justifiable from his perspective, but no more so than another athlete who believes the Bylaws' credit requirements are too strict, their GPA requirements too high, their ban on gambling unfair. Lines must be drawn *somewhere* for NCAA sports to continue to attract consumer interest. Both *Alston* and *Board of Regents*—two cases Plaintiff relies on extensively—recognize this maxim. *See* ECF 47 at 27 (citing *Alston*, 594 U.S. at 90; *Bd. of Regents*, 468 U.S. at 101; *Banks v. NCAA*, 977 F.3d 1081, 1089–90; *Ortega*, 2026 WL 1847877, at *9). Determining precisely where that line is drawn falls squarely within the "wide berth" that must be afforded to the NCAA's business judgments. *Alston*, 594 U.S. at 102.

**ii. Plaintiff Has Not Proffered a Substantially Less Restrictive Alternative.**

At step three of the rule-of-reason analysis, Plaintiff bears a heavy burden to demonstrate that (1) the Five-Year Rule is "patently and inexplicably stricter than is necessary to achieve the procompetitive benefits," *Id.* at 101 (cleaned up), and (2) Plaintiff's alternatives are "substantially less restrictive" and "virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost." *Epic Games*, 67 F.4th at 990 (cleaned up). Plaintiff, on this third attempt, fails to show either.

Most of Plaintiff's proffered alternatives would not achieve the NCAA's procompetitive aims. As previously explained, "counting only NCAA Division-I seasons against eligibility" would allow

athletes to remain in college football far past any current limitation. ECF 59 at 17. Even accepting Plaintiff's premise that NAIA competition would be limited to four seasons (he does not address JUCO eligibility rules, nor does he address why the NAIA's eligibility rules would not *also* be struck down as anticompetitive under his theories of harm), that would still facilitate a "student-athlete" playing eight full seasons of collegiate football. Similarly, degree progress and GPA requirements *are already in effect*. Those requirements, without eligibility rules, would effectively destroy any limit on participation in collegiate athletics.

That leaves the NCAA's new age-based eligibility rule, which Plaintiff calls "active proof" that the NCAA's procompetitive justifications can be achieved through less restrictive means. *Id.* at 18. But Plaintiff's reliance on that separate rule is a red herring. Plaintiff does not challenge the age-based rule here, and the Court need not decide whether that different framework is better, worse, more permissive, or more restrictive than the Five-Year Rule. At step three, the question is much narrower: whether Plaintiff has shown that the age-based model is a substantially less restrictive alternative that would be virtually as effective in serving the NCAA's procompetitive purposes. *See Epic Games*, 67 F.4th at 990 ("At step three of the Rule of Reason, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." (internal quotation marks omitted) (citing *Alston*, 594 U.S. at 97) (quotations omitted). He has not.

The two rules are not interchangeable. The Five-Year Rule allowed student-athletes four seasons of competition within five years and included a waiver process designed to protect that four-season opportunity in appropriate circumstances. The new age-based model uses a different eligibility trigger of a five-year period beginning at the start of the academic year following a student-athlete's 19th birthday or upon full-time enrollment at a collegiate institution, whichever comes sooner. ECF 22-1 ¶ 35. And while that model may permit some student-athletes to compete in five seasons, it also

eliminates most opportunities to reclaim a lost season, except in clearly defined circumstances involving pregnancy, military service, or religious missions. *Id.*

Put differently, the new model does not simply add a year of eligibility. It trades one structure for another which includes possible additional participation for some student-athletes, but fewer avenues for others to protect the four seasons of competition the Five-Year Rule sought to provide. A student-athlete who loses a season to a devastating injury or family tragedy could seek relief under the Five-Year Rule's waiver process. Under the age-based model, that same student-athlete may receive fewer than four seasons of competition. Plaintiff cannot isolate the one feature of the new rule that would benefit him and label the entire framework less restrictive.

That is especially true because antitrust analysis does not turn on whether a plaintiff can identify a different rule that would produce a better result for his own eligibility. It asks whether the proposed alternative would be substantially less restrictive in the relevant market as a whole while still serving the challenged rule's procompetitive purposes. *See Am. Express*, 585 U.S. at 541; *See Epic Games*, 67 F.4th at 990.

The new model is thus neither more permissive nor more restrictive. It is simply different. Plaintiff would no doubt prefer that rule to benefit him, but the focus of antitrust law is on the effects on the market *as a whole*. *See Blythe*, 2026 WL 2653349, at *7. That Plaintiff might personally have benefitted from an age-based eligibility system does not establish that it is a "substantially less restrictive" rule in the relevant market. As he has throughout the pendency of this litigation, Plaintiff conflates harm (or benefit) to himself with harm to competition in the market. *See* ECF 22 at 26; ECF 47 at 24.

Plaintiff analogizes this case to *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), and *In Re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019), *affirmed*, 958 F.3d 1239 (9th Cir. 2020), but neither is analogous. *See* ECF 59 at 20–21. Each of those cases dealt

with the NCAA *increasing* the funding available to student-athletes across the board. As explained, the new age-based eligibility rule—in addition to being unrelated to student-athlete financial benefits—is neither more permissive nor more restrictive. As Plaintiff recognizes, the NCAA's aim in enacting new eligibility rules was "**simplifying the eligibility process for student-athletes and member institutions**." *Id.* at 21 (emphasis in original).

Plaintiff asks the Court to second guess rational decisions made by the NCAA in the face of multiple competing considerations and the needs of hundreds of thousands of student-athletes. The Sherman Act does not authorize the Court to do so. *See Alston*, 594 U.S. at 84; *Epic Games*, 67 F.4th at 990; *Bd. of Regents*, 468 U.S. at 120. As such, Plaintiff's third motion for a temporary restraining order and preliminary injunction should be denied.

## IV. THE REMAINING WINTER FACTORS WEIGH AGAINST RELIEF

Plaintiff fails to address the remaining *Winter* factors, other than by concluding that he "has shown" irreparable harm and that the balance of equities and public interest favor a preliminary injunction. ECF 59 at 23. But Plaintiff fails to even cite portions of the record that purportedly establish these factors—each a prerequisite to preliminary relief. And nowhere in the record has Plaintiff adequately explained his long delay in filing suit against eligibility rules that he has known since he enrolled at a DI program in 2024 would render him eligible at the conclusion of the 2025–26 season. *See* ECF 22 at 11. That fatally undermines his claim of irreparable harm, as does the financial nature of his purported injuries. *Id.* at 31–32; ECF 47 at 31–32. Nor has Plaintiff accounted for the destabilizing effect that the lawsuits just like his happening all over the country have had on the NCAA's ability to govern college sports. Finally, Plaintiff has ignored clear precedent from the United States Supreme Court elucidating the zero-sum nature of college athletics. *See* ECF 47 at 9 (citing *B.P.J.*, 146 S. Ct. at 2381). Only 11 members of each team can take the field at a given time. That is not hypothetical, it is axiomatic. *At the very least*, for every snap Plaintiff takes for UNLV this season,

another properly eligible UNLV defensive lineman will sit. Plaintiff is asking the Court to foist the very harms he complains of onto another party or parties with no opportunity to protect their rights in this litigation. That does not serve the public interest. *See Patterson v. NCAA*, No. 3:35-cv-00994, 2026 WL 115417, at *9 (M.D. Tenn. Jan. 15, 2026).

Finally, Plaintiff asserts that his claims are distinguishable from *Blythe* because the plaintiff there "submitted a nearly bare evidentiary record lacking any expert analysis or detailed data." ECF 59 at 23. But the Ninth Circuit's teaching in *Blythe* was not that a plaintiff seeking antitrust relief on a preliminary basis simply needs to present some manner of evidence tangentially related to his market definition or anticompetitive theories. Indeed, much like Plaintiff here, Blythe *did* present evidence of NIL statistics and MLB draft composition in support of his proffered market. 2026 WL 2653349, at *6. But that evidence failed to "address market dynamics, the relevant market participants, or whether any market participants are employers seen as reasonably good substitutes." *Id.* Nor did his evidence allow the district court to resolve the "numerous critical questions" required to define the relevant market. *Id.* at *5 n.4. Or "establish either directly or indirectly that the student-athlete sellers/laborers are substantially anticompetitively harmed by the Five-Year Rule 'as a whole' in the relevant market." *Id.* at *7. Plaintiff's belief that he can overcome the deficiencies identified in *Blythe* by sheer *volume* of evidence is mistaken. For the reasons discussed above, as well as in the NCAA's oppositions to Plaintiff's prior motions, Plaintiff's evidence remains insufficient to enable the Court to undertake the "careful analysis of market realities" that antitrust law demands. *See Alston,* 594 U.S. at 93.

## CONCLUSION

Plaintiff's *third* motion for injunctive relief does not cure the myriad dispositive defects previously and repeatedly identified by the NCAA, this Court, and the Ninth Circuit. His new materials show, at most, that many senior athletes are productive on the football field and that some receive substantial estimated NIL valuations. They do not show *anything* about the effects the Five-Year Rule

has on Plaintiff's proffered market of Division I football athletes. Nor do they cure the defects in his market definition identified by both the NCAA and the Ninth Circuit, which Plaintiff fails to even address. Accordingly, the NCAA respectfully requests that the Court deny Plaintiff's third request for a preliminary injunction.

Respectfully submitted,

Dated: September 29, 2026

NAYLOR & BRASTER

By: */s/ John M. Naylor*
John M. Naylor
Nevada Bar No. 5435
Kelly M. Scarborough
Nevada Bar No. 16979
10100 W. Charleston Blvd., Suite 120
Las Vegas, NV 89135

*Attorneys for Defendant National Collegiate Athletic Association*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 4(b), I hereby certify that I am an employee of NAYLOR & BRASTER and that on this 29th day of September 2026, I caused the document entitled "**DEFENDANT NCAA'S OPPOSITION TO PLAINTIFF'S THIRD MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**" to be served through the Court's CM/ECF system to those persons designated by the parties that have appeared in the matter.

*/s/ Halee A. Mennear*
An Employee of NAYLOR & BRASTER